

# PAVAN PARIKH
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

**ELECTRONICALLY FILED**
**March 8, 2024 10:57 AM**
**PAVAN PARIKH**
**Clerk of Courts**
**Hamilton County, Ohio**
**CONFIRMATION 1441483**

**TERRASMART INC FKA RBI SOLAR INC**

**vs.**

**ARCH INSURANCE COMPANY**

**A 2401119**

**FILING TYPE:  INITIAL FILING (IN COUNTY) WITH JURY DEMAND**

**PAGES FILED: 584**

EFR200

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO
## CIVIL DIVISION

| | | |
|---|---|---|
| **TERRASMART, INC. f/k/a RBI SOLAR, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. _____** |
| | ) | |
| **v.** | ) | **Judge_____** |
| | ) | |
| **ARCH INSURANCE COMPANY** | ) | |
| | ) | **COMPLAINT WITH JURY DEMAND** |
| *Serve via Certified Mail:* | ) | **ENDORSED HEREON** |
| **CSC-Lawyers Incorporating Service Company** | ) | |
| **221 Bolivar St.** | ) | **(Eligible for assignment to the commercial docket pursuant to Sup.R. 49.05(E)(12))** |
| **Jefferson City, MO 65101** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

Plaintiff Terrasmart, Inc. f/k/a RBI Solar, Inc. ("Terrasmart"), through undersigned counsel, and for its Complaint against Defendant Arch Insurance Company ("Arch") alleges as follows:

### NATURE OF ACTION

1.  This is civil action for breach of contract and declaratory relief arising out of Arch's wrongful failure to immediately defend Terrasmart in a civil action captioned *Cypress Creek EPC, LLC, et al. v. Terrasmart, Inc. f/k/a RBI Solar Inc.*, Case No. 23STCV25381 that is pending in the Superior Court of the State of California, County of Los Angeles, Central District (the "Cypress Creek Lawsuit").

2.     Arch issued comprehensive general liability insurance policies providing coverage to Terrasmart and/or its predecessor for successive annual periods starting on April 1, 2017.  The Cypress Creek Lawsuit alleges a single covered "occurrence" and seeks damages because of "property damage" as those terms are defined in the Arch policies.  Further, Terrasmart has incurred defense costs that exceed the single deductible that is applicable to the Arch policies. Arch thus has an immediate duty to defend Terrasmart in full in the Cypress Creek Lawsuit.

3.     Although Arch has agreed that its duty to defend is triggered and "offer[ed] to participate in the defense of Terrsamart" in the Cypress Creek Lawsuit, Arch has wrongfully asserted that the allegations in the Cypress Creek Lawsuit constitute twenty-one separate "occurrences," each subject to a separate policy deductible.  Arch has refused to immediately accept its full defense obligation to Terrasmart on the grounds that the twenty-one separate deductibles have not been met.

4.     By this action, Terrasmart seeks: (1) a declaration that Arch is obligated to immediately defend Terrasmart in full in connection with the Cypress Creek Lawsuit; (2) a declaration that the Cypress Creek Lawsuit alleges a single covered "occurrence" (as that term is defined in the Arch policies); and (3) breach of contract damages against Arch for defense costs already incurred by Terrasmart in connection with the Cypress Creek Lawsuit.

## THE PARTIES

5.     Plaintiff Terrasmart is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

6.     Defendant Arch is a Missouri Corporation with its principal places of business in Jersey City, New Jersey, and Kansas City, Missouri.

## JURISDICTION AND VENUE

7.      This Court has personal jurisdiction over Arch pursuant to R.C. 2307.382(2) and (9).

8.      Venue is proper in this Court pursuant to Civ.R. 3(C)(6) and (7).

9.      This case is eligible for the Commercial Docket because the case involves an insurance coverage dispute between two business entities regarding their commercial insurance contracts.  *See* Sup.R. 49.05(E)(12).

## THE ARCH POLICIES

10.     Arch issued a series of successive annual commercial general liability policies providing insurance coverage to Rough Brothers, Inc., as the first named insured starting on April 1, 2017, through April 1, 2020 (collectively, the "Arch Policies"), as follows:

> a.      Policy No. 11GPP0510103 issued to Rough Brothers Inc., for the period April 1, 2017, to April 1, 2018;
>
> b.      Policy No. 11GPP0510104 issued to Rough Brothers Inc., for the period April 1, 2018, to April 1, 2019; and
>
> c.      Policy No. 11GPP0510105 issued to Rough Brothers Inc., for the period April 1, 2019, to April 1, 2020.

True and correct copies of the Arch Policies are attached hereto as Exhibits A, B, and C.

11.     Each of the Arch Policies has a $1.5 million per occurrence limit and a $2 million aggregate limit, subject to a $500,000 per occurrence deductible, which deductible is exhausted by defense costs incurred by Terrasmart.

12.     Terrasmart's predecessor, RBI Solar, Inc., is a "named insured" on each of the Arch Policies.  Rough Brothers, Inc.; RBI Solar, Inc.; and Terrasmart all maintain (or maintained) their

principal place of business in Ohio and conduct (or conducted) the majority of their operations in Ohio. As such, the place of performance under the Arch Policies is Ohio.

13.     The insuring agreements of the Arch Policies provide, in relevant part, that Arch "will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies" and that Arch has "the right and duty to defend the insured against any suit seeking those damages." The insuring agreements of the Arch Policies further provide that the insurance applies to "property damage" that takes place during the policy period and that is caused by an "occurrence."

14.     The Arch Policies define the term "property damage" to mean:

    a.    "Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it."

15.     The Arch Policies define the term "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

**THE CYPRESS CREEK LAWSUIT**

16.     Terrasmart is a leading provider of, among other things, solar panel racking systems, including "tracking" racking systems, which maximize energy production by using motors, gearboxes, controllers, and other equipment that allow the modules to rotate on an axis to track the path of the sun across the sky.

17.     Cypress Creek EPC ("Cypress Creek"), the plaintiff in the Cypress Creek Lawsuit, owns and operates solar power plants that are composed of: (i) racking systems that support solar modules; (ii) solar panel modules; and (iii) inverters, combiner boxes, transformers, wiring, and other balance of system equipment (collectively, the "Solar Projects").

-4-

18.     In 2017 and 2018, Terrsamart sold to Cypress Creek tracking racking systems (the "Tracking Systems") for twenty-one Solar Projects.  The solar panel modules, inverters, wiring and other balance of system equipment for the Solar Projects were supplied and sold by companies other than Terrasmart.

19.     The Tracking Systems were purchased under virtually identical purchase orders.  The parties to each of the purchase orders are Cypress Creek and RBI Solar, Inc. (Terrasmart's predecessor).  The Tracking Systems were primarily manufactured in Ohio and delivered to Cypress Creek in 2017 and 2018.  The Tracking Systems were installed by Cypress Creek.

20.     Cypress Creek filed the Cypress Creek Lawsuit against Terrasmart on October 18, 2023.  A true and correct copy of the complaint in the Cypress Creek Lawsuit is attached hereto as Exhibit D.

21.     The Cypress Creek Lawsuit alleges that the Tracking Systems "routinely helix, where the racks twist on their axis . . . ."  According to Cypress Creek, the helixing causes "serious damages" to the solar panel modules, causes the modules to crack and to fall off the racks and causes damage to other associated equipment, including the wiring and connections.   Both the solar panel modules and the wiring are components of the Solar Projects that were not supplied by Terrasmart.

22.     Cypress Creek asserts that it has "incurred significant damages," will be required to replace more than 35,000 solar panel modules, and that the helixing impairs the functioning and production of the Solar Projects.  Cypress Creek also alleges that it has suffered losses attributable to stowing certain tracking systems "including diminished use of the modules."

23.     According to the Cypress Creek Lawsuit, the helixing of the Tracking Systems and subsequent damage to other components within the Solar Projects were allegedly caused by

Terrasmart's purported failure to properly manufacture the Tracking Systems and the various components of the Tracking Systems, including the couplers, gearboxes, motors, tracker control units, jaw hubs, and bearings.

24.    The Cypress Creek Lawsuit contains causes of action for:  (1) Breach of Express Warranty; (2) Breach of Contract – Obligation to Repair / Replace; (3) Deceit – Negligent Misrepresentation; (4) Negligent Design of a Product; and (5) Negligent Manufacture of a Product.

25.    Terrasmart denies the allegations against it in the Cypress Creek Lawsuit.

### **ARCH'S WRONGFUL FAILURE TO IMMEDIATELY DEFEND**

26.    Terrasmart provided timely notice of the Cypress Creek Lawsuit to Arch.

27.    The Cypress Creek Lawsuit alleges covered "property damage" that occurred during the policy periods of the Arch Policies caused by a single "occurrence."

28.    Because the Cypress Creek Lawsuit alleges property damage caused by a single "occurrence," Terrasmart is only required to satisfy a single $500,000 deductible in connection with the Cypress Creek Lawsuit.

29.    On January 31, 2024, Arch sent a letter to Terrasmart containing an "offer to participate in [Terrasmart's] defense subject to a reservation of rights" pursuant to which "Arch agrees to participate in the defense of Terrasmart in the [Cypress Creek Litigation] subject to a reservation of rights under Arch Policy Nos. 11GPP0510103 (4/1/17-4/1/18) and 11GPP051010f (4/1/18-4/1/19)."

30.    By agreeing to participate in the defense of Terrasmart in the Cypress Creek Lawsuit, Arch agrees that the allegations in the Cypress Creek Lawsuit potentially or arguably fall within the coverage of the Arch Policies.

31.    Arch nevertheless has wrongfully claimed that "there are at least twenty-one (21)

occurrences at issue." According to Arch, Terrasmart must satisfy a separate $500,000 deductible for each of those twenty-one "occurrences."  In other words, Arch contends that Terrasmart must incur defense or indemnity in excess of $10.5 million to satisfy the applicable deductibles.

32.     Terrasmart has incurred in excess of $500,000 in defending against the claim made by Cypress Creek.  Arch's actions have caused Terrasmart to incur defense costs that exceed the single $500,000 deductible that should apply to Cypress Creek's claim.

33.     Terrasmart continues to incur defense costs in defending against the Cypress Creek Lawsuit.

34.     Terrasmart has satisfied its obligations under the Arch Policies, including but not limited to the payment of premiums, timely notice, and payment of any required retention, except insofar as performance by Terrasmart has been excused and/or waived by Arch or is otherwise subject to avoidance by operation of law.

## COUNT I
## (DECLARATORY JUDGMENT)

35.     Terrasmart incorporates by reference and realleges paragraphs 1 through 34 of this Complaint as if set forth fully herein.

36.     Terrasmart has satisfied the single $500,000 deductible that applies to the claim made by Cypress Creek.

37.     Arch has an immediate duty to defend Terrasmart with respect to the Cypress Creek Lawsuit.

38.     Although Arch has recognized its duty to defend Terrasmart, Arch has disputed that it has a current and immediate obligation to defend because, according to Arch, Terrasmart must satisfy twenty-one $500,000 deductibles.

39.     To date, Arch has refused to advance, reimburse, or pay any defense costs incurred

-7-

by Terrasmart, in connection with the Cypress Creek Lawsuit.

40.     An actual, present and justiciable controversy therefore has arisen and exists between Terrasmart and Arch regarding their respective rights and duties under the Arch Policies, and, as such, Terrasmart is entitled to a declaration of its rights under the Arch Policies pursuant to R.C. 2721.03.

WHEREFORE, Terrasmart respectfully prays that this Court:

A.     Declare that Arch has an immediate duty to defend Terrasmart in connection with the Cypress Creek Lawsuit;

B.     Declare that the Cypress Creek Lawsuit alleges a single covered "occurrence," subject to a single $500,000 deductible;

C.     Award Terrasmart its attorneys' fees and costs incurred in this action in an amount to be proven at trial;

D.     Award Terrasmart prejudgment and post-judgment interest on its damages in the full amount permitted by law; and

E.     Award Terrasmart such other relief as this Court deems just and proper.

## COUNT II
## (BREACH OF CONTRACT)

41.     Terrasmart incorporates by reference and realleges paragraphs 1 through 40 of this Complaint as if set forth fully herein.

42.     Pursuant to the Arch Policies, Arch is required to defend Terrasmart in connection with the Cypress Creek Lawsuit after the single $500,000 deductible is satisfied.

43.     The $500,000 deductible has been exhausted as required, however, Arch has failed and refused to: (a) immediately defend Terrasmart in the Cypress Creek Lawsuit; or (b) reimburse Terrasmart for defense costs incurred in connection with the Cypress Creek Lawsuit.

44.     Arch has breached its contractual obligations to Terrasmart by virtue of its failure defend Terrasmart or to pay or reimburse Terrasmart for such defense costs.

45.     As a direct and proximate cause of Arch's breaches, Terrasmart has been denied the benefits of the insurance coverage provided by the Arch Policies.

WHEREFORE, Terrasmart respectfully prays that this Court:

A.     Award Terrasmart its damages in an amount to be proven at trial;

B.     Award Terrasmart its attorneys' fees and costs incurred in this action in an amount to be proven at trial;

C.     Award Terrasmart prejudgment and post-judgment interest on its damages in the full amount permitted by law; and

D.     Award Terrasmart such other relief as this Court deems just and proper.


Respectfully submitted,

*/s/ William G. Geisen*
William G. Geisen (0083049)
Robin D. Miller (0074375)
Cassandra L. Welch (0095828)
100 E. RiverCenter Blvd., Ste. 450
Covington, KY 41011
Telephone:  (859) 652-7601
Email:  wgeisen@stites.com
         rmiller@stites.com
         cwelch@stites.com

*Attorneys for Plaintiff Terrasmart, Inc. f/k/a RBI Solar, Inc.*

## JURY DEMAND

Plaintiff Terrasmart, Inc. f/k/a RBI Solar, Inc., hereby demands a trial by jury on all issues so triable alleged herein.

_/s/ William G. Geisen_____
Counsel for Plaintiff

# EXHIBIT A

BROKER – Marsh USA, Inc.

# Rough Brothers, Inc.

**POLICY NUMBER** - 11GPP0510103 General Liability

**POLICY PERIOD** -   04/01/17 to  04/01/18



a member of Arch Insurance Group

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your Insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Includes copyright material of Insurance Services Office, Inc. with its permission.



## Signature Page

IN WITNESS WHEREOF, Arch Insurance Company has caused this policy to be executed and attested.

_John Mentz_
President

_Patrick K. Nails_
Secretary

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

POLICY NUMBER: 11GPP0510103

IL 09 85 01 15

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

| SCHEDULE – PART I |
| --- |
| **Terrorism Premium (Certified Acts)**    $100 |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):** <br> GENERAL LIABILITY |
| **Additional information, if any, concerning the terrorism premium:** |

| SCHEDULE – PART II |
| --- |
| **Federal share of terrorism losses**   83%   **Year: 20**   17 <br> (Refer to Paragraph **B.** in this endorsement.) <br><br> **Federal share of terrorism losses**   82%   **Year: 20**   18 <br> (Refer to Paragraph **B.** in this endorsement.) |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

IL 09 85 01 15        © Insurance Services Office, Inc., 2015        Page 1 of 2

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015
IL 09 85 01 15

**Policy Number**
**11GPP0510103**

## COMMON POLICY DECLARATIONS

# ARCH INSURANCE COMPANY

Named Insured    ROUGH BROTHERS, INC.      Effective Date: 04-01-17

12:01 A.M., Standard Time

Agent Name    MARSH USA INC. NJ      Agent No.   00312

| Item 1. | Named Insured and Mailing Address | Agent Name and Address |
|---|---|---|
| | ROUGH BROTHERS, INC.<br>(SEE NAMED INSURED ENDORSEMENT)<br>3556 LAKE SHORE ROAD<br>P.O. BOX 2028<br>BUFFALO NY 14219 | MARSH USA INC. NJ<br>445 SOUTH STREET<br>SUITE 210<br>MORRISTOWN NJ 07962<br><br>Agent No.00312 |

| Item 2. | Policy Period | From: 04-01-2017 | To: 04-01-2018 |
|---|---|---|---|
| | at 12:01 A.M., Standard Time at your mailing address shown above. | | |

**Item 3.**   Business Description:
Form of Business:   CORPORATION

**Item 4.**   In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This policy consists of the following coverage parts for which a premium is indicated. Where no premium is shown, there is no coverage. This premium may be subject to adjustment.

| Coverage Part(s) | Premium | |
|---|---|---|
| Commercial Property Coverage Part | | NOT COVERED |
| Commercial General Liability Coverage Part | $ | 56,509.00 |
| Commercial Crime Coverage Part | | NOT COVERED |
| Commercial Inland Marine Coverage Part | | NOT COVERED |
| Commercial Auto (Business or Truckers) Coverage Part | | NOT COVERED |
| Commercial Garage Coverage Part | | NOT COVERED |
| | | |
| | | |
| | | |
| | | |
| **Total Policy Premium** | $ | 56,509.00 |

**Item 5.**   Forms and Endorsements

Forms(s) and Endorsement(s) made a part of this policy at time of issue:

**See Schedule of Forms and Endorsements**

Countersigned:

Date: 05-12-17        By: _____
                                                  Authorized Representative

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.
**FAIC-SKLBUS-CPD (6/01)**

**Policy Number**
**11GPP0510103**

### SCHEDULE OF FORMS AND ENDORSEMENTS

# ARCH INSURANCE COMPANY

Named Insured ROUGH BROTHERS, INC.

Effective Date: 04-01-17
12:01 A.M., Standard Time

Agent Name MARSH USA INC. NJ

Agent No. 00312

COMMON POLICY FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| 00 ML0065 00 | 06-07 | U.S. TREASURY DEPARTMENT'S OFFICE |
| 05 ML0002 00 | 12-14 | ARCH INSURANCE GROUP SIGNATURE PAGE |
| IL 09 85 | 01-15 | DISCLOSURE PURSUANT/TERROR RISK INS ACT |
| FAIC-SKLBUS-CPD | 06-01 | COMMON POLICY DECLARATIONS |
| FAIC-SKLBUS-FE | 06-01 | SCHEDULE OF FORMS AND ENDORSEMENTS |
| FAIC-SKLBUS-SNI | 06-01 | SCHEDULE OF NAMED INSURED(S) |
| IL 00 17 | 11-98 | COMMON POLICY CONDITIONS |
| IL 00 23 | 07-02 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDT |
| IL 01 41 | 09-08 | NEW JERSEY CHANGES - CIVIL UNION |
| IL 02 08 | 09-07 | NJ CHANGES-CANC & NONRENL |
| IL 02 44 | 09-07 | OHIO CHANGES-CANC & NONRENEWAL |
| IL 02 68 | 01-14 | NEW YORK CHANGES-CANC & NONRENL |
| 00 ML0087 00 | 11-10 | NOTICE OF CANC - SPECIFIED DAYS |

GENERAL LIABILITY FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| FAIC-SKLBUS-CGLDEC | 06-01 | COMM GENERAL LIABILITY COVERAGE SUPP DEC |
| 00 GL0045 00 | 12-03 | GENERAL LIABILITY ASBESTOS EXCLUSION |
| 00 GL0356 00 | 10-11 | CGL DEDUCTIBLE ENDORSEMENT |
| 00 GL0193 33 | 01-09 | EMPLOYEE BENEFITS LIABILITY COVERAGE |
| 00 GL0469 00 | 06-08 | AMENDED DUTIES IN THE EVENT OF |
| 00 GL0474 00 | 06-98 | ANTI STACKING ENDORSEMENT |
| 00 GL0477 00 | 06-08 | PREMIUM COMPUTATION ENDORSEMENT |
| 00 GL0588 00 | 04-10 | BODILY INJURY DEFINITION EXTENSION ENDT |
| 00 GL0590 00 | 04-10 | FELLOW EMPLOYEE COVERAGE ENDORSEMENT |
| 00 GL0592 00 | 04-10 | DESIGNATED ENTITY EXCLUSION ENDORSEMENT |
| 00 GL0593 00 | 04-10 | INCIDENTAL MED MALPRACTICE LIAB COV ENDT |
| 00 GL0598 00 | 04-10 | PRIMARY AND NONCONTRIBUTING INSURANCE |
| 00 GL0599 00 | 04-10 | BI OR PD EXPECTED OR INTENDED END |
| 00 GL0600 00 | 04-10 | NON-OWNED WATERCRAFT EXTENSION END |
| CG 00 01 | 04-13 | COMMERCIAL GENERAL LIABILITY COV FORM |
| CG 01 63 | 07-11 | NY CHANGES-COMM GEN LIAB COV FORM |
| CG 01 04 | 12-04 | NEW YORK CHANGES - PREMIUM AUDIT |
| CG 02 24 | 10-93 | EARLIER NOTICE OF CANC PROVIDED BY US |
| CG 20 11 | 04-13 | ADDL INSD-MANAGERS/LESSORS OF PREMISES |
| CG 20 15 | 04-13 | ADDL INSD-VENDORS |
| CG 20 26 | 04-13 | ADDL INSD-DESIGNATED PERSON/ORGANIZATION |
| CG 20 28 | 04-13 | ADDL INSD-LESSOR OF LEASED EQUIPMENT |
| CG 20 37 | 04-13 | ADDL INSD-OWNERS/LESSEES/CONTR-COMP OPS |
| CG 21 06 | 05-14 | EXCL-ACC/DISCL OF CONFI OR PERSONAL INFO |
| CG 21 33 | 11-85 | EXCL-DESIGNATED PRODUCTS |
| CG 21 47 | 07-98 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |

FAIC-SKLBUS-FE (6/01)

Policy Number
**11GPP0510103**

### SCHEDULE OF FORMS AND ENDORSEMENTS

## ARCH INSURANCE COMPANY

Named Insured   ROUGH BROTHERS, INC.

Effective Date: 04-01-17
12:01 A.M., Standard Time

Agent Name   MARSH USA INC. NJ

Agent No.   00312

| | | |
|---|---|---|
| CG 21 65 | 12-04 | TOTAL POLLUTION EXCL-WITH EXCEPTIONS |
| CG 21 70 | 01-15 | CAP LOSSES FROM CERTIF ACTS OF TERRORISM |
| CG 22 43 | 04-13 | EXCL-ENGINEERS, ARCH OR SURV (PROF LIAB) |
| CG 22 74 | 10-01 | LIMITED CONTR LIABILITY COV FOR PERS/ADV |
| CG 24 04 | 05-09 | WAIVER OF TRANSFER RIGHTS OF RECOVERY |
| CG 26 21 | 10-91 | NY CHANGES - TRANSFER OF DUTIES |
| CG 26 36 | 12-93 | NY CHANGES - TRANSFER OF DUTIES |

FAIC-SKLBUS-FE (6/01)

Policy Number
**11GPP0510103**

SCHEDULE OF NAMED INSURED(S)

## ARCH INSURANCE COMPANY

Named Insured    ROUGH BROTHERS, INC.

Effective Date:   04-01-17
12:01 A.M., Standard Time

Agent Name    MARSH USA INC. NJ

Agent No.   00312

FAIC-SKLBUS-CPD   (cont.)

THE NAMED INSURED ON FORM FAIC-SKLBUS-CPD IS AMENDED TO READ:

ROUGH BROTHERS, INC.
DELTA T SOLUTIONS, INC.
GIBRALTAR INDUSTRIES HOLDING COMPANY (UK) LIMITED
RBI INTERNATIONAL, LLC
RBI SOLAR BRAZIL LTDA
RBI SOLAR, INC.
RBI SOLAR KK (JAPAN)
RENUSOL AMERICA, INC.
RENUSOL GMBH
ROUGH BROTHERS ASIA, LLC
ROUGH BROTHERS CONSTRUCTION INC.
ROUGH BROTHERS GREENHOUSE MANUFACTURING (SHANGHAI)
CO., LTD.
ROUGH BROTHERS HOLDING COMPANY
ROUGH BROTHERS MANUFACTURING, INC.
ROUGH BROTHERS, INC.
SOLAR GROUP, INC

FAIC-SKLBUS-SNI (6/01)

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

IL 00 23 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "Special nuclear material" or "by-product material".

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2001 IL 00 23 07 02

IL 01 41 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW JERSEY CHANGES – CIVIL UNION

This endorsement modifies insurance provided under the following:

    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
    ELECTRONIC DATA LIABILITY COVERAGE PART
    EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
    FARM COVERAGE PART
    FARM UMBRELLA LIABILITY POLICY
    LIQUOR LIABILITY COVERAGE PART
    MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCT WITHDRAWAL COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    UNDERGROUND STORAGE TANK POLICY

**A.** The term "spouse" is replaced by the following:

Spouse or party to a civil union recognized under New Jersey law.

**B.** Under the Commercial Auto Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to the:

1. Individual Named Insured by blood, adoption, marriage or civil union recognized under New Jersey law, who is a resident of such Named Insured's household, including a ward or foster child; or

2. Individual named in the Schedule by blood, adoption, marriage or civil union recognized under New Jersey law, who is a resident of the individual's household, including a ward or foster child, if the Drive Other Car Coverage — Broadened Coverage For Named Individual Endorsement is attached.

**C.** With respect to coverage for the ownership, maintenance, or use of "covered autos" provided under the Commercial Liability Umbrella Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to you by blood, adoption, marriage or civil union recognized under New Jersey law, who is a resident of your household, including a ward or foster child.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

IL 02 08 09 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW JERSEY CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Pursuant to New Jersey law, this policy cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly discriminatory or without adequate prior notice to the insured. The underwriting reasons or guidelines that an insurer can use to cancel or nonrenew this policy are maintained by the insurer in writing and will be furnished to the insured and/or the insured's lawful representative upon written request.

This provision shall not apply to any policy which has been in effect for less than 60 days at the time notice of cancellation is mailed or delivered, unless the policy is a renewal policy.

B. Paragraph 2. of the **Cancellation** Common Policy Condition is replaced by the following:

2. If this policy has been in effect for less than 60 days, we may cancel this policy for any reason subject to the following:

a. We may cancel this policy by mailing or delivering to the first Named Insured and any person entitled to notice under this policy written notice, of cancellation, at least:

(1) 10 days before the effective date of cancellation if we cancel for:

(a) Nonpayment of premium; or

(b) Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f) as follows:

(i) "The risk, danger or probability that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. Any change in the circumstances of an insured that will increase the probability of such a destruction may be considered a 'moral hazard'"; and

(ii) "The substantial risk, danger or probability that the character, circumstances or personal habits of the insured may increase the possibility of loss or liability for which an insurer will be held responsible. Any change in the character or circumstances of an individual, corporate, partnership or other insured that will increase the probability of such a loss or liability may be considered a 'moral hazard'".

 © ISO Properties, Inc., 2006 □

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

b. In the notice of cancellation which is sent to the first Named Insured, we will state the reason for cancellation.

C. The following is added to the **Cancellation** Common Policy Condition:

7. **Cancellation Of Policies In Effect For 60 Days Or More**

a. If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

(1) Nonpayment of premium;

(2) Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f);

(3) Material misrepresentation or nondisclosure to us of a material fact at the time of acceptance of the risk;

(4) Increased hazard or material change in the risk assumed which we could not have reasonably contemplated at the time of assumption of the risk;

(5) Substantial breaches of contractual duties, conditions or warranties that materially affect the nature and/or insurability of the risk;

(6) Lack of cooperation from the insured on loss control matters materially affecting insurability of the risk;

(7) Fraudulent acts against us by the insured or its representative that materially affect the nature of the risk insured;

(8) Loss of or reduction in available insurance capacity;

(9) Material increase in exposure arising out of changes in statutory or case law subsequent to the issuance of the insurance contract or any subsequent renewal;

(10) Loss of or substantial changes in applicable reinsurance;

(11) Failure by the insured to comply with any Federal, State or local fire, health, safety or building or construction regulation, law or ordinance with respect to an insured risk which substantially increases any hazard insured against within 60 days of written notification of a violation of any such law, regulation or ordinance;

(12) Failure by the insured to provide reasonable and necessary underwriting information to us upon written request therefore and a reasonable opportunity to respond.

(13) Agency termination, provided:

(a) We document that replacement coverage at comparable rates and terms has been provided to the first Named Insured, and we have informed the first Named Insured, in writing, of the right to continue coverage with us; or

(b) We have informed the first Named Insured, in writing, of the right to continue coverage with us and the first Named Insured has agreed, in writing, to the cancellation or nonrenewal based on the termination of the first Named Insured's appointed agent.

(14) Any other reasons in accordance with our underwriting guidelines for cancellation of commercial lines coverage.

b. If we cancel this policy based on Paragraph 7.a.(1) or (2) above, we will mail or deliver a written notice, to the first Named Insured and any person entitled to notice under this policy, at least 10 days before the effective date of cancellation. If we cancel this policy for any other reason listed above, we will mail or deliver a written notice to the first Named Insured and any person entitled to notice under this policy, not more than 120 days nor less than 30 days before the effective date of such cancellation.

c. In the notice of cancellation which is sent to the first Named Insured, we will state the reason for cancellation. For cancellation due to the nonpayment of premium, the notice will state the effect of nonpayment by the due date. Cancellation for nonpayment of premium will not be effective if payment of the amount due is made before the effective date set forth in the notice.

d. Notice will be sent to the last mailing addresses known to us, by:

(1) Certified mail; or

(2) First class mail, if we have obtained from the post office a date stamped proof of mailing showing names and addresses.

 © ISO Properties, Inc., 2006 IL 02 08 09 07

e. We need not send notice of cancellation if you have:

(1) Replaced coverage elsewhere; or

(2) Specifically requested termination.

D. The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

1. We may elect not to renew this policy for any reason permitted to cancel it. If we elect not to renew this policy, we will mail a notice of non-renewal, stating the reasons for nonrenewal, to the first Named Insured at least 30 days but not more than 120 days before the expiration date of this policy. If this policy does not have a fixed expiration date, it shall be deemed to expire annually on the anniversary of its inception.

2. This notice will be sent to the first Named Insured at the last mailing address known to us by:

a. Certified mail; or

b. First class mail, if we have obtained from the post office a date stamped proof of mailing showing the first Named Insured's name and address.

3. We need not mail or deliver this notice if you have:

a. Replaced coverage elsewhere; or

b. Specifically requested termination.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

IL 02 44 09 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OHIO CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** With respect to a policy which has been in effect for more than 90 days, or is a renewal of a policy we issued, the **Cancellation** Common Policy Condition is replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy only for one or more of the following reasons, except as provided in Paragraph 6. below:

   **a.** Nonpayment of premium;

   **b.** Discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted thereunder;

   **c.** Discovery of a moral hazard or willful or reckless acts or omissions on your part which increases any hazard insured against;

   **d.** The occurrence of a change in the individual risk which substantially increases any hazard insured against after the insurance coverage has been issued or renewed except to the extent the insurer could reasonably have foreseen the change or contemplated the risk in writing the contract;

   **e.** Loss of applicable reinsurance or a substantial decrease in applicable reinsurance, if the Superintendent has determined that reasonable efforts have been made to prevent the loss of, or substantial decrease in, the applicable reinsurance, or to obtain replacement coverage;

   **f.** Failure of an insured to correct material violations of safety codes or to comply with reasonable written loss control recommendations; or

   **g.** A determination by the Superintendent of Insurance that the continuation of the policy would create a condition that would be hazardous to the policyholders or the public.

3. We will mail written notice of cancellation to the first Named Insured, and agent if any, at the last mailing addresses known to us. Proof of mailing will be sufficient proof of notice.

4. We will mail the notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

   **b.** 30 days before the effective date of cancellation, if we cancel for a reason stated in **2.b.** through **2.g.** above.

IL 02 44 09 07 © ISO Properties, Inc., 2006 Page 1 of 2 □

5. The notice of cancellation will:

   a. State the effective date of cancellation. The policy period will end on that date.

   b. Contain the date of the notice and the policy number, and will state the reason for cancellation.

6. Policies written for a term of more than one year or on a continuous basis may be cancelled by us for any reason at an anniversary date, upon 30 days' written notice of cancellation.

7. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

B. The following is added to the Common Policy Conditions and supersedes any provisions to the contrary:

**NONRENEWAL**

1. If we elect not to renew this policy, we will mail written notice of nonrenewal to the first Named Insured, and agent if any, at the last mailing addresses known to us. The notice will contain the date of the notice and the policy number, and will state the expiration date of the policy.

2. We will mail the notice of nonrenewal at least 30 days before the expiration date of the policy.

3. Proof of mailing will be sufficient proof of notice.

C. **Common Policy Conditions**

1. Paragraph **A.2.a.** of the **Businessowners** Common Policy Conditions is deleted.

2. Paragraph **E.2.** of the **Cancellation** Common Policy Condition in the Standard Property Policy is deleted. Paragraph **E.2.** is replaced by the following (unless Item **A.** of this endorsement applies):

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

   b. 30 days before the effective date, if we cancel for any other reason.

© ISO Properties, Inc., 2006

IL 02 44 09 07

IL 02 68 01 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **1.**, **2.**, **3.** and **5.** of the **Cancellation** Common Policy Condition are replaced by the following:

**1.** The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

**2. Cancellation Of Policies In Effect**

**a. 60 Days Or Less**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 30 days before the effective date of cancellation if we cancel for any reason not included in Paragraph **A.2.b.** below.

**(2)** 15 days before the effective date of cancellation if we cancel for any of the reasons included in Paragraph **A.2.b.** below.

**b. For More Than 60 Days**

If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed below, provided we mail the first Named Insured written notice at least 15 days before the effective date of cancellation:

**(1)** Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

**(2)** Conviction of a crime arising out of acts increasing the hazard insured against;

**(3)** Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim;

**(4)** After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

**(5)** Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, which results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

**(6)** Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

IL 02 68 01 14 © Insurance Services Office, Inc., 2013 Page 1 of 5

(7) A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

(8) Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Department of Financial Services, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Department of Financial Services.

3. We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the policy and to the authorized agent or broker.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

B. The following is added to the Cancellation Common Policy Condition:

7. If one of the reasons for cancellation in Paragraph A.2.b. or D.2.b.(2) exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

C. The following conditions are added:

1. Nonrenewal

If we decide not to renew this policy we will send notice as provided in Paragraph C.3. below.

2. Conditional Renewal

If we conditionally renew this policy subject to:

a. A change of limits;

b. A change in type of coverage;

c. A reduction of coverage;

d. An increased deductible;

e. An addition of exclusion; or

f. Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in Paragraph C.3. below.

3. Notices Of Nonrenewal And Conditional Renewal

a. If we decide not to renew this policy or to conditionally renew this policy as provided in Paragraphs C.1. and C.2. above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 60 but not more than 120 days before:

(1) The expiration date; or

(2) The anniversary date if this is a continuous policy.

b. Notice will be mailed or delivered to the first Named Insured at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

c. Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

d. If we violate any of the provisions of Paragraph C.3.a., b. or c. above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

(1) And if notice is provided prior to the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60-day period, has replaced the coverage or elects to cancel;

© Insurance Services Office, Inc., 2013

(2) And if the notice is provided on or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy for another policy period, at the lower of the current rates or the prior period's rates, unless the first Named Insured, during this additional policy period, has replaced the coverage or elects to cancel.

e. If you elect to renew on the basis of a late conditional renewal notice, the terms, conditions and rates set forth in such notice shall apply:

(1) Upon expiration of the 60-day period, unless Subparagraph (2) below applies; or

(2) Notwithstanding the provisions in Paragraphs d.(1) and d.(2), as of the renewal date of the policy if the conditional renewal notice was sent at least 30 days prior to the expiration or anniversary date of the policy.

f. We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the policy has been replaced or is no longer desired.

D. The following provisions apply when the Commercial Property Coverage Part, the Farm Coverage Part or the Capital Assets Program (Output Policy) Coverage Part is made a part of this policy:

1. Items D.2. and D.3. apply if this policy meets the following conditions:

a. The policy is issued or issued for delivery in New York State covering property located in this state; and

b. The policy insures:

(1) For loss of or damage to structures, other than hotels or motels, used predominantly for residential purposes and consisting of no more than four dwelling units; or

(2) For loss of or damage to personal property other than farm personal property or business property; or

(3) Against damages arising from liability for loss of, damage to or injury to persons or property, except liability arising from business or farming; and

c. The portion of the annual premium attributable to the property and contingencies described in 1.b. exceeds the portion applicable to other property and contingencies.

2. Paragraph 2. of the Cancellation Common Policy Condition is replaced by the following:

2. Procedure And Reasons For Cancellation

a. We may cancel this entire policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 15 days before the effective date of cancellation if we cancel for nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

b. But if this policy:

(1) Has been in effect for more than 60 days; or

(2) Is a renewal of a policy we issued;

we may cancel this policy only for one or more of the following reasons:

(1) Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

(2) Conviction of a crime arising out of acts increasing the risk of loss;

(3) Discovery of fraud or material misrepresentation in obtaining the policy or in making a claim;

(4) Discovery of willful or reckless acts or omissions increasing the risk of loss;

(5) Physical changes in the covered property that make that property uninsurable in accordance with our objective and uniformly applied underwriting standards in effect when we:

(a) Issued the policy; or

(b) Last voluntarily renewed the policy;

© Insurance Services Office, Inc., 2013

(6) The Superintendent of Financial Services' determination that continuing the policy would violate Chapter 28 of the Insurance Law; or

(7) Required pursuant to a determination by the Superintendent of Financial Services that the continuation of our present premium volume would be hazardous to the interests of our policyholders, our creditors or the public.

3. The following are added:

   a. **Conditional Continuation**

   Instead of cancelling this policy, we may continue it on the condition that:

   (1) The policy limits be changed; or

   (2) Any coverage not required by law be eliminated.

   If this policy is conditionally continued, we will mail or deliver to the first Named Insured written notice at least 20 days before the effective date of the change or elimination. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

   b. **Nonrenewal**

   If, as allowed by the laws of New York State, we:

   (1) Do not renew this policy; or

   (2) Condition policy renewal upon:

       (a) Change of limits; or

       (b) Elimination of coverage;

   we will mail or deliver written notice of nonrenewal or conditional renewal:

       (a) At least 45 days; but

       (b) Not more than 60 days;

   before the expiration date of the policy. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

E. The following is added to the Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions, the Commercial Property Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

   When the property is subject to the Anti-arson Application in accordance with New York Department of Financial Services' Insurance Regulation No. 96, the following provisions are added:

   If you fail to return the completed, signed and affirmed anti-arson application to us:

   1. Or our broker or agent within 45 days of the effective date of a new policy, we will cancel the entire policy by giving 20 days' written notice to you and to the mortgageholder shown in the Declarations.

   2. Before the expiration date of any policy, we will cancel the policy by giving written notice to you and to the mortgageholder shown in the Declarations at least 15 days before the effective date of cancellation.

   The cancellation provisions set forth in **E.1.** and **E.2.** above supersede any contrary provisions in this policy including this endorsement.

   If the notice in **E.1.** or **E.2.** above is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

F. The following applies to the Commercial Property Coverage Part, the Farm Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

   Paragraphs f. and g. of the **Mortgageholders** Condition are replaced by the following:

   f. **Cancellation**

   (1) If we cancel this policy, we will give written notice to the mortgageholder at least:

       (a) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

       (b) 30 days before the effective date of cancellation if we cancel for any other reason.

(2) If you cancel this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, cancellation will become effective on the later of:

    (a) The effective date of cancellation of the insured's coverage; or

    (b) 10 days after we give notice to the mortgageholder.

**g. Nonrenewal**

(1) If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

(2) If you elect not to renew this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, nonrenewal will become effective on the later of:

    (a) The expiration date of the policy; or

    (b) 10 days after we give notice to the mortgageholder.

**G.** The following provisions apply when the following are made a part of this policy:

Commercial General Liability Coverage Part

Employment-Related Practices Liability Coverage Part

Farm Liability Coverage Form

Liquor Liability Coverage Part

Products/Completed Operations Liability Coverage Part

1. The aggregate limits of this policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraph **C.3.d.** above.

2. The last sentence of Limits Of Insurance does not apply when the policy period is extended because we sent the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NOTICE OF CANCELLATION – CERTIFICATE HOLDERS
## (SPECIFIED DAYS)

The person(s) or organization(s) listed or described in the Schedule below have requested that they receive written notice of cancellation when this policy is cancelled by us. We will mail or deliver to the Person(s) or Organization(s) listed or described in the Schedule a copy of the written notice of cancellation that we sent to you. If possible, such copies of the notice will be mailed at least 30 days, except for cancellation for non-payment of premium which will be mailed 10 days, prior to the effective date of the cancellation, to the address or addresses of certificate holders as provided by your broker or agent.

**Schedule**

Person(s) or Organization(s) including mailing address:

All certificate holders where written notice of the cancellation of this policy is required by written contract, permit or agreement with the Named Insured and whose names and addresses will be provided by the broker or agent listed in the Declarations Page of this policy for the purposes of complying with such request.

This notification of cancellation of the policy is intended as a courtesy only. Our failure to provide such notification to the person(s) or organization(s) shown in the Schedule will not extend any policy cancellation date nor impact or negate any cancellation of the policy. This endorsement does not entitle the person(s) or organization(s) listed or described in the Schedule above to any benefit, rights or protection under this policy.

Any provision of this endorsement that is in conflict with a statute or rule is hereby amended to conform to that statute or rule.

All other terms and conditions of this policy remain unchanged.
Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-17

00 ML0087 00 11 10                                                                                     Page 1 of 1

<div align="right">

**Policy Number**
**11GPP0510103**

</div>

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
### SUPPLEMENTAL DECLARATIONS
# ARCH INSURANCE COMPANY

Named Insured   ROUGH BROTHERS, INC.

Effective Date: 04-01-17
12:01 A.M., Standard Time

Agent Name   MARSH USA INC. NJ

Agent No. 00312

**Item 1.  Business Description:**

**Item 2.  Limits of Insurance**

| Coverage | | Limit of Liability |
|---|---|---|
| Aggregate Limits of Liability | $     2,000,000 | Products/Completed Operations Aggregate |
| | $     2,000,000 | General Aggregate (other than Products/Completed Operations) |
| Coverage A -   Bodily Injury and Property Damage Liability | $     1,500,000 | any one occurrence subject to the Products/Completed Operations and General Aggregate Limits of Liability |
| Damage To Premises Rented To You | $     1,500,000 | any one premises subject to the Coverage A occurrence and the General Aggregate Limits of Liability |
| Coverage B -   Personal and Advertising Injury Liability | $     1,500,000 | any one person or organization subject to the General Aggregate Limits of Liability |
| Coverage C -   Medical Payments | $          5,000 | any one person subject to the Coverage A occurrence and the General Aggregate Limits of Liability |

**Item 3.  Retroactive Date**

Coverage A of this Insurance does not apply to "bodily injury" or "property damage" which occurs before the
Retroactive Date, if any, shown here: _____

<div align="center">

(Enter Date or "None" if no Retroactive Date applies)

</div>

**Item 4.  Form of Business and Location of Premises**

Forms of Business: CORPORATION
Location of All Premises You Own, Rent or Occupy:
**See Schedule of Locations**

**Item 5.  Forms and Endorsements**

Form(s) and Endorsement(s) made a part of this policy at time of issue:
**See Schedule of Forms and Endorsements**

**Item 6.  Premiums**

| | | |
|---|---|---|
| Coverage Part Premium: | $     56,509.00 | |
| Other Premium: | | |
| Total Premium: | $     56,509.00 | |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.
**FAIC-SKLBUS-CGI.DEC (6/01)**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

**ASBESTOS EXCLUSION**

This policy does not apply to:

Any claim, "suit," demand or loss that alleges "bodily injury," "property damage," or "personal and advertising injury," (including but not limited to, compliance with any request, demand, order, or statutory or regulatory requirement or any other action authorized or required by law) including any costs, fees, expenses, penalties, judgments, fines, or sanctions arising there from, which arises out of, or would not have occurred, in whole or in part, but for the "asbestos hazard."

As used in this exclusion, "asbestos hazard" means:

(1)    actual, alleged or threatened exposure to asbestos in any manner or form whatsoever, either directly or indirectly, or

(2)    the failure to warn, advise or instruct related to asbestos in any manner or form whatsoever, or

(3)    the failure to prevent exposure to asbestos in any manner or form whatsoever, or

(4)    the presence of asbestos in any place whatsoever, whether or not within a building or structure.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

Endorsement Effective Date:

00 GL0045 00 12 03                                                                 Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**COMMERCIAL GENERAL LIABILITY DEDUCTIBLE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**PRODUCTS AND COMPLETED OPERATIONS LIABILITY COVERAGE FORM**
**LIQUOR LIABILITY COVERAGE FORM**
**EMPLOYEE BENEFITS LIABILITY COVERAGE FORM**
**PROFESSIONAL LIABILITY COVERAGE FORM**

<u>Schedule</u>

An "X" in the table below indicates how a Deductible(s) applies to your policy or coverage form:

| Indicate below | Coverage | Deductible Amount | Each Occurrence | Per Claim |
|---|---|---|---|---|
| [X] | Bodily Injury Liability and Property Damage Liability* | $ 500,000 | [X] | [ ] |
| [ ] | Bodily Injury Liability and Property Damage Liability* — Other than Products - Completed Operations | | [ ] | [ ] |
| [ ] | Bodily Injury Liability and Property Damage Liability* — Products - Completed Operations | | [ ] | [ ] |
| [ ] | Personal and Advertising Injury | | Each Person or Organization | |
| [X] | Employee Benefits Liability | $ 500,000 | Each Employee | |
| [ ] | Liquor Liability | | [ ] Per Common Cause | [ ] Per Claim |
| [X] | Other: DAMAGES TO PREMISES RENTED TO YOU | $ 500,000 | | |
| [ ] | Other: | | | |

**Deductible Aggregate:**

*Medical Payments: Included [X] Excluded [ ]

**A.     DEDUCTIBLE**

Our obligation to pay damages, costs, benefits, or medical payments, subject to the Limit of Insurance as shown in the Declarations, will be reduced by the **Deductible** shown in the Schedule. Our Limit of Insurance includes, and is not in addition to, the **Deductible**. This deductible cannot be satisfied by the payment of any other deductible as required by any other insurance issued by us or any other carrier that may also apply to our obligation to pay damages, costs, benefits or medical payments.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**B.** **DEDUCTIBLE AGGREGATE** (this provision applies only if an amount is shown as the **Deductible Aggregate** in the Schedule)

Subject to the applicable Limit of Insurance and related policy provisions, we will pay for all damages, costs, benefits, or medical payments payable under the policy without reduction by the **Deductible** when, as a result of the application of the **Deductibles** to damages, costs, benefits, or medical payments payable under the policy, the sum of all **Deductibles** paid by you exceeds the amount shown in the Schedule as the **Deductible Aggregate**.

If the policy period is longer than one year, the **Deductible Aggregate** amount applies separately to each policy year. Each policy year begins with the inception or anniversary date of the policy and ends at the earlier of the next anniversary date or the expiration of the policy.

The **Deductible Aggregate** amount shown above is not subject to adjustment unless a basis of adjustment is shown below.

The **Deductible Aggregate** is adjustable at the rate of _____ per _____ however the minimum amount of the aggregate deductible will be no less than the **Deductible Aggregate** amount shown above.

The adjustment basis is _____ and is estimated at the inception of this policy as the amount of _____ .

If any payments are made by us under this policy for damages or "Allocated Loss Adjustment Expenses", the Deductible(s) shown in this endorsement applies regardless of whether any other policies issued by us or any other carrier also apply.

**C.** **ALLOCATED LOSS ADJUSTMENT EXPENSES**

You must reimburse us for "Allocated Loss Adjustment Expenses" incurred by us as part of Supplementary Payments in defending a claim or "suit" as indicated by one of the options below:

[X] 1. Option I - "Allocated Loss Adjustment Expenses" Are Included In The **Deductible** Shown In The Schedule. Your total reimbursement for damages, costs, benefits, medical payments and "Allocated Loss Adjustment Expenses" combined shall not exceed the **Deductible** shown in the Schedule.

[ ] 2. Option II - "Allocated Loss Adjustment Expenses" Are Payable In Addition To The **Deductible** Shown In The Schedule On A Shared Basis. The portion of "Allocated Loss Adjustment Expenses" that you must pay will be calculated by dividing the smaller of: (a) the **Deductible** shown in the Schedule; or (b) the damages, costs, benefits, and medical payments we pay; by (c) the damages, costs, benefits, and medical payments we pay.

If we pay no damages, costs, benefits, and medical payment, you must reimburse us for all "Allocated Loss Adjustment Expenses" up to the **Deductible** shown in the Schedule and _____ % (If no amount is shown, 50% will apply) of all remaining "Allocated Loss Adjustment Expenses". Your combined reimbursement for damages, costs, benefits, medical payments and "Allocated Loss Adjustment Expenses" under this option may exceed the **Deductible** shown in the Schedule.

[ ] 3. Option III - "Allocated Loss Adjustment Expenses" Are Payable In Addition To The **Deductible** Shown In The Schedule And Are Your Full Responsibility. You must pay all "Allocated Loss Adjustment Expenses" attributed to all damages, costs, benefits, and medical payments paid by us. Your total reimbursement for damages, costs, benefits, medical payments and "Allocated Loss Adjustment Expenses" under this option may exceed the **Deductible** shown in the Schedule.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

☐ 4. Option IV - "Allocated Loss Adjustment Expenses" Are Payable By Us. We will pay all "Allocated Loss Adjustment Expenses" attributed to all damages, costs, benefits, and medical payments paid by us.

Your obligation to reimburse us for "Allocated Loss Adjustment Expense" applies separately to each occurrence, claim, "employee", common cause or person or organization.

"Allocated Loss Adjustment Expenses" means such claim adjustment expenses directly allocated by us to a particular claim. Such expenses shall include, but not be limited to, attorney's fees for claims in suit; court costs; pre- and post judgment interest; undercover operatives and detective services; employing experts; medical examination, medical cost containment expenses, laboratory, x-ray, and autopsy; stenographic, witnesses, summons, and copies of documents and transcripts; or expenses reasonably chargeable to the investigation, negotiation, settlement or defense of any claim or "suit" against you or for the protection and perfection of your or our subrogation rights.

"Allocated Loss Adjustment Expenses" does not include our general overhead, the salary and benefits of any our "employees", nor the fees of any attorney who is our "employee" or under our permanent retainer; nor the fees of any attorney we retain to provide counsel to us about our obligations, if any, under any policy issued by us with respect to a claim or "suit" against you.

**D.     OUR RIGHT TO REIMBURSEMENT**

When we pay all or any part of any **Deductible** shown in the Schedule, you must promptly reimburse us for: a) the **Deductible** or the part of the **Deductible** paid by us, and b) all "Allocated Loss Adjustment Expenses" incurred by us in defending a claim or "suit" according to the option selected in Section **C.**, above.

If we require collateral or other security to secure the **Deductible** and other obligations under this Commercial General Liability Deductible Endorsement, you shall provide such collateral or other security in an amount and form as we may determine.

Upon notification of payment by us, you will promptly reimburse us for any such amounts that we have paid. If you fail to reimburse us, or fail to provide us with any security or collateral in an amount or form as we may require, we may treat such failure as non-payment of premium and we may, at our option, cancel this policy by mailing or delivering to you advance written notice in accordance with the CANCELLATION Common Policy Condition. Any resulting return premium may be applied to the reimbursement amounts due.

We may mutually agree upon a final payment amount to satisfy your present and future payment obligations under this Commercial General Liability Deductible Endorsement. Payment by you of such amount will end your obligations to make payments to us under this endorsement.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-17

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NEW YORK - EMPLOYEE BENEFITS LIABILITY
## COVERAGE ENDORSEMENT – CLAIMS MADE

**THIS ENDORSEMENT IS ATTACHED TO AND IS PART OF YOUR COMMERCIAL GENERAL LIABILITY COVERAGE FORM AND PROVIDES "CLAIMS" MADE COVERAGE. PLEASE READ ALL PROVISIONS CAREFULLY, AND CONTACT YOUR AGENT IF YOU HAVE ANY QUESTIONS.**

1.  THIS ENDORSEMENT APPLIES ONLY TO DAMAGES ARISING OUT OF AN ACT, ERROR, OR OMISSION IN THE "ADMINISTRATION" OF YOUR "EMPLOYEE BENEFIT PROGRAM", BETWEEN THE RETROACTIVE DATE, IF ANY, SHOWN IN THE SCHEDULE OF THIS ENDORSEMENT AND THE END OF THE POLICY PERIOD.

2.  THIS ENDORSEMENT APPLIES ONLY TO "CLAIMS" MADE AGAINST THE INSURED AFTER THE INCEPTION DATE AND BEFORE THE END OF THE POLICY PERIOD AND ALL COVERAGE UNDER THIS ENDORSEMENT CEASES UPON TERMINATION OF THE POLICY, EXCEPT FOR THE AUTOMATIC BASIC EXTENDED REPORTING PERIOD, UNLESS YOU PURCHASE THE SUPPLEMENTAL EXTENDED REPORTING PERIOD COVERAGE.

3.  "CLAIMS" SUBMITTED AFTER THE EXTENDED REPORTING PERIOD TERMINATES WILL NOT BE COVERED AND THE INSURED MAY HAVE COVERAGE GAPS.

4.  A BASIC EXTENDED REPORTING PERIOD IS AUTOMATICALLY PROVIDED WITHOUT ADDITIONAL CHARGE. THIS PERIOD STARTS WITH THE END OF THE POLICY PERIOD AND LASTS FOR A PERIOD OF SIXTY (60) DAYS.

5.  A SUPPLEMENTAL EXTENDED REPORTING PERIOD FOR ONE (1) YEAR IS AVAILABLE, BUT ONLY BY ENDORSEMENT AND FOR AN ADDITIONAL CHARGE. THE SUPPLEMENTAL EXTENDED REPORTING PERIOD STARTS WHEN THE BASIC EXTENDED REPORTING PERIOD ENDS.

6.  THE ADDITIONAL PREMIUM SHALL BE 50% OF THE ANNUAL PREMIUM FOR THIS ENDORSEMENT.

7.  DURING THE FIRST SEVERAL YEARS OF THE CLAIMS MADE RELATIONSHIP, "CLAIMS" MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES. THE INSURED CAN EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE LEVEL INCREASES, UNTIL THE "CLAIMS" MADE RELATIONSHIP REACHES MATURITY.

## SCHEDULE

| Coverage | Limit of Insurance | Deductible | Premium |
|---|---|---|---|
| Employee Benefits Programs | $1,000,000 Each Employee | $500,000 Each Employee | INCLUDED |
| | $2,000,000 Aggregate | | . |
| Retroactive Date | 8/1/2015 | If no date is entered, the Retroactive Date is the Inception Date of the policy period. | |

The following is added to **Section I – Coverages**:

**COVERAGE – EMPLOYEE BENEFITS LIABILITY**

**1. Insuring Agreement**

    a.  We will pay on behalf of the insured all sums that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages, even if any allegations of the "suit" are groundless, false or fraudulent. However we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or suit that may result. But:

        1.  The amount we will pay for damages is limited to the amount described in Paragraph E. (Section III – Limits of Insurance); and

        2.  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payments of judgments or settlements.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

    b.  This insurance applies to damages only if:

        1.  The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

        2.  The act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

        3.  A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with Paragraph c. below, during the policy period or an Extended Reporting Period we provide under **EXTENDED REPORTING PERIOD** section. of this endorsement.

    c.  A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

        1.  When notice of such "claim" is received and recorded by any Insured or by us, whichever comes first; or

        2.  When we make settlement in accordance with Paragraph 1.a. above.

    d.  All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any Insured.

**2. Exclusions**

This endorsement does not apply to:

    a.  "Bodily injury" "property damage" or "personal and advertising injury".

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

b. Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

c. Any "claim" based upon:

   1. Failure of an investment to perform;

   2. Errors in providing information on past performance of investment vehicles; or

   3. Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program."

d. Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program."

e. Damages arising out of failure of performance of contract by any insurer.

f. Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

g. Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectable insurance.

h. Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

i. Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

j. Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

3. For the purposes of the coverage provided by this endorsement:

   a. All references to Supplementary Payments — Coverages **A** and **B** are replaced by **Supplementary Payments — Coverages A, B,** and Employee Benefits Liability.

   b. Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

4. For the purposes of the coverage provided by this endorsement, paragraphs **2.** and **4.** of **Section II — Who Is An Insured** are replaced by the following:

   2. Each of the following is also an insured:

      a. Each of your "employees" who is or was authorized to administer your "employee benefit program".

      b. Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

      c. Your legal representative if you die, but only with respect to duties as such. That representative will have all of your rights and duties under this endorsement.

4. Any organization you newly acquire or form, other than a partnership, joint venture, or limited liability company, and over which you maintain ownership or majority interest, will qualify as a named insured if no other similar insurance applies to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

   b. Coverage under this provision does not apply to any act, error, or omission that was committed before you acquired or formed the organization.

5. For the purposes of the coverage provided by this endorsement, Paragraph 3. of **Section II – Who is an Insured** does not apply.

6. For the purposes of the coverage provided by this endorsement, **Section III – Limits of Insurance** is replaced by the following:

   1. **Limits of Insurance**

      a. The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

         1. Insureds;

         2. "Claims" made or "suits" brought;

         3. Persons or organizations making "claims" or bringing "suits";

         4. Acts, errors, or omissions; or

         5. Benefits included in your "employee benefit program".

      b. The Aggregate limit is the most we will pay for all damages because of the acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

      c. Subject to the Aggregate limit, the Each Employee limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

         1. An act, error or omission; or

         2. A series of related acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

   However the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

   The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the Aggregate Limit of Insurance will be increased proportionally to the extension of the additional policy period.

2. **Deductible**

    a. Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Schedule as applicable to Each Employee. The Limit of Insurance shall not be reduced by the amount of this deductible.

    b. The deductible amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

    c. The terms of this insurance, including those with respect to:

        1. Our right and duty to defend "suits" seeking those damages; and

        2. Your duties and the duties of any other involved insured in the event of an act, error or omission, or "claim" apply irrespective of the application of the deductible amount.

    d. We may pay some or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for the amount of the deductible we have paid.

7. For the purposes of the coverage provided by this endorsement, Conditions 2. and 4. of Section IV — Conditions are replaced by the following:

2. **Duties In the Event of An Act, Error Or Omission, Or 'Claim' or 'Suit'**

    a. You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim". To the extent possible, notice should include:

        1. What the act, error or omission was and when it occurred; and

        2. The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

    b. If a "claim" is made or suit" is brought against any insured, you must:

        1. Immediately record the specifics of the "claim" or "suit" and the date received; and

        2. Notify us as soon as practicable.

    c. You and any other involved insured must:

        1. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit".

        2. Authorize us to obtain records and other information;

        3. Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

        4. Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

    d.  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

4.  **Other Insurance**

If other valid and collectable insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

a.  **Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any other insurance is also primary. Then we will share with all that other insurance by the method described in c. below.

b.  **Excess Insurance**

    1.  This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an act, error or omission on other than a claims-made basis, if:

        a.  No Retroactive Date is shown in the Schedule of this insurance; or

        b.  The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

    2.  When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

    3.  When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in the absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

    4.  We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the schedule of this endorsement.

c.  **Method Of Sharing**

If all the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance of all insurers.

8.  For the purposes of coverage provided by this endorsement, the following Extended Reporting provisions are added:

**EXTENDED REPORTING PERIOD**

1.  We will provide one or more Extended Reporting Periods, as described below, if:

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

    a.   This Endorsement is canceled or not renewed for any reason; or

    b.   We renew or replace this Endorsement with insurance that does not apply to an act, error, or omission on a claims-made basis; or

    c.   We renew or replace this Endorsement with insurance that has decreased in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion or any other change less favorable to the insured.

However, upon cancellation due to nonpayment of premium or fraud on the part of the insured:

    d.   We shall not be required to provide a premium quotation for the Supplemental Extended Reporting Period coverage unless requested by the insured; and

    e.   The Supplemental Extended Reporting Period does not apply if the "claims" made relationship between the insured and us is less than one year.

2.   Extended Reporting Periods do not extend the policy period or change the scope of coverage provided. They apply only to "claims" to which the following applies:

    a.   The "claim" is first made during an Extended Reporting Period;

    b.   The act, error, or omission occurs before the end of the policy period; and

    c.   The act, error, or omission did not commence before the Retroactive Date, if any.

Once in effect, Extended Reporting Periods may not be canceled.

3.   A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for 60 days.

The Basic Extended Reporting Period does not reinstate or increase the Limit of Insurance.

4.   No later than 30 days after the end of the policy period, we will advise you of the Basic Extended Reporting Period described in Paragraph 3. of this Section. We will also advise you of the availability and importance of purchasing the Supplemental Extended Reporting Period, as described in Paragraph 5. of this Section.

5.   A Supplemental Extended Reporting Period lasting one year is available, but only by endorsement and for an additional charge. This additional period starts when the Basic Extended Reporting Period, as set forth in Paragraph 3. ends.

6.   You must give us a written request for the endorsement within:

    a.   60 days from the effective date of termination of coverage; or

    b.   30 days from the date of mailing or delivery of the advice required in Paragraph **4**, whichever period is greater.

7.   The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due and any premium or co-payment you owe us for coverage provided under this policy. This premium charge is 50% of the policy premium. The premium charged shall be based upon the rates for such coverage in effect on the date the policy was issued or last renewed.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

8. The Supplemental Extended Reporting Period does not reinstate or increase the Limit of Insurance. The Limit of Insurance for the Supplemental Extended Reporting Period shall be part of, not in addition to, the Limit of Insurance shown in the Schedule. The Limit of Insurance for the Supplemental Extended Reporting Period shall be equal to Limit of Insurance remaining in the policy's Aggregate Limit of Insurance.

9. An insured who is either employed by or otherwise affiliated with you during the policy period shall continue to be covered under this policy and any extended reporting period, even after the affiliation has ended, for such insured's act, error, or omission during the period of affiliation.

10. Extended Reporting Period coverage shall be provided, upon termination of coverage, to any insured, if:

    a    You have been placed in liquidation or bankruptcy or if you permanently cease operations;

    b.    You or your designated trustee do not purchase extended reporting period coverage;

    c.    Such insured requests the extended reporting period coverage within 120 days of the termination of coverage; and

    d.    Such insured pays the additional charge for the coverage.

9. For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions** section:

1. "Administration" means:

    a.    Providing information to "employees" including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs".

    b.    Handling records in connection with the "employee benefit program"; or

    c.    Effecting, continuing, or terminating any "employee's" participation in any benefit included in the "employee benefit program".

    However, "administration" does not include handling payroll deductions.

2. "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

3. "Claim" means any demand or "suit" made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

4. "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

    a.    Group life insurance, group accident or health insurance; dental, vision, and hearing plans; and flexible spending accounts; provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

    b.    Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

   c.   Unemployment insurance, social security benefits, workers' compensation and disability benefits;

   d.   Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family and civil leave; tuition assistance plans; transportation and health club subsidies; and

   e.   Any other similar benefits designated in the Schedule of added thereto by endorsement.

10. For the purposes of the coverage provided by this endorsement, Definitions **5.** and **18.** in the **Definitions** Section are replaced by the following:

   **5.**   "Employee" means a person actively employed, formerly employed, on leave of absence or disabled or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

   **18.**   "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

      a.   An arbitration proceeding in which such damages are claimed and to which the Insured must submit or does submit with our consent; or

      b.   Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

11. For purposes of this endorsement, the following provision applies and supersedes any provision to the contrary:

   a. No "claim" made by an insured, injured person or other claimant during the policy period, any renewal thereof, or any applicable Extended Reporting Period shall be invalidated because of a failure to give notice of such "claim" within the time prescribed in the policy if it shall be shown: (i) not to have been reasonably possible to have given notice within the prescribed time; and (ii) notice was given as soon as was reasonably possible thereafter.

   b. No "claim" made by an insured, injured person or other claimant during the policy period, any renewal thereof, or any applicable Extended Reporting Period shall be invalidated because of a failure to give notice of such "claim" within the time prescribed in the policy unless the late notice has prejudiced us, except as provided in item a. above. Notwithstanding the foregoing, we may deny coverage for a "claim" to the extent that notice of such "claim" was given to us after the policy period or any applicable Extended Reporting Period.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein: Endorsement Effective Date: 04-01-17

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMENDED DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT AND REPRESENTATIONS CONDITIONS ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

1. Under **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**, Condition **2. Duties in the Event of Occurrence, Claim or Suit** is amended by the addition of the following paragraphs:

   e. It is agreed that where you report an "occurrence" to an insurer providing other than Commercial General Liability insurance, which later develops into a General Liability claim covered under this policy, failure to report such "occurrence" to us at the time of the "occurrence" shall not be deemed in violation of these conditions. However, you shall give immediate notification of the "occurrence" to us, as soon as it is reasonably possible that the "occurrence" is a General Liability claim.

   f. It is agreed that knowledge of an "occurrence" by any of your agents, servants or "employees" shall not constitute knowledge by you unless one of your "executive officers" or anyone responsible for administering your insurance program has received such notice from the agent, servant or "employee".

2. If Employee Benefits Liability Coverage applies to this policy, the following shall apply:

   Under **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** as amended by the Employee Benefits Liability Coverage, Condition **2. Duties In The Event Of An Act, Error Or Omission, "Claim" or "Suit"** is amended by the addition of the following paragraphs:

   f. It is agreed that where you report an act, error or omission to an insurer providing other than Commercial General Liability insurance, which later develops into a General Liability claim covered under this policy, failure to report such act, error or omission to us at the time of the act, error or omission shall not be deemed in violation of these conditions. However, you shall give immediate notification of the act, error or omission to us, as soon as it is reasonably possible that the act, error or omission is a General Liability claim.

   g. It is agreed that knowledge of an act, error or omission by any of your agents, servants or "employees" shall not constitute knowledge by you unless one of your "executive officers" or anyone responsible for administering your insurance program has received such notice from the agent, servant or "employee".

3. Under **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**, Condition **6. Representations** is amended by the addition of the following paragraph:

   d. Your failure to disclose all hazards existing as of the inception date of the policy shall not prejudice you with respect to the coverage afforded by this policy, provided such failure or omission is not intentional or grossly negligent.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-17

00 GL0469 00 06 08                                                      Page 2 of 2

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ANTI STACKING ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**EMPLOYEE BENEFITS LIABILITY COVERAGE**
**LIQUOR LIABILITY COVERAGE FORM**
**STOP GAP - EMPLOYERS LIABILITY COVERAGE ENDORSEMENT**

Under **SECTION IV- COMMERCIAL GENERAL LIABILITY CONDITIONS** and **SECTION IV- LIQUOR LIABILITY CONDITIONS**, the following condition is added:

**Two Or More Coverage Forms Or Policies Issued By Us**

If any "occurrence" or offense covered under this policy is also covered in whole or in part under any other coverage form or policy issued to you by us (or by any of our related or affiliated companies) including but not limited to prior policies issued to you by us, (or by any of our related or affiliated companies), the most that will be paid under all such coverage forms and policies covering the "occurrence" or offense is the single highest applicable limit of liability of one of the policies which cover the "occurrence" or offense. This provision does not apply to policies written by us (or by any of our related or affiliated companies) as insurance that specifically applies in excess of this insurance.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04 01 17

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PREMIUM COMPUTATION ENDORSEMENT**

This endorsement applies to the lines of business indicated below:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**EMPLOYEE BENEFITS LIABILITY COVERAGE**
**LIQUOR LIABILITY COVERAGE FORM**
**STOP GAP - EMPLOYERS LIABILITY COVERAGE ENDORSEMENT**

Your Premium will be calculated as follows:
1. Audit Period: 4/1/2017                    through 4/1/2018
☒ Annual      ☐ Semi-Annual      ☐ Monthly      ☐ Other
Deposit Premium  $56,509

2.    The deposit premium set forth above is adjustable, and is only an estimated premium for the Audit Period shown in 1. above. The final earned premium for the Audit Period will be determined as specified in Condition **5. Premium Audit** of **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** and Condition **5. Premium Audit** of **SECTION IV – LIQUOR LIABILITY CONDITIONS**. The Audit Premium will be computed by applying the Composite Rate(s) against the Audited Exposure and Exposure Reporting Basis listed in the Premium Adjustment Table below. Such rates are prior to any applicable taxes, licenses or fees.

3.    Premium Adjustment Table

| LOB | Class Code | Class Description | Estimated Exposure | Exposure Reporting Basis | Composite Rate | Estimated Premium |
|---|---|---|---|---|---|---|
| GL | 20350 | COMPOSITE RATE | 265,800,038 | REVENUE | .2126 | $56,509 |
|  |  |  |  | PER 1,000 |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-2017

00 GL0477 00 06 08                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BODILY INJURY DEFINITION EXTENSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Under the:

1.  **COMMERCIAL GENERAL LIABILITY COVERAGE FORM SECTION V – DEFINITIONS,** Definition 3. "Bodily injury";

2.  **LIQUOR LIABILITY COVERAGE FORM SECTION V - DEFINITIONS,** Definition 1. "Bodily injury"; or

3.  **PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM SECTION V - DEFINITIONS,** Definition 2. "Bodily injury"

Is deleted and replaced by the following definition:

> "Bodily injury" means physical injury, sickness or disease sustained by a person including death resulting from any of these. "Bodily injury" includes mental anguish, shock, or emotional distress when accompanied by physical injury, sickness or disease.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-17

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**FELLOW EMPLOYEE COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM

Under **Section II – WHO IS AN INSURED**, paragraphs 2.a.(1)(a), 2.a(1)(b) and 2.a(1)(c) are deleted in their entirety.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUCH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-17

00 GL0590 00 04 10                                                            Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**DESIGNATED ENTITY EXCLUSION ENDORSEMENT**

This Endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

It is agreed that any insurance provided under the GENERAL LIABILITY COVERAG COVERAGE FORM does not apply to the following DESIGNATED ENTITY:

DESIGNATED ENTITY:

THE D.S. BROWN COMPANY AND SEISMIC ENERGY PRODUCTS, INC.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-2017

00 GL0592 00 04 10                                                                 Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**INCIDENTAL MEDICAL MALPRACTICE LIABILITY COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

A.  **SECTION V – DEFINITIONS** is amended by the addition of the following definition:

"Incidental medical malpractice injury" means "bodily injury" arising out of the rendering of or failure to render the following services:

a.  Medical, surgical, dental, x-ray or nursing service or treatment or the furnishing of food or beverages in connection therewith, or

b.  The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

B.  Under **Section II – WHO IS AN INSURED**, Paragraph **2. a. (1)(d)** is deleted in its entirety and replaced with the following:

d.  Arising out of his or her providing or failing to provide professional health care, except for "bodily injury" arising out of "incidental medical malpractice injury" by any physician, dentist, emergency medical technician, nurse or other medical practitioner employed or retained by you. However, the insurance provided hereunder to such persons will not apply to liability arising out of services performed outside of the scope of their duties as your "employees." Any series of continuous, repeated or related acts will be treated as the occurrence of a single negligent professional healthcare service.

The Coverage provided by this endorsement does not apply to you or any insured if you are engaged in the business or occupation of providing any of the services described in the definition of "incidental medical malpractice injury."

The Coverage provided by this endorsement will be excess over any other insurance available to you or any insured.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-2017

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PRIMARY AND NON CONTRIBUTING INSURANCE ENDORSEMENT –
DESIGNATED CONTRACT(S)**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

**SCHEDULE**

**Designated Contract(s): ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED
SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS.**

With respect to the contract(s) designated in the Schedule above, it is agreed that **SECTION IV-
COMMERCIAL GENERAL LIABILITY CONDITIONS, Condition 4. Other Insurance, SECTION IV-
LIQUOR LIABILITY CONDITIONS, Condition 4. Other Insurance or SECTION IV- PRODUCTS
/COMPLETED OPERATIONS LIABILITY, Condition 4. Other Insurance** is amended by the addition of
the following paragraph:

**d.      Primary and Non Contributing Insurance – Designated Contract(s)**

Where you are specifically required by a written contract designated in the Schedule above to provide
insurance that is primary and non-contributory, and the written contract designated in the Schedule so
requiring is executed by you before any "occurrence", offense, or "injury" this insurance will be primary
and the other insurance will not contribute with this insurance, but only if and to the extent required by
that written contract.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:

00 GL0598 00 04 10                                                                                      Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BODILY INJURY OR PROPERTY DAMAGE EXPECTED OR INTENDED ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, Exclusion **2.a. Expected or Intended Injury** is deleted in its entirety and replaced by the following exclusion:

a. **Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 4/1/2017

00 GL0599 00 04 10                                                                 Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**NON-OWNED WATERCRAFT EXTENSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, Exclusion **2. g. (2) (a)** is deleted in its entirety and replaced with the following:

    (a)    Less than 100 feet long.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510103

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 4/1/2017

00 GL0600 00 04 10                               Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 00 01 04 13

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II — Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V — Definitions.

## SECTION I – COVERAGES

## COVERAGE A — BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   (1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance; and

   (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments — Coverages A and B.

b. This insurance applies to "bodily injury" and "property damage" only if:

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   (2) The "bodily injury" or "property damage" occurs during the policy period; and

   (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II — Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

   (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

   (b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

   (a) The supervision, hiring, employment, training or monitoring of others by that insured; or

   (b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph (1), (2) or (3) above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

   (a) Employment by the insured; or

   (b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

  (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

  (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

  (a) Less than 26 feet long; and

  (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

  (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

  (b) The operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

    © Insurance Services Office, Inc., 2012     CG 00 01 04 13

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions**

   This insurance does not apply to:

   a. **Knowing Violation Of Rights Of Another**

      "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

   b. **Material Published With Knowledge Of Falsity**

      "Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

   c. **Material Published Prior To Policy Period**

      "Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

   d. **Criminal Acts**

      "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

   e. **Contractual Liability**

      "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

   f. **Breach Of Contract**

      "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

   g. **Quality Or Performance Of Goods – Failure To Conform To Statements**

      "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

   h. **Wrong Description Of Prices**

      "Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**COVERAGE C — MEDICAL PAYMENTS**

**1. Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

**SUPPLEMENTARY PAYMENTS — COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I — Coverage A — Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

**SECTION II — WHO IS AN INSURED**

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      (1) "Bodily injury" or "personal and advertising injury":

         (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

         (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

         (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

         (d) Arising out of his or her providing or failing to provide professional health care services.

      (2) "Property damage" to property:

         (a) Owned, occupied or used by;

         (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

© Insurance Services Office, Inc., 2012

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal And Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   (1) How, when and where the "occurrence" or offense took place;

   (2) The names and addresses of any injured persons and witnesses; and

   (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received; and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section I — Coverage **A** — Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

© Insurance Services Office, Inc., 2012

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

### 7. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

### 8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

### 9. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in Paragraph a. above;

      (2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

   (a) Snow removal;

   (b) Road maintenance, but not construction or resurfacing; or

   (c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   (1) Products that are still in your physical possession; or

   (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      (a) When all of the work called for in your contract has been completed.

      (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   b. Does not include "bodily injury" or "property damage" arising out of:

   (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

   (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

   (3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      (2) The providing of or failure to provide warnings or instructions.

   c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

   a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      (2) The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

COMMERCIAL GENERAL LIABILITY
CG 01 63 07 11

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES –
# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Paragraph **1. Insuring Agreement** of Section **I –
Coverage A Bodily Injury And Property Damage
Liability** is replaced by the following:

**1. Insuring Agreement**

**a.** We will pay those sums that the insured
becomes legally obligated to pay as
damages because of "bodily injury" or
"property damage" to which this insurance
applies. We will have the right and duty to
defend the insured against any "suit"
seeking those damages even if the
allegations of the "suit" are groundless, false
or fraudulent. However, we will have no
duty to defend the insured against any "suit"
seeking damages for "bodily injury" or
"property damage" to which this insurance
does not apply. We may, at our discretion,
investigate any "occurrence" and settle any
claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is
limited as described in Section **III –
Limits Of Insurance;** and

**(2)** Our right and duty to defend end when
we have used up the applicable limit of
insurance in the payment of judgments
or settlements under Coverages **A** or **B**
or medical expenses under Coverage **C.**

No other obligation or liability to pay sums
or perform acts or services is covered
unless explicitly provided for under
Supplementary Payments – Coverages **A**
and **B.**

**b.** This insurance applies to "bodily injury" and
"property damage" only if:

**(1)** The "bodily injury" or "property damage"
is caused by an "occurrence" that takes
place in the "coverage territory";

**(2)** The "bodily injury" or "property damage"
occurs during the policy period; and

**(3)** Prior to the policy period, no insured
listed under Paragraph **1.** of Section **II –
Who Is An Insured** and no "employee"
authorized by you to give or receive
notice of an "occurrence" or claim, knew
that the "bodily injury" or "property
damage" had occurred, in whole or in
part. If such a listed insured or
authorized "employee" knew, prior to the
policy period, that the "bodily injury" or
"property damage" occurred, then any
continuation, change or resumption of
such "bodily injury" or "property damage"
during or after the policy period will be
deemed to have been known prior to the
policy period.

**c.** "Bodily injury" or "property damage" which
occurs during the policy period and was
not, prior to the policy period, known to
have occurred by any insured listed under
Paragraph **1.** of Section **II – Who Is An
Insured** or any "employee" authorized by
you to give or receive notice of an
"occurrence" or claim, includes any
continuation, change or resumption of that
"bodily injury" or "property damage" after the
end of the policy period.

**d.** "Bodily injury" or "property damage" will be
deemed to have been known to have
occurred at the earliest time when any
insured listed under Paragraph **1.** of
Section **II – Who Is An Insured** or any
"employee" authorized by you to give or
receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily
injury" or "property damage" to us or any
other insurer;

**(2)** Receives a written or verbal demand or
claim for damages because of the "bodily
injury" or "property damage"; or

CG 01 63 07 11 © Insurance Services Office, Inc., 2010 Page 1 of 3 ☐

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

B. Paragraph 1.a. of Section I – Coverage B Personal And Advertising Injury Liability is replaced by the following:

1. **Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A and B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

C. The following is added as Paragraph e. to the Duties In The Event Of Occurrence, Offense, Claim Or Suit Condition (Paragraph 2. of Section IV – Commercial General Liability Conditions):

e. Notice given by or on behalf of the insured, or written notice by or on behalf of the injured person or any other claimant, to any agent of ours in New York State, with particulars sufficient to identify the insured, shall be considered to be notice to us.

D. Paragraph 3. of Section IV – Commercial General Liability Conditions is replaced by the following:

3. **Legal Action Against Us**

a. Except as provided in Paragraph b., no person or organization has a right under this Coverage Part:

(1) To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

(2) To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

b. With respect to "bodily injury" and "personal and advertising injury" claims, if we deny coverage or do not admit liability because an insured or the injured person, someone acting for the injured person or other claimant fails to give us written notice as soon as practicable, then the injured person, someone acting for the injured person or other claimant may bring an action against us, provided the sole question is whether the denial of coverage or nonadmission of liability is based on the failure to provide timely notice.

However, the injured person, someone acting for the injured person or other claimant may not bring an action if within 60 days after we deny coverage or do not admit liability, we or an insured:

(1) Brings an action to declare the rights of the parties under the policy; and

(2) Names the injured person, someone acting for the injured person or other claimant as a party to the action.

© Insurance Services Office, Inc., 2010 CG 01 63 07 11 □

**E.** The following provision is added and supersedes any provision to the contrary:

Failure to give notice to us as required under this Coverage Part shall not invalidate any claim made by the insured, injured person or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by the insured, injured person or other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

**F.** The definition of "loading or unloading" in the **Definitions** Section does not apply.

CG 01 63 07 11 © Insurance Services Office, Inc., 2010 Page 3 of 3 □

COMMERCIAL GENERAL LIABILITY
CG 01 04 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – PREMIUM AUDIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **b.** of the **Premium Audit** Condition **Section IV** is replaced by the following:

**PREMIUM AUDIT**

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. An audit to determine the final premium due or to be refunded will be completed within 180 days after the expiration date of the policy. But the audit may be waived if the total annual premium attributable to the auditable exposure base is not reasonably expected to exceed $1500. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

**B.** Except as provided in Paragraph **A.** above, the **Examination Of Your Books And Records** Common Policy Condition continues to apply.

CG 01 04 12 04 © ISO Properties, Inc., 2003 Page 1 of 1

POLICY NUMBER: 11GPP0510103

COMMERCIAL GENERAL LIABILITY
CG 02 24 10 93

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EARLIER NOTICE OF CANCELLATION
# PROVIDED BY US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

**Number of Days' Notice** 90

(If no entry appears above, information required to complete this Schedule will be shown in the Declarations as applicable to this endorsement.)

For any statutorily permitted reason other than nonpayment of premium, the number of days required for notice of cancellation, as provided in paragraph **2.** of either the CANCELLATION Common Policy Condition or as amended by an applicable state cancellation endorsement, is increased to the number of days shown in the Schedule above.

CG 02 24 10 93              Copyright, Insurance Services Office, Inc., 1992              Page 1 of 1

POLICY NUMBER: 11GPP0510103

COMMERCIAL GENERAL LIABILITY
CG 20 11 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Designation Of Premises (Part Leased To You):** |
| ANY PREMISES WHERE REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS |
| **Name Of Person(s) Or Organization(s) (Additional Insured):** |
| ANY PERSON OR ORGANIZATION WHERE REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS |
| **Additional Premium:**     **INCL.** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** **Section II – Who Is An Insured is** amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

**1.** Any "occurrence" which takes place after you cease to be a tenant in that premises.

**2.** Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

 © Insurance Services Office, Inc., 2012

POLICY NUMBER: 11GPP0510103

COMMERCIAL GENERAL LIABILITY
CG 20 15 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – VENDORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) (Vendor) | Your Products |
|---|---|
| ANY VENDOR WHERE REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS | ANY OF YOUR COVERED PRODUCTS AS REQUIRED BY WRITTEN CONTRACT |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) (referred to throughout this endorsement as vendor) shown in the Schedule, but only with respect to "bodily injury" or "property damage" arising out of "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business.

However:

1. The insurance afforded to such vendor only applies to the extent permitted by law; and

2. If coverage provided to the vendor is required by a contract or agreement, the insurance afforded to such vendor will not be broader than that which you are required by the contract or agreement to provide for such vendor.

**B.** With respect to the insurance afforded to these vendors, the following additional exclusions apply:

1. The insurance afforded the vendor does not apply to:

   a. "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

   b. Any express warranty unauthorized by you;

   c. Any physical or chemical change in the product made intentionally by the vendor;

   d. Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

CG 20 15 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 2

e. Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

f. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

g. Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

h. "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

(1) The exceptions contained in Sub-paragraphs d. or f.; or

(2) Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

2. This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

C. With respect to the insurance afforded to these vendors, the following is added to **Section III — Limits Of Insurance:**

If coverage provided to the vendor is required by a contract or agreement, the most we will pay on behalf of the vendor is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

 © Insurance Services Office, Inc., 2012 CG 20 15 04 13

POLICY NUMBER: 11GPP0510103

<div align="right">COMMERCIAL GENERAL LIABILITY<br>CG 20 26 04 13</div>

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): |
| --- |
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

1. In the performance of your ongoing operations; or

2. In connection with your premises owned by or rented to you.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

POLICY NUMBER: 11GPP0510103

COMMERCIAL GENERAL LIABILITY
CG 20 28 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – LESSOR OF LEASED EQUIPMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): |
|---|
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 28 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 1

POLICY NUMBER: 11GPP0510103

**COMMERCIAL GENERAL LIABILITY**
CG 20 37 04 13

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS | |
| | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 37 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 21 06 05 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

 © Insurance Services Office, Inc., 2013

POLICY NUMBER: 11GPP0510103                COMMERCIAL GENERAL LIABILITY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – DESIGNATED PRODUCTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

**Designated Product(s):**
AIRCRAFT PRODUCTS

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any of "your products" shown in the Schedule.

CG 21 33 11 85            Copyright, Insurance Services Office, Inc., 1984            Page 1 of 1    □

COMMERCIAL GENERAL LIABILITY
CG 21 47 07 98

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

B. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

 Copyright, Insurance Services Office, Inc., 1997

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph 2. Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability is replaced by the following:

This insurance does not apply to:

**f. Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

(a) "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

(b) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

(i) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(ii) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

CG 21 65 12 04     © ISO Properties, Inc., 2003     Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 21 70 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

CG 21 70 01 15 © Insurance Services Office, Inc., 2015 Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 22 43 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

2. Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

POLICY NUMBER: 11GPP0510103

COMMERCIAL GENERAL LIABILITY
CG 22 74 10 01

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITED CONTRACTUAL LIABILITY COVERAGE FOR PERSONAL AND ADVERTISING INJURY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

Designated Contract Or Agreement:
ALL WRITTEN CONTRACTS WHERE THE INSURED IS SPECIFICALLY REQUIRED TO
INDEMNIFY ANOTHER PARTY FOR PERSONAL AND ADVERTISING INJURY DAMAGES.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** With respect to the contract or agreement designated in the Schedule above, Subparagraph e. of Paragraph 2. **Exclusions** of Section I - **Coverage B - Personal And Advertising Injury Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement.

This exclusion does not apply to:

**(1)** Liability for damages that the insured would have in the absence of the contract or agreement; or

**(2)** Liability for "personal and advertising injury" if:

**(a)** The liability pertains to your business and is assumed in the designated contract or agreement shown in the Schedule in which you assume the tort liability of another. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

**(b)** The "personal and advertising injury" occurs subsequent to the execution of the designated contract or agreement shown in the Schedule; and

**(c)** The "personal and advertising injury" arises out of the offenses of false arrest, detention or imprisonment.

Solely for the purposes of liability so assumed in such designated contract or agreement, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "personal injury" described in Paragraph **A.2.e.(2)(c)** above, provided:

   (I) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same designated contract or agreement; and

   (II) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**B.** With respect to the contract or agreement designated in the Schedule above, the following is added to **Section I - Supplementary Payments - Coverages A and B:**

If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**1.** The "suit" against the indemnitee seeks damages for which the insured has assumed tort liability of the indemnitee in a designated contract or agreement shown in the Schedule, if such liability pertains to your business. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

**2.** This insurance applies to such liability assumed by the insured;

**3.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same designated contract or agreement;

**4.** The allegations in the "suit" and the information we know about the offense are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**5.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**6.** The indemnitee:

   **a.** Agrees in writing to:

   (1) Cooperate with us in the investigation, settlement or defense of the "suit";

   (2) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

   (3) Notify any other insurer whose coverage is available to the indemnitee; and

   (4) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

   **b.** Provides us with written authorization to:

   (1) Obtain records and other information related to the "suit"; and

   (2) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **A.2.e.(2)** of this endorsement, such payments will not be deemed to be damages for "personal and advertising injury" as described in Paragraph **A.2.e.(2)(c)** above and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

**1.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**2.** The conditions set forth above, or the terms of the agreement described in Paragraph **6.** above, are no longer met.

© ISO Properties, Inc., 2001

POLICY NUMBER: 11GPP0510103

**COMMERCIAL GENERAL LIABILITY**
CG 24 04 05 09

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

**Name Of Person Or Organization:**
ANY PERSON OR ORGANIZATION WHERE WAIVER OF OUR RIGHT TO RECOVER IS
PERMITTED BY LAW AND IS REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH
CONTRACT WAS EXECUTED PRIOR TO THE LOSS

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of Section **IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

CG 24 04 05 09

© Insurance Services Office, Inc., 2008

Page 1 of 1  ☐

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS USED UP

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following Condition is added to COMMERCIAL GENERAL LIABILITY CONDITIONS (Section IV):

**Transfer of Duties When a Limit of Insurance Is Used Up.**

a. If we conclude that, based on "occurrences," offenses, claims or "suits" which have been reported to us and to which this insurance may apply, the:

(1) General Aggregate Limit (other than the Products/Completed Operations Aggregate Limit);

(2) Products/Completed Operations Aggregate Limit;

(3) Personal and Advertising Injury Limit;

(4) Each Occurrence Limit; or

(5) Fire Damage Limit

is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

b. When a limit of insurance described in paragraph a. above has actually been used up in the payment of judgments or settlements:

(1) We will notify the first Named Insured, in writing, as soon as practicable, that:

(a) Such a limit has actually been used up; and

(b) Our duty to defend "suits" seeking damages subject to that limit has also ended.

(2) We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all claims and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and "suits".

We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the claim or "suit" is reported to us after that limit of insurance has been used up.

(3) The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

c. The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with paragraph b.(2) above.

The duty of the first Named Insured to reimburse us will begin on:

(1) The date on which the applicable limit of insurance is used up, if we sent notice in accordance with paragraph a. above; or

(2) The date on which we sent notice in accordance with paragraph b.(1) above, if we did not send notice in accordance with paragraph a. above.

d. The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

 Copyright, Insurance Services Office, Inc., 1991  □

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

COMMERCIAL GENERAL LIABILITY
CG 26 36 12 93

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS USED UP

This endorsement modifies insurance provided under the following:

OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY COVERAGE FORM

The following Condition is added to CONDITIONS (Section IV):

**Transfer of Duties When a Limit of Insurance Is Used Up.**

a. If we conclude that, based on "occurrences", claims or "suits" which have been reported to us and to which this Insurance may apply, the Aggregate Limit or the Each Occurrence Limit is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

b. When a limit of insurance described in paragraph **a.** above has actually been used up in the payment of judgments or settlements:

   (1) We will notify the first Named Insured, in writing, as soon as practicable, that:

      (a) Such a limit has actually been used up; and

      (b) Our duty to defend "suits" seeking damages subject to that limit has also ended.

   (2) We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all claims and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and "suits".

   We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the claim or "suit" is reported to us after that limit of insurance has been used up.

   (3) The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

c. The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with paragraph **b.(2)** above.

   The duty of the first Named Insured to reimburse us will begin on:

   (1) The date on which the applicable limit of insurance is used up, if we sent notice in accordance with paragraph **a.** above; or

   (2) The date on which we sent notice in accordance with paragraph **b.(1)** above, if we did not send notice in accordance with paragraph **a.** above.

d. The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

 Copyright, Insurance Services Office, Inc., 1993  □

E-FILED 03/08/2024 10:57 AM  /  CONFIRMATION 1441483  /  A 2401119  /  COMMON PLEAS DIVISION  /  IFIJ

# E<small>XHIBIT</small> B

**BROKER – Marsh USA, Inc.**

# Rough Brothers, Inc.

**POLICY NUMBER - 11GPP0510104 General Liability**

**POLICY PERIOD -** 04/01/18 to 04/01/19



a member of Arch Insurance Group

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site —http://www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



Insurance Group®

Signature Page

IN WITNESS WHEREOF, Arch Insurance Company has caused this policy to be executed and attested.

John Mentz

President

Patrick K. Nails

Secretary

05 ML0002 00 12 14

Page 1 of 1

POLICY NUMBER: 11GPP0510104

IL 09 85 01 15

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

| SCHEDULE -- PART I |
| --- |
| Terrorism Premium (Certified Acts)   $100 |
| This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies): |
| GENERAL LIABILITY |
| |
| Additional information, if any, concerning the terrorism premium: |
| |

| SCHEDULE -- PART II |
| --- |
| **Federal share of terrorism losses**   82%   **Year: 20**  18 |
| (Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses**   81%   **Year: 20**  19 |
| (Refer to Paragraph **B.** in this endorsement.) |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015

IL 09 85 01 15

**Policy Number**
**11GPP0510104**

COMMON POLICY DECLARATIONS

# ARCH INSURANCE COMPANY

Named Insured    ROUGH BROTHERS, INC.

Effective Date: 04-01-18
12:01 A.M., Standard Time

Agent Name    MARSH USA INC. NJ

Agent No.    00312

| Item 1. | Named Insured and Mailing Address | Agent Name and Address |
|---|---|---|
| ROUGH BROTHERS, INC.<br>(SEE NAMED INSURED ENDORSEMENT)<br>3556 LAKE SHORE ROAD<br>P.O. BOX 2028<br>BUFFALO NY 14219 | | MARSH USA INC. NJ<br>445 SOUTH STREET<br>SUITE 210<br>MORRISTOWN NJ 07962<br><br>Agent No. 00312 |

| Item 2. | Policy Period | From: 04-01-2018 | To: 04-01-2019 |
|---|---|---|---|

at 12:01 A.M., Standard Time at your mailing address shown above.

**Item 3.** Business Description:
Form of Business:    CORPORATION

**Item 4.** In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This policy consists of the following coverage parts for which a premium is indicated. Where no premium is shown, there is no coverage. This premium may be subject to adjustment.

| Coverage Part(s) | Premium |
|---|---|
| Commercial Property Coverage Part | NOT COVERED |
| Commercial General Liability Coverage Part | $ 54,113.00 |
| Commercial Crime Coverage Part | NOT COVERED |
| Commercial Inland Marine Coverage Part | NOT COVERED |
| Commercial Auto (Business or Truckers) Coverage Part | NOT COVERED |
| Commercial Garage Coverage Part | NOT COVERED |
| | |
| | |
| | |
| | |
| | |
| **Total Policy Premium** | $ 54,113.00 |

**Item 5.** Forms and Endorsements

Forms(s) and Endorsement(s) made a part of this policy at time of issue:

**See Schedule of Forms and Endorsements**

Countersigned:

Date: 05-07-18      By: _____
                                                     Authorized Representative

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVFRAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

**FAIC-SKLBUS-CPD (6/01)**

Policy Number
**11GPP0510104**

### SCHEDULE OF FORMS AND ENDORSEMENTS

## ARCH INSURANCE COMPANY

Named Insured   ROUGH BROTHERS, INC.

Effective Date:   04-01-18
12:01 A.M., Standard Time

Agent Name   MARSH USA INC. NJ

Agent No.   00312

COMMON POLICY FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| 00 ML0065 00 | 06-07 | U.S. TREASURY DEPARTMENT'S OFFICE |
| 05 ML0002 00 | 12-14 | ARCH INSURANCE GROUP SIGNATURE PAGE |
| IL 09 85 | 01-15 | DISCLOSURE PURSUANT/TERROR RISK INS ACT |
| FAIC-SKLBUS-CPD | 06-01 | COMMON POLICY DECLARATIONS |
| FAIC-SKLBUS-FE | 06-01 | SCHEDULE OF FORMS AND ENDORSEMENTS |
| FAIC-SKLBUS-SN1 | 06-01 | SCHEDULE OF NAMED INSURED(S) |
| IL 00 17 | 11-98 | COMMON POLICY CONDITIONS |
| IL 00 23 | 07-02 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDT |
| IL 02 44 | 09-07 | OHIO CHANGES-CANC & NONRENEWAL |
| IL 02 68 | 01-14 | NEW YORK CHANGES-CANC & NONRENEL |
| 00 ML0087 00 | 11-10 | NOTICE OF CANC - SPECIFIED DAYS |

GENERAL LIABILITY FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| FAIC-SKLBUS-CGLDEC | 06-01 | COMM GENERAL LIABILITY COVERAGE SUPP DEC |
| 00 GL0045 00 | 12-03 | GENERAL LIABILITY ASBESTOS EXCLUSION |
| 00GL035600 | 10-11 | CGL DEDUCTIBLE ENDORSEMENT |
| 00 GL0469 00 | 06-08 | AMENDED DUTIES IN THE EVENT OF |
| 00 GL0471 00 | 06-08 | EMPLOYEE BENEFITS LIABILITY COVERAGE |
| 00 GL0474 00 | 06-08 | ANTI STACKING ENDORSEMENT |
| 00 GL0477 00 | 06-08 | PREMIUM COMPUTATION ENDORSEMENT |
| 00 GL0588 00 | 04-10 | BODILY INJURY DEFINITION EXTENSION ENDT |
| 00 GL0590 00 | 04-10 | FELLOW EMPLOYEE COVERAGE ENDORSEMENT |
| 00 GL0592 00 | 04-10 | DESIGNATED ENTITY EXCLUSION ENDORSEMENT |
| 00 GL0593 00 | 04-10 | INCIDENTAL MED MALPRACTICE LIAB COV ENDT |
| 00 GL0598 00 | 04-10 | PRIMARY AND NONCONTRIBUTING INSURANCE |
| 00 GL0599 00 | 04-10 | BI OR PD EXPECTED OR INTENDED END |
| 00 GL0600 00 | 04-10 | NON-OWNED WATERCRAFT EXTENSION END |
| 00 GL0739 00 | 02-13 | PER LOCATION OR PER PROJECT AGGREGATE LI |
| CG 00 01 | 04-13 | COMMERCIAL GENERAL LIABILITY COV FORM |
| CG 01 63 | 07-11 | NY CHANGES-COMM GEN LIAB COV FORM |
| CG 01 04 | 12-04 | NEW YORK CHANGES - PREMIUM AUDIT |
| 00 GL0480 00 | 06-14 | BROAD FORM NAMED INSURED ENDORSEMENT |
| CG 02 24 | 10-93 | EARLIER NOTICE OF CANC PROVIDED BY US |
| CG 20 10 | 04-13 | ADDL INSD - OWNERS/LESSEES/CONTRACTORS |
| CG 20 11 | 04-13 | ADDL INSD-MANAGERS/LESSORS OF PREMISES |
| CG 20 15 | 04-13 | ADDL INSD-VENDORS |
| CG 20 26 | 04-13 | ADDL INSD-DESIGNATED PERSON/ORGANIZATION |
| CG 20 28 | 04-13 | ADDL INSD-LESSOR OF LEASED EQUIPMENT |
| CG 20 37 | 04-13 | ADDL INSD-OWNERS/LESSEES/CONTR-COMP OPS |
| CG 21 06 | 05-14 | EXCL-ACC/DISCL OF CONFI OR PERSONAL INFO |
| CG 21 33 | 11-85 | EXCL-DESIGNATED PRODUCTS |

**FAIC-SKLBUS-FE (6/01)**

**Policy Number**
**11GPP0510104**

**SCHEDULE OF FORMS AND ENDORSEMENTS**

# ARCH INSURANCE COMPANY

| Named Insured | ROUGH BROTHERS, INC. | Effective Date: 04-01-18 |
|---|---|---|
| | | 12:01 A.M., Standard Time |
| Agent Name | MARSH USA INC. NJ | Agent No.   00312 |

| | | |
|---|---|---|
| CG 21 47 | 07-98 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG 21 65 | 12-04 | TOTAL POLLUTION EXCL-WITH EXCEPTIONS |
| CG 21 70 | 01-15 | CAP LOSSES FROM CERTIF ACTS OF TERRORISM |
| CG 22 43 | 04-13 | EXCL-ENGINEERS, ARCH OR SURV (PROF LIAB) |
| CG 22 74 | 10-01 | LIMITED CONTR LIABILITY COV FOR PERS/ADV |
| CG 24 04 | 05-09 | WAIVER OF TRANSFER RIGHTS OF RECOVERY |
| CG 26 21 | 10-91 | NY CHANGES - TRANSFER OF DUTIES |
| CG 26 36 | 12-93 | NY CHANGES - TRANSFER OF DUTIES |

FAIC-SKLBUS-FE (6/01)

**Policy Number**
**11GPP0510104**

SCHEDULE OF NAMED INSURED(S)

# ARCH INSURANCE COMPANY

Named Insured   ROUGH BROTHERS, INC.

Effective Date:  04-01-18
12:01 A.M., Standard Time

Agent Name   MARSH USA INC. NJ

Agent No.   00312

FAIC-SKLBUS-CPD   (cont.)

THE NAMED INSURED ON FORM FAIC-SKLBUS-CPD IS AMENDED TO READ:

ROUGH BROTHERS, INC.
DELTA T SOLUTIONS, INC.
GIBRALTAR INDUSTRIES HOLDING COMPANY (UK) LIMITED
NEXUS CORPORATION
RBI SOLAR BRAZIL LTDA
RBI SOLAR INC.
RBI SOLAR KK (JAPAN)
RENUSOL AMERICA, INC.
RENUSOL GMBH
ROUGH BROTHERS CONSTRUCTION, INC.
ROUGH BROTHERS GREENHOUSE MANUFACTURING (SHANGHAI)
CO., LTD.
ROUGH BROTHERS HOLDING CO., INC.
ROUGH BROTHERS MANUFACTURING INC.

FAIC-SKLBUS-SNI (6/01)

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

 Copyright, Insurance Services Office, Inc., 1998 ☐

IL 00 23 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF
TRANSPORTATION

1. The insurance does not apply:

    A. Under any Liability Coverage, to "bodily injury" or "property damage":

       (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

       (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

    C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

       (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

       (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

       (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

    "Hazardous properties" includes radioactive, toxic or explosive properties.

    "Nuclear material" means "source material", "Special nuclear material" or "by-product material".

© ISO Properties, Inc., 2001

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2001 IL 00 23 07 02 □

IL 02 44 09 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OHIO CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** With respect to a policy which has been in effect for more than 90 days, or is a renewal of a policy we issued, the **Cancellation** Common Policy Condition is replaced by the following:

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy only for one or more of the following reasons, except as provided in Paragraph **6.** below:

    **a.** Nonpayment of premium;

    **b.** Discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted thereunder;

    **c.** Discovery of a moral hazard or willful or reckless acts or omissions on your part which increases any hazard insured against;

    **d.** The occurrence of a change in the individual risk which substantially increases any hazard insured against after the insurance coverage has been issued or renewed except to the extent the insurer could reasonably have foreseen the change or contemplated the risk in writing the contract;

    **e.** Loss of applicable reinsurance or a substantial decrease in applicable reinsurance, if the Superintendent has determined that reasonable efforts have been made to prevent the loss of, or substantial decrease in, the applicable reinsurance, or to obtain replacement coverage;

    **f.** Failure of an insured to correct material violations of safety codes or to comply with reasonable written loss control recommendations; or

    **g.** A determination by the Superintendent of Insurance that the continuation of the policy would create a condition that would be hazardous to the policyholders or the public.

**3.** We will mail written notice of cancellation to the first Named Insured, and agent if any, at the last mailing addresses known to us. Proof of mailing will be sufficient proof of notice.

**4.** We will mail the notice of cancellation at least:

    **a.** 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

    **b.** 30 days before the effective date of cancellation, if we cancel for a reason stated in **2.b.** through **2.g.** above.

IL 02 44 09 07         © ISO Properties, Inc., 2006         Page 1 of 2    □

5. The notice of cancellation will:

   a. State the effective date of cancellation. The policy period will end on that date.

   b. Contain the date of the notice and the policy number, and will state the reason for cancellation.

6. Policies written for a term of more than one year or on a continuous basis may be cancelled by us for any reason at an anniversary date, upon 30 days' written notice of cancellation.

7. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

B. The following is added to the Common Policy Conditions and supersedes any provisions to the contrary:

**NONRENEWAL**

1. If we elect not to renew this policy, we will mail written notice of nonrenewal to the first Named Insured, and agent if any, at the last mailing addresses known to us. The notice will contain the date of the notice and the policy number, and will state the expiration date of the policy.

2. We will mail the notice of nonrenewal at least 30 days before the expiration date of the policy.

3. Proof of mailing will be sufficient proof of notice.

C. **Common Policy Conditions**

1. Paragraph **A.2.a.** of the **Businessowners** Common Policy Conditions is deleted.

2. Paragraph **E.2.** of the **Cancellation** Common Policy Condition in the Standard Property Policy is deleted. Paragraph **E.2.** is replaced by the following (unless Item **A.** of this endorsement applies):

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

   b. 30 days before the effective date, if we cancel for any other reason.

 © ISO Properties, Inc., 2006 IL 02 44 09 07 □

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

IL 02 68 01 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraphs **1.**, **2.**, **3.** and **5.** of the **Cancellation Common Policy Condition** are replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

2. **Cancellation Of Policies In Effect**

   a. **60 Days Or Less**

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   (1) 30 days before the effective date of cancellation if we cancel for any reason not included in Paragraph **A.2.b.** below.

   (2) 15 days before the effective date of cancellation if we cancel for any of the reasons included in Paragraph **A.2.b.** below.

   b. **For More Than 60 Days**

   If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed below, provided we mail the first Named Insured written notice at least 15 days before the effective date of cancellation:

   (1) Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

(2) Conviction of a crime arising out of acts increasing the hazard insured against;

(3) Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim;

(4) After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

(5) Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, which results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

(6) Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

IL 02 68 01 14 © Insurance Services Office, Inc., 2013 Page 1 of 5

(7) A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

(8) Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Department of Financial Services, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Department of Financial Services.

**3.** We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the policy and to the authorized agent or broker.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7.** If one of the reasons for cancellation in Paragraph **A.2.b.** or **D.2.b.(2)** exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

**C.** The following conditions are added:

**1. Nonrenewal**

If we decide not to renew this policy we will send notice as provided in Paragraph **C.3.** below.

**2. Conditional Renewal**

If we conditionally renew this policy subject to:

**a.** A change of limits;

**b.** A change in type of coverage;

**c.** A reduction of coverage;

**d.** An increased deductible;

**e.** An addition of exclusion; or

**f.** Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in Paragraph **C.3.** below.

**3. Notices Of Nonrenewal And Conditional Renewal**

**a.** If we decide not to renew this policy or to conditionally renew this policy as provided in Paragraphs **C.1.** and **C.2.** above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 60 but not more than 120 days before:

(1) The expiration date; or

(2) The anniversary date if this is a continuous policy.

**b.** Notice will be mailed or delivered to the first Named Insured at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

**c.** Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

**d.** If we violate any of the provisions of Paragraph **C.3.a., b.** or **c.** above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

(1) And if notice is provided prior to the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60-day period, has replaced the coverage or elects to cancel;

---

© Insurance Services Office, Inc., 2013 IL 02 68 01 14

(2) And if the notice is provided on or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy for another policy period, at the lower of the current rates or the prior period's rates, unless the first Named Insured, during this additional policy period, has replaced the coverage or elects to cancel.

e. If you elect to renew on the basis of a late conditional renewal notice, the terms, conditions and rates set forth in such notice shall apply:

(1) Upon expiration of the 60-day period, unless Subparagraph (2) below applies; or

(2) Notwithstanding the provisions in Paragraphs d.(1) and d.(2), as of the renewal date of the policy if the conditional renewal notice was sent at least 30 days prior to the expiration or anniversary date of the policy.

f. We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the policy has been replaced or is no longer desired.

D. The following provisions apply when the Commercial Property Coverage Part, the Farm Coverage Part or the Capital Assets Program (Output Policy) Coverage Part is made a part of this policy:

1. Items D.2. and D.3. apply if this policy meets the following conditions:

a. The policy is issued or issued for delivery in New York State covering property located in this state; and

b. The policy insures:

(1) For loss of or damage to structures, other than hotels or motels, used predominantly for residential purposes and consisting of no more than four dwelling units; or

(2) For loss of or damage to personal property other than farm personal property or business property; or

(3) Against damages arising from liability for loss of, damage to or injury to persons or property, except liability arising from business or farming; and

c. The portion of the annual premium attributable to the property and contingencies described in 1.b. exceeds the portion applicable to other property and contingencies.

2. Paragraph 2. of the Cancellation Common Policy Condition is replaced by the following:

2. Procedure And Reasons For Cancellation

a. We may cancel this entire policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 15 days before the effective date of cancellation if we cancel for nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

b. But if this policy:

(1) Has been in effect for more than 60 days; or

(2) Is a renewal of a policy we issued;

we may cancel this policy only for one or more of the following reasons:

(1) Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

(2) Conviction of a crime arising out of acts increasing the risk of loss;

(3) Discovery of fraud or material misrepresentation in obtaining the policy or in making a claim;

(4) Discovery of willful or reckless acts or omissions increasing the risk of loss;

(5) Physical changes in the covered property that make that property uninsurable in accordance with our objective and uniformly applied underwriting standards in effect when we:

(a) Issued the policy; or

(b) Last voluntarily renewed the policy;

(6) The Superintendent of Financial Services' determination that continuing the policy would violate Chapter 28 of the Insurance Law; or

(7) Required pursuant to a determination by the Superintendent of Financial Services that the continuation of our present premium volume would be hazardous to the interests of our policyholders, our creditors or the public.

3. The following are added:

**a. Conditional Continuation**

Instead of cancelling this policy, we may continue it on the condition that:

(1) The policy limits be changed; or

(2) Any coverage not required by law be eliminated.

If this policy is conditionally continued, we will mail or deliver to the first Named Insured written notice at least 20 days before the effective date of the change or elimination. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**b. Nonrenewal**

If, as allowed by the laws of New York State, we:

(1) Do not renew this policy; or

(2) Condition policy renewal upon:

(a) Change of limits; or

(b) Elimination of coverage;

we will mail or deliver written notice of nonrenewal or conditional renewal:

(a) At least 45 days; but

(b) Not more than 60 days;

before the expiration date of the policy. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

E. The following is added to the Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions, the Commercial Property Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

When the property is subject to the Anti-arson Application in accordance with New York Department of Financial Services' Insurance Regulation No. 96, the following provisions are added:

If you fail to return the completed, signed and affirmed anti-arson application to us:

1. Or our broker or agent within 45 days of the effective date of a new policy, we will cancel the entire policy by giving 20 days' written notice to you and to the mortgageholder shown in the Declarations.

2. Before the expiration date of any policy, we will cancel the policy by giving written notice to you and to the mortgageholder shown in the Declarations at least 15 days before the effective date of cancellation.

The cancellation provisions set forth in **E.1.** and **E.2.** above supersede any contrary provisions in this policy including this endorsement.

If the notice in **E.1.** or **E.2.** above is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

F. The following applies to the Commercial Property Coverage Part, the Farm Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

Paragraphs f. and g. of the **Mortgageholders** Condition are replaced by the following:

**f. Cancellation**

(1) If we cancel this policy, we will give written notice to the mortgageholder at least:

(a) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(b) 30 days before the effective date of cancellation if we cancel for any other reason.

 © Insurance Services Office, Inc., 2013 IL 02 68 01 14

(2) If you cancel this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, cancellation will become effective on the later of:

    (a) The effective date of cancellation of the insured's coverage; or

    (b) 10 days after we give notice to the mortgageholder.

g. **Nonrenewal**

(1) If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

(2) If you elect not to renew this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, nonrenewal will become effective on the later of:

    (a) The expiration date of the policy; or

    (b) 10 days after we give notice to the mortgageholder.

**G.** The following provisions apply when the following are made a part of this policy:

Commercial General Liability Coverage Part

Employment-Related Practices Liability Coverage Part

Farm Liability Coverage Form

Liquor Liability Coverage Part

Products/Completed Operations Liability Coverage Part

1. The aggregate limits of this policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraph **C.3.d.** above.

2. The last sentence of Limits Of Insurance does not apply when the policy period is extended because we sent the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NOTICE OF CANCELLATION – CERTIFICATE HOLDERS
## (SPECIFIED DAYS)

The person(s) or organization(s) listed or described in the Schedule below have requested that they receive written notice of cancellation when this policy is cancelled by us. We will mail or deliver to the Person(s) or Organization(s) listed or described in the Schedule a copy of the written notice of cancellation that we sent to you. If possible, such copies of the notice will be mailed at least **30** days, except for cancellation for non-payment of premium which will be mailed 10 days, prior to the effective date of the cancellation, to the address or addresses of certificate holders as provided by your broker or agent.

**Schedule**

Person(s) or Organization(s) including mailing address:

All certificate holders where written notice of the cancellation of this policy is required by written contract, permit or agreement with the Named Insured and whose names and addresses will be provided by the broker or agent listed in the Declarations Page of this policy for the purposes of complying with such request.

This notification of cancellation of the policy is intended as a courtesy only. Our failure to provide such notification to the person(s) or organization(s) shown in the Schedule will not extend any policy cancellation date nor impact or negate any cancellation of the policy. This endorsement does not entitle the person(s) or organization(s) listed or described in the Schedule above to any benefit, rights or protection under this policy.

Any provision of this endorsement that is in conflict with a statute or rule is hereby amended to conform to that statute or rule.

All other terms and conditions of this policy remain unchanged.
Endorsement Number:

Policy Number: 11GPP051.0104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-18

00 ML0087 00 11 10                                                          Page 1 of 1

**Policy Number**
**11GPP0510104**

### COMMERCIAL GENERAL LIABILITY COVERAGE PART
SUPPLEMENTAL DECLARATIONS
# ARCH INSURANCE COMPANY

Named Insured   ROUGH BROTHERS, INC.

Effective Date:   04-01-18
12:01 A.M., Standard Time

Agent Name   MARSH USA INC. NJ

Agent No.   00312

**Item 1.** Business Description:

**Item 2.** Limits of Insurance

| Coverage | | Limit of Liability | |
|---|---|---|---|
| Aggregate Limits of Liability | $ | 2,000,000 | Products/Completed Operations Aggregate |
| | $ | 2,000,000 | General Aggregate (other than Products/Completed Operations) |
| Coverage A - Bodily Injury and Property Damage Liability | $ | 1,500,000 | any one occurrence subject to the Products/Completed Operations and General Aggregate Limits of Liability |
| Damage To Premises Rented To You | $ | 1,500,000 | any one premises subject to the Coverage A occurrence and the General Aggregate Limits of Liability |
| Coverage B - Personal and Advertising Injury Liability | $ | 1,500,000 | any one person or organization subject to the General Aggregate Limits of Liability |
| Coverage C - Medical Payments | $ | 5,000 | any one person subject to the Coverage A occurrence and the General Aggregate Limits of Liability |

**Item 3.** Retroactive Date

Coverage A of this insurance does not apply to "bodily injury" or "property damage" which occurs before the

Retroactive Date, if any, shown here: _____

(Enter Date or "None" if no Retroactive Date applies)

**Item 4.** Form of Business and Location of Premises

Forms of Business: CORPORATION
Location of All Premises You Own, Rent or Occupy:
   **See Schedule of Locations**

**Item 5.** Forms and Endorsements

Form(s) and Endorsement(s) made a part of this policy at time of issue:
   **See Schedule of Forms and Endorsements**

**Item 6.** Premiums

| | | |
|---|---|---|
| Coverage Part Premium: | $ | 54,113.00 |
| Other Premium: | | |
| Total Premium: | $ | 54,113.00 |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.
**FAIC-SKLBUS-CGLDEC (6/01)**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

**ASBESTOS EXCLUSION**

This policy does not apply to:

Any claim, "suit," demand or loss that alleges "bodily injury," "property damage," or "personal and advertising injury," (including but not limited to, compliance with any request, demand, order, or statutory or regulatory requirement or any other action authorized or required by law) including any costs, fees, expenses, penalties, judgments, fines, or sanctions arising there from, which arises out of, or would not have occurred, in whole or in part, but for the "asbestos hazard."

As used in this exclusion, "asbestos hazard" means:

(1)     actual, alleged or threatened exposure to asbestos in any manner or form whatsoever, either directly or indirectly, or

(2)     the failure to warn, advise or instruct related to asbestos in any manner or form whatsoever, or

(3)     the failure to prevent exposure to asbestos in any manner or form whatsoever, or

(4)     the presence of asbestos in any place whatsoever, whether or not within a building or structure.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

Endorsement Effective Date:

00 GL0045 00 12 03                                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**COMMERCIAL GENERAL LIABILITY DEDUCTIBLE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**PRODUCTS AND COMPLETED OPERATIONS LIABILITY COVERAGE FORM**
**LIQUOR LIABILITY COVERAGE FORM**
**EMPLOYEE BENEFITS LIABILITY COVERAGE FORM**
**PROFESSIONAL LIABILITY COVERAGE FORM**

<u>Schedule</u>

An "X" in the table below indicates how a Deductible(s) applies to your policy or coverage form:

| Indicate below | Coverage | Deductible Amount | Each Occurrence | Per Claim |
|---|---|---|---|---|
| [X] | Bodily Injury Liability and Property Damage Liability* | $ 500,000 | [X] | [ ] |
| [ ] | Bodily Injury Liability and Property Damage Liability* — Other than Products - Completed Operations | | [ ] | [ ] |
| [ ] | Bodily Injury Liability and Property Damage Liability* — Products - Completed Operations | | [ ] | [ ] |
| [ ] | Personal and Advertising Injury | | Each Person or Organization | |
| [X] | Employee Benefits Liability | $ 500,000 | Each Employee | |
| [ ] | Liquor Liability | | [ ] Per Common Cause | [ ] Per Claim |
| [X] | Other: DAMAGES TO PREMISES RENTED TO YOU | $ 500,000 | | |
| [ ] | Other: | | | |

**Deductible Aggregate:**

*Medical Payments: Included [X] Excluded [ ]

**A. DEDUCTIBLE**

Our obligation to pay damages, costs, benefits, or medical payments, subject to the Limit of Insurance as shown in the Declarations, will be reduced by the **Deductible** shown in the Schedule. Our Limit of Insurance includes, and is not in addition to, the **Deductible**. This deductible cannot be satisfied by the payment of any other deductible as required by any other insurance issued by us or any other carrier that may also apply to our obligation to pay damages, costs, benefits or medical payments.

**B.** **DEDUCTIBLE AGGREGATE** (this provision applies only if an amount is shown as the **Deductible Aggregate** in the Schedule)

Subject to the applicable Limit of Insurance and related policy provisions, we will pay for all damages, costs, benefits, or medical payments payable under the policy without reduction by the **Deductible** when, as a result of the application of the **Deductibles** to damages, costs, benefits, or medical payments payable under the policy, the sum of all **Deductibles** paid by you exceeds the amount shown in the Schedule as the **Deductible Aggregate**.

If the policy period is longer than one year, the **Deductible Aggregate** amount applies separately to each policy year. Each policy year begins with the inception or anniversary date of the policy and ends at the earlier of the next anniversary date or the expiration of the policy.

The **Deductible Aggregate** amount shown above is not subject to adjustment unless a basis of adjustment is shown below.

The **Deductible Aggregate** is adjustable at the rate of           per however the minimum amount of the aggregate deductible will be no less than the **Deductible Aggregate** amount shown above.

The adjustment basis is          and is estimated at the inception of this policy as the amount of       .

If any payments are made by us under this policy for damages or "Allocated Loss Adjustment Expenses", the Deductible(s) shown in this endorsement applies regardless of whether any other policies issued by us or any other carrier also apply.

**C.** **ALLOCATED LOSS ADJUSTMENT EXPENSES**

You must reimburse us for "Allocated Loss Adjustment Expenses" incurred by us as part of Supplementary Payments in defending a claim or "suit" as indicated by one of the options below:

[X] 1. Option I – "Allocated Loss Adjustment Expenses" Are Included In The **Deductible** Shown In The Schedule. Your total reimbursement for damages, costs, benefits, medical payments and "Allocated Loss Adjustment Expenses" combined shall not exceed the **Deductible** shown in the Schedule.

[ ] 2. Option II – "Allocated Loss Adjustment Expenses" Are Payable In Addition To The **Deductible** Shown In The Schedule On A Shared Basis. The portion of "Allocated Loss Adjustment Expenses" that you must pay will be calculated by dividing the smaller of: (a) the **Deductible** shown in the Schedule; or (b) the damages, costs, benefits, and medical payments we pay; by (c) the damages, costs, benefits, and medical payments we pay.

If we pay no damages, costs, benefits, and medical payment, you must reimburse us for all "Allocated Loss Adjustment Expenses" up to the **Deductible** shown in the Schedule and _____ % (if no amount is shown, 50% will apply) of all remaining "Allocated Loss Adjustment Expenses". Your combined reimbursement for damages, costs, benefits, medical payments and "Allocated Loss Adjustment Expenses" under this option may exceed the **Deductible** shown in the Schedule.

[ ] 3. Option III – "Allocated Loss Adjustment Expenses" Are Payable In Addition To The **Deductible** Shown In The Schedule And Are Your Full Responsibility. You must pay all "Allocated Loss Adjustment Expenses" attributed to all damages, costs, benefits, and medical payments paid by us. Your total reimbursement for damages, costs, benefits, medical payments and "Allocated Loss Adjustment Expenses" under this option may exceed the **Deductible** shown in the Schedule.

00 GL0356 00 10 11             Page 2 of 3

4. Option IV - "Allocated Loss Adjustment Expenses" Are Payable By Us. We will pay all "Allocated Loss Adjustment Expenses" attributed to all damages, costs, benefits, and medical payments paid by us.

Your obligation to reimburse us for "Allocated Loss Adjustment Expense" applies separately to each occurrence, claim, "employee", common cause or person or organization.

"Allocated Loss Adjustment Expenses" means such claim adjustment expenses directly allocated by us to a particular claim. Such expenses shall include, but not be limited to, attorney's fees for claims in suit; court costs; pre- and post judgment interest; undercover operatives and detective services; employing experts; medical examination, medical cost containment expenses, laboratory, x-ray, and autopsy; stenographic, witnesses, summons, and copies of documents and transcripts; or expenses reasonably chargeable to the investigation, negotiation, settlement or defense of any claim or "suit" against you or for the protection and perfection of your or our subrogation rights.

"Allocated Loss Adjustment Expenses" does not include our general overhead, the salary and benefits of any our "employees", nor the fees of any attorney who is our "employee" or under our permanent retainer; nor the fees of any attorney we retain to provide counsel to us about our obligations, if any, under any policy issued by us with respect to a claim or "suit" against you.

**D.    OUR RIGHT TO REIMBURSEMENT**

When we pay all or any part of any **Deductible** shown in the Schedule, you must promptly reimburse us for: a) the **Deductible** or the part of the **Deductible** paid by us, and b) all "Allocated Loss Adjustment Expenses" incurred by us in defending a claim or "suit" according to the option selected in Section **C.**, above.

If we require collateral or other security to secure the **Deductible** and other obligations under this Commercial General Liability Deductible Endorsement, you shall provide such collateral or other security in an amount and form as we may determine.

Upon notification of payment by us, you will promptly reimburse us for any such amounts that we have paid. If you fail to reimburse us, or fail to provide us with any security or collateral in an amount or form as we may require, we may treat such failure as non-payment of premium and we may, at our option, cancel this policy by mailing or delivering to you advance written notice in accordance with the CANCELLATION Common Policy Condition. Any resulting return premium may be applied to the reimbursement amounts due.

We may mutually agree upon a final payment amount to satisfy your present and future payment obligations under this Commercial General Liability Deductible Endorsement. Payment by you of such amount will end your obligations to make payments to us under this endorsement.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-18

00 GL0356 00 10 11                                                                                                  Page 3 of 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMENDED DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT AND REPRESENTATIONS CONDITIONS ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

1. Under **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**, Condition **2. Duties in the Event of Occurrence, Claim or Suit** is amended by the addition of the following paragraphs:

   e. It is agreed that where you report an "occurrence" to an insurer providing other than Commercial General Liability insurance, which later develops into a General Liability claim covered under this policy, failure to report such "occurrence" to us at the time of the "occurrence" shall not be deemed in violation of these conditions. However, you shall give immediate notification of the "occurrence" to us, as soon as it is reasonably possible that the "occurrence" is a General Liability claim.

   f. It is agreed that knowledge of an "occurrence" by any of your agents, servants or "employees" shall not constitute knowledge by you unless one of your "executive officers" or anyone responsible for administering your insurance program has received such notice from the agent, servant or "employee".

2. If Employee Benefits Liability Coverage applies to this policy, the following shall apply:

   Under **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** as amended by the Employee Benefits Liability Coverage, Condition **2. Duties In The Event Of An Act, Error Or Omission, "Claim" or "Suit"** is amended by the addition of the following paragraphs:

   f. It is agreed that where you report an act, error or omission to an insurer providing other than Commercial General Liability insurance, which later develops into a General Liability claim covered under this policy, failure to report such act, error or omission to us at the time of the act, error or omission shall not be deemed in violation of these conditions. However, you shall give immediate notification of the act, error or omission to us, as soon as it is reasonably possible that the act, error or omission is a General Liability claim.

   g. It is agreed that knowledge of an act, error or omission by any of your agents, servants or "employees" shall not constitute knowledge by you unless one of your "executive officers" or anyone responsible for administering your insurance program has received such notice from the agent, servant or "employee".

3. Under **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**, Condition **6. Representations** is amended by the addition of the following paragraph:

   d. Your failure to disclose all hazards existing as of the inception date of the policy shall not prejudice you with respect to the coverage afforded by this policy, provided such failure or omission is not intentional or grossly negligent.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-18

00 GL 0469 00 06 08                                                                                                    Page 2 of 2

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EMPLOYEE BENEFITS LIABILITY COVERAGE**

**THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE.**
**PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**SCHEDULE**

| Coverage | Limit Of Insurance | | Self Insured Retention | Premium |
|---|---|---|---|---|
| Employee Benefits Programs | $ 1,000,000 | each employee | $ 500,000 each employee | $ INCL |
| | $ 2,000,000 | aggregate | | |
| Retroactive Date: | 8/1/2015 | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | |

A.  The following is added to Section I – Coverages:

  **COVERAGE – EMPLOYEE BENEFITS LIABILITY**

  1.  **Insuring Agreement**

    a.  We will pay those sums in excess of the Self Insured Retention that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

      (1)  The amount we will pay for damages is limited as described in Paragraph **D.** (Section III – Limits Of Insurance); and

      2)  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

    b.  This insurance applies to damages only if:

      (1)  The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

      (2)  The act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

00 GL0471 00 06 08                                                                                     Page 1 of 9

    (3)    A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with Paragraph c. below, during the policy period or an Extended Reporting Period we provide under Paragraph F. of this endorsement.

  c.    A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

    (1)    When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

    (2)    When we make settlement in accordance with Paragraph 1.a. above.

A "claim" received and recorded by the insured within 60 days after the end of the policy period will be considered to have been received within the policy period, if no subsequent policy is available to cover the claim.

  d.    All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

**2.    Exclusions**

This insurance does not apply to:

  **a.    Dishonest, Fraudulent, Criminal Or Malicious Act**

    Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

  **b.    Bodily Injury, Property Damage, Or Personal And Advertising Injury**

    "Bodily injury", "property damage" or "personal and advertising injury".

  **c.    Failure To Perform A Contract**

    Damages arising out of failure of performance of contract by any insurer.

  **d.    Insufficiency Of Funds**

    Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

  **e.    Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation**

    Any "claim" based upon:

    (1)    Failure of any investment to perform;

    (2)    Errors in providing information on past performance of investment vehicles; or

(3)    Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**f.**    **Workers' Compensation And Similar Laws**

Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**g.**    **ERISA**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**h.**    **Available Benefits**

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**i.**    **Taxes, Fines Or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**j.**    **Employment-Related Practices**

Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

**B.**    For the purposes of the coverage provided by this endorsement:

**1.**    All references to Supplementary Payments — Coverages A and B are replaced by Supplementary Payments – Coverages A, B and **Employee Benefits Liability**.

**2.**    Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

**C.**    For the purposes of the coverage provided by this endorsement, Paragraphs **2.** and **3.** of **Section II – Who Is An Insured** are replaced by the following:

**2.**    Each of the following is also an insured:

**a.**    Each of your "employees" who is or was authorized to administer your "employee benefit program".

**b.**    Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

**c.**    Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However:

    a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

    b. Coverage under this provision does not apply to any act, error or omission that was committed before you acquired or formed the organization.

**D.** For the purposes of the coverage provided by this endorsement, **Section III – Limits Of Insurance** is replaced by the following:

**1. Limits Of Insurance**

    a. The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

        (1) Insureds;

        (2) "Claims" made or "suits" brought;

        (3) Persons or organizations making "claims" or bringing "suits";

        (4) Acts, errors or omissions; or

        (5) Benefits included in your "employee benefit program".

    We shall only be liable for losses covered under the Policy up to the Limits of Insurance in excess of the Self Insured Retention listed in the Schedule above, whether or not such Self Insured Retention is recoverable or collectible.

    b. The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

    c. Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

        (1) An act, error or omission; or

        (2) A series of related acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

    However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

    The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this

endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

2. **Self Insured Retention**

   a. Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of any Self Insured Retention amount stated in the Schedule as applicable to Each Employee.

   b. The Self Insured Retention amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

   c. The terms of this insurance, including those with respect to:

      (1 Our right and duty to defend any "suits" seeking those damages; and

      (2) Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim" apply.

E. For the purposes of the coverage provided by this endorsement, Conditions 2. and 4. of **Section IV – Commercial General Liability Conditions** are replaced by the following:

   2. **Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

      a. You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim" either within the Self Insured Retention amount or the Limits of Insurance. To the extent possible, notice should include:

         (1) What the act, error or omission was and when it occurred; and

         (2) The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

      b. If a "claim" is made or "suit" is brought against any insured, you must:

         (1) Immediately record the specifics of the "claim" or "suit" and the date received; and

         (2) Notify us as soon as practicable.

         You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

      c. You shall be responsible for the investigation, defense and settlement of any "claim" or "suit" for damages within the Self Insured Retention. You shall exercise utmost good faith, diligence and prudence to settle all "claims" and "suits" within the Self Insured Retention.

         We shall have the right but not the duty to participate with you at our own expense in the defense or settlement of any "claim" or "suit" seeking damages covered under the Policy. In the event of a "claim" or "suit" which in our reasonable judgment may result

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

in payments in an amount in excess of the Self Insured Retention, we may, at our sole discretion, assume control of the defense or settlement of such "claim" or "suit". You will continue to be responsible for the payment of the Self Insured Retention.

d.    You and any other involved insured must:

    (1)    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

    (2)    Authorize us to obtain records and other information;

    (3)    Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

    (4)    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

e.    No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**4.**    **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

a.    **Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

b.    **Excess Insurance**

    (1)    This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this Insurance and that applies to an act, error or omission on other than a claims-made basis, if:

        (a)    No Retroactive Date is shown in the Schedule of this insurance; or

        (b)    The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

    (2)    When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

    (3)    When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

    (4)   We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

  **c.**  **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance of all insurers.

**F.**  For the purposes of the coverage provided by this endorsement, the following Extended Reporting Period provisions are added, or, if this endorsement is attached to a claims-made Coverage Part, replaces any similar Section in that Coverage Part:

**EXTENDED REPORTING PERIOD**

**1.**  You will have the right to purchase an Extended Reporting Period, as described below, if:

  **a.**  This endorsement is canceled or not renewed; or

  **b.**  We renew or replace this endorsement with insurance that:

    (1)   Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

    (2)   Does not apply to an act, error or omission on a claims-made basis.

**2.**  The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to "claims" for acts, errors or omissions that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be canceled.

**3.**  An Extended Reporting Period of five years is available, but only by an endorsement and for an extra charge.

You must give us a written request for the endorsement within 60 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

  **a.**  The "employee benefit programs" insured;

  **b.**  Previous types and amounts of insurance;

  **c.**  Limits of insurance available under this endorsement for future payment of damages; and

    d.    Other related factors.

The additional premium will not exceed 100% of the annual premium for this endorsement.

The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

**4.** If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for claims first received and recorded during the Extended Reporting Period.

The extended reporting period aggregate limit of insurance will be equal to the dollar amount shown in the Schedule of this endorsement under Limits of Insurance.

Paragraph **D.1.b.** of this endorsement will be amended accordingly. The Each Employee Limit shown in the Schedule will then continue to apply as set forth in Paragraph **D.1.c.**

**G.** For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions Section:**

**1.** "Administration" means:

    a.    Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    b.    Handling records in connection with the "employee benefit program"; or

    c.    Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

However, "administration" does not include handling payroll deductions.

**2.** "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

**3.** "Claim" means any demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

**4.** "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

    a.    Group life insurance, group accident or health insurance, dental, vision and hearing plans, and flexible spending accounts, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

    b.    Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

c. Unemployment insurance, social security benefits, workers' compensation and disability benefits;

d. Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

e. Any other similar benefits designated in the Schedule or added thereto by endorsement.

H. For the purposes of the coverage provided by this endorsement, Definitions 5.and 18. in the **Definitions** Section are replaced by the following:

5. "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

18. "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-18

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ANTI STACKING ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**EMPLOYEE BENEFITS LIABILITY COVERAGE**
**LIQUOR LIABILITY COVERAGE FORM**
**STOP GAP - EMPLOYERS LIABILITY COVERAGE ENDORSEMENT**

Under **SECTION IV- COMMERCIAL GENERAL LIABILITY CONDITIONS** and **SECTION IV- LIQUOR LIABILITY CONDITIONS**, the following condition is added:

    **Two Or More Coverage Forms Or Policies Issued By Us**

    If any "occurrence" or offense covered under this policy is also covered in whole or in part under any other coverage form or policy issued to you by us (or by any of our related or affiliated companies) including but not limited to prior policies issued to you by us, (or by any of our related or affiliated companies), the most that will be paid under all such coverage forms and policies covering the "occurrence" or offense is the single highest applicable limit of liability of one of the policies which cover the "occurrence" or offense. This provision does not apply to policies written by us (or by any of our related or affiliated companies) as insurance that specifically applies in excess of this insurance.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-18

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PREMIUM COMPUTATION ENDORSEMENT**

This endorsement applies to the lines of business indicated below:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**EMPLOYEE BENEFITS LIABILITY COVERAGE**
**LIQUOR LIABILITY COVERAGE FORM**
**STOP GAP - EMPLOYERS LIABILITY COVERAGE ENDORSEMENT**

Your Premium will be calculated as follows:
1. Audit Period: 4/1/2018                                    through 4/1/2019
☒ Annual      ☐ Semi-Annual      ☐ Monthly      ☐ Other
Deposit Premium  $54,113

2.    The deposit premium set forth above is adjustable, and is only an estimated premium for the Audit Period shown in 1. above. The final earned premium for the Audit Period will be determined as specified in Condition **5. Premium Audit** of **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** and Condition **5. Premium Audit** of **SECTION IV – LIQUOR LIABILITY CONDITIONS**. The Audit Premium will be computed by applying the Composite Rate(s) against the Audited Exposure and Exposure Reporting Basis listed in the Premium Adjustment Table below. Such rates are prior to any applicable taxes, licenses or fees.

3.    Premium Adjustment Table

| LOB | Class Code | Class Description | Estimated Exposure | Exposure Reporting Basis | Composite Rate | Estimated Premium |
|-----|-----------|------------------|-------------------|-------------------------|----------------|-------------------|
| GL | 20350 | COMPOSITE RATE | 254,528,561 | REVENUE | .2126 | $54,113 |
|  |  |  |  | PER 1,000 |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-2018

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BODILY INJURY DEFINITION EXTENSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Under the:

1.  **COMMERCIAL GENERAL LIABILITY COVERAGE FORM SECTION V – DEFINITIONS,** Definition 3. "Bodily injury";

2.  **LIQUOR LIABILITY COVERAGE FORM SECTION V - DEFINITIONS,** Definition 1. "Bodily injury"; or

3.  **PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM SECTION V - DEFINITIONS,** Definition 2. "Bodily injury"

is deleted and replaced by the following definition:

> "Bodily injury" means physical injury, sickness or disease sustained by a person including death resulting from any of these. "Bodily injury" includes mental anguish, shock, or emotional distress when accompanied by physical injury, sickness or disease.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-18

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**FELLOW EMPLOYEE COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS / COMPLETED OPERATIONS LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM

**Under Section II — WHO IS AN INSURED**, paragraphs **2.a.(1)(a)**, **2.a(1)(b)** and **2.a(1)(c)** are deleted in their entirety.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-18

00 GL0590 00 04 10                                                                                   Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**DESIGNATED ENTITY EXCLUSION ENDORSEMENT**

This Endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

It is agreed that any insurance provided under the GENERAL LIABILITY COVERAG COVERAGE FORM does not apply to the following DESIGNATED ENTITY:

DESIGNATED ENTITY:

THE D.S. BROWN COMPANY AND SEISMIC ENERGY PRODUCTS, INC.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-2018

00 GL0592 00 04 10                                                               Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**INCIDENTAL MEDICAL MALPRACTICE LIABILITY COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

A.    **SECTION V – DEFINITIONS** is amended by the addition of the following definition:

"Incidental medical malpractice injury" means "bodily injury" arising out of the rendering of or failure to render the following services:

a.    Medical, surgical, dental, x-ray or nursing service or treatment or the furnishing of food or beverages in connection therewith, or

b.    The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

B.    Under Section II – WHO IS AN INSURED, Paragraph 2. a. (1)(d) is deleted in its entirety and replaced with the following:

d.    Arising out of his or her providing or failing to provide professional health care, except for "bodily injury" arising out of "incidental medical malpractice injury" by any physician, dentist, emergency medical technician, nurse or other medical practitioner employed or retained by you. However, the insurance provided hereunder to such persons will not apply to liability arising out of services performed outside of the scope of their duties as your "employees." Any series of continuous, repeated or related acts will be treated as the occurrence of a single negligent professional healthcare service.

The Coverage provided by this endorsement does not apply to you or any insured if you are engaged in the business or occupation of providing any of the services described in the definition of "incidental medical malpractice injury."

The Coverage provided by this endorsement will be excess over any other insurance available to you or any insured.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-2018

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PRIMARY AND NON CONTRIBUTING INSURANCE ENDORSEMENT –
DESIGNATED CONTRACT(S)**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

SCHEDULE

**Designated Contract(s): ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED
SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS.**

With respect to the contract(s) designated in the Schedule above, it is agreed that **SECTION IV-
COMMERCIAL GENERAL LIABILITY CONDITIONS,** Condition **4. Other Insurance, SECTION IV-
LIQUOR LIABILITY CONDITIONS,** Condition **4. Other Insurance** or **SECTION IV- PRODUCTS
/COMPLETED OPERATIONS LIABILITY,** Condition **4. Other Insurance** is amended by the addition of
the following paragraph:

**d.    Primary and Non Contributing Insurance – Designated Contract(s)**

Where you are specifically required by a written contract designated in the Schedule above to provide
insurance that is primary and non-contributory, and the written contract designated in the Schedule so
requiring is executed by you before any "occurrence", offense, or "injury" this insurance will be primary
and the other insurance will not contribute with this insurance, but only if and to the extent required by
that written contract.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:

00 GL0598 00 04 10                                                                         Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BODILY INJURY OR PROPERTY DAMAGE EXPECTED OR INTENDED ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, Exclusion 2.a. Expected or Intended Injury is deleted in its entirety and replaced by the following exclusion:

a.     **Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 4/1/2018

00 GL0599 00 04 10                                                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**NON-OWNED WATERCRAFT EXTENSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, Exclusion 2. **g.** **(2) (a)** is deleted in its entirety and replaced with the following:

    (a)    Less than 100 feet long.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 4/1/2018

00 GL0600 00 04 10                                              Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PER LOCATION OR PER PROJECT AGGREGATE LIMIT AND POLICY AGGREGATE LIMIT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**Schedule**

| | | |
|---|---|---|
| ☐ | Per Location Aggregate Limit: | |
| ☒ | Per Project Aggregate Limit: | $2,000,000 |
| | Policy Aggregate Limit: | $2,000,000 |

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by an "occurrence" under **SECTION I – COVERAGE A**, and for all medical expenses caused by accidents under **SECTION I – COVERAGE C**, which can be attributed only to ongoing operations at a single "location" or "project":

    **1.** A separate Per Location Aggregate Limit applies to each "location" you own or rent if there is an "X" in the Per Location box of the **Schedule**, and that limit is equal to the corresponding amount shown in the **Schedule**.

    **2.** A separate Per Project Aggregate Limit applies to each "project" at which you perform operations if there is an "X" in the Per Project box of the **Schedule**, and that limit is equal to the corresponding amount shown in the **Schedule**.

    **3.** The Per Location Aggregate Limit or Per Project Aggregate Limit (whichever is applicable) is the most we will pay for the sum of all such damages under **COVERAGE A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under **COVERAGE C** regardless of the number of:

        **a.** Insureds;

        **b.** Claims made or "suits" brought; or

        **c.** Persons or organizations making claims or bringing "suits".

    **4.** Any payments made under **COVERAGE A** for damages or under **COVERAGE C** for medical expenses shall reduce the Per Location or Per Project Aggregate Limit (whichever is applicable) for that "location" or "project". Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Per Location or Per Project Aggregate Limit for any other "location" or "project".

    **5.** The limits shown in the Declarations for Each Occurrence and for Damage To Premises Rented To You continue to apply. However, instead of being subject to the General

Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Per Location or Per Project Aggregate Limit.

B. For all sums which the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies and which cannot be attributed only to ongoing operations at a single "location" or "project":

1. Any payments made for such damages shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

2. Such payments shall not reduce any Per Location or Per Project Aggregate Limit.

C. When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will be subject to and reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor any Per Location Aggregate Limit or Per Project Aggregate Limit.

D. The Policy Aggregate Limit shown in the **Schedule** is the most we will pay under this policy for the sum of all damages under Coverage A. and Coverage B., and Medical Expenses under Coverage **C.** The General Aggregate Limit, the Products-Completed Operations Aggregate Limit, and the Per Location Aggregate Limit(s) or Per Project Aggregate Limit(s) (whichever is applicable) are all subject to the Policy Aggregate Limit.

E. The provisions of **SECTION III – LIMITS OF INSURANCE** not otherwise modified by this endorsement shall continue to apply as stipulated.

F. For the purposes of this endorsement, **SECTION V – DEFINITIONS** is amended to include the following additional definitions:

"Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

"Project" means construction project. If the applicable construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number:     11GPP0510104

Named Insured:    GIBRALTAR INDUSTRIES

Endorsement Effective Date:   04/01/2018

COMMERCIAL GENERAL LIABILITY
CG 00 01 04 13

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II — Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V — Definitions.

## SECTION I – COVERAGES

### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   (1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance; and

   (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments --Coverages A and B.

b. This insurance applies to "bodily injury" and "property damage" only if:

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   (2) The "bodily injury" or "property damage" occurs during the policy period; and

   (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

(a) The supervision, hiring, employment, training or monitoring of others by that insured; or

(b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph (1), (2) or (3) above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

 © Insurance Services Office, Inc., 2012

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

  (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

    (i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

    (ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

    (iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

  (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

  (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

    (i) Any insured; or

    (ii) Any person or organization for whom you may be legally responsible; or

  (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

    (i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

    (ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

    (iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

  (e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

© Insurance Services Office, Inc., 2012

(2) Any loss, cost or expense arising out of any:

   (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

   (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

   (a) Less than 26 feet long; and

   (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

   (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

   (b) The operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions**

   This insurance does not apply to:

   a. **Knowing Violation Of Rights Of Another**

      "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

   b. **Material Published With Knowledge Of Falsity**

      "Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

   c. **Material Published Prior To Policy Period**

      "Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

   d. **Criminal Acts**

      "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

   e. **Contractual Liability**

      "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

   f. **Breach Of Contract**

      "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

   g. **Quality Or Performance Of Goods – Failure To Conform To Statements**

      "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

   h. **Wrong Description Of Prices**

      "Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

© Insurance Services Office, Inc., 2012

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**COVERAGE C – MEDICAL PAYMENTS**

1. **Insuring Agreement**

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      provided that:

      (a) The accident takes place in the "coverage territory" and during the policy period;

      (b) The expenses are incurred and reported to us within one year of the date of the accident; and

      (c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

      (1) First aid administered at the time of an accident;

      (2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

      (3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

   We will not pay expenses for "bodily injury":

   a. **Any Insured**

      To any insured, except "volunteer workers".

   b. **Hired Person**

      To a person hired to do work for or on behalf of any insured or a tenant of any insured.

   c. **Injury On Normally Occupied Premises**

      To a person injured on that part of premises you own or rent that the person normally occupies.

   d. **Workers' Compensation And Similar Laws**

      To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

   e. **Athletics Activities**

      To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

   f. **Products-Completed Operations Hazard**

      Included within the "products-completed operations hazard".

   g. **Coverage A Exclusions**

      Excluded under Coverage **A**.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I — Coverage A — Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

© Insurance Services Office, Inc., 2012

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      (1) "Bodily injury" or "personal and advertising injury":

         (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

         (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

         (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

         (d) Arising out of his or her providing or failing to provide professional health care services.

      (2) "Property damage" to property:

         (a) Owned, occupied or used by;

         (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received; and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

 © Insurance Services Office, Inc., 2012

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

**b. Excess Insurance**

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** — Coverage **A** — Bodily Injury And Property Damage Liability.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

(2) When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

© Insurance Services Office, Inc., 2012 CG 00 01 04 13

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph a. above;

(2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

If such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

    (a) Snow removal;

    (b) Road maintenance, but not construction or resurfacing; or

    (c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

  a. False arrest, detention or imprisonment;

  b. Malicious prosecution;

  c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

  d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

  e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

  f. The use of another's advertising idea in your "advertisement"; or

  g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

  a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    (1) Products that are still in your physical possession; or

    (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      (a) When all of the work called for in your contract has been completed.

      (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  b. Does not include "bodily injury" or "property damage" arising out of:

    (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

    (3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

  a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      (2) The providing of or failure to provide warnings or instructions.

   c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

   a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      (2) The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

COMMERCIAL GENERAL LIABILITY
CG 01 63 07 11

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES –
# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Paragraph 1. **Insuring Agreement** of Section I – Coverage A Bodily Injury And Property Damage Liability is replaced by the following:

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

CG 01 63 07 11 © Insurance Services Office, Inc., 2010 Page 1 of 3

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

B. Paragraph 1.a. of Section I – Coverage B Personal And Advertising Injury Liability is replaced by the following:

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A and B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

C. The following is added as Paragraph e. to the Duties In The Event Of Occurrence, Offense, Claim Or Suit Condition (Paragraph 2. of Section IV – Commercial General Liability Conditions):

e. Notice given by or on behalf of the insured, or written notice by or on behalf of the injured person or any other claimant, to any agent of ours in New York State, with particulars sufficient to identify the insured, shall be considered to be notice to us.

D. Paragraph 3. of Section IV – Commercial General Liability Conditions is replaced by the following:

3. Legal Action Against Us

a. Except as provided in Paragraph b., no person or organization has a right under this Coverage Part:

(1) To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

(2) To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

b. With respect to "bodily injury" and "personal and advertising injury" claims, if we deny coverage or do not admit liability because an insured or the injured person, someone acting for the injured person or other claimant fails to give us written notice as soon as practicable, then the injured person, someone acting for the injured person or other claimant may bring an action against us, provided the sole question is whether the denial of coverage or nonadmission of liability is based on the failure to provide timely notice.

However, the injured person, someone acting for the injured person or other claimant may not bring an action if within 60 days after we deny coverage or do not admit liability, we or an insured:

(1) Brings an action to declare the rights of the parties under the policy; and

(2) Names the injured person, someone acting for the injured person or other claimant as a party to the action.

**E.** The following provision is added and supersedes any provision to the contrary:

Failure to give notice to us as required under this Coverage Part shall not invalidate any claim made by the insured, injured person or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by the insured, injured person or other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

**F.** The definition of "loading or unloading" in the **Definitions** Section does not apply.

CG 01 63 07 11 © Insurance Services Office, Inc., 2010 Page 3 of 3 ▢

COMMERCIAL GENERAL LIABILITY
CG 01 04 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – PREMIUM AUDIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **b.** of the **Premium Audit** Condition **Section IV** is replaced by the following:

**PREMIUM AUDIT**

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. An audit to determine the final premium due or to be refunded will be completed within 180 days after the expiration date of the policy. But the audit may be waived if the total annual premium attributable to the auditable exposure base is not reasonably expected to exceed $1500. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

**B.** Except as provided in Paragraph **A.** above, the **Examination Of Your Books And Records** Common Policy Condition continues to apply.

© ISO Properties, Inc., 2003 □

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BROAD FORM NAMED INSURED ENDORSEMENT**

This Endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

The Named Insured includes all subsidiaries, affiliated, associated, controlled or allied companies, corporations, or firms now or hereafter constituted in which there is common ownership of more than fifty percent (50%) and for which similar coverage is not separately provided.

The person or organization first named in Item 1 of the Declarations, by acceptance of this policy, is authorized to act and agrees to act on behalf of all persons or organizations insured under the policy with respect to all matters pertaining to the insurance afforded by the policy, including the giving or receipt of notice of cancellation, the payment of premiums and deductibles, and the receiving of return premiums, if any.

The insurance provided by this endorsement remains subject to paragraph **3.** under **SECTION II – WHO IS AN INSURED** regarding newly acquired or formed organizations. Further, nothing in this endorsement shall be construed to affect any of our rights to amend the policy premium during the policy period upon the acquisition of a new subsidiary or other entity by the Named Insured. The first Named Insured shall report to us, as soon as practicable, any acquisitions, dissolution, mergers or ownership changes that occur at any time throughout the policy period.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510104

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the Inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-2018

00 GL0480 00 06 14                                                                                     Page 1 of 1

POLICY NUMBER: 11GPP0510104          **COMMERCIAL GENERAL LIABILITY**
**CG 02 24 10 93**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EARLIER NOTICE OF CANCELLATION PROVIDED BY US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Number of Days' Notice** 90

(If no entry appears above, information required to complete this Schedule will be shown in the Declarations as applicable to this endorsement.)

For any statutorily permitted reason other than nonpayment of premium, the number of days required for notice of cancellation, as provided in paragraph 2. of either the CANCELLATION Common Policy Condition or as amended by an applicable state cancellation endorsement, is increased to the number of days shown in the Schedule above.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

POLICY NUMBER: 11GPP0510104

COMMERCIAL GENERAL LIABILITY
CG 20 10 04 13

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location(s) Of Covered Operations |
|---|---|
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS. | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.** Your acts or omissions; or

**2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

**1.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

**2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 2

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III — Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

CG 20 10 04 13

POLICY NUMBER: 11CPP0510104

COMMERCIAL GENERAL LIABILITY
CG 20 11 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Designation Of Premises (Part Leased To You): |
| --- |
| ANY PREMISES WHERE REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS |

| Name Of Person(s) Or Organization(s) (Additional Insured): |
| --- |
| ANY PERSON OR ORGANIZATION WHERE REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS |

| Additional Premium: | INCL. |
| --- | --- |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** Section II – Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to be a tenant in that premises.

2. Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to Section III – Limits Of Insurance:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 11 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 1

POLICY NUMBER: 11GPP0510104

COMMERCIAL GENERAL LIABILITY
CG 20 15 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – VENDORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) (Vendor) | Your Products |
|---|---|
| ANY VENDOR WEERE REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS | ANY OF YOUR COVERED PRODUCTS AS REQUIRED BY WRITTEN CONTRACT |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** Section II – Who Is An Insured is amended to include as an additional insured any person(s) or organization(s) (referred to throughout this endorsement as vendor) shown in the Schedule, but only with respect to "bodily injury" or "property damage" arising out of "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business.

However:

**1.** The insurance afforded to such vendor only applies to the extent permitted by law; and

**2.** If coverage provided to the vendor is required by a contract or agreement, the insurance afforded to such vendor will not be broader than that which you are required by the contract or agreement to provide for such vendor.

**B.** With respect to the insurance afforded to these vendors, the following additional exclusions apply:

**1.** The insurance afforded the vendor does not apply to:

**a.** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

**b.** Any express warranty unauthorized by you;

**c.** Any physical or chemical change in the product made intentionally by the vendor;

**d.** Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

CG 20 15 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 2

e. Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

f. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

g. Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

h. "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

(1) The exceptions contained in Subparagraphs d. or f.; or

(2) Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

2. This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

C. With respect to the insurance afforded to these vendors, the following is added to **Section III — Limits Of Insurance:**

If coverage provided to the vendor is required by a contract or agreement, the most we will pay on behalf of the vendor is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

 © Insurance Services Office, Inc., 2012 CG 20 15 04 13

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

POLICY NUMBER: 11GPP0510104

COMMERCIAL GENERAL LIABILITY
CG 20 26 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED — DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): |
|---|
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** **Section II — Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

1. In the performance of your ongoing operations; or

2. In connection with your premises owned by or rented to you.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III — Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 26 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 1

POLICY NUMBER: 11GPP0510104

COMMERCIAL GENERAL LIABILITY
CG 20 28 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – LESSOR OF LEASED EQUIPMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): |
|---|
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 28 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 1

POLICY NUMBER: 11GPP0510104

COMMERCIAL GENERAL LIABILITY
CG 20 37 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS. | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

A. **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

B. With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance**:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 37 04 13 © Insurance Services Office, Inc., 2012 Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 21 06 05 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of Section **I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

CG 21 06 05 14 © Insurance Services Office, Inc., 2013 Page 1 of 1

POLICY NUMBER: 11GPP0510104                                       COMMERCIAL GENERAL LIABILITY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – DESIGNATED PRODUCTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

**Designated Product(s):**
AIRCRAFT PRODUCTS

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any of "your products" shown in the Schedule.

**CG 21 33 11 85**              Copyright, Insurance Services Office, Inc., 1984              **Page 1 of 1**        □

COMMERCIAL GENERAL LIABILITY
CG 21 47 07 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

B. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph **2. Exclusions** of Section **I — Coverage A — Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

  **(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

    This exclusion does not apply to:

    **(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

    **(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

      **(i)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

      **(ii)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

  **(2)** Any loss, cost or expense arising out of any:

    **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

    **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

CG 21 65 12 04          © ISO Properties, Inc., 2003          Page 1 of 1    □

COMMERCIAL GENERAL LIABILITY
CG 21 70 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

CG 21 70 01 15 © Insurance Services Office, Inc., 2015 Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 22 43 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

2. Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

CG 22 43 04 13 © Insurance Services Office, Inc., 2012 Page 1 of 1

POLICY NUMBER: 11GPP0510104

COMMERCIAL GENERAL LIABILITY
CG 22 74 10 01

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LIMITED CONTRACTUAL LIABILITY COVERAGE FOR PERSONAL AND ADVERTISING INJURY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Designated Contract Or Agreement: |
|---|
| ALL WRITTEN CONTRACTS WHERE THE INSURED IS SPECIFICALLY REQUIRED TO INDEMNIFY ANOTHER PARTY FOR PERSONAL AND ADVERTISING INJURY DAMAGES. |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

A. With respect to the contract or agreement designated in the Schedule above, Subparagraph e. of Paragraph 2. Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement.

This exclusion does not apply to:

(1) Liability for damages that the insured would have in the absence of the contract or agreement; or

(2) Liability for "personal and advertising injury" if:

(a) The liability pertains to your business and is assumed in the designated contract or agreement shown in the Schedule in which you assume the tort liability of another. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

(b) The "personal and advertising injury" occurs subsequent to the execution of the designated contract or agreement shown in the Schedule; and

(c) The "personal and advertising injury" arises out of the offenses of false arrest, detention or imprisonment.

© ISO Properties, Inc., 2001

Solely for the purposes of liability so assumed in such designated contract or agreement, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "personal injury" described in Paragraph A.2.e.(2)(c) above, provided:

   (i) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same designated contract or agreement; and

   (ii) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

B. With respect to the contract or agreement designated in the Schedule above, the following is added to **Section I - Supplementary Payments - Coverages A And B:**

If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

1. The "suit" against the Indemnitee seeks damages for which the insured has assumed tort liability of the indemnitee in a designated contract or agreement shown in the Schedule, if such liability pertains to your business. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

2. This insurance applies to such liability assumed by the insured;

3. The obligation to defend, or the cost of the defense of, that Indemnitee, has also been assumed by the insured in the same designated contract or agreement;

4. The allegations in the "suit" and the information we know about the offense are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

5. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

6. The indemnitee:

  a. Agrees in writing to:

    (1) Cooperate with us in the investigation, settlement or defense of the "suit";

    (2) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

    (3) Notify any other insurer whose coverage is available to the indemnitee; and

    (4) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

  b. Provides us with written authorization to:

    (1) Obtain records and other information related to the "suit"; and

    (2) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph A.2.e.(2) of this endorsement, such payments will not be deemed to be damages for "personal and advertising injury" as described in Paragraph A.2.e.(2)(c) above and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

1. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

2. The conditions set forth above, or the terms of the agreement described in Paragraph 6. above, are no longer met.

© ISO Properties, Inc., 2001

POLICY NUMBER: 11GPP0510104

**COMMERCIAL GENERAL LIABILITY**
CG 24 04 05 09

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

**Name Of Person Or Organization:**
ANY PERSON OR ORGANIZATION WHERE WAIVER OF OUR RIGHT TO RECOVER IS PERMITTED BY LAW AND IS REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO THE LOSS.

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following is added to Paragraph 8. **Transfer Of Rights Of Recovery Against Others To Us** of Section **IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

CG 24 04 05 09        © Insurance Services Office, Inc., 2008        Page 1 of 1 ☐

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS USED UP

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following Condition is added to COMMERCIAL GENERAL LIABILITY CONDITIONS (Section IV):

**Transfer of Duties When a Limit of Insurance Is Used Up.**

a. If we conclude that, based on "occurrences," offenses, claims or "suits" which have been reported to us and to which this insurance may apply, the:

(1) General Aggregate Limit (other than the Products/Completed Operations Aggregate Limit);

(2) Products/Completed Operations Aggregate Limit;

(3) Personal and Advertising Injury Limit;

(4) Each Occurrence Limit; or

(5) Fire Damage Limit

is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

b. When a limit of insurance described in paragraph a. above has actually been used up in the payment of judgments or settlements:

(1) We will notify the first Named Insured, in writing, as soon as practicable, that:

  (a) Such a limit has actually been used up; and

  (b) Our duty to defend "suits" seeking damages subject to that limit has also ended.

(2) We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all claims and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and "suits".

We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the claim or "suit" is reported to us after that limit of insurance has been used up.

(3) The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

c. The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with paragraph b.(2) above.

The duty of the first Named Insured to reimburse us will begin on:

(1) The date on which the applicable limit of insurance is used up, if we sent notice in accordance with paragraph a. above; or

(2) The date on which we sent notice in accordance with paragraph b.(1) above, if we did not send notice in accordance with paragraph a. above.

d. The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

COMMERCIAL GENERAL LIABILITY
CG 26 36 12 93

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – TRANSFER OF DUTIES
# WHEN A LIMIT OF INSURANCE IS USED UP

This endorsement modifies insurance provided under the following:

OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY COVERAGE FORM

The following Condition is added to CONDITIONS (Section IV):

Transfer of Duties When a Limit of Insurance Is Used Up.

a. If we conclude that, based on "occurrences", claims or "suits" which have been reported to us and to which this insurance may apply, the Aggregate Limit or the Each Occurrence Limit is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

b. When a limit of insurance described in paragraph a. above has actually been used up in the payment of judgments or settlements:

(1) We will notify the first Named Insured, in writing, as soon as practicable, that:

(a) Such a limit has actually been used up; and

(b) Our duty to defend "suits" seeking damages subject to that limit has also ended.

(2) We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all claims and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and "suits".

We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the claim or "suit" is reported to us after that limit of insurance has been used up.

(3) The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

c. The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with paragraph b.(2) above.

The duty of the first Named Insured to reimburse us will begin on:

(1) The date on which the applicable limit of insurance is used up, if we sent notice in accordance with paragraph a. above; or

(2) The date on which we sent notice in accordance with paragraph b.(1) above, if we did not send notice in accordance with paragraph a. above.

d. The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

Copyright, Insurance Services Office, Inc., 1993

# E<span></span>XHIBIT C

**BROKER – Marsh USA, Inc.**

# Rough Brothers, Inc.

**POLICY NUMBER - 11GPP0510105 General Liability**

**POLICY PERIOD -** 04/01/19 to 04/01/20



a member of Arch Insurance Group

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http://www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ



Signature Page

IN WITNESS WHEREOF, Arch Insurance Company has caused this policy to be executed and attested.

John Mentz

President

Patrick K. Nails

Secretary

05 ML0002 00 12 14

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**POLICYHOLDER NOTICE --TEXAS**

LOSS CONTROL ENGINEERING SERVICES

As a policyholder of Arch Insurance Company insured for certain general liability and/or commercial auto exposures in the State of Texas, you are entitled to loss control consultative services.

These services may include, but not necessarily be limited to: loss data and analyses; training assistance in hazard reduction and loss control; physical hazard surveys; and training in hazard recognition and loss control.

The above services will be made available by Arch Insurance Company.  If you have any questions with which we can assist you regarding loss prevention services, please contact the Arch Loss Control Services Center at 1-888-411-2832, LossControl@archinsurance.com, or at the following address:

Arch Insurance Group
One Liberty Plaza, 53rd Floor
New York, NY 10006

E-FILED 03/08/2024 10:57 AM  /  CONFIRMATION 1441483  /  A 2401119  /  COMMON PLEAS DIVISION  /  IFIJ

POLICY NUMBER: 11CPP0510105

IL 09 85 01 15

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

| SCHEDULE – PART I |
|---|
| Terrorism Premium (Certified Acts)   $100 |
| This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies): |
| GENERAL LIABILITY |
| |
| Additional information, if any, concerning the terrorism premium: |
| |

| SCHEDULE – PART II |
|---|
| Federal share of terrorism losses ___81%___ Year: 20 __19__ |
| (Refer to Paragraph B. in this endorsement.) |
| |
| Federal share of terrorism losses ___80%___ Year: 20 __20__ |
| (Refer to Paragraph B. in this endorsement.) |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

© Insurance Services Office, Inc., 2015

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015

IL 09 85 01 15

Policy Number
**11GPP0510105**

### COMMON POLICY DECLARATIONS

# ARCH INSURANCE COMPANY

Named Insured    ROUGH BROTHERS, INC.

Effective Date: 04-01-19
12:01 A.M., Standard Time

Agent Name    MARSH USA INC. NJ

Agent No.    00312

| Item 1. Named Insured and Mailing Address | Agent Name and Address |
|---|---|
| ROUGH BROTHERS, INC.<br>(SEE NAMED INSURED ENDORSEMENT)<br>3556 LAKE SHORE ROAD<br>P.O. BOX 2028<br>BUFFALO NY 14219 | MARSH USA INC. NJ<br>445 SOUTH STREET<br>SUITE 210<br>MORRISTOWN NJ 07962<br><br>Agent No. 00312 |

| Item 2. | Policy Period | From: 04-01-2019 | To: 04-01-2020 |
|---|---|---|---|

at 12:01 A.M., Standard Time at your mailing address shown above.

| Item 3. | Business Description: |
|---|---|
| | Form of Business:    CORPORATION |

**Item 4.**    In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This policy consists of the following coverage parts for which a premium is indicated. Where no premium is shown, there is no coverage. This premium may be subject to adjustment.

| Coverage Part(s) | Premium |
|---|---|
| Commercial Property Coverage Part | NOT COVERED |
| Commercial General Liability Coverage Part | $ 62,925.00 |
| Commercial Crime Coverage Part | NOT COVERED |
| Commercial Inland Marine Coverage Part | NOT COVERED |
| Commercial Auto (Business or Truckers) Coverage Part | NOT COVERED |
| Commercial Garage Coverage Part | NOT COVERED |
| | |
| | |
| | |
| **Total Policy Premium** | $ 62,925.00 |

| Item 5. | Forms and Endorsements |
|---|---|

Forms(s) and Endorsement(s) made a part of this policy at time of issue:

**See Schedule of Forms and Endorsements**

Countersigned:

Date: 05-14-19      By: _____
                                      Authorized Representative

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS, HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.    CLASS 2 - CLASS CODE - 14057

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

**FAIC-SKLBUS-CPD (6/01)**

**Policy Number**
**11GPP0510105**

**SCHEDULE OF FORMS AND ENDORSEMENTS**

# ARCH INSURANCE COMPANY

Named Insured   ROUGH BROTHERS, INC.

Effective Date:  04-01-19
12:01 A.M., Standard Time

Agent Name   MARSH USA INC. NJ

Agent No.   00312

COMMON POLICY FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| 00 ML0065 00 | 06-07 | U.S. TREASURY DEPARTMENT'S OFFICE |
| 05 ML0002 00 | 12-14 | ARCH INSURANCE GROUP SIGNATURE PAGE |
| 05 ML0040 00 | 05-05 | PH NOTICE-TX-LOSS CNTL ENG SERV |
| IL 09 85 | 01-15 | DISCLOSURE PURSUANT/TERROR RISK INS ACT |
| FAIC-SKLBUS-CPD | 06-01 | COMMON POLICY DECLARATIONS |
| FAIC-SKLBUS-FE | 06-01 | SCHEDULE OF FORMS AND ENDORSEMENTS |
| FAIC-SKLBUS-SNI | 06-01 | SCHEDULE OF NAMED INSURED(S) |
| IL 00 17 | 11-98 | COMMON POLICY CONDITIONS |
| IL 00 23 | 07-02 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDT |
| IL 02 44 | 09-07 | OHIO CHANGES-CANC & NONRENEWAL |
| IL 02 68 | 01-14 | NEW YORK CHANGES-CANC & NONRENL |
| 00 ML0087 00 | 11-10 | NOTICE OF CANC - SPECIFIED DAYS |

GENERAL LIABILITY FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| FAIC-SKLBUS-CGLDEC | 06-01 | COMM GENERAL LIABILITY COVERAGE SUPP DEC |
| 00 GL0471 33 | 10-08 | NY -EMPLOYEE BENEFITS LIAB COVERAGE ENDT |
| 00 GL0477 33 | 10-08 | NEW YORK - PREMIUM COMPUTATION ENDT |
| 00 GL0045 00 | 12-03 | GENERAL LIABILITY ASBESTOS EXCLUSION |
| 00 GL0356 00 | 10-11 | CGL DEDUCTIBLE ENDORSEMENT |
| 00 GL0469 00 | 06-08 | AMENDED DUTIES IN THE EVENT OF |
| 00 GL0474 00 | 06-08 | ANTI STACKING ENDORSEMENT |
| 00 GL0588 00 | 04-10 | BODILY INJURY DEFINITION EXTENSION ENDT |
| 00 GL0590 00 | 04-10 | FELLOW EMPLOYEE COVERAGE ENDORSEMENT |
| 00 GL0592 00 | 04-10 | DESIGNATED ENTITY EXCLUSION ENDORSEMENT |
| 00 GL0593 00 | 04-10 | INCIDENTAL MED MALPRACTICE LIAB COV ENDT |
| 00 GL0598 00 | 04-10 | PRIMARY AND NONCONTRIBUTING INSURANCE |
| 00 GL0599 00 | 04-10 | BI OR PD EXPECTED OR INTENDED END |
| 00 GL0600 00 | 04-10 | NON-OWNED WATERCRAFT EXTENSION END |
| 00 GL0739 00 | 02-13 | PER LOCATION OR PER PROJECT AGGREGATE LI |
| CG 00 01 | 04-13 | COMMERCIAL GENERAL LIABILITY COV FORM |
| CG 01 63 | 07-11 | NY CHANGES-COMM GEN LIAB COV FORM |
| CG 01 04 | 12-04 | NEW YORK CHANGES - PREMIUM AUDIT |
| 00 GL0480 00 | 06-14 | BROAD FORM NAMED INSURED ENDORSEMENT |
| CG 02 24 | 10-93 | EARLIER NOTICE OF CANC PROVIDED BY US |
| CG 20 10 | 04-13 | ADDL INSD - OWNERS/LESSEES/CONTRACTORS |
| CG 20 10 | 07 04 | ADDL INSD-OWNERS/LESSEES/CONTR-COMP OPS |
| CG 20 11 | 04-13 | ADDL INSD-MANAGERS/LESSORS OF PREMISES |
| CG 20 15 | 04-13 | ADDL INSD-VENDORS |
| CG 20 26 | 04-13 | ADDL INSD-DESIGNATED PERSON/ORGANIZATION |
| CG 20 28 | 04-13 | ADDL INSD-LESSOR OF LEASED EQUIPMENT |
| CG 20 37 | 04-13 | ADDL INSD-OWNERS/LESSEES/CONTR-COMP OPS |
| CG 20 37 | 07 04 | ADDL INSD-OWNERS/LESSEES/CONTR COMP OPS |
| CG 21 06 | 05-14 | EXCL-ACC/DISCL OF CONFI OR PERSONAL INFO |
| CG 21 33 | 11-85 | EXCL-DESIGNATED PRODUCTS |

**FAIC-SKLBUS-FE (6/01)**

Policy Number
**11GPP0510105**

**SCHEDULE OF FORMS AND ENDORSEMENTS**

# ARCH INSURANCE COMPANY

Named Insured   ROUGH BROTHERS, INC.

Effective Date:  04-01-19
12:01 A.M., Standard Time

Agent Name   MARSH USA INC. NJ

Agent No.   00312

| | | |
|---|---|---|
| CG 21 47 | 07-98 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG 21 65 | 12-04 | TOTAL POLLUTION EXCL-WITH EXCEPTIONS |
| CG 21 70 | 01-15 | CAP LOSSES FROM CERTIF ACTS OF TERRORISM |
| CG 22 43 | 04-13 | EXCL-ENGINEERS, ARCH OR SURV (PROF LIAB) |
| CG 22 74 | 10-01 | LIMITED CONTR LIABILITY COV FOR PERS/ADV |
| CG 24 04 | 05-09 | WAIVER OF TRANSFER RIGHTS OF RECOVERY |
| CG 26 21 | 10-91 | NY CHANGES - TRANSFER OF DUTIES |
| CG 26 36 | 12-93 | NY CHANGES - TRANSFER OF DUTIES |
| 00 ML0207 00 | 11-03 | MEDICAL PAYMENTS LIMIT OF LIABILITY AMD |

FAIC-SKLBUS-FE (6/01)

**Policy Number**
**11GPP0510105**

SCHEDULE OF NAMED INSURED(S)

# ARCH INSURANCE COMPANY

Named Insured  ROUGH BROTHERS, INC.

Effective Date: 04-01-19
12:01 A.M., Standard Time

Agent Name  MARSH USA INC. NJ

Agent No.  00312

FAIC-SKLBUS-CPD  (cont.)

THE NAMED INSURED ON FORM FAIC-SKLBUS-CPD IS AMENDED TO READ:

ROUGH BROTHERS, INC.
DELTA T SOLUTIONS, INC.
GIBRALTAR INDUSTRIES HOLDING COMPANY (UK) LIMITED
NEXUS CORPORATION
RBI SOLAR BRAZIL LTDA
RBI SOLAR INC.
RBI SOLAR KK (JAPAN)
RENUSOL AMERICA, INC.
RENUSOL GMBH
ROUGH BROTHERS CONSTRUCTION, INC.
ROUGH BROTHERS GREENHOUSE MANUFACTURING (SHANGHAI) CO., LTD.
ROUGH BROTHERS HOLDING CO., INC.
ROUGH BROTHERS MANUFACTURING INC.

FAIC-SKLBUS-SNI (6/01)

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98                Copyright, Insurance Services Office, Inc., 1998                Page 1 of 1    □

IL 00 23 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "Special nuclear material" or "by-product material".

IL 00 23 07 02      © ISO Properties, Inc., 2001      Page 1 of 2

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2001

IL 02 44 09 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OHIO CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** With respect to a policy which has been in effect for more than 90 days, or is a renewal of a policy we issued, the **Cancellation** Common Policy Condition is replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy only for one or more of the following reasons, except as provided in Paragraph **6.** below:

   **a.** Nonpayment of premium;

   **b.** Discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted thereunder;

   **c.** Discovery of a moral hazard or willful or reckless acts or omissions on your part which increases any hazard insured against;

   **d.** The occurrence of a change in the individual risk which substantially increases any hazard insured against after the insurance coverage has been issued or renewed except to the extent that the insurer could reasonably have foreseen the change or contemplated the risk in writing the contract;

   **e.** Loss of applicable reinsurance or a substantial decrease in applicable reinsurance, if the Superintendent has determined that reasonable efforts have been made to prevent the loss of, or substantial decrease in, the applicable reinsurance, or to obtain replacement coverage;

   **f.** Failure of an insured to correct material violations of safety codes or to comply with reasonable written loss control recommendations; or

   **g.** A determination by the Superintendent of Insurance that the continuation of the policy would create a condition that would be hazardous to the policyholders or the public.

3. We will mail written notice of cancellation to the first Named Insured, and agent if any, at the last mailing addresses known to us. Proof of mailing will be sufficient proof of notice.

4. We will mail the notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

   **b.** 30 days before the effective date of cancellation, if we cancel for a reason stated in **2.b.** through **2.g.** above.

IL 02 44 09 07 © ISO Properties, Inc., 2006 Page 1 of 2

5. The notice of cancellation will:

   a. State the effective date of cancellation. The policy period will end on that date.

   b. Contain the date of the notice and the policy number, and will state the reason for cancellation.

6. Policies written for a term of more than one year or on a continuous basis may be cancelled by us for any reason at an anniversary date, upon 30 days' written notice of cancellation.

7. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

B. The following is added to the Common Policy Conditions and supersedes any provisions to the contrary:

**NONRENEWAL**

1. If we elect not to renew this policy, we will mail written notice of nonrenewal to the first Named Insured, and agent if any, at the last mailing addresses known to us. The notice will contain the date of the notice and the policy number, and will state the expiration date of the policy.

2. We will mail the notice of nonrenewal at least 30 days before the expiration date of the policy.

3. Proof of mailing will be sufficient proof of notice.

C. **Common Policy Conditions**

1. Paragraph **A.2.a.** of the **Businessowners** Common Policy Conditions is deleted.

2. Paragraph **E.2.** of the **Cancellation** Common Policy Condition in the Standard Property Policy is deleted. Paragraph **E.2.** is replaced by the following (unless Item **A.** of this endorsement applies):

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

   b. 30 days before the effective date, if we cancel for any other reason.

© ISO Properties, Inc., 2006

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

IL 02 68 01 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraphs **1.**, **2.**, **3.** and **5.** of the **Cancellation** Common Policy Condition are replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

2. **Cancellation Of Policies In Effect**

   a. **60 Days Or Less**

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   (1) 30 days before the effective date of cancellation if we cancel for any reason not included in Paragraph **A.2.b.** below.

   (2) 15 days before the effective date of cancellation if we cancel for any of the reasons included in Paragraph **A.2.b.** below.

   b. **For More Than 60 Days**

   If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed below, provided we mail the first Named Insured written notice at least 15 days before the effective date of cancellation:

   (1) Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

(2) Conviction of a crime arising out of acts increasing the hazard insured against;

(3) Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim;

(4) After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

(5) Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, which results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

(6) Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

IL 02 68 01 14 © Insurance Services Office, Inc., 2013 Page 1 of 5

(7) A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

(8) Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Department of Financial Services, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Department of Financial Services.

3. We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the policy and to the authorized agent or broker.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

   However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

B. The following is added to the **Cancellation** Common Policy Condition:

7. If one of the reasons for cancellation in Paragraph **A.2.b.** or **D.2.b.(2)** exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

C. The following conditions are added:

1. **Nonrenewal**

   If we decide not to renew this policy we will send notice as provided in Paragraph **C.3.** below.

2. **Conditional Renewal**

   If we conditionally renew this policy subject to:

   a. A change of limits;

b. A change in type of coverage;

c. A reduction of coverage;

d. An increased deductible;

e. An addition of exclusion; or

f. Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in Paragraph **C.3.** below.

3. **Notices Of Nonrenewal And Conditional Renewal**

   a. If we decide not to renew this policy or to conditionally renew this policy as provided in Paragraphs **C.1.** and **C.2.** above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 60 but not more than 120 days before:

      (1) The expiration date; or

      (2) The anniversary date if this is a continuous policy.

   b. Notice will be mailed or delivered to the first Named Insured at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

   c. Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

   d. If we violate any of the provisions of Paragraph **C.3.a., b.** or **c.** above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

      (1) And if notice is provided prior to the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60-day period, has replaced the coverage or elects to cancel;

© Insurance Services Office, Inc., 2013

(2) And if the notice is provided on or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy for another policy period, at the lower of the current rates or the prior period's rates, unless the first Named Insured, during this additional policy period, has replaced the coverage or elects to cancel.

e. If you elect to renew on the basis of a late conditional renewal notice, the terms, conditions and rates set forth in such notice shall apply:

(1) Upon expiration of the 60-day period, unless Subparagraph (2) below applies; or

(2) Notwithstanding the provisions in Paragraphs d.(1) and d.(2), as of the renewal date of the policy if the conditional renewal notice was sent at least 30 days prior to the expiration or anniversary date of the policy.

f. We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another Insurer of yours mails or delivers notice that the policy has been replaced or is no longer desired.

D. The following provisions apply when the Commercial Property Coverage Part, the Farm Coverage Part or the Capital Assets Program (Output Policy) Coverage Part is made a part of this policy:

1. Items **D.2.** and **D.3.** apply if this policy meets the following conditions:

a. The policy is issued or issued for delivery in New York State covering property located in this state; and

b. The policy insures:

(1) For loss of or damage to structures, other than hotels or motels, used predominantly for residential purposes and consisting of no more than four dwelling units; or

(2) For loss of or damage to personal property other than farm personal property or business property; or

(3) Against damages arising from liability for loss of, damage to or injury to persons or property, except liability arising from business or farming; and

c. The portion of the annual premium attributable to the property and contingencies described in **1.b.** exceeds the portion applicable to other property and contingencies.

2. Paragraph 2. of the **Cancellation** Common Policy Condition is replaced by the following:

**2. Procedure And Reasons For Cancellation**

a. We may cancel this entire policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 15 days before the effective date of cancellation if we cancel for nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

b. But if this policy:

(1) Has been in effect for more than 60 days; or

(2) Is a renewal of a policy we issued;

we may cancel this policy only for one or more of the following reasons:

(1) Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

(2) Conviction of a crime arising out of acts increasing the risk of loss;

(3) Discovery of fraud or material misrepresentation in obtaining the policy or in making a claim;

(4) Discovery of willful or reckless acts or omissions increasing the risk of loss;

(5) Physical changes in the covered property that make that property uninsurable in accordance with our objective and uniformly applied underwriting standards in effect when we:

(a) Issued the policy; or

(b) Last voluntarily renewed the policy;

(6) The Superintendent of Financial Services' determination that continuing the policy would violate Chapter 28 of the Insurance Law; or

(7) Required pursuant to a determination by the Superintendent of Financial Services that the continuation of our present premium volume would be hazardous to the interests of our policyholders, our creditors or the public.

3. The following are added:

a. **Conditional Continuation**

Instead of cancelling this policy, we may continue it on the condition that:

(1) The policy limits be changed; or

(2) Any coverage not required by law be eliminated.

If this policy is conditionally continued, we will mail or deliver written notice to the first Named Insured written notice at least 20 days before the effective date of the change or elimination. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

b. **Nonrenewal**

If, as allowed by the laws of New York State, we:

(1) Do not renew this policy; or

(2) Condition policy renewal upon:

(a) Change of limits; or

(b) Elimination of coverage;

we will mail or deliver written notice of nonrenewal or conditional renewal:

(a) At least 45 days; but

(b) Not more than 60 days;

before the expiration date of the policy. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

E. The following is added to the Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions, the Commercial Property Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

When the property is subject to the Anti-arson Application in accordance with New York Department of Financial Services' Insurance Regulation No. 96, the following provisions are added:

If you fail to return the completed, signed and affirmed anti-arson application to us:

1. Or our broker or agent within 45 days of the effective date of a new policy, we will cancel the entire policy by giving 20 days' written notice to you and to the mortgageholder shown in the Declarations.

2. Before the expiration date of any policy, we will cancel the policy by giving written notice to you and to the mortgageholder shown in the Declarations at least 15 days before the effective date of cancellation.

The cancellation provisions set forth in **E.1.** and **E.2.** above supersede any contrary provisions in this policy including this endorsement.

If the notice in **E.1.** or **E.2.** above is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

F. The following applies to the Commercial Property Coverage Part, the Farm Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

Paragraphs **f.** and **g.** of the **Mortgageholders** Condition are replaced by the following:

f. **Cancellation**

(1) If we cancel this policy, we will give written notice to the mortgageholder at least:

(a) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(b) 30 days before the effective date of cancellation if we cancel for any other reason.

© Insurance Services Office, Inc., 2013

IL 02 68 01 14

(2) If you cancel this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, cancellation will become effective on the later of:

    (a) The effective date of cancellation of the insured's coverage; or

    (b) 10 days after we give notice to the mortgageholder.

**g. Nonrenewal**

(1) If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

(2) If you elect not to renew this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, nonrenewal will become effective on the later of:

    (a) The expiration date of the policy; or

    (b) 10 days after we give notice to the mortgageholder.

**G.** The following provisions apply when the following are made a part of this policy:

Commercial General Liability Coverage Part
Employment-Related Practices Liability Coverage Part
Farm Liability Coverage Form
Liquor Liability Coverage Part
Products/Completed Operations Liability Coverage Part

1. The aggregate limits of this policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraph **C.3.d.** above.

2. The last sentence of Limits Of Insurance does not apply when the policy period is extended because we sent the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice.

IL 02 68 01 14            © Insurance Services Office, Inc., 2013            **Page 5 of 5**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NOTICE OF CANCELLATION – CERTIFICATE HOLDERS
## (SPECIFIED DAYS)

The person(s) or organization(s) listed or described in the Schedule below have requested that they receive written notice of cancellation when this policy is cancelled by us. We will mail or deliver to the Person(s) or Organization(s) listed or described in the Schedule a copy of the written notice of cancellation that we sent to you. If possible, such copies of the notice will be mailed at least 30 days, except for cancellation for non-payment of premium which will be mailed 10 days, prior to the effective date of the cancellation, to the address or addresses of certificate holders as provided by your broker or agent.

**Schedule**

Person(s) or Organization(s) including mailing address:

All certificate holders where written notice of the cancellation of this policy is required by written contract, permit or agreement with the Named Insured and whose names and addresses will be provided by the broker or agent listed in the Declarations Page of this policy for the purposes of complying with such request.

This notification of cancellation of the policy is intended as a courtesy only. Our failure to provide such notification to the person(s) or organization(s) shown in the Schedule will not extend any policy cancellation date nor impact or negate any cancellation of the policy. This endorsement does not entitle the person(s) or organization(s) listed or described in the Schedule above to any benefit, rights or protection under this policy.

Any provision of this endorsement that is in conflict with a statute or rule is hereby amended to conform to that statute or rule.

All other terms and conditions of this policy remain unchanged.
Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-19

00 ML0087 00 11 10                                                                                    Page 1 of 1

**Policy Number**
**11GPP0510105**

COMMERCIAL GENERAL LIABILITY COVERAGE PART
SUPPLEMENTAL DECLARATIONS

# ARCH INSURANCE COMPANY

Named Insured   ROUGH BROTHERS, INC.

Effective Date:  04-01-19
12:01 A.M., Standard Time

Agent Name  MARSH USA INC. NJ

Agent No.  00312

**Item 1.** Business Description:

**Item 2.** Limits of Insurance

| Coverage | | Limit of Liability | |
|---|---|---|---|
| Aggregate Limits of Liability | $ | 2,000,000 | Products/Completed Operations Aggregate |
| | $ | 2,000,000 | General Aggregate (other than Products/Completed Operations) |
| Coverage A - Bodily Injury and Property Damage Liability | $ | 1,500,000 | any one occurrence subject to the Products/Completed Operations and General Aggregate Limits of Liability |
| Damage To Premises Rented To You | $ | 1,500,000 | any one premises subject to the Coverage A occurrence and the General Aggregate Limits of Liability |
| Coverage B - Personal and Advertising Injury Liability | $ | 1,500,000 | any one person or organization subject to the General Aggregate Limits of Liability |
| Coverage C - Medical Payments | $ | 5,000 | any one person subject to the Coverage A occurrence and the General Aggregate Limits of Liability |

**Item 3.** Retroactive Date

Coverage A of this Insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroactive Date, if any, shown here: _____

(Enter Date or "None" if no Retroactive Date applies)

**Item 4.** Form of Business and Location of Premises

Forms of Business: CORPORATION
Location of All Premises You Own, Rent or Occupy:
   **See Schedule of Locations**

**Item 5.** Forms and Endorsements

Form(s) and Endorsement(s) made a part of this policy at time of issue:
   **See Schedule of Forms and Endorsements**

**Item 6.** Premiums

| | | |
|---|---|---|
| Coverage Part Premium: | $ | 62,925.00 |
| Other Premium: | | |
| Total Premium: | $ | 62,925.00 |

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS, HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.     CLASS 2 - CLASS CODE - 14057

   THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.
**FAIC-SKLBUS-CGLDEC (6/01)**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**NEW YORK - EMPLOYEE BENEFITS LIABILITY COVERAGE ENDORSEMENT**

THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE.
PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY AND CONTACT YOUR AGENT OR
BROKER IF YOU HAVE ANY QUESTIONS.

This Endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

1. THIS ENDORSEMENT APPLIES ONLY TO DAMAGES ARISING OUT OF AN ACT, ERROR, OR OMISSION IN THE "ADMINISTRATION" OF YOUR "EMPLOYEE BENEFIT PROGRAM", BETWEEN THE RETROACTIVE DATE, IF ANY, SHOWN IN THE SCHEDULE OF THIS ENDORSEMENT AND THE END OF THE POLICY PERIOD.

2. THIS ENDORSEMENT APPLIES ONLY TO "CLAIMS" MADE AGAINST THE INSURED AFTER THE INCEPTION DATE AND BEFORE THE END OF THE POLICY PERIOD AND ALL COVERAGE UNDER THIS ENDORSEMENT CEASES UPON TERMINATION OF THE POLICY, EXCEPT FOR THE AUTOMATIC BASIC EXTENDED REPORTING PERIOD, UNLESS YOU PURCHASE THE SUPPLEMENTAL EXTENDED REPORTING PERIOD COVERAGE.

3. "CLAIMS" SUBMITTED AFTER THE EXTENDED REPORTING PERIOD TERMINATES WILL NOT BE COVERED AND THE INSURED MAY HAVE COVERAGE GAPS.

4. A BASIC EXTENDED REPORTING PERIOD IS AUTOMATICALLY PROVIDED WITHOUT ADDITIONAL CHARGE. THIS PERIOD STARTS WITH THE END OF THE POLICY PERIOD AND LASTS FOR A PERIOD OF SIXTY (60) DAYS.

5. A SUPPLEMENTAL EXTENDED REPORTING PERIOD FOR ONE (1) YEAR IS AVAILABLE, BUT ONLY BY ENDORSEMENT AND FOR AN ADDITIONAL CHARGE. THE SUPPLEMENTAL EXTENDED REPORTING PERIOD STARTS WHEN THE BASIC EXTENDED REPORTING PERIOD ENDS.

6. THE ADDITIONAL PREMIUM SHALL BE 50% OF THE ANNUAL PREMIUM FOR THIS ENDORSEMENT.

7. DURING THE FIRST SEVERAL YEARS OF THE CLAIMS MADE RELATIONSHIP, "CLAIMS" MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES. THE INSURED CAN EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE LEVEL INCREASES, UNTIL THE "CLAIMS" MADE RELATIONSHIP REACHES MATURITY.

**SCHEDULE**

| Coverage | Limit Of Insurance | | Self Insured Retention | Premium |
|---|---|---|---|---|
| Employee Benefits Programs | $1,000,000 | each employee | $500,000 each employee | INCL |
| | $2,000,000 | aggregate | | |
| Retroactive Date: 8/1/2015 | ( If no date is entered, the Retroactive Date is the Inception Date of the policy period.) | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | |

A. The following is added to Section I – Coverages:

**COVERAGE – EMPLOYEE BENEFITS LIABILITY**

1. **Insuring Agreement**

   a. We will pay those sums in excess of the Self Insured Retention that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages, even if any allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Paragraph **D.** (Section III – Limits Of Insurance); and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

   b. This insurance applies to damages only if:

      (1) The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

      (2) The act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

      (3) A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or an Extended Reporting Period we provide under Paragraph **G.** of this Endorsement.

   c. A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

      (1) When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

      (2) When we make settlement in accordance with Paragraph **1.a.** above.

   d. All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

2. **Exclusions**

   This insurance does not apply to:

**a. Dishonest, Fraudulent, Criminal Or Malicious Act**

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

**b. Bodily Injury, Property Damage, Or Personal And Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

**c. Failure To Perform A Contract**

Damages arising out of failure of performance of contract by any insurer.

**d. Insufficiency Of Funds**

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

**e. Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation**

Any "claim" based upon:

(1) Failure of any investment to perform;

(2) Errors in providing information on past performance of investment vehicles; or

(3) Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**f. Workers' Compensation And Similar Laws**

Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**g. ERISA**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**h. Available Benefits**

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**i. T axes, Fines Or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

  **j.**  **Employment-Related Practices**

    Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

**B.** For the purposes of the coverage provided by this Endorsement:

  **1.**  All references to **Supplementary Payments – Coverages A and B** are replaced by **Supplementary Payments – Coverages A, B and Employee Benefits Liability.**

  **2.**  Paragraphs **1.b.**and **2.** of the Supplementary Payments provision do not apply.

**C.** For the purposes of the coverage provided by this Endorsement, Paragraphs **2.**and **3.** of **Section II –Who Is An Insured** are replaced by the following:

  **2.**  Each of the following is also an insured:

    **a.**  Each of your "employees" who is or was authorized to administer your "employee benefit program".

    **b.**  Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

    **c.**  Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

  **3.**  Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However:

    **a.**  Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

    **b.**  Coverage under this provision does not apply to any act, error or omission that was committed before you acquired or formed the organization.

**D.** For the purposes of the coverage provided by this Endorsement, **Section III – Limits Of Insurance** is replaced by the following:

**1.** **Limits Of Insurance**

  **a.**  The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

    **(1)**  Insureds;

    **(2)**  "Claims" made or "suits" brought;

    **(3)**  Persons or organizations making "claims" or bringing "suits";

    **(4)**  Acts, errors or omissions; or

      (5)    Benefits included in your "employee benefit program".

We shall only be liable for losses covered under the Policy up to the Limits of Insurance in excess of the Self Insured Retention listed in the Schedule above, whether or not such Self Insured Retention is recoverable or collectible.

**b.**    The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

**c.**    Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

      (1)    An act, error or omission; or

      (2)    A series of related acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

However, the amount paid under this Endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Insurance of this Endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this Endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the Limits of Insurance will be increased in proportion to any extension period.

**2.**    **Self Insured Retention**

    **a.**    Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of any Self Insured Retention amount stated in the Schedule as applicable to Each Employee.

    **b.**    The Self Insured Retention amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

    **c.**    The terms of this insurance, including those with respect to:

      (1)    Our right and duty to defend any "suits" seeking those damages; and

      (2)    Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim" apply.

**E.**    For the purposes of the coverage provided by this Endorsement, Conditions 2. and 4. of **Section IV – Commercial General Liability Conditions** are replaced by the following:

    **2.**    **Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

    **a.**    You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim" either within the Self Insured Retention amount or the Limits of Insurance. To the extent possible, notice should include:

    (1)    What the act, error or omission was and when it occurred; and

    (2)    The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

**b.**    If a "claim" is made or "suit" is brought against any insured, you must:

    (1)    Immediately record the specifics of the "claim" or "suit" and the date received; and

    (2)    Notify us as soon as practicable.

You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

**c.**    You shall be responsible for the investigation, defense and settlement of any "claim" or "suit" for damages within the Self Insured Retention. You shall exercise utmost good faith, diligence and prudence to settle all "claims" and "suits" within the Self Insured Retention.

We shall have the right but not the duty to participate with you in the defense or settlement of any "claim" or "suit" seeking damages covered under the Policy up to the Self Insured Retention. In the event of a "claim" or "suit" which in our reasonable judgment may result in payments in an amount in excess of the Self Insured Retention, we have the right and duty to assume control of the defense or settlement of such "claim" or "suit". You will continue to be responsible for the payment of the Self Insured Retention.

**d.**    You and any other involved insured must:

    (1)    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

    (2)    Authorize us to obtain records and other information;

    (3)    Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

    (4)    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

**e.**    No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**4.**    **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this Endorsement, our obligations are limited as follows:

    **a.**    **Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

b.   **Excess Insurance**

(1)   This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an act, error or omission on other than a claims-made basis, if:

(a)   No Retroactive Date is shown in the Schedule of this insurance; or

(b)   The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

(2)   When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3)   When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

(4)   We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this Endorsement.

c.   **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance of all insurers.

F.   For the purposes of the coverage provided by this Endorsement, the following Condition shall also apply to this Endorsement:

**Transfer of Duties When a Limit of Insurance is Used Up**

a.   If we conclude that, based on incidents, "claims" or "suits" which have been reported to us and to which this insurance may apply, the:

(1)   Aggregate Limit; or

(2)   Each Employee Limit;

is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**b.** When a Limit of Insurance described in paragraph a. above has actually been used up in the payment of judgments or settlements:

  **(1)** We will notify the first Named Insured, in writing, as soon as practicable, that:

   **(a)** Such a limit has actually been used up; and

   **(b)** Our duty to defend "suits" seeking damages subject to that limit has also ended.

  **(2)** We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all "claims" and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said "claims" and "suits".

   We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

   We will take no action whatsoever with respect to any "claim" or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the "claim" or "suit" is reported to us after that limit of Insurance has been used up.

  **(3)** The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

**c.** The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with paragraph **b.(2)** above.

  The duty of the first Named Insured to reimburse us will begin on:

  **(1)** The date on which the applicable Limit of Insurance is used up, if we sent notice in accordance with paragraph a. above; or

  **(2)** The date on which we sent notice in accordance with paragraph **b.(1)** above, if we did not send notice in accordance with paragraph a. above.

**d.** The exhaustion of any Limit of Insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

**G.** For the purposes of the coverage provided by this Endorsement, the following Extended Reporting Period provisions are added, or, if this Endorsement is attached to a claims-made Coverage Part, replaces any similar Section in that Coverage Part:

**EXTENDED REPORTING PERIOD**

  **1.** We will provide one or more Extended Reporting Periods, as described below, if:

   **a.** This Endorsement is canceled or not renewed for any reason; or

b. We renew or replace this Endorsement with insurance that does not apply to an act, error, or omission on a claims-made basis; or

c. We renew or replace this Endorsement with insurance that has decreased in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion or any other change less favorable to the insured.

However, upon cancellation due to nonpayment of premium or fraud on the part of the insured:

d. We shall not be required to provide a premium quotation for the Supplemental Extended Reporting Period coverage unless requested by the insured; and

e. The Supplemental Extended Reporting Period does not apply if the "claims" made relationship between the insured and us is less than one year.

2. Extended Reporting Periods do not extend the policy period or change the scope of coverage provided. They apply only to "claims" to which the following applies:

a. The "claim" is first made during an Extended Reporting Period;

b. The act, error, or omission occurs before the end of the policy period; and

c. The act, error, or omission did not commence before the Retroactive Date, if any.

Once in effect, Extended Reporting Periods may not be canceled.

3. A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for 60 days.

The Basic Extended Reporting Period does not reinstate or increase the Limit of Insurance.

4. No later than 30 days after the end of the policy period, we will advise you of the Basic Extended Reporting Period described in Paragraph 3. of this Section. We will also advise you of the availability and importance of purchasing the Supplemental Extended Reporting Period, as described in Paragraph 5. of this Section.

5. A Supplemental Extended Reporting Period lasting one year is available, but only by Endorsement and for an additional charge. This additional period starts when the Basic Extended Reporting Period, as set forth in Paragraph 3. ends.

6. You must give us a written request for the Endorsement within:

a. 60 days from the effective date of termination of coverage; or

b. 30 days from the date of mailing or delivery of the advice required in Paragraph 4.,

whichever period is greater.

7. The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due and any premium or co-payment you owe us for coverage provided under this policy. This premium charge is 50% of the policy premium. The premium charged shall be based upon the rates for such coverage in effect on the date the policy was issued or last renewed.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

8. The Supplemental Extended Reporting Period does not reinstate or increase the Limit of Insurance. The Limit of Insurance for the Supplemental Extended Reporting Period shall be part of, not in addition to, the Limit of Insurance shown in the Schedule. The Limit of Insurance for the Supplemental Extended Reporting Period shall be equal to Limit of Insurance remaining in the policy's Aggregate Limit of Insurance.

9. An insured who is either employed by or otherwise affiliated with you during the policy period shall continue to be covered under this policy and any extended reporting period, even after the affiliation has ended, for such insured's act, error, or omission during the period of affiliation.

10. Extended Reporting Period coverage shall be provided, upon termination of coverage, to any insured, if:

    a. You have been placed in liquidation or bankruptcy or if you permanently cease operations;

    b. You or your designated trustee do not purchase extended reporting period coverage;

    c. Such insured requests the extended reporting period coverage within 120 days of the termination of coverage; and

    d. Such insured pays the additional charge for the coverage.

G. For the purposes of the coverage provided by this Endorsement, the following definitions are added to the **Definitions** Section:

1. "Administration" means:

    a. Giving counsel, other than legal advice, to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    b. Handling records in connection with the "employee benefit program"; or

    c. Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

However, "administration" does not include handling payroll deductions.

2. "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

3. "Claim" means any demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

4. "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

    a. Group life insurance, group accident or health insurance, dental, vision and hearing plans, and flexible spending accounts, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

b.    Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

c.    Unemployment insurance, social security benefits, workers' compensation and disability benefits;

d.    Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

e.    Any other similar benefits designated in the Schedule or added thereto by Endorsement.

H.    For the purposes of the coverage provided by this Endorsement, Definitions 5.and 18. in the **Definitions** Section are replaced by the following:

5.    "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

18.    "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

a.    An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b.    Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 4/1/2019

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**NEW YORK - PREMIUM COMPUTATION ENDORSEMENT**

This endorsement applies to the lines of business indicated below:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**EMPLOYEE BENEFITS LIABILITY COVERAGE**
**LIQUOR LIABILITY COVERAGE FORM**
Your Premium will be calculated as follows:

1. Audit Period: 04/01/2019 through 04/01/2020

☒ Annual      ☐ Semi-Annual      ☐ Monthly      ☐ Other

Deposit Premium $62,925

2. The deposit premium set forth above is adjustable, and is only an estimated premium for the Audit Period shown in 1. above. The final earned premium for the Audit Period will be determined as specified in Condition 5. **Premium Audit** of SECTION IV – **COMMERCIAL GENERAL LIABILITY CONDITIONS** and Condition 5. **Premium Audit** of **SECTION IV – LIQUOR LIABILITY CONDITIONS**. The Audit Premium will be computed by applying the Composite Rate(s) against the Audited Exposure and Exposure Reporting Basis listed in the Premium Adjustment Table below. Such rates are prior to any applicable taxes, licenses or fees.

3. Premium Adjustment Table

| LOB | Class Code | Class Description | Estimated Exposure | Exposure Reporting Basis | Composite Rate | Estimated Premium |
|-----|-----------|------------------|-------------------|-------------------------|----------------|-------------------|
| GL | 15250 | COMPOSITE | 306,800,000 | REVENUE | 0.2051 | $62,925 |
|    |       |           |             | PER 1,000 |        |         |
|    |       |           |             |           |        |         |

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 4/1/2019

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

**ASBESTOS EXCLUSION**

This policy does not apply to:

Any claim, "suit," demand or loss that alleges "bodily injury," "property damage," or "personal and advertising injury," (including but not limited to, compliance with any request, demand, order, or statutory or regulatory requirement or any other action authorized or required by law) including any costs, fees, expenses, penalties, judgments, fines, or sanctions arising there from, which arises out of, or would not have occurred, in whole or in part, but for the "asbestos hazard."

As used in this exclusion, "asbestos hazard" means:

(1)     actual, alleged or threatened exposure to asbestos in any manner or form whatsoever, either directly or indirectly, or

(2)     the failure to warn, advise or instruct related to asbestos in any manner or form whatsoever, or

(3)     the failure to prevent exposure to asbestos in any manner or form whatsoever, or

(4)     the presence of asbestos in any place whatsoever, whether or not within a building or structure.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

Endorsement Effective Date:

00 GL0045 00 12 03                                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**COMMERCIAL GENERAL LIABILITY DEDUCTIBLE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**PRODUCTS AND COMPLETED OPERATIONS LIABILITY COVERAGE FORM**
**LIQUOR LIABILITY COVERAGE FORM**
**EMPLOYEE BENEFITS LIABILITY COVERAGE FORM**
**PROFESSIONAL LIABILITY COVERAGE FORM**

<u>Schedule</u>

An "X" in the table below indicates how a Deductible(s) applies to your policy or coverage form:

| Indicate below | Coverage | Deductible Amount | Each Occurrence | Per Claim |
|---|---|---|---|---|
| [X] | Bodily Injury Liability and Property Damage Liability* | $ 500,000 | [X] | [ ] |
| [ ] | Bodily Injury Liability and Property Damage Liability* — Other than Products – Completed Operations | | [ ] | [ ] |
| [ ] | Bodily Injury Liability and Property Damage Liability* — Products – Completed Operations | | [ ] | [ ] |
| [ ] | Personal and Advertising Injury | | Each Person or Organization | |
| [X] | Employee Benefits Liability | $ 500,000 | Each Employee | |
| [ ] | Liquor Liability | | [ ] Per Common Cause | [ ] Per Claim |
| [ ] | Other: | | | |
| [ ] | Other: | | | |

**Deductible Aggregate:**

*Medical Payments: Included [X] Excluded [ ]

**A. DEDUCTIBLE**

Our obligation to pay damages, costs, benefits, or medical payments, subject to the Limit of Insurance as shown in the Declarations, will be reduced by the **Deductible** shown in the Schedule. Our Limit of Insurance includes, and is not in addition to, the **Deductible**. This deductible cannot be satisfied by the payment of any other deductible as required by any other insurance issued by us or any other carrier that may also apply to our obligation to pay damages, costs, benefits or medical payments.

00 GL0356 00 10 11

Page 1 of 3

**B.** **DEDUCTIBLE AGGREGATE** (this provision applies only if an amount is shown as the **Deductible Aggregate** in the Schedule)

Subject to the applicable Limit of Insurance and related policy provisions, we will pay for all damages, costs, benefits, or medical payments payable under the policy without reduction by the **Deductible** when, as a result of the application of the **Deductibles** to damages, costs, benefits, or medical payments payable under the policy, the sum of all **Deductibles** paid by you exceeds the amount shown in the Schedule as the **Deductible Aggregate**.

If the policy period is longer than one year, the **Deductible Aggregate** amount applies separately to each policy year. Each policy year begins with the inception or anniversary date of the policy and ends at the earlier of the next anniversary date or the expiration of the policy.

The **Deductible Aggregate** amount shown above is not subject to adjustment unless a basis of adjustment is shown below.

The **Deductible Aggregate** is adjustable at the rate of _____ per _____ however the minimum amount of the aggregate deductible will be no less than the **Deductible Aggregate** amount shown above.

The adjustment basis is _____ and is estimated at the inception of this policy as the amount of _____ .

If any payments are made by us under this policy for damages or "Allocated Loss Adjustment Expenses", the Deductible(s) shown in this endorsement applies regardless of whether any other policies issued by us or any other carrier also apply.

**C.** **ALLOCATED LOSS ADJUSTMENT EXPENSES**

You must reimburse us for "Allocated Loss Adjustment Expenses" incurred by us as part of Supplementary Payments in defending a claim or "suit" as indicated by one of the options below:

[X] 1. Option I - "Allocated Loss Adjustment Expenses" Are Included In The **Deductible** Shown In The Schedule. Your total reimbursement for damages, costs, benefits, medical payments and "Allocated Loss Adjustment Expenses" combined shall not exceed the **Deductible** shown in the Schedule.

[ ] 2. Option II - "Allocated Loss Adjustment Expenses" Are Payable In Addition To The **Deductible** Shown In The Schedule On A Shared Basis. The portion of "Allocated Loss Adjustment Expenses" that you must pay will be calculated by dividing the smaller of: (a) the **Deductible** shown in the Schedule; or (b) the damages, costs, benefits, and medical payments we pay; by (c) the damages, costs, benefits, and medical payments we pay.

If we pay no damages, costs, benefits, and medical payment, you must reimburse us for all "Allocated Loss Adjustment Expenses" up to the **Deductible** shown in the Schedule and _____ % (if no amount is shown, 50% will apply) of all remaining "Allocated Loss Adjustment Expenses". Your combined reimbursement for damages, costs, benefits, medical payments and "Allocated Loss Adjustment Expenses" under this option may exceed the **Deductible** shown in the Schedule.

[ ] 3. Option III - "Allocated Loss Adjustment Expenses" Are Payable In Addition To The **Deductible** Shown In The Schedule And Are Your Full Responsibility. You must pay all "Allocated Loss Adjustment Expenses" attributed to all damages, costs, benefits, and medical payments paid by us. Your total reimbursement for damages, costs, benefits, medical payments and "Allocated Loss Adjustment Expenses" under this option may exceed the **Deductible** shown in the Schedule.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

☐ 4. Option IV - "Allocated Loss Adjustment Expenses" Are Payable By Us. We will pay all "Allocated Loss Adjustment Expenses" attributed to all damages, costs, benefits, and medical payments paid by us.

Your obligation to reimburse us for "Allocated Loss Adjustment Expense" applies separately to each occurrence, claim, "employee", common cause or person or organization.

"Allocated Loss Adjustment Expenses" means such claim adjustment expenses directly allocated by us to a particular claim. Such expenses shall include, but not be limited to, attorney's fees for claims in suit; court costs; pre- and post judgment interest; undercover operatives and detective services; employing experts; medical examination, medical cost containment expenses, laboratory, x-ray, and autopsy; stenographic, witnesses, summons, and copies of documents and transcripts; or expenses reasonably chargeable to the investigation, negotiation, settlement or defense of any claim or "suit" against you or for the protection and perfection of your or our subrogation rights.

"Allocated Loss Adjustment Expenses" does not include our general overhead, the salary and benefits of any our "employees", nor the fees of any attorney who is our "employee" or under our permanent retainer; nor the fees of any attorney we retain to provide counsel to us about our obligations, if any, under any policy issued by us with respect to a claim or "suit" against you.

**D.** **OUR RIGHT TO REIMBURSEMENT**

When we pay all or any part of any **Deductible** shown in the Schedule, you must promptly reimburse us for: a) the **Deductible** or the part of the **Deductible** paid by us, and b) all "Allocated Loss Adjustment Expenses" incurred by us in defending a claim or "suit" according to the option selected in Section **C.**, above.

If we require collateral or other security to secure the **Deductible** and other obligations under this Commercial General Liability Deductible Endorsement, you shall provide such collateral or other security in an amount and form as we may determine.

Upon notification of payment by us, you will promptly reimburse us for any such amounts that we have paid. If you fail to reimburse us, or fail to provide us with any security or collateral in an amount or form as we may require, we may treat such failure as non-payment of premium and we may, at our option, cancel this policy by mailing or delivering to you advance written notice in accordance with the CANCELLATION Common Policy Condition. Any resulting return premium may be applied to the reimbursement amounts due.

We may mutually agree upon a final payment amount to satisfy your present and future payment obligations under this Commercial General Liability Deductible Endorsement. Payment by you of such amount will end your obligations to make payments to us under this endorsement.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMENDED DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT AND REPRESENTATIONS CONDITIONS ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

1.　Under **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**, Condition **2. Duties in the Event of Occurrence, Claim or Suit** is amended by the addition of the following paragraphs:

　　e.　It is agreed that where you report an "occurrence" to an insurer providing other than Commercial General Liability insurance, which later develops into a General Liability claim covered under this policy, failure to report such "occurrence" to us at the time of the "occurrence" shall not be deemed in violation of these conditions. However, you shall give immediate notification of the "occurrence" to us, as soon as it is reasonably possible that the "occurrence" is a General Liability claim.

　　f.　It is agreed that knowledge of an "occurrence" by any of your agents, servants or "employees" shall not constitute knowledge by you unless one of your "executive officers" or anyone responsible for administering your insurance program has received such notice from the agent, servant or "employee".

2.　If Employee Benefits Liability Coverage applies to this policy, the following shall apply:

　　Under **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** as amended by the Employee Benefits Liability Coverage, Condition **2. Duties In The Event Of An Act, Error Or Omission, "Claim" or "Suit"** is amended by the addition of the following paragraphs:

　　f.　It is agreed that where you report an act, error or omission to an insurer providing other than Commercial General Liability insurance, which later develops into a General Liability claim covered under this policy, failure to report such act, error or omission to us at the time of the act, error or omission shall not be deemed in violation of these conditions. However, you shall give immediate notification of the act, error or omission to us, as soon as it is reasonably possible that the act, error or omission is a General Liability claim.

　　g.　It is agreed that knowledge of an act, error or omission by any of your agents, servants or "employees" shall not constitute knowledge by you unless one of your "executive officers" or anyone responsible for administering your insurance program has received such notice from the agent, servant or "employee".

3.　Under **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**, Condition **6. Representations** is amended by the addition of the following paragraph:

　　d.　Your failure to disclose all hazards existing as of the inception date of the policy shall not prejudice you with respect to the coverage afforded by this policy, provided such failure or omission is not intentional or grossly negligent.

00 GL0469 00 06 08　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 1 of 2

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-19

CO GL0469 00 06 08                                                                                      Page 2 of 2

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ANTI STACKING ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**EMPLOYEE BENEFITS LIABILITY COVERAGE**
**LIQUOR LIABILITY COVERAGE FORM**
**STOP GAP - EMPLOYERS LIABILITY COVERAGE ENDORSEMENT**

Under **SECTION IV- COMMERCIAL GENERAL LIABILITY CONDITIONS** and **SECTION IV- LIQUOR LIABILITY CONDITIONS**, the following condition is added:

**Two Or More Coverage Forms Or Policies Issued By Us**

If any "occurrence" or offense covered under this policy is also covered in whole or in part under any other coverage form or policy issued to you by us (or by any of our related or affiliated companies) including but not limited to prior policies issued to you by us, (or by any of our related or affiliated companies), the most that will be paid under all such coverage forms and policies covering the "occurrence" or offense is the single highest applicable limit of liability of one of the policies which cover the "occurrence" or offense. This provision does not apply to policies written by us (or by any of our related or affiliated companies) as insurance that specifically applies in excess of this insurance.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11CPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BODILY INJURY DEFINITION EXTENSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Under the:

1.  **COMMERCIAL GENERAL LIABILITY COVERAGE FORM SECTION V – DEFINITIONS**, Definition 3. "Bodily injury";

2.  **LIQUOR LIABILITY COVERAGE FORM SECTION V - DEFINITIONS**, Definition 1. "Bodily injury"; or

3.  **PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM SECTION V - DEFINITIONS**, Definition 2. "Bodily injury"

is deleted and replaced by the following definition:

> "Bodily injury" means physical injury, sickness or disease sustained by a person including death resulting from any of these. "Bodily injury" includes mental anguish, shock, or emotional distress when accompanied by physical injury, sickness or disease.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-19

00 GL0588 00 04 10                                                                 Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**FELLOW EMPLOYEE COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM

Under **Section II — WHO IS AN INSURED**, paragraphs **2.a.(1)(a), 2.a(1)(b)** and **2.a(1)(c)** are deleted in their entirety.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-19

00 GL0590 00 04 10                                                                                     Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**DESIGNATED ENTITY EXCLUSION ENDORSEMENT**

This Endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

It Is agreed that any insurance provided under the GENERAL LIABILITY COVER.. COVERAGE FORM does not apply to the following DESIGNATED ENTITY:

DESIGNATED ENTITY:

THE D.S. BROWN COMPANY AND SEISMIC ENERGY PRODUCTS, INC.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:
Policy Number: 11GPP0510105
Named Insured: ROUGE BROTHERS, INC.
This endorsement is effective on the inception date of this Policy unless otherwise stated herein:
Endorsement Effective Date: 04-01-2019

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**INCIDENTAL MEDICAL MALPRACTICE LIABILITY COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.**   **SECTION V – DEFINITIONS** is amended by the addition of the following definition:

"Incidental medical malpractice injury" means "bodily injury" arising out of the rendering of or failure to render the following services:

a.   Medical, surgical, dental, x-ray or nursing service or treatment or the furnishing of food or beverages in connection therewith, or

b.   The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

**B.**   Under **Section II – WHO IS AN INSURED**, Paragraph 2. a. (1)(d) is deleted in its entirety and replaced with the following:

d.   Arising out of his or her providing or failing to provide professional health care, except for "bodily injury" arising out of "incidental medical malpractice injury" by any physician, dentist, emergency medical technician, nurse or other medical practitioner employed or retained by you. However, the insurance provided hereunder to such persons will not apply to liability arising out of services performed outside of the scope of their duties as your "employees." Any series of continuous, repeated or related acts will be treated as the occurrence of a single negligent professional healthcare service.

The Coverage provided by this endorsement does not apply to you or any insured if you are engaged in the business or occupation of providing any of the services described in the definition of "incidental medical malpractice injury."

The Coverage provided by this endorsement will be excess over any other insurance available to you or any insured.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-2019

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PRIMARY AND NON CONTRIBUTING INSURANCE ENDORSEMENT –
DESIGNATED CONTRACT(S)**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

SCHEDULE

**Designated Contract(s): ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED
SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS.**

With respect to the contract(s) designated in the Schedule above, it is agreed that **SECTION IV-
COMMERCIAL GENERAL LIABILITY CONDITIONS**, Condition 4. Other Insurance, **SECTION IV-
LIQUOR LIABILITY CONDITIONS**, Condition 4. Other Insurance or **SECTION IV- PRODUCTS
/COMPLETED OPERATIONS LIABILITY**, Condition 4. Other Insurance is amended by the addition of
the following paragraph:

**d.    Primary and Non Contributing Insurance – Designated Contract(s)**

Where you are specifically required by a written contract designated in the Schedule above to provide
insurance that is primary and non-contributory, and the written contract designated in the Schedule so
requiring is executed by you before any "occurrence", offense, or "injury" this insurance will be primary
and the other insurance will not contribute with this insurance, but only if and to the extent required by
that written contract.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:

00 GL0598 00 04 10                                                            Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PRIMARY AND NON CONTRIBUTING INSURANCE ENDORSEMENT –
DESIGNATED CONTRACT(S)**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

SCHEDULE

**Designated Contract(s):**

**E. W. HOWELL CO., LLC; THE NEW YORK BOTANICAL GARDEN; THE CITY OF NEW YORK (AND
ALL EMPLOYEES, MEMBERS, SUBSIDIARIES, CONSULTANTS, OFFICERS, OF THE ABOVE)**

With respect to the contract(s) designated in the Schedule above, it is agreed that **SECTION IV-
COMMERCIAL GENERAL LIABILITY CONDITIONS**, Condition 4. **Other Insurance, SECTION IV-
LIQUOR LIABILITY CONDITIONS**, Condition 4. **Other Insurance or SECTION IV- PRODUCTS
/COMPLETED OPERATIONS LIABILITY**, Condition 4. **Other Insurance** is amended by the addition of
the following paragraph:

**d.    Primary and Non Contributing Insurance – Designated Contract(s)**

Where you are specifically required by a written contract designated in the Schedule above to provide
insurance that is primary and non-contributory, and the written contract designated in the Schedule so
requiring is executed by you before any "occurrence", offense, or "injury" this insurance will be primary
and the other insurance will not contribute with this insurance, but only if and to the extent required by
that written contract.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:

00 GL0598 00 04 10                                                                                  Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BODILY INJURY OR PROPERTY DAMAGE EXPECTED OR INTENDED ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** Exclusion **2.a. Expected or Intended Injury** is deleted in its entirety and replaced by the following exclusion:

    a.    **Expected or Intended Injury**

        "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 4/1/2019

00 GL0599 00 04 10                                               Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**NON-OWNED WATERCRAFT EXTENSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, Exclusion **2. g. (2) (a)** is deleted in its entirety and replaced with the following:

    (a)    Less than 100 feet long.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 4/1/2019

00 GL0600 00 04 10                          Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PER LOCATION OR PER PROJECT AGGREGATE LIMIT AND POLICY AGGREGATE LIMIT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**Schedule**

| | | |
|---|---|---|
| ☐ | Per Location Aggregate Limit: | |
| ☒ | Per Project Aggregate Limit: | $2,000,000 |
| | Policy Aggregate Limit: | $2,000,000 |

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by an "occurrence" under **SECTION I – COVERAGE A**, and for all medical expenses caused by accidents under **SECTION I – COVERAGE C**, which can be attributed only to ongoing operations at a single "location" or "project":

1. A separate Per Location Aggregate Limit applies to each "location" you own or rent if there is an "X" in the Per Location box of the **Schedule**, and that limit is equal to the corresponding amount shown in the **Schedule**.

2. A separate Per Project Aggregate Limit applies to each "project" at which you perform operations if there is an "X" in the Per Project box of the **Schedule**, and that limit is equal to the corresponding amount shown in the **Schedule**.

3. The Per Location Aggregate Limit or Per Project Aggregate Limit (whichever is applicable) is the most we will pay for the sum of all such damages under **COVERAGE A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under **COVERAGE C** regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

4. Any payments made under **COVERAGE A** for damages or under **COVERAGE C** for medical expenses shall reduce the Per Location or Per Project Aggregate Limit (whichever is applicable) for that "location" or "project". Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Per Location or Per Project Aggregate Limit for any other "location" or "project".

5. The limits shown in the Declarations for Each Occurrence and for Damage To Premises Rented To You continue to apply. However, instead of being subject to the General

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Per Location or Per Project Aggregate Limit.

B.    For all sums which the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies and which cannot be attributed only to ongoing operations at a single "location" or "project":

    1.    Any payments made for such damages shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

    2.    Such payments shall not reduce any Per Location or Per Project Aggregate Limit.

C.    When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will be subject to and reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor any Per Location Aggregate Limit or Per Project Aggregate Limit.

D.    The Policy Aggregate Limit shown in the **Schedule** is the most we will pay under this policy for the sum of all damages under Coverage **A.** and Coverage **B.**, and Medical Expenses under Coverage **C.** The General Aggregate Limit, the Products-Completed Operations Aggregate Limit, and the Per Location Aggregate Limit(s) or Per Project Aggregate Limit(s) (whichever is applicable) are all subject to the Policy Aggregate Limit.

E.    The provisions of **SECTION III – LIMITS OF INSURANCE** not otherwise modified by this endorsement shall continue to apply as stipulated.

F.    For the purposes of this endorsement, **SECTION V – DEFINITIONS** is amended to include the following additional definitions:

    "Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

    "Project" means construction project. If the applicable construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number:    11GPP0510105

Named Insured:    ROUGH BROTHERS, INC.

Endorsement Effective Date:    04/01/2019

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II — Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V — Definitions.

## SECTION I — COVERAGES

### COVERAGE A — BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments — Coverages A and B.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II — Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

(a) The supervision, hiring, employment, training or monitoring of others by that insured; or

(b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph (1), (2) or (3) above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

f. **Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

CG 00 01 04 13 © Insurance Services Office, Inc., 2012 Page 3 of 16

(2) Any loss, cost or expense arising out of any:

   (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

   (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

   (a) Less than 26 feet long; and

   (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

   (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

   (b) The operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

a. **Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b. **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

c. **Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e. **Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. **Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

g. **Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

h. **Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j. **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k. **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l. **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m. **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n. **Pollution-related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

o. **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

p. **Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C – MEDICAL PAYMENTS

1. **Insuring Agreement**

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      provided that:

      (a) The accident takes place in the "coverage territory" and during the policy period;

      (b) The expenses are incurred and reported to us within one year of the date of the accident; and

      (c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

      (1) First aid administered at the time of an accident;

      (2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

      (3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

   We will not pay expenses for "bodily injury":

   a. **Any Insured**

      To any insured, except "volunteer workers".

   b. **Hired Person**

      To a person hired to do work for or on behalf of any insured or a tenant of any insured.

   c. **Injury On Normally Occupied Premises**

      To a person injured on that part of premises you own or rent that the person normally occupies.

   d. **Workers' Compensation And Similar Laws**

      To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

   e. **Athletics Activities**

      To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

   f. **Products-Completed Operations Hazard**

      Included within the "products-completed operations hazard".

   g. **Coverage A Exclusions**

      Excluded under Coverage A.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© Insurance Services Office, Inc., 2012    CG 00 01 04 13

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

(1) "Bodily injury" or "personal and advertising injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by;

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III — LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

© Insurance Services Office, Inc., 2012

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   (1) How, when and where the "occurrence" or offense took place;

   (2) The names and addresses of any injured persons and witnesses; and

   (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received; and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

© Insurance Services Office, Inc., 2012

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section I — Coverage **A** — Bodily Injury And Property Damage Liability.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

(2) When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

© Insurance Services Office, Inc., 2012

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

### 7. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

### 8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

### 9. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph a. above;

(2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

  (1) Equipment designed primarily for:

    (a) Snow removal;

    (b) Road maintenance, but not construction or resurfacing; or

    (c) Street cleaning;

  (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

  (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

  a. False arrest, detention or imprisonment;

  b. Malicious prosecution;

  c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

  d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

  e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

  f. The use of another's advertising idea in your "advertisement"; or

  g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

  a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    (1) Products that are still in your physical possession; or

    (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      (a) When all of the work called for in your contract has been completed.

      (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  b. Does not include "bodily injury" or "property damage" arising out of:

    (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

    (3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

  a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

    a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

    a. Means:

        (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            (a) You;

            (b) Others trading under your name; or

            (c) A person or organization whose business or assets you have acquired; and

        (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    b. Includes:

        (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

        (2) The providing of or failure to provide warnings or instructions.

    c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

    a. Means:

        (1) Work or operations performed by you or on your behalf; and

        (2) Materials, parts or equipment furnished in connection with such work or operations.

    b. Includes:

        (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

        (2) The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012

COMMERCIAL GENERAL LIABILITY
CG 01 63 07 11

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES –
# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Paragraph **1. Insuring Agreement** of Section I –
Coverage **A Bodily Injury And Property Damage
Liability** is replaced by the following:

1. Insuring Agreement

a. We will pay those sums that the insured
becomes legally obligated to pay as
damages because of "bodily injury" or
"property damage" to which this insurance
applies. We will have the right and duty to
defend the insured against any "suit"
seeking those damages even if the
allegations of the "suit" are groundless, false
or fraudulent. However, we will have no
duty to defend the insured against any "suit"
seeking damages for "bodily injury" or
"property damage" to which this insurance
does not apply. We may, at our discretion,
investigate any "occurrence" and settle any
claim or "suit" that may result. But:

(1) The amount we will pay for damages is
limited as described in Section III –
Limits Of Insurance; and

(2) Our right and duty to defend end when
we have used up the applicable limit of
insurance in the payment of judgments
or settlements under Coverages **A** or **B**
or medical expenses under Coverage **C.**

No other obligation or liability to pay sums
or perform acts or services is covered
unless explicitly provided for under
Supplementary Payments – Coverages **A**
and **B.**

b. This insurance applies to "bodily injury" and
"property damage" only if:

(1) The "bodily injury" or "property damage"
is caused by an "occurrence" that takes
place in the "coverage territory";

(2) The "bodily injury" or "property damage"
occurs during the policy period; and

(3) Prior to the policy period, no insured
listed under Paragraph 1. of Section II –
Who Is An Insured and no "employee"
authorized by you to give or receive
notice of an "occurrence" or claim, knew
that the "bodily injury" or "property
damage" had occurred, in whole or in
part. If such a listed insured or
authorized "employee" knew, prior to the
policy period, that the "bodily injury" or
"property damage" occurred, then any
continuation, change or resumption of
such "bodily injury" or "property damage"
during or after the policy period will be
deemed to have been known prior to the
policy period.

c. "Bodily injury" or "property damage" which
occurs during the policy period and was
not, prior to the policy period, known to
have occurred by any insured listed under
Paragraph 1. of Section II – Who Is An
Insured or any "employee" authorized by
you to give or receive notice of an
"occurrence" or claim, includes any
continuation, change or resumption of that
"bodily injury" or "property damage" after the
end of the policy period.

d. "Bodily injury" or "property damage" will be
deemed to have been known to have
occurred at the earliest time when any
insured listed under Paragraph 1. of
Section II – Who Is An Insured or any
"employee" authorized by you to give or
receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily
injury" or "property damage" to us or any
other insurer;

(2) Receives a written or verbal demand or
claim for damages because of the "bodily
injury" or "property damage"; or

CG 01 63 07 11 © Insurance Services Office, Inc., 2010 Page 1 of 3 □

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

B. Paragraph 1.a. of Section I — **Coverage B Personal And Advertising Injury Liability** is replaced by the following:

1. **Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A and B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments — Coverages A and B.

C. The following is added as Paragraph **e.** to the **Duties In The Event Of Occurrence, Offense, Claim Or Suit** Condition (Paragraph 2. of Section IV — **Commercial General Liability Conditions**):

e. Notice given by or on behalf of the insured, or written notice by or on behalf of the injured person or any other claimant, to any agent of ours in New York State, with particulars sufficient to identify the insured, shall be considered to be notice to us.

D. Paragraph 3. of Section IV — **Commercial General Liability Conditions** is replaced by the following:

3. **Legal Action Against Us**

a. Except as provided in Paragraph **b.**, no person or organization has a right under this Coverage Part:

(1) To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

(2) To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

b. With respect to "bodily injury" and "personal and advertising injury" claims, if we deny coverage or do not admit liability because an insured or the injured person or other claimant fails to give us written notice as soon as practicable, then the injured person, someone acting for the injured person or other claimant may bring an action against us, provided the sole question is whether the denial of coverage or nonadmission of liability is based on the failure to provide timely notice.

However, the injured person, someone acting for the injured person or other claimant may not bring an action if within 60 days after we deny coverage or do not admit liability, we or an insured:

(1) Brings an action to declare the rights of the parties under the policy; and

(2) Names the injured person, someone acting for the injured person or other claimant as a party to the action.

© Insurance Services Office, Inc., 2010  CG 01 63 07 11  □

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**E.** The following provision is added and supersedes any provision to the contrary:

Failure to give notice to us as required under this Coverage Part shall not invalidate any claim made by the insured, injured person or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by the insured, injured person or other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

**F.** The definition of "loading or unloading" in the **Definitions** Section does not apply.

COMMERCIAL GENERAL LIABILITY
CG 01 04 12 04

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES – PREMIUM AUDIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **b.** of the **Premium Audit** Condition Section **IV** is replaced by the following:

**PREMIUM AUDIT**

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. An audit to determine the final premium due or to be refunded will be completed within 180 days after the expiration date of the policy. But the audit may be waived if the total annual premium attributable to the auditable exposure base is not reasonably expected to exceed $1500. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

**B.** Except as provided in Paragraph **A.** above, the **Examination Of Your Books And Records** Common Policy Condition continues to apply.

CG 01 04 12 04 © ISO Properties, Inc., 2003 Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BROAD FORM NAMED INSURED ENDORSEMENT**

This Endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

The Named Insured includes all subsidiaries, affiliated, associated, controlled or allied companies, corporations, or firms now or hereafter constituted in which there is common ownership of more than fifty percent (50%) and for which similar coverage is not separately provided.

The person or organization first named in Item 1 of the Declarations, by acceptance of this policy, is authorized to act and agrees to act on behalf of all persons or organizations insured under the policy with respect to all matters pertaining to the insurance afforded by the policy, including the giving or receipt of notice of cancellation, the payment of premiums and deductibles, and the receiving of return premiums, if any.

The insurance provided by this endorsement remains subject to paragraph 3. under **SECTION II – WHO IS AN INSURED** regarding newly acquired or formed organizations. Further, nothing in this endorsement shall be construed to affect any of our rights to amend the policy premium during the policy period upon the acquisition of a new subsidiary or other entity by the Named Insured. The first Named Insured shall report to us, as soon as practicable, any acquisitions, dissolution, mergers or ownership changes that occur at any time throughout the policy period.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: 04-01-2019

00 GL0480 00 06 14                                                                 Page 1 of 1

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 02 24 10 93

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EARLIER NOTICE OF CANCELLATION
# PROVIDED BY US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS / COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Number of Days' Notice** 90

(If no entry appears above, information required to complete this Schedule will be shown in the Declarations as applicable to this endorsement.)

For any statutorily permitted reason other than nonpayment of premium, the number of days required for notice of cancellation, as provided in paragraph **2.** of either the CANCELLATION Common Policy Condition or as amended by an applicable state cancellation endorsement, is increased to the number of days shown in the Schedule above.

Copyright, Insurance Services Office, Inc., 1992

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 20 10 04 13

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location(s) Of Covered Operations |
|---|---|
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS. | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or

2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 2

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

  **1.** Required by the contract or agreement; or

  **2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 20 11 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| |
|---|
| **Designation Of Premises (Part Leased To You):** ANY PREMISES WHERE REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS. |
| **Name Of Person(s) Or Organization(s) (Additional Insured):** ANY PERSON OR ORGANIZATION WHERE REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS. |
| **Additional Premium:** INCL. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to be a tenant in that premises.

2. Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 11 04 13 © Insurance Services Office, Inc., 2012 Page 1 of 1

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 20 15 04 13

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – VENDORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) (Vendor) | Your Products |
|---|---|
| ANY VENDOR WHERE REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS. | ANY OF YOUR COVERED PRODUCTS AS REQUIRED BY WRITTEN CONTRACT. |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

A. **Section II – Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) (referred to throughout this endorsement as vendor) shown in the Schedule, but only with respect to "bodily injury" or "property damage" arising out of "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business.

However:

1. The insurance afforded to such vendor only applies to the extent permitted by law; and

2. If coverage provided to the vendor is required by a contract or agreement, the insurance afforded to such vendor will not be broader than that which you are required by the contract or agreement to provide for such vendor.

B. With respect to the insurance afforded to these vendors, the following additional exclusions apply:

1. The insurance afforded the vendor does not apply to:

   a. "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

   b. Any express warranty unauthorized by you;

   c. Any physical or chemical change in the product made intentionally by the vendor;

   d. Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

CG 20 15 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 2

e. Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

f. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

g. Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

h. "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

(1) The exceptions contained in Sub-paragraphs d. or f.; or

(2) Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

2. This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

C. With respect to the insurance afforded to these vendors, the following is added to **Section III — Limits Of Insurance:**

If coverage provided to the vendor is required by a contract or agreement, the most we will pay on behalf of the vendor is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

CG 20 15 04 13

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 20 26 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): |
|---|
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS. |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

1. In the performance of your ongoing operations; or

2. In connection with your premises owned by or rented to you.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

POLICY NUMBER: 11GPP0510105

**COMMERCIAL GENERAL LIABILITY**
**CG 20 28 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – LESSOR OF LEASED EQUIPMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): |
| --- |
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS. |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 28 04 13 © Insurance Services Office, Inc., 2012 Page 1 of 1

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 20 37 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| ALL PARTIES WHERE REQUIRED BY A WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO LOSS. | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 37 04 13 © Insurance Services Office, Inc., 2012 Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 21 06 05 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

B. The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

POLICY NUMBER: 11GPP0510105         COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED PRODUCTS

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Designated Product(s):**
AIRCRAFT PRODUCTS

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any of "your products" shown in the Schedule.

CG 21 33 11 85        Copyright, Insurance Services Office, Inc., 1984        **Page 1 of 1**    □

COMMERCIAL GENERAL LIABILITY
CG 21 47 07 98

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

B. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Copyright, Insurance Services Office, Inc., 1997

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph **2. Exclusions** of **Section I — Coverage A — Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

(a) "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

(b) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

(i) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(ii) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

© ISO Properties, Inc., 2003

□

COMMERCIAL GENERAL LIABILITY
CG 21 70 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

CG 21 70 01 15 © Insurance Services Office, Inc., 2015 Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 22 43 04 13

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2. **Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph 2. **Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

2. Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

CG 22 43 04 13 © Insurance Services Office, Inc., 2012 Page 1 of 1

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 22 74 10 01

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LIMITED CONTRACTUAL LIABILITY COVERAGE FOR PERSONAL AND ADVERTISING INJURY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

Designated Contract Or Agreement:
ALL WRITTEN CONTRACTS WHERE THE INSURED IS SPECIFICALLY REQUIRED TO
INDEMNIFY ANOTHER PARTY FOR PERSONAL AND ADVERTISING INJURY DAMAGES.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** With respect to the contract or agreement designated in the Schedule above, Subparagraph **e.** of Paragraph **2. Exclusions** of Section I - **Coverage B - Personal And Advertising Injury Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement.

This exclusion does not apply to:

**(1)** Liability for damages that the insured would have in the absence of the contract or agreement; or

**(2)** Liability for "personal and advertising injury" if:

**(a)** The liability pertains to your business and is assumed in the designated contract or agreement shown in the Schedule in which you assume the tort liability of another. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

**(b)** The "personal and advertising injury" occurs subsequent to the execution of the designated contract or agreement shown in the Schedule; and

**(c)** The "personal and advertising injury" arises out of the offenses of false arrest, detention or imprisonment.

© ISO Properties, Inc., 2001

Solely for the purposes of liability so assumed in such designated contract or agreement, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an Insured are deemed to be damages because of "personal injury" described in Paragraph A.2.e.(2)(c) above, provided:

    (i) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same designated contract or agreement; and

    (ii) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

B. With respect to the contract or agreement designated in the Schedule above, the following is added to **Section I - Supplementary Payments - Coverages A And B:**

If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

1. The "suit" against the indemnitee seeks damages for which the insured has assumed tort liability of the indemnitee in a designated contract or agreement shown in the Schedule, if such liability pertains to your business. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

2. This insurance applies to such liability assumed by the insured;

3. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same designated contract or agreement;

4. The allegations in the "suit" and the information we know about the offense are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

5. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

6. The indemnitee:

  a. Agrees in writing to:

    (1) Cooperate with us in the investigation, settlement or defense of the "suit";

    (2) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

    (3) Notify any other insurer whose coverage is available to the indemnitee; and

    (4) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

  b. Provides us with written authorization to:

    (1) Obtain records and other information related to the "suit"; and

    (2) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph A.2.e.(2) of this endorsement, such payments will not be deemed to be damages for "personal and advertising injury" as described in Paragraph A.2.e.(2)(c) above and will not reduce the limits of insurance.

Our obligation to defend an Insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

1. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

2. The conditions set forth above, or the terms of the agreement described in Paragraph 6. above, are no longer met.

 © ISO Properties, Inc., 2001 CG 22 74 10 01 □

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 24 04 05 09

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person Or Organization: |
| --- |
| ANY PERSON OR ORGANIZATION WHERE WAIVER OF OUR RIGHT TO RECOVER IS PERMITTED BY LAW AND IS REQUIRED BY WRITTEN CONTRACT PROVIDED SUCH CONTRACT WAS EXECUTED PRIOR TO THE LOSS. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of Section **IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

© Insurance Services Office, Inc., 2008

POLICY NUMBER: 11GPP0510105

**COMMERCIAL GENERAL LIABILITY**
CG 24 04 05 09

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Name Of Person Or Organization:**
E.W. HOWELL CO., LLC
245 NEWTOWN ROAD, SUITE 600
PLAINVIEW, NY 11803

PROJECT:
NYBG ENID A. HAUPT CONSERVATORY DOME RESTORATION

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of Section **IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

CG 24 04 05 09 © Insurance Services Office, Inc., 2008 Page 1 of 1 ☐

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES — TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS USED UP

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following Condition is added to COMMERCIAL GENERAL LIABILITY CONDITIONS (Section IV):

**Transfer of Duties When a Limit of Insurance Is Used Up.**

a. If we conclude that, based on "occurrences," offenses, claims or "suits" which have been reported to us and to which this insurance may apply, the:

(1) General Aggregate Limit (other than the Products/Completed Operations Aggregate Limit);

(2) Products/Completed Operations Aggregate Limit;

(3) Personal and Advertising Injury Limit;

(4) Each Occurrence Limit; or

(5) Fire Damage Limit

is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

b. When a limit of insurance described in paragraph a. above has actually been used up in the payment of judgments or settlements:

(1) We will notify the first Named Insured, in writing, as soon as practicable, that:

(a) Such a limit has actually been used up; and

(b) Our duty to defend "suits" seeking damages subject to that limit has also ended.

(2) We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all claims and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and "suits".

We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the claim or "suit" is reported to us after that limit of insurance has been used up.

(3) The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

c. The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with paragraph b.(2) above.

The duty of the first Named Insured to reimburse us will begin on:

(1) The date on which the applicable limit of insurance is used up, if we sent notice in accordance with paragraph a. above; or

(2) The date on which we sent notice in accordance with paragraph b.(1) above, if we did not send notice in accordance with paragraph a. above.

d. The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

Copyright, Insurance Services Office, Inc., 1991

COMMERCIAL GENERAL LIABILITY
CG 26 36 12 93

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES – TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS USED UP

This endorsement modifies insurance provided under the following:

OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY COVERAGE FORM

The following Condition is added to CONDITIONS (Section IV):

**Transfer of Duties When a Limit of Insurance Is Used Up.**

**a.** If we conclude that, based on "occurrences", claims or "suits" which have been reported to us and to which this insurance may apply, the Aggregate Limit or the Each Occurrence Limit is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

**b.** When a limit of insurance described in paragraph a. above has actually been used up in the payment of judgments or settlements:

(1) We will notify the first Named Insured, in writing, as soon as practicable, that:

    (a) Such a limit has actually been used up; and

    (b) Our duty to defend "suits" seeking damages subject to that limit has also ended.

(2) We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all claims and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and "suits".

We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the claim or "suit" is reported to us after that limit of insurance has been used up.

(3) The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

**c.** The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with paragraph b.(2) above.

The duty of the first Named Insured to reimburse us will begin on:

(1) The date on which the applicable limit of insurance is used up, if we sent notice in accordance with paragraph a. above; or

(2) The date on which we sent notice in accordance with paragraph b.(1) above, if we did not send notice in accordance with paragraph a. above.

**d.** The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

 Copyright, Insurance Services Office, Inc., 1993

POLICY NUMBER: 11GPP0510105

**COMMERCIAL GENERAL LIABILITY**
CG 20 10 07 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| E. W. HOWELL CO., LLC; THE NEW YORK BOTANICAL GARDEN; THE CITY OF NEW YORK (AND ALL EMPLOYEES, MEMBERS, SUBSIDIARIES, CONSULTANTS, OFFICERS, OF THE ABOVE) | PROJECT: NYBG ENID A. HAUPT CONSERVATORY DOME RESTORATION |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 07 04 © ISO Properties, Inc., 2004 Page 1 of 1

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 20 10 07 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| DPR CONSTRUCTION, A GENERAL PARTNERSHIP, their officers, partners, agents, employees, affiliates, parents and subsidiaries; ARE-San Francisco No. 21, L.P., and Alexandria Real Estate Equities, Inc., all indemnitees and the Project's lenders, and their respective divisions, parents, subsidiaries, limited liability companies, members, managers, partners, partnerships, shareholders, affiliated organizations, successors and assigns, officers, directors, representatives, agents and employees, together with such other persons and organizations as Owner may reasonably designate from time to time | ARE 213 East Grand SSF 213 East Grand Avenue South San Francisco, CA |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or

2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 07 04

© ISO Properties, Inc., 2004

Page 1 of 1

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 20 10 07 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| SUNVEST SOLAR INC, AND FCPC PHASE 3 CARTER CASINO | FCPC PHASE 3 CARTER CASINO, 618 WI-32, CARTER, WI 54566 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or

2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 07 04    © ISO Properties, Inc., 2004    Page 1 of 1    □

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 20 37 07 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): | Location And Description Of Completed Operations |
|---|---|
| E. W. HOWELL CO., LLC; THE NEW YORK BOTANICAL GARDEN; THE CITY OF NEW YORK (AND ALL EMPLOYEES, MEMBERS, SUBSIDIARIES, CONSULTANTS, OFFICERS, OF THE ABOVE) | PROJECT: NYBG ENID A. HAUPT CONSERVATORY DOME RESTORATION |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 20 37 07 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location And Description Of Completed Operations |
|---|---|
| DPR CONSTRUCTION, A GENERAL PARTNERSHIP, their officers, partners, agents, employees, affiliates, parents and subsidiaries; ARE-San Francisco No. 21, L.P., and Alexandria Real Estate Equities, Inc., all indemnitees and the Project's lenders, and their respective divisions, parents, subsidiaries, limited liability companies, members, managers, partners, partnerships, shareholders, affiliated organizations, successors and assigns, officers, directors, representatives, agents and employees, together with such other persons and organizations as Owner may reasonably designate from time to time | ARE 213 East Grand SSF 213 East Grand Avenue South San Francisco, CA |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

© ISO Properties, Inc., 2004

POLICY NUMBER: 11GPP0510105

COMMERCIAL GENERAL LIABILITY
CG 20 37 07 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location And Description Of Completed Operations |
|---|---|
| SUNVEST SOLAR INC, AND FCPC PHASE 3 CARTER CASINO | FCPC PHASE 3 CARTER CASINO, 618 WI-32, CARTER, WI 54566 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

CG 20 37 07 04

© ISO Properties, Inc., 2004

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**Coverage C – Medical Payments Limit of Liability Amendment**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

It is hereby understood and agreed that the Limits of Liability for Section I - Coverage C – Medical Payments is amended to $10,000 in lieu of $5,000 but only for the following scheduled project:

**Scheduled Project:**

The Pennsylvania State University
c/o 2-C Administration
106 Physical Plan Building
University Park, PA  16802

PSU Project and Quest CDN Numbers:

Quest CDN 6112934
PSU Project #00-06109.00

All other terms and conditions of this Policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK [STATE] INSURANCE LAW AND REGULATIONS.  HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

Issued By:

Endorsement Number:

Policy Number: 11GPP0510105

Named Insured: ROUGH BROTHERS, INC.

Endorsement Effective Date: 02-26-2019

President

# EXHIBIT D

E-FILED 03/08/2024 10:57 AM  /  CONFIRMATION 1441483  /  A 2401119  /  COMMON PLEAS DIVISION  /  IFIJ

1

**PERKINS COIE LLP**

2

Meredith A. Jones-McKeown, Bar No. 233301

3

MJonesMcKeown@perkinscoie.com
505 Howard Street, Suite 1000

4

San Francisco, CA 94105-3204
Telephone: 415.344.7000

5

Facsimile: 415.344.7050

6

Attorney for Plaintiffs

7

CYPRESS CREEK EPC, LLC, et. al.

Electronically FILED by
Superior Court of California,
County of Los Angeles
10/18/2023 1:12 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By E. Galicia, Deputy Clerk

8

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9

**COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

10

11

CYPRESS CREEK EPC, LLC, a Delaware
limited liability company; BRONSON

12

SOLAR, LLC, a Texas limited liability
company; CHISUM SOLAR, LLC, a

13

Texas limited liability company; EDDY
SOLAR II, LLC, a Texas limited liability

14

company; GASTON SOLAR II, LLC, a
South Carolina limited liability company;

15

HIGHWAY 56 SOLAR, LLC, a Texas
limited liability company; STERLING

16

SOLAR, LLC, a Texas limited liability
company; WEST MOORE SOLAR II,

17

LLC, a Texas limited liability company;
BAR D SOLAR, LLC, a Colorado limited

18

liability company; BOVINE SOLAR, LLC,
a Texas limited liability company;

19

CASCADE SOLAR, LLC, a Texas limited
liability company; COPPERFIELD

20

SOLAR LLC, a North Carolina limited
liability company; GASTON SOLAR I,

21

LLC, a South Carolina limited liability
company; LEON SOLAR, LLC, a Texas

22

limited liability company; MARLIN
SOLAR, LLC, a Texas limited liability

23

company; MORNING VIEW SOLAR,
LLC, a North Carolina limited liability

24

company; NORTH GAINESVILLE
SOLAR, LLC, a Texas limited liability

25

company; STAUNTON SOLAR, LLC, an
Indiana limited liability company;

26

WHITESBORO SOLAR, LLC, a Texas
limited liability company; WHITESBORO

27

SOLAR II, LLC, a Texas limited liability
company; WHITEWRIGHT SOLAR,

28

LLC, a Texas limited liability company;

Case No. 23STCV25381

**PLAINTIFFS' COMPLAINT FOR
DAMAGES**

1. Breach of Express Warranty
2. Breach of Contract - Obligation to
   Repair/Replace
3. Deceit - Negligent Misrepresentation
4. Negligent Design of a Product
5. Negligent Manufacture of a Product

**DEMAND FOR JURY TRIAL**

and YELLOW JACKET SOLAR, LLC, a
Texas limited liability company,

Plaintiffs,

v.

TERRASMART, INC., an Ohio
corporation f/k/a RBI Solar, Inc, and
DOES 1 through 10, inclusive,

Defendants.

Plaintiffs Cypress Creek EPC, LLC, a Delaware limited liability company ("Cypress Creek EPC"), Bronson Solar, LLC, a Texas limited liability company ("Bronson LLC"), Chisum Solar, LLC, a Texas limited liability company ("Chisum LLC"), Eddy Solar II, LLC, a Texas limited liability company ("Eddy II LLC"), Gaston Solar II, LLC, a South Carolina limited liability company ("Gaston II LLC"), Highway 56 Solar, LLC, a Texas limited liability company ("Highway 56 LLC"), Sterling Solar, LLC, a Texas limited liability company ("Sterling"), West Moore Solar II, LLC, a Texas limited liability company ("West Moore II LLC"), Bar D Solar, LLC, a Colorado limited liability company ("Bar D LLC"), Bovine Solar LLC, a Texas limited liability company ("Bovine LLC"), Cascade Solar, LLC, a Texas limited liability company ("Cascade LLC"), Copperfield Solar, LLC, a North Carolina limited liability company ("Copperfield LLC"), Gaston Solar I, LLC, a South Carolina limited liability company ("Gaston I LLC"), Leon Solar, LLC, a Texas limited liability company ("Leon Solar, LLC"), Marlin Solar, LLC, a Texas limited liability company ("Marlin LLC"), Morning View Solar, LLC, a North Carolina limited liability company ("Morning View LLC"), North Gainesville Solar, LLC, a Texas limited liability company ("North Gainesville LLC"), Staunton Solar, LLC, a Indiana limited liability company ("Staunton LLC"), Whitesboro Solar, LLC, a Texas limited liability company ("Whitesboro LLC"), Whitesboro Solar II, LLC, a Texas limited liability company ("Whitesboro II LLC"), Whitewright Solar, LLC, a Texas limited liability company ("Whitewright LLC"), and Yellow Jacket Solar, LLC, a Texas limited liability company ("Yellowjacket LLC") hereby allege as follows:

- 2 -

## JURISDICTION AND VENUE

1.     Venue lies properly with this Court under California Code of Civil Procedure § 395.5 because Cypress (as subsequently defined) is informed and believes, and based upon such information and belief, allege that Defendant Terrasmart, Inc., an Ohio corporation and formerly known as RBI Solar, Inc., also an Ohio corporation is an Ohio corporation conducting business in the State of California ("Defendant"), maintains offices in California, and has not designated a local principal office.

2.     This Court has subject matter jurisdiction over Cypress and Defendant (collectively, the "Parties") because of the Court's inherent general subject matter jurisdiction as a California superior court.

3.     Jurisdiction is proper because the amount in controversy exceeds the Court's jurisdictional minimum.  This Court has jurisdiction over the Defendant because it conducts business in the state of California.

4.     This Court has personal jurisdiction over the Parties, including under California Code of Civil Procedure § 410.40,  because each of the Plaintiffs' claims in this action relate to a transaction involving not less than one million dollars and the Purchase Orders (as defined below) contain a provision that states Defendant agrees to jurisdiction in the state courts of California.

5.     The Purchase Orders state that the Parties agree to jurisdiction and venue in the state courts located in Los Angeles, California.

## GENERAL ALLEGATIONS

6.     At all relevant times, Cypress Creek EPC has been a limited liability company organized and existing under the laws of the State of Delaware. Cypress Creek EPC is licensed to conduct business in the State of California.

7.     Cypress is informed and believes and thereon alleges that Does 1 through 10, whether individual, corporate, associate, or otherwise, are fictitious names of Defendants whose true names and capacities are presently unknown to Cypress.  Each of the fictitiously named

- 3 -

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

1  Defendants, whether acting for herself, himself, itself, or as agents, corporations, associations,

2  predecessors, successors, or otherwise, is in some way liable to Cypress on the facts herein alleged.

3  At such time as Doe Defendants' true names and capacities become known to Cypress, Cypress

4  will seek leave of this Court to amend this Complaint to assert their true names and capacities.

5      8.     Cypress is informed and believes and thereon alleges that at all relevant times

6  Defendants were the agents and employees of each other Defendant, and that each Defendant was

7  acting in the scope of its authority as such agent and/or employee of each other Defendant, and with

8  the knowledge of each other Defendant such that Defendants are jointly and severally liable to

9  Cypress.

10     9.     Cypress Creek EPC and its affiliates develop, own, and operate solar power plants

11  ("Solar Projects") across the United States.  Typically, Cypress Creek EPC or one of its affiliates

12  retains a firm to design the plant, purchases all or a portion of the equipment necessary for a fully

13  functioning plant, places the equipment, and then operates and maintains the plant.

14     10.    As part of the development process, Cypress Creek EPC enters into EPC

15  Agreements with affiliated or related entities that own the respective sites, and under those EPC

16  Agreements Cypress Creek EPC agrees to engineer, procure and install the solar project for the

17  affiliated owner entity.

18     11.    Bronson LLC owns the Bronson Solar Project (as subsequently defined) which was

19  installed by Cypress Creek EPC.

20     12.    Chisum LLC owns the Chisum Solar Project (as subsequently defined) which was

21  installed by Cypress Creek EPC.

22     13.    Eddy II LLC owns the Eddy II Solar Project (as subsequently defined) which was

23  installed by Cypress Creek EPC.

24     14.    Gaston II LLC owns the Gaston II Solar Project (as subsequently defined) which

25  was installed by Cypress Creek EPC.

26     15.    Highway 56 owns the Highway 56 Solar Project (as subsequently defined) which

27  was installed by Cypress Creek EPC.

28

-4-

PLAINTIFFS' COMPLAINT FOR DAMAGES

16. Sterling LLC owns the Sterling Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

17. West Moore Solar II LLC owns the West Moore II Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

18. Bar D LLC owns the Bar D Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

19. Bovine LLC owns the Bovine Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

20. Cascade LLC owns the Cascade Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

21. Copperfield LLC owns the Copperfield Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

22. Gaston I LLC owns the Gaston I Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

23. Leon LLC owns the Leon Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

24. Marlin LLC owns the Marlin Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

25. Morning View LLC owns the Morning View Solar Project (as subsequently described) which was installed by Cypress Creek EPC.

26. North Gainesville LLC owns the North Gainesville LLC Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

27. Staunton LLC owns the Staunton Solar Project (as subsequently described) which was installed by Cypress Creek EPC.

28. Whitesboro LLC owns the Whitesboro I Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

29. Whitesboro II LLC owns the Whitesboro II Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

30.     Whitewright LLC owns the Whitewright Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

31.     Yellow Jacket LLC owns the Yellow Jacket Solar Project (as subsequently defined) which was installed by Cypress Creek EPC.

32.     Bronson LLC, Chisum LLC, Eddy II LLC, Gaston II LLC, Highway 56 LLC, Sterling LLC, West Moore II LLC, Bar D LLC, Bovine, LLC, Cascade LLC, Copperfield LLC, Gaston I LLC, Leon LLC, Marlin LLC, Morning View LLC, North Gainesville LLC, Staunton LLC, Whitesboro LLC, Whitesboro II LLC, Whitewright LLC, and Yellow Jacket LLC are collectively referred to as "Project Owners." Cypress Creek EPC and Project Owners are collectively referred to as "Cypress."

33.     Cypress Creek EPC and the Project Owners are indirectly owned and controlled by Cypress Creek Renewables Holdings, LLC.

34.     Cypress is informed and believes, and on such information and belief alleges that, Defendant currently designs, manufactures, and sells solar array products. Defendant markets itself on its website as a "leading provider of solar racking technologies, electrical balance-of-system products, installation services, and project optimization software."

35.     Defendant is in the business of selling parts necessary for the operation of solar systems and represents itself as a "market leading provider" of solar mounting systems.

36.     The Solar Projects that Cypress operates and maintains are typically composed of (i) fixed or tracking racking systems that support the modules, (ii) the modules, and (iii) inverters, combiner boxes, transformers, wiring, and other balance of system equipment (collectively the "Solar Power Generating System"). Each of these Solar Power Generating System components are necessary to generate solar power and must be integrated with one another.

37.     The modules, inverters, wiring, and other balance of system equipment for the Projects were supplied and sold by companies other than Defendant.

38.     A "fixed" racking system is one that supports the modules, but which keeps the modules in a fixed position. A "tracking" racking system maximizes energy production by using

- 6 -

motors, gearboxes, controllers, and other equipment that allow the modules to rotate on an axis to track the path of the sun across the sky.

39. Defendant sold Cypress tracking racking systems (the "Tracking Systems") for the Solar Projects.

**Defendant Made Critical Representations Regarding the Design and Engineering of the Tracking Systems and their Suitability for the Solar Projects.**

40. Prior to entering into the Purchase Orders (defined below), Defendant repeatedly made important representations to Cypress regarding the Tracking Systems, copies of which are attached hereto as **Exhibit A.** These representations regarding the Tracking Systems included the following:

     a. The design of the Tracking Systems results in "near elimination of dynamic effects."

     b. The Tracking Systems have "no dynamic effects experienced and as a result, no dampeners are required."

     c. The Tracking Systems will have "Better O&M," "simple O&M," and "easy maintenance."

     d. The Tracking Systems involve "3 Steps" for "Simple Installation" and there is "no alignment necessary."

     e. The design of the Tracking Systems supports "crystalline" and "thin film" modules.

41. Prior to entering into the Purchase Orders, RBI also retained the engineering firm of Rowan Williams Davies & Irwin Inc. ("RWDI") to provide wind engineering consultation services, including recommendations regarding the wind loads acting on various components of the Tracking System.

42. Thereafter, RWDI issued a February 23, 2017 Final Report (the "RWDI Final Report") setting forth its recommendations as to the analysis Defendant must perform in order to properly consider dynamic loading in Defendant's design of the Tracking Systems for use in Cypress' Solar Power Generating Systems.

- 7 -

43. Defendant sent Cypress the RWDI Final Report in July 2017 and represented to Cypress that it used the RWDI Final Report to develop its engineering of the Tracking Systems.

44. Based on these myriad representations and in reliance thereon, Cypress agreed to purchase Tracking Systems for operation at more than twenty separate Solar Projects.

45. Prior to entering into the first Purchase Order that is the subject of this action, Defendant sent Plaintiffs its form warranty agreement for the Tracking Systems.

**Cypress Paid Defendant More than $40 Million for Tracking Systems.**

46. The Tracking Systems were purchased under twenty-five (25) separate purchase orders (the "Purchase Orders") for use in connection with thin film modules ("Thin Film Modules") and crystalline modules ("Crystalline Modules"). The Thin Film Modules and Crystalline Modules were not purchased from or supplied by Defendant.

47. The Parties entered into the following seven (7) separate Purchase Orders for Tracking Systems to use in connection with Thin Film Modules:

      a. A Purchase Order for a total price of $3,243,082.00 for the Bronson project.

      b. A Purchase Order for a total price of $3,054,949.00 for the Chisum project.

      c. A Purchase Order for a total price of $2,975,843.00 for the Eddy II project.

      d. A Purchase Order for a total price of $2,327,852.00 for the Gaston II project.

      e. A Purchase Order for a total price of $1,822,101.00 for the Highway 56 project.

      f. A Purchase Order for a total price of $2,996,354.00 for the Sterling project.

      g. A Purchase Order for a total price of $1,649,864.00 for the West Moore II project.

48. The Parties entered into the following eighteen (18) separate Purchase Orders for Tracking Systems to use in connection with Crystalline Modules:

      a. A Purchase Order for a total price of $1,207,745.00 and another Purchase Order in the amount of $152,632.00 for the Bar D project.

      b. A Purchase Order for a total price of $2,672,198.00 for the Bovine project.

      c. A Purchase Order for a total price of $2,562,161.00 for the Cascade project.

      d. A Purchase Order for a total price of $474,097.00 for the Copperfield project.

- 8 -

e. A Purchase Order for a total price of $2,550,555.00 and another Purchase Order in the amount of $175,900.00 for the Gaston I project.

f. A Purchase Order in the amount of $2,483,059.00 for the Leon project.

g. A Purchase Order in the amount of $7,500.00 and another Purchase Order in the amount of $1,340,143.00 for the Marlin project.

h. A Purchase Order in the amount of $487,637.00 for the Morning View project.

i. A Purchase Order in the amount of $7,500.00 and another Purchase Order in the amount of $1,285,745.00 for the North Gainesville project.

j. A Purchase Order in the amount of $1,036,426.00 for the Staunton project.

k. A Purchase Order in the amount of $1,239,227.00 for the Whitesboro I project.

l. A Purchase Order in the amount of $1,248,736.00 for the Whitesboro II project.

m. A Purchase Order in the amount of $2,527,420.00 for the Whitewright project.

n. A Purchase Order in the amount of $1,276,219.00 for the Yellow Jacket project. The projects listed in this Paragraph and the preceding Paragraph are collectively referred to as the "Projects."

49. Cypress Creek EPC paid Defendant $40,652,966 for the 25 Purchase Orders.

50. The Purchase Orders are essentially identical, where the terms and conditions of each Purchase Order are the same and the only substantive differences are the project-specific commercial terms specifying the quantity of Tracking Systems purchased under the respective Purchase Order, the value of the Purchase Order, the delivery date for the Tracking Systems, and the specifications for each project, including the number of supported modules, the module manufacturer, and the loading assumptions for the Tracking System.

51. As set forth in the Purchase Order in the "Warranties" provision at "Page 3 of 5":

a. Defendant expressly warranted that the Tracking Systems will "be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for [Cypress'] particular purposes, to the extent [Defendant] knows or should know of."

- 9 -

b. Defendant was required to "provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed, and that it would "comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws" (the "Standard of Care").

c. Cypress waived "none of the warranties available to it, either by express promise or implication." (Purchase Order, p. 3.)

52. The Purchase Orders specify "Wind" "Loading Assumptions" ranging between 105 mph and 126 mph; *i.e.*, the Tracking Systems were required to be able to regularly sustain wind loads in that range.

53. In connection with each Purchase Order, Defendant also issued "Materials Warranty Agreements" for the Tracking Systems that Defendant supplied to Cypress. The Purchase Orders and Material Warranty Agreements are collectively referred to as the "Tracker Agreements," which are attached hereto as **Group Exhibit B**.

54. The Materials Warranty Agreements are essentially identical, where the terms of each are the same and the only substantive differences are the references to the specific "Project," warranted "Product," and the effective date of the Materials Warranty Agreement.

55. As set forth in the Materials Warranty Agreement:

a. Defendant warranted that the structural components of the Tracking Systems "will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and

- 10 -

1    regulatory requirements that have been approved by a licensed professional

2    engineer" (the "Structural Warranty").

3    b. Defendant warranted that the motors, gearboxes and controller assembly

4    components on the Tracking Systems "will be free from defects in material

5    and/or workmanship for a period of five (5) years from the date of shipment of

6    the Product when used under normal conditions, when used in accordance

7    with its documentation, including system programming requirements

8    contained in the operating manual and when constructed and installed in

9    compliance with documentation supplied by RBI Solar and all applicable

10   construction codes and regulatory requirements that have been approved by

11   a licensed professional engineer" (the "Component Warranty").

12   c. That "[i]n the event the structural components or the motor, gearbox and

13   controller assembly components of the [Tracking System] fail to comply with

14   the Structural Warranty or the Component Warranty, then [Defendant] will

15   repair or replace, at its option and cost, the defective Product."

16   56. Pursuant to the Purchase Orders, Defendant's services included commissioning.

17   57. As set forth in the Purchase Orders, Defendant provided Plaintiff with installation

18   manuals for the Tracking System.

19   58. Defendant issued the Materials Warranty Agreement to and for the benefit of

20   Cypress.

21   59. The Materials Warranty Agreements for the Gaston, Copperfield, Bar D, Morning

22   View, and Staunton Projects were subsequently transferred to Gaston LLC, Copperfield LLC, Bar

23   D LLC, Morning View LLC, Staunton LLC with Defendant's written consent (the "Transferred

24   Warranties"). Copies of the Warranty Transfer Agreements are included in Group Exhibit B.

25   60. Pursuant to separate agreements (the "EPC Agreements"), the Project Owners

26   retained Cypress Creek EPC to install the RBI Tracking Systems for their respective projects, to

27   "maintain and enforce" the vendor warranties on behalf of the respective Project Owners, and to

28   complete any warranty repairs.

- 11 -

**The Tracking Systems Are Defective and Cause Catastrophic Failures.**

61.     Defendant engineered, designed, manufactured, supplied, and delivered the Tracking Systems for the Projects.

62.     Defendant supplied Cypress Creek EPC with installation manuals for the Tracking Systems, which Defendant revised multiple times.

63.     Defendant performed commissioning services for the Tracking Systems at or about substantial completion of the Projects.

64.     Cypress began to observe serious and catastrophic failures of the Tracking Systems after commencing commercial operation. For example, as shown in the photos below, the Tracking Systems routinely helix, where the racks twist on their axis in an unexpected and unacceptable manner. The helixing renders the Tracking Systems unable to track and causes the modules to crack and to fall off the racks and causes damage to wiring.



- 12 -

65.     Cypress is informed and believes, and on such information and belief alleges that, the helixing and other defects in the Tracking System were caused by the Defendant, including *inter alia*:

      a.  Failure to properly design, engineer, and manufacture the Tracking Systems;

      b.  Failure to design, engineer, and manufacture the Tracking System in accordance with Standard of Care;

      c.  Failure to design, engineer, and manufacture the Tracking System to meet the performance requirements set forth in the Purchase Orders, including the wind loading specifications;

      d.  Failure to properly consider dynamic wind loading in its design of the Tracking System;

      e.  Failure to perform the analysis RWDI stated was necessary in order for Defendant to properly consider wind loads (i.e., dynamic loads) in its design;

      f.  Failure to properly design various components of the Tracking Systems, including the couplers, gearboxes, motors, tracker control units, jaw hubs, and bearings;

      g.  Failure to properly manufacture various components of the Tracking Systems, including the couplers, gearboxes, motors, tracker control units, jaw hubs, and bearings;

      h.  Failure to implement adequate quality control and quality assurance measures for the mechanical components of the Tracking Systems;

      i.  Failure to prepare adequate installation instructions; and

      j.  Failure to prepare adequate operation and maintenance instructions.

66.     The Tracking Systems fail to perform as intended and are not in conformity with Defendant's representations at sites with both Thin Film and Crystalline modules.

67.     The components of the Tracking Systems require frequent, excessive, and costly repair and replacement.

- 13 -

68. The helixing Tracking Systems cause serious damage to the modules, whereby the modules crack, fall to the ground, and stop functioning and to other associated equipment, including wiring and connections. Cypress estimates it will be required to replaced more than 35,000 modules due to the defective Tracking Systems.

69. The failure of components and helixing of the Tracking Systems significantly impairs the functioning and production of the Solar Power Generating Systems.

70. Due to the high failure rates, excessive operation and repair costs, and overall system instability, Cypress has ceased using the tracking feature of the Tracking Systems at six of the seven Thin Film sites, such that the sites no longer track the sun across the sky.

**Defendant Failed to Repair or Replace the Defective Tracking Systems.**

71. Cypress promptly and timely notified Defendant of the Tracking System defects and catastrophic failures.

72. Defendant failed to repair or replace the defective Tracking Systems.

73. In response to Cypress' defect notices, Defendant ignored the notices, completed limited repairs that were insufficient to remedy the defects in the Tracking Systems, and routinely asserted that the Tracking System failures were caused by Cypress Creek EPC's improper installation which could be remedied with re-alignment of the Tracking System.

74. Cypress Creek EPC has and continues to incur damages under the EPC Agreements to repair the defective Tracking Systems.

75. Cypress Creek EPC has been and continues to enforce the Express Warranties (defined below) set forth in the Tracking Agreements on its behalf and on behalf of the Project Owners, including by pursuing the claims set forth in this complaint.

**Cypress Has Incurred Significant Damages.**

76. Cypress has incurred and will continue to incur significant damages to repair and maintain the defective Tracking Systems.

77. Cypress has incurred and will continue to incur significant damages to repair and maintain the Solar Power Generating Systems, including to replace modules.

- 14 -

78. Additionally, Cypress has suffered considerable losses attributable to stowing the Tracking Systems at six Thin Film sites, including diminished use of the modules.

79. Defendant has caused Cypress to incur significant damages well in excess of the jurisdictional limit California Code of Civil Procedure § 85.

80. Cypress and Defendant entered into a tolling agreement for the projects that are the subject of this complaint (the "Tolling Agreement"). The Tolling Agreement tolled the statute of limitations for all claims and defenses that are relevant to this action as of August 31, 2022.

81. Cypress cancelled the Tolling Agreement as of October 18, 2023.

## FIRST CAUSE OF ACTION
**(Breach of Contract Claims for Breach of Express Warranties against Defendant and DOES 1-10)**

82. Cypress repeats and incorporates paragraphs 1 through 81, inclusive, by reference herein as though set forth in full.

83. The Tracker Agreements include the following express warranties (the "Express Warranties"):

    a. Defendant expressly warranted that any articles and products delivered pursuant to the purchase orders would be "merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for [Cypress'] particular purposes, to the extent [Defendant] knows or should know of." (Purchase Order, p. 3).

    b. Defendant expressly warranted that the structural components of the Tracking System will be "new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product." (Material Warranty Agreement, p. 1).

    c. Defendant expressly warranted that the motors, gearboxes, and controller components of the Tracking System will be "new, will conform in all material

- 15 -

1    respects to the specifications expressly set forth in the Sales Agreement, and will

2    be free from defects in material and/or workmanship for a period of five (5)

3    years from the date of the shipment of the Product when used under normal

4    conditions." (Material Warranty Agreement, p. 1).

5    84.    Cypress fully performed its obligations under the Tracker Agreements.

6    85.    As described above, Defendant materially breached the Express Warranties set forth

7    in the Tracker Agreements.

8    86.    As described above, Defendant materially breached its obligation to provide its

9    Services in accordance with the Standard of Care.

10   87.    As a proximate result of Defendant's and DOES 1 through 10's, inclusive, and each

11   of them, material breaches of the Tracker Agreements, Cypress has been damaged in an amount to

12   be proven at trial.

13

14   ## SECOND CAUSE OF ACTION
     **(Breach of Contract Claims for Failure to Repair or Replace Defective Tracking Systems against Defendant and DOES 1-10)**

15

16   88.    Cypress repeats and incorporates paragraphs 1 through 81, inclusive, by reference

17   herein as though set forth in full.

18   89.    Under the terms of the Tracker Agreements, Defendant was required to repair or

19   replace the Tracking System "[i]n the event the structural components or the motor, gearbox

20   and controller assembly components of the [Tracking System] fail to comply with the Structural

21   Warranty or the Component Warranty."

22   90.    As set forth above, the Tracking Systems fail to comply with the Structural Warranty

23   and Component Warranty.

24   91.    Cypress fully performed its obligations under the Tracker Agreements, including

25   providing timely written notice of the Tracking System defects.

26   92.    Defendant breached the Tracker Agreements by failing to repair or replace the

27   defective Tracking Systems.

28

- 16 -

93.    As a result of Defendant's and DOES 1 through 10's, inclusive, and each of them, breach of the Tracker Agreements, Cypress has been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### (Deceit - Negligent Misrepresentation Claims against Defendant and DOES 1-10)

94.    Cypress repeats and incorporates paragraphs 1 through 81, inclusive, by reference herein as though set forth in full.

95.    As set forth above, Defendant made representations regarding the design, engineering, installation, and performance of the Tracking Systems that were intended to induce Cypress' reliance on these representations.

96.    The failures of the Tracking Systems detailed above demonstrate that the Defendant's representations set forth in Paragraph 40 above are false (the "False Statements").

97.    Contrary to the False Statements:

   a.  The design of the Tracking Systems has not eliminated dynamic effects and instead suffer and fail from dynamic effects;

   b.  The Tracking Systems are difficult and costly to install, operate and maintain;

   c.  The Tracking Systems require excessive and onerous realignment; and

   d.  The Tracking Systems do not support all structural loads, where the heavier thin film modules suffer greater damage than the tables with crystalline modules;

98.    Cypress reasonably and justifiably relied on Defendant's False Statements in engaging with Defendant and executing the Purchase Orders.

99.    Cypress is informed and believes, and on such information and belief alleges that, Defendant negligently failed to perform the analysis RWDI stated was necessary in order for Defendant to properly consider wind loads (i.e., dynamic loads) in its design.

100.   Defendant's negligent failure to properly consider dynamic loads in its design caused the Tracking Systems to suffer and fail from dynamic effects, to be costly to operate and maintain, to require excessive and onerous realignment, and to fail to support the relevant structural loads.

- 17 -

101. Cypress is informed and believes, and on such information and belief alleges that, Defendant's myriad False Statements were made without reasonable grounds for believing them to be true.

102. Defendant's False Statements were set forth in written materials that Defendant provided to Cypress to induce the purchase of Defendant's Tracking Systems.

103. Cypress is informed and believes, and on such information and belief alleges that, Defendant made the False Statements with substantial certainty that Cypress would rely on the False Statements in determining whether to purchase the Defendant's Tracking Systems.

104. As a proximate result of Defendant's and DOES 1 through 10's, inclusive, and each of them, False Statements, Cypress has been damaged in an amount to be proven at trial, including damages Cypress has or will incur to replace modules that were damaged by the defective Tracking Systems.

**FOURTH CAUSE OF ACTION**
**(Negligent Design of a Product Claim against Defendant and DOES 1-10)**

105. Cypress repeats and incorporates paragraphs 1 through 81, inclusive, by reference herein as though set forth in full.

106. Defendant designed, manufactured, supplied, and installed the Tracking Systems that were installed on all 21 Projects and Defendant received a direct financial benefit from the sale of the Tracking Systems.

107. Defendant had a duty to perform the services provided under the Purchase Orders with professional skill, prudence, and diligence as generally accepted in the industry.

108. As a purchaser and foreseeable users, Defendant owed Cypress a duty of care in its design and manufacture of the Tracker Systems, including a duty to design the Tracker Systems so that they could be safely used for their intended purpose.

109. The Tracker Agreements require Defendant to perform services performed thereunder in accordance with the Standard of Care.

- 18 -

110. Defendant negligently designed the Tracking Systems and the Tracking System components.

111. Defendant negligently prepared the installation manuals for the Tracking Systems.

112. Defendant negligently prepared the operation and maintenance manuals for the Tracking Systems.

113. As a result of Defendants negligent design, Cypress has been harmed as alleged herein, in that Cypress has suffered damage to all 21 projects.

114. Defendant's negligent design of the Tracking Systems and negligent preparation of installation manuals and operation and maintenance manuals was a substantial factor in causing Cypress' harm.

115. The resulting damage to Cypress, including damage to the Solar Power Generating Systems, was foreseeable to Defendant.

116. Defendant knew or should have known that its negligent design of the Tracking Systems would result in the type of harm Cypress suffered, namely, damage to the Solar Power Generating Systems, including the modules, and inability to operate the Solar Power Generating Systems.

117. Defendant knew or should have known that its negligent design of the Tracking Systems created unsafe conditions during ordinary use, including fires resulting from module and wire damage caused by the defective Trackers.

118. Defendant knew or should have known that its negligent preparation of installation manuals and operation and maintenance manuals would result in the type of harm Cypress suffered, namely, damage to the Solar Power Generating Systems, including the modules, and inability to operate the Solar Power Generating Systems.

- 19 -

119.    As a direct and proximate result of Defendant's negligence in designing the Tracking Systems and negligent preparation of installation manuals and operation and maintenance manuals, Cypress has been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Negligent Manufacture of a Product Claim against Defendant and DOES 1-10)

120.    Cypress repeats and incorporates paragraphs 1 through 81, inclusive, by reference herein as though set forth in full.

121.    Defendant designed, manufactured, supplied, and installed the Tracking Systems that were installed on all 21 Projects and Defendant received a direct financial benefit from the sale of the Tracking Systems.

122.    Defendant had a duty to perform the services provided under the Purchase Orders with professional skill, prudence, and diligence as generally accepted in the industry.

123.    As a purchaser and foreseeable user, Defendant owed Cypress a duty of care in its design and manufacture of the Tracker Systems, including a duty to manufacture the Tracker Systems so that they could be safely used for their intended purpose.

124.    The Tracker Agreements require Defendant to perform services performed thereunder in accordance with the Standard of Care.

125.    Defendant negligently manufactured the Tracking Systems and the Tracking System components.

126.    Defendant failed to use the amount of care in manufacturing the product that a reasonably careful manufacturer would use in similar circumstances to avoid exposing Cypress to foreseeable risks of harm.

127.    As a result of Defendants negligent manufacturing, Cypress has been harmed as alleged herein, in that Cypress has suffered damage to all 21 projects.

128.    Defendant's negligent manufacturing of the Tracking Systems was a substantial factor in causing Cypress' harm.

129.    The resulting damage to Cypress, including damage to the Solar Power Generating Systems, was foreseeable to Defendant.

130.    Defendant knew or should have known that its negligent manufacturing of the Tracking Systems would result in the type of harm Cypress suffered, namely, damage to the Solar Power Generating Systems, including the modules, inability to operate the Solar Power Generating Systems.

131.    Defendant knew or should have known that its negligent manufacturing of the Tracking Systems created unsafe conditions during ordinary use, including fires resulting from module and wire damage caused by the defective Trackers.

132.    As a direct and proximate result of Defendant's negligence in manufacturing the Tracking Systems, Cypress has been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

Count 1 - Breach of Express Warranty

Wherefore, Plaintiffs pray for judgment on their Complaint against Defendant and Does 1 through 10 as follows:

1.    That Plaintiffs be awarded damages in an amount to be proven at trial;

2.    That Plaintiffs be awarded its costs of suit incurred in this action; and

3.    That Plaintiffs be awarded such other and further relief as this Court deems just and proper.

- 21 -

1

<u>Count 2 - Breach of Contract - Obligation to Repair/Replace</u>

2       Wherefore, Plaintiffs pray for judgment on their Complaint against Defendant and Does 1

3  through 10 as follows:

4       1.     That Plaintiffs be awarded damages in an amount to be proven at trial;

5       2.     That Plaintiffs be awarded its costs of suit incurred in this action; and

6       3.     That Plaintiffs be awarded such other and further relief as this Court deems just

7  and proper.

8

<u>Count 3 - Deceit - Negligent Misrepresentation</u>

9       Wherefore, Plaintiffs pray for judgment on their Complaint against Defendant and Does 1

10  through 10 as follows:

11       1.     That Plaintiffs be awarded damages in an amount to be proven at trial;

12       2.     That Plaintiffs be awarded its costs of suit incurred in this action; and

13       3.     That Plaintiffs be awarded such other and further relief as this Court deems just

14  and proper.

15

<u>Count 4 - Negligent Design of a Product</u>

16       Wherefore, Plaintiffs pray for judgment on their Complaint against Defendant and Does 1

17  through 10 as follows:

18       1.     That Plaintiffs be awarded damages in an amount to be proven at trial;

19       2.     That Plaintiffs be awarded its costs of suit incurred in this action; and

20       3.     That Plaintiffs be awarded such other and further relief as this Court deems just

21  and proper.

22

<u>Count 5 - Negligent Manufacture of a Product</u>

23       Wherefore, Plaintiffs pray for judgment on their Complaint against Defendant and Does 1

24  through 10 as follows:

25       1.     That Plaintiffs be awarded damages in an amount to be proven at trial;

26       2.     That Plaintiffs be awarded its costs of suit incurred in this action; and

27

28

PLAINTIFFS' COMPLAINT FOR DAMAGES

3. That Plaintiffs be awarded such other and further relief as this Court deems just and proper.

<div align="center">

**JURY DEMAND**

</div>

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: October 18, 2023                      **PERKINS COIE LLP**

By: _____
           Meredith A. Jones-McKeown

Attorneys for Plaintiffs
CYPRESS CREEK EPC, LLC, et. al.

# EXHIBIT A



# Single Axis Tracker

ENGINEERING · MANUFACTURING · INSTALLATION



Ground Mount

Roof Mount

Landfill

Specialty Structures

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**RBI**

# Tracker Architecture



Linked push/pull



Distributed Row

- Better land utilization (suited for unfavorable geotech conditions and higher slope terrains)
- Simple to manage layout changes – Design flexibility
- Easy maintenance



Linked drive shaft

Architectures differ in how the rows are connected, but have very similar approaches within the row



RBI SOLAR

**RBI**

# Typical Tracker Constraints



- Single Torque Tube to **carry deflection and torque forces**, prioritizing torque for a **less optimal** deflection section

2



E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**RBI**

# <u>Single Member for Torsion and Bending</u>

-Torsion Moment:



-Bending Moment:



**A**   Max Bending   **B**
      Moment, **Mb**

- Point **Mb** is where shear force passes through zero. Here, the slope of the bending moment must vanish.
- Since the distance from **Mb** to support **B** is greater than **Mb** to support **A**, the bending moment will diminish (greater than zero) as it approaches support **B**.

A torque tube limits the length of the row, increases material content, sacrifices bending moment resistance



RBI SOLAR

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFU

**RBI**

# Single axis tracker design innovation

**1** Separating the torque force member and deflection carrying member

**2** Proprietary gear reduction system to reduce additive torque forces

**3** Lower reactions = less steel required. Favorable with steel prices increasing



Deflection carrying members
(Purlin & Top Chord)

Torque force member



RBI SOLAR

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFU



# Traditional vs. RBI Solar Tracker

Single Torque Tube to **carry deflection and torque forces**, prioritizing torque for a **less optimal** deflection section

All torque forces compound to the large slew drive on the end **increasing the section size** of the torque tube closer to the drive

Traditional Tracker Design



RBI Solar Tracker Design





E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ



**RBI**

# Tracker Advantages

**Distributed row architecture**
- Better O&M, Installation, Cost

**Table architecture**
- Flexible building blocks
- Superior grade following
- Easy installation

**Less steel with optimized components**
- Less metal than closest competitors
- Torque forces handled by a small square tube and deflection by roll formed sections
- No module rails creating better torsional rigidity for the modules (avoid micro-cracks)
- Only 1 type of post required (most need separate type for the drive)

**No Dampeners**
- **No dynamic effects** experienced and as a result, **no dampeners** are required

**Longer rows**
- 90-120 modules per row
- One controller, drive, etc. per row

**Lowest installation costs**
- No heavy equipment
- Only ~30 fasteners per table (non module)







RBi SOLAR

6

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1341483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ



# Table Architecture

Flexible table architecture allows for superior grade following
- Works well for small and large projects
- A ~1.5 inch tube is the only member connecting tables
- Can modify 2 brackets and expand the range significantly

Current design is 12 and 8 modules per table interior/exterior





E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFU

**RBI**

# Patent Pending Gear Design

Motor Attachment

Simple eccentric gearbox design

- Transfers the torque forces to each post
- Integrated bearing
- Superior holding torque
- Low cost, powder metal and cast components









RBI SOLAR

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**RBI**

# Gearbox Testing



**Isometric/Right View**



**Front View**

## Life Cycle Gearbox Test

- Stress test on gearbox drive train: Gearbox will undergo a large number of turns in a short period of time. Higher loads and speeds (RPM's) are experienced throughout test.



**Isometric/Rear View**



**RBI SOLAR**

Case: 1:24-cv-00198-JPH Doc #: 3 Filed: 04/11/24 Page: 325 of 585 PAGEID #: 947



# Simple Installation – 3 Steps



Place gear and attach shaft
- 14 fasteners

Attach purlins and top chords
- 16 fasteners





Attach modules

Simplest Installation of Tracker

No heavy machinery required
- All components < 50 lbs

23% less fasteners than competing trackers

Less components, steps, hardware than competing trackers

No alignment necessary



E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441283 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

# RBI

# Controller – 3rd Party

## Company Profile
- 1.1 GW of solar tracker controllers in field world wide

## Controller Options
- Self powered controller, battery, 30W panel
- AC powered
- Parasitic powered







RBI SOLAR



# Motor

## Technical Data

- Rated Voltage: 24VDC
- Motor Rated Speed: 2086 RPM
- Ratio: 1/202.5
- Rated Speed: 10.3 +/-10%RPM
- Rated Torque: 46 N-m
- Max Torque: 92 N-m
- Rated Current: 5 A
- IP Rating: IP65



| P1(W) | I(A) | T(N.m) | P2(W) | P.F | EFF(%) |
|---|---|---|---|---|---|
| 250 | 10 | 95 | 75 | 1 | 100 |
| 225 | 9 | 85.5 | 67.5 | .9 | 90 |
| 200 | 8 | 76 | 60 | .8 | 80 |
| 175 | 7 | 66.5 | 52.5 | .7 | 70 |
| 150 | 6 | 57 | 45 | .6 | 60 |
| 125 | 5 | 47.5 | 37.5 | .5 | 50 |
| 100 | 4 | 38 | 30 | .4 | 40 |
| 75 | 3 | 28.5 | 22.5 | .3 | 30 |
| 50 | 2 | 19 | 15 | .2 | 20 |
| 25 | 1 | 9.5 | 7.5 | .1 | 10 |
| 0 | 0 | 0 | 0 | 0 | 0 |





RBI SOLAR

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

**RBI**

# <u>Summary</u>

- Cost: Reduced amount of steel needed = Lower cost

- Design:
  Flexible table architecture
  ~ 50% of components are roll formed
  1.5" Torque Tube

- Installation: Less components, steps, and hardware than competing trackers for quick, simple install

- **Proprietary patent pending design**
  Eccentric Gearbox design



E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

# RBI Single Axis-Tracker

Solar Mounting Solutions



**Tilt:**
- +/- 60 degrees

**Post:**
- Galvanized Cee Post, G235

**Components:**
- Purlins:     Zee purlin, galv G165
- Post Mounting Plate:     HDG Steel
- Hardware:     HDG
- Motor:     DC Motor, 24 volt, 180 Nm
- Motor Mount:     Galvanized
- DriveShaft:     Galvanized
- Gearbox:     Sealed



# RBI Single...

| | |
|---|---|
| Distributed Row | Each distributed tracker row is contained and powered independently of the larger array |
| Distributed Motor Drive | Uses independent low-voltage DC Motor to rotate a driver shaft |
| UL 2703 listing in process | |
| DC and AC / 200 Vac rated / IP55 | Internal handling and grounding / Patent pending raised purlin slots |
| | Both a DC and AC power option are available to drive the tracker rows |
| 11 Amp | 1 battery per tracker row / Battery integrated with a pony panel |
| Wireless | |
| PAD / Wireless communications / Medion, Zigbee | 1 TCU per tracker row / 1 NCU per 250 TCU s / 2 to 8 NCU s per site (depending on Historic wind conditions) / Backtracking |
| ±60 degrees from zenith / Backtracking capabilities | |
| Slews to 0 degrees / Sheds snow at 60 degrees | Slews during high wind events / Capable of shedding accumulated snow / Programmable to individual site risks |
| Clearing mode programmed to 60 degrees | Program to O&M activities |
| Gravel Piers / G115 gdu | Rolled galvanized toe posts |
| Zee Purlin / Zee Pivot Arm / G115 gdu / 50 ksi galvanized steel | |
| Patent pending gearbox design / 1 pos post | Gearbox at each posts eliminated the effects of torque and screw buildup along a row |
| Internally damped / No dampeners required | Design eliminates the effects of dynamics |
| 90 to 120 module rows maximum | Rows can vary in length |
| Driven or Ground Screws | |



E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFJ

## Single Axis Tracker

# Drive System History

GREENHOUSES

Since the 1970's...

- Designed and installed roof vents on 300' rotating axis

- 1 Motor/Gearbox unit per distributed row

- Integrated 3rd party controller system

- Weather sensors with responsive "stowing" strategies









E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFJ

# Single Axis Tracker

## Tracker Architecture



Linked Push/Pull



Distributed Row



Linked Drive Shaft

- Better land utilization (suited for unfavorable geotech conditions and higher slope terrains)
- Simple to manage layout changes – Design flexibility
- Easy maintenance

Architectures differ in how the rows are connected, but have very similar approaches within the row



RBI SOLAR

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFU

# Single Axis Tracker

## Typical Tracker Constraints – Typical Market Offering



Single Torque Tube to **carry deflection and torque forces**, prioritizing torque for a **less optimal** deflection section



E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

# Single Axis Tracker – Comp...

## Single Member for Torsion and Bending

-Torsion Moment:



-Bending Moment:



**A**  Max Bending  **B**
Moment, Mb

- Additional moment at **Mb** governs the rows design, resulting in over-design of torque tube along most of row.
- Torque tube is sized for torsion and bending stresses simultaneously, resulting in large tube sections.

A torque tube limits the length of the row, increases material content, sacrifices bending moment resistance.



**RBI SOLAR**

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

## Single Axis Tracker

# RBI's Single Axis Tracker Design Innovation

**①** Separating the torque force member and deflection carrying member

**②** Proprietary gear reduction system to reduce additive torque forces

**③** Lower reactions and near elimination of dynamic effects



Deflection carrying members
(Purlin & Top Chord)

Torque force member

Purlin
Gearbox
Pivot Arm
Post Connection
Drive Shaft
Driven Post



RBI SOLAR

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

## Single Axis Tracker

## Traditional vs. RBI Solar Tracker

Single Torque Tube to **carry deflection and torque forces**, prioritizing torque for a **less optimal** deflection section

All torque forces compound to the large slew drive on the end **increasing the section size** of the torque tube closer to the drive

Traditional Tracker Design

RBI Solar Tracker Design







E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFU

# Single Axis Tracker

## RBI's Tracker Advantages

**Distributed row architecture**
- Better O&M, Installation, Cost

**Table architecture**
- Flexible building blocks
- Superior grade following
- Easy Installation



**Less steel with optimized components**
- Torque forces handled by a small drive shaft and deflection by roll formed sections
- No module rails creating better torsional rigidity for the modules (**avoid micro-cracks**)
- Only 1 type of post required (most competitors need separate type for the drive)

**No Dampers**
- No dynamic effects experienced and as a result, no dampeners are required



**Longer rows**
- Up to 120 modules per row
- One controller, drive etc. per row

**Lowest Installation Cost**
- No heavy equipment
- Only 28 field fasteners per table
- 3 Step easy installation process



RBI SOLAR

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

# Single Axis Tracker

## RBI's Table Architecture

Flexible table architecture allows for superior grade following

- Works well for small and large projects
- A 1.5 inch tube is the only member connecting tables
- <u>Little to no pre-construction civil work is required</u>

Current design is 12 and 8 modules per table interior/exterior





E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

# Single Axis Tracker

## RBI's Patented Gear Design

Simple eccentric gearbox design

- Transfers the torque forces to each post
- Simplified gearing design
- Superior holding torque
- No greasing or maintenance required
- Lightweight

Motor Attachment









E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

# Single Axis Tracker

## Simple Installation – 3 Steps



① Install pre-assembled top chords to driven posts (4 field fasteners per post)



② Attach purlins and drive shaft (10 field fasteners per post)

③ Attach modules and pony panel/controller

Installation speed with 35 installers
   1 MW/day

No special tools or heavy machinery required
   Heaviest component weighs <95 lbs.

Fewer components, steps, and hardware than competing trackers

No re-alignment necessary



RBI SOLAR



E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

# Single Axis Tracker

## Controller – 3rd Party

**Company Profile**

- 4+ GW of solar tracker controllers in field world wide

**Controller Options**

- DC self powered controller, battery, 60W panel
- AC powered – Northeast (colder regions <15F)

**Stow Strategy**

- Stows at 40 mph winds
- Sheds under 3 inches of snow
- Stow strategy customization available per site

1 Network Control Unit (NCU) /200 Controllers (TCU)

Minimum 2 Remote Sensor Units (RSU's) per site
(Additional dependent on site)







E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFU

# Single Axis Tracker

## Motor

### Technical Data

- Rated Voltage: 24VDC
- Output Power: 180 W
- Rated Speed: 3000 rpm +/- 10%
- Rated Current: 10.7 A
- Max Torque: 180 N-m
- Brush Life: >2000 h
- Using Temperature: -40ºC ~ 60ºC
- Protection Grade: IP65







E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFU

# Single Axis Tracker

## Summary

Cost
Reduced amount of steel
Lower to no civil costs

Design
- Flexible table architecture
- ~ 50% of components are roll formed
- 1.5" Drive Shaft



Installation
Less components, steps, and hardware than competing trackers for quick, simple install

**Proprietary patent pending design**
Eccentric Gearbox design





# Single Axis Tracker Solution | SAT-2

The innovative SAT-2 design by RBI Solar eliminates the limitations associated with other commercial single axis tracker systems and redefines how single axis trackers are utilized in the marketplace.

**Why choose RBI Solar SAT-2?**

- Multiple Foundation options available
- Variable slope tolerances, reducing the costs associated with civil work
- Twin purlin design reduces stress on modules
- Independent row lengths up to 145 modules to accommodate various layout constraints
- Lower land acquisition costs
- Gearbox and driveshaft eliminate need for dampeners



www.rbisolar.com

E-FILED 03/08/2024 10:57 AM





*Single Axis Tracker Solution Features*

| Technology | Distributed Row, making for simple O&M |
|---|---|
| Row Architecture | Articulating tables to follow variable terrain |
| Structure Architecture | Twin purlin design reduces stress on modules |
| System Power | AC or DC power options to fit your situational needs |
| Drive Architecture | Patented Gearbox and Driveshaft, no dampeners required |
| Installation | No special tools or heavy equipment needed |
| Foundations | Multiple foundation types to accommodate any soil conditions |
| Module configurations | Portrait |
| Row Length | Up to 145 modules to accommodate multiple layout configurations |
| Modules Supported | Crystalline, thin film, framed and frameless |
| Engineering | One size foundation throughout the array |
| Pre-Assembly | 3-step installation process reduces connections required in the field |
| Slope Accommodation | Lowers land acquisition costs |
| Bankability | Over 100 MW commissioned across the US |

*Contact us at info@rbisolar.com or (513) 242-2051*

DESIGN  ENGINEERING  MANUFACTURING  INSTALLATION

5513 Vine Street, Cincinnati, OH 45217 | 513-242-2051 | info@rbisolar.com | www.rbisolar.com



# EXHIBIT B



**CYPRESS CREEK**
RENEWABLES

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

# Purchase Order

PO DATE: 05/15/2018
TERMS: SEE ATTACHED

*All Documentation MUST reference PO# and Project Name*

**Purchase Order #:** P13788
**Project Name:** Bronson-Epc
**Pin #:** TX-000065
**Project Location:** Bronson Solar, LLC 4343 FM 1875 Road #1 Beasley TX 77417
**Shipping Term: DDP** (Project Site)

| To: | Ship To: |
|-----|----------|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-242-2051 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Site contact corey.carson@ccrenew.com |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|-------------|-----------|-----|------|--------|
| Total Price - Including Design, Eng Service, and Material | $2,971,891.00 | 1 | Each | $2,971,891.00 |
| Freight to Site | $256,191.00 | 1 | Each | $256,191.00 |
| Pull Test | $7,000.00 | 1 | Each | $7,000.00 |
| Commissioning Services | $8,000.00 | 1 | Each | $8,000.00 |
| PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE: ~~07/15/2018~~ 7/16/18 *WP* | | Reference:<br>Deliver By Date: ~~07/15/2018~~ 7/16/18 *WP* | | |

| RECAP | |
|-------|--|
| SUBTOTAL | $3,243,082.00 |
| TOTAL | $3,243,082.00 |

ADDRESS CORRESPONDENCE TO:

Procurement Department
Buyers@ccrenew.com

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

05/15/2018
APPROVED BY
DATE

VENDOR:

**Wes Pauly**

Digitally signed by
Wes Pauly
Date: 2018.05.17
10:11:33 -04'00'

APPROVED BY
DATE

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

## ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

## TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

## SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

## INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

## INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

## TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

## LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

## CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) if any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

## INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:
(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or
(b) is received without restriction from a third party without breach of any obligation of confidentiality; or
(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or
(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or
(e)  is disclosed by either Party to a third party under no confidentiality obligation.
Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**
**Bronson – Beasley TX**



**RBI SOLAR**

**CLIENT:**   Corey Kuhar
**Cypress Creek Renewables**
**Phone:**   919-921-8690
**Email:**   corey.kuhar@ccrenew.com

**DATE:**   April 11, 2018

**RACKING SPECIFICATIONS, PROJECT SPECIFIC**

| | |
|---|---|
| • Number Of Modules Supported: | 81,488 modules |
| • Module Manufacturer/Model Number: | Solar Frontier |
| • Module Wattage: | 175 watts |
| • Total System Size (DC): | 14.2604 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 2 ea |
| • Approximate Distance Between Posts: | Varies |
| • Minimum Module Clearance: | 18 inches |
| • String Size: | 11 Mods/String |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions: | Snow*: 0 psf Wind**: 126 mph |

*IBC 2012                    **ASCE 7-10 (Wind Category I)

**TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - <u>APPROXIMATE</u>:**

| | |
|---|---|
| • # of Tables: | 3704 Total |
| • # of Rows: | 556 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • # of Inclinometer Sensors in a Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | DC Self-Powered |
| • Snow Sensor (Y/N): | No |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING**   Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | $$/Watt | | $$/Mod. |
|---|---|---|---|---|---|
| TOTAL PRICE: | $ | 2,971,891.00 | $ 0.208 | $ | 36.47 |

Price includes:
- Design
- Stamped Engineered Drawings
- Approved Module Grounding Method
- Posts (Estimated 7408 Total) @ 6' Embed

- Racking System
- Foundation Post Assumed to be Structural Cee-Channel
- No Freight

| | | | | | |
|---|---|---|---|---|---|
| Freight of Materials to Site: | $ | 256,191.00 | $ 0.018 | $ | 3.14 |
| Add For Pull Test: | $ | 7,000.00 | | | |
| Commissioning Services: | $ | 8,000.00 | | | |

**Due to steel price volatility, this quote is valid for 10 days and subject to reconfirmation thereafter or indexed to CRU.**

**GENERAL RACKING SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design shall be based on recommendations and data supplied in a certified geotechnical report (by others). A signed and sealed geotechnical report is required for final foundation design and submittals to the local building authorities.
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to placement for orders of any materials.

**MATERIALS ONLY INCLUSIONS:**

- 
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of TX
- C-Channel posts for tracking system.
- Structural racking for tracker system, including all hardware and module mounting hardware.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G115 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.

**MATERIALS ONLY EXCLUSIONS:**

- Geotechnical Report or site survey.
- Electrical wiring and grounding/bonding material (unless called-out in Pricing section above).
- Fencing, unloading of materials and storage of materials.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others.
- Site Management Control System - wind speed, monotoring, etc
- Sales/Use Tax and Permit Fees.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**

- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0 ), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.

**RBI Commisioning scope:**

- Ensure all tracker control components are communicating with the zigbee mesh network.
- RSU, Anemometers, & Snow Sensor setup
- Tracker auto-mode and parametrization

**FOUNDATION REFUSAL DEFINITION:**
- A refusal is encountered when the advancement of a pile ceases for a period of 30 seconds or more during post driving prior to reaching full design embedment depth. Should a refusal be encountered additional charges are possible.
- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing
  - Above grade ballast

**OTHER PROVISIONS:**

**GROUNDING:**
- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**
- Wire management components not included. Base design includes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**
- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**
- Structural: 10 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT PAYMENT TERMS: | Contract Value | Description of Work |
|---|---|---|
| | 15% | Deposit With Order |
| | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

Contact: RBI Solar        Phone: 513-242-2051

Email: info@rbisolar.com



# MATERIALS WARRANTY AGREEMENT

"Project": Bronson-Epc / 1890008

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek Renewables

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.

- The Warranty does not apply to Products that:
  - have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
  - have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
  - have any serial numbers, markings, legends or labeling altered, defaced, or removed;
  - have only non-structural wear and tear, aging, or surface imperfections; or
  - are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
  - The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.

- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.

- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.

- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.

- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

| | |
|---|---|
| _____ | **8/7/18** |
| Customer | Date |
| _____ | 8/7/2018 |
| RBI Solar, Inc. | Date |

Effective Date: ___August 31, 2018___



**CYPRESS CREEK**
RENEWABLES

# Purchase Order

| | |
|---|---|
| PO DATE: | 04/06/2018 |
| TERMS: | SEE ATTACHED |

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

*All Documentation MUST reference PO# and Project Name*

**Purchase Order #:** P12707
**Project Name:** Chisum-Epc
**Pin #:** TX-TNMP-007
**Project Location:** Chisum Solar, LLC  Farm to Market Road 196 Blossom TX 75416
**Shipping Term:** DDP (Project Site)

| To: | Ship To: |
|---|---|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-242-2051 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Please send correspondence to corey.carson@ccrenew.com |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Design, Engineering, Approved Grounding Method, Posts, Racking System, Motors, and controls for | $2,830,732.00 | 1 | Each | $2,830,732.00 |
| Freight to Site | $209,217.00 | 1 | Each | $209,217.00 |
| Pull Test | $7,000.00 | 1 | Each | $7,000.00 |
| Commissioning Services | $8,000.00 | 1 | Each | $8,000.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE
ON OR BEFORE: ~~06/21/2018~~ 6/5/18  *W P*

Reference:
Deliver By Date: ~~05/21/2018~~ 6/5/18  *W P*

| RECAP | |
|---|---|
| **SUBTOTAL** | $3,054,949.00 |
| **TOTAL** | $3,054,949.00 |

ADDRESS CORRESPONDENCE TO:

Procurement Department
commodities@ccrenew.com

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

04/06/2018
**APPROVED BY**
**DATE**

VENDOR: **Wes Pauly**  Digitally signed by
Wes Pauly
Date: 2018.04.16
09:35:07 -04'00'

**APPROVED BY**
**DATE**

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

**TAXES**
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

**WARRANTIES**
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

**CHANGES**
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

**INSURANCE**
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

**NO WAIVER**
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e)  is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**
**Chisum - Blossom TX**



| CLIENT: | Corey Kuhar |
| | **Cypress Creek Renewables** |
| | **Phone:** 919-921-8690 |
| | **Email:** corey.kuhar@ccrenew.com |

| DATE: | **March 14, 2018** |

| PROJECT: | Chisum - Blossom TX |

### RACKING SPECIFICATIONS, PROJECT SPECIFIC

| | |
|---|---|
| • Number Of Modules Supported: | 81,504 modules |
| • Module Manufacturer/Model Number: | Solar Frontier |
| • Module Wattage: | 175 watts |
| • Total System Size (DC): | 14.2632 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 2 ea |
| • Approximate Distance Between Posts: | Varies |
| • Minimum Module Clearance: | 18 inches |
| • String Size: | 12 Mods/String |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions: | Snow*: 0 psf    Wind**: 105 mph |
|     *IBC 2012 | **ASCE 7-10 (Wind Category I) |

### TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - <u>APPROXIMATE</u>:

| | |
|---|---|
| • # of Tables: | 3396 Total |
| • # of Rows: | 500 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • # of Inclinometer Sensors in a Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | DC Self-Powered |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING**

Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | $$/Watt | | $$/Mod. |
|---|---|---|---|---|---|
| TOTAL PRICE: | $ | 2,830,732.00 | $ 0.198 | $ | 34.73 |

Price includes:
- Design
- Stamped Engineered Drawings
- Approved Module Grounding Method
- Posts (Estimated 6792 Total) @ 8' Embed

- • Racking System
- • Motors & Controls System
- • Foundation Post Assumed to be Structural Cee-Channel
- • No Freight

| | | | | | |
|---|---|---|---|---|---|
| Freight of Materials to Site: | $ | 209,217.00 | $ 0.015 | $ | 2.57 |
| Add For Pull Test: | $ | 7,000.00 | | | |
| Commissioning Services: | $ | 8,000.00 | | | |

**Due to steel price volatility, this quote is valid for 10 days and subject to reconfirmation thereafter or indexed to CRU.**

**GENERAL RACKING SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design shall be based on recommendations and data supplied in a certified geotechnical report (by others). A signed and sealed geotechnical report is required for final foundation design and submittals to the local building authorities.
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to placement for orders of any materials.

**MATERIALS ONLY INCLUSIONS:**

- 
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of TX
- C-Channel posts for tracking system.
- Structural racking for tracker system, including all hardware and module mounting hardware.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- Freight to site.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G160 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.

**MATERIALS ONLY EXCLUSIONS:**

- Geotechnical Report or site survey.
- Electrical wiring and grounding/bonding material (unless called-out in Pricing section above).
- Fencing, unloading of materials and storage of materials.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others.
- Site Management Control System - wind speed, monotoring, etc
- Sales/Use Tax and Permit Fees.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**
- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0˚), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.

**RBI Commisioning scope:**
- Ensure all tracker control components are communicating with the zigbee mesh network.
- RSU, Anemometers, & Snow Sensor setup
- Tracker auto-mode and parametrization

**FOUNDATION REFUSAL DEFINITION:**
- A refusal is encountered when the advancement of a pile ceases for a period of 30 seconds or more during post driving prior to reaching full design embedment depth. Should a refusal be encountered additional charges are possible.
- In the event of a refusal, site specific conditions will determine alternate foundation option used:
    - Pull test/cut/re-drill
    - Pre-drill and drive with crush stone
    - Spread footing

**OTHER PROVISIONS:**

**GROUNDING:**
- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**
- Wire management components not included. Base design inlcudes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**
- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**
- Structural: 25 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT | Contract Value | Description of Work |
|---|---|---|
| PAYMENT | 15% | Deposit With Order |
| TERMS: | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

    **Contact:** RBI Solar                          **Phone:** 513-242-2051

    **Email:** info@rbisolar.com



## MATERIALS WARRANTY AGREEMENT

"Project": Chisum-Epc / 1890007

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek Renewables

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
    - have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
    - have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
    - have any serial numbers, markings, legends or labeling altered, defaced, or removed;
    - have only non-structural wear and tear, aging, or surface imperfections; or
    - are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
    - The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

8/7/18

_____      _____
Customer                             Date

                                     8/7/18
_____      _____
RBI Solar, Inc.                      Date

Effective Date: **August 6, 2018**



**CYPRESS CREEK**
POWER EPS

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

# Purchase Order

PO DATE: 03/27/2018
TERMS: SEE ATTACHED

*All Documentation MUST reference PO# and Project Name*

**Purchase Order #:** P12417
**Project Name:** Eddy II-Epc
**Pin #:** TX-ONC-002
**Project Location:** Eddy II Farm 698 Franklin Rd Eddy TX 76630
**Shipping Term:** DDP (Project Site)

| To: | Ship To: |
|-----|----------|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-242-2051 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Please send correspondence to corey.carson@ccrenew.com |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|-------------|------------|-----|------|--------|
| Design, Stamped Engineering Drawings, Approved Module Grounding Method, Posts, Racking System, Motors, and Controls | $2,737,587.00 | 1 | Each | $2,737,587.00 |
| Pull Test | $7,000.00 | 1 | Each | $7,000.00 |
| Commissioning Services | $8,000.00 | 1 | Each | $8,000.00 |
| Freight | $223,256.00 | 1 | Each | $223,256.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE : 03/27/2018 5/13/18 *WP*

Reference:
Deliver By Date: 03/27/2018 5/13/18 *WP*

| RECAP | |
|-------|--------|
| SUBTOTAL | $2,975,843.00 |
| TOTAL | $2,975,843.00 |

ADDRESS CORRESPONDENCE TO:

Procurement Department
commodities@ccrenew.com

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

03/27/2018
APPROVED BY
DATE

VENDOR:

04/04/18      Wes Pauly
APPROVED BY
DATE

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**

**Eddy II - Eddy TX**

**RBI SOLAR**

**CLIENT:**   **Corey Kuhar**
**Cypress Creek Renewables**
**Phone:** 919-921-8690
**Email:** corey.kuhar@ccrenew.com

**DATE:** **March 20, 2018**

**PROJECT:** **Eddy II - Eddy TX**

**RACKING SPECIFICATIONS, PROJECT SPECIFIC**

| | |
|---|---|
| • Number Of Modules Supported: | 81,504 modules |
| • Module Manufacturer/Model Number: | Solar Frontier |
| • Module Wattage: | 175 watts |
| • Total System Size (DC): | 14.2632 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 2 ea |
| • Approximate Distance Between Posts: | Varies |
| • Minimum Module Clearance: | 18 inches |
| • String Size: | 12 Mods/String |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions: Snow*: 5 psf | Wind**: 105 mph |

*IBC 2012                                    **ASCE 7-10 (Wind Category I)

**TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - APPROXIMATE:**

| | |
|---|---|
| • # of Tables: | 3392 Total |
| • # of Rows: | 504 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • # of Inclinometer Sensors in a Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | DC Self-Powered |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING**   Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | | $$/Watt | | $$/Mod. |
|---|---|---|---|---|---|---|
| TOTAL PRICE: | $ | 2,737,587.00 | $ | 0.192 | $ | 33.59 |

Price includes:
- Design
- Stamped Engineered Drawings
- Approved Module Grounding Method
- Posts (Estimated 6784 Total) @ 5' Embed

- Racking System
- Motors & Controls System
- Foundation Post Assumed to be Structural Cee-Channel
- No Freight

| | | | | | | |
|---|---|---|---|---|---|---|
| Freight of Materials to Site: | $ | 223,256.00 | $ | 0.016 | $ | 2.74 |
| Add For Pull Test: | $ | 7,000.00 | $ | 0.000 | | |
| Commissioning Services: | $ | 8,000.00 | $ | 0.001 | | |
| | $ | 2,975,843.00 | $ | 0.209 | | |

**Due to steel price volatility, this quote is valid for 10 days and subject to reconfirmation thereafter or indexed to CRU.**

**GENERAL RACKING SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design shall be based on recommendations and data supplied in a certified geotechnical report (by others). A signed and sealed geotechnical report is required for final foundation design and submittals to the local building authorities.
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to placement for orders of any materials.

**MATERIALS ONLY INCLUSIONS:**

- 
  RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of TX
- C-Channel posts for tracking system.
- Structural racking for tracker system, including all hardware and module mounting hardware.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- Freight to site.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G160 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.

**MATERIALS ONLY EXCLUSIONS:**

- Geotechnical Report or site survey.
- Electrical wiring and grounding/bonding material (unless called-out in Pricing section above).
- Fencing, unloading of materials and storage of materials.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others.
- Site Management Control System - wind speed, monotoring, etc
- Sales/Use Tax and Permit Fees.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**

- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0 ), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.

**RBI Commisioning scope:**

- Ensure all tracker control components are communicating with the zigbee mesh network.
- RSU, Anemometers, & Snow Sensor setup
- Tracker auto-mode and parametrization

**FOUNDATION REFUSAL DEFINITION:**

- A refusal is encountered when the advancement of a pile ceases for a period of 30 seconds or more during post driving prior to reaching full design embedment depth. Should a refusal be encountered additional charges are possible.
- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing

**OTHER PROVISIONS:**

**GROUNDING:**

- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**

- Wire management components not included. Base design includes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**

- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**

- Structural: 25 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT PAYMENT TERMS: | Contract Value | Description of Work |
|---|---|---|
| | 15% | Deposit With Order |
| | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

Contact: RBI Solar          Phone: 513-242-2051

Email: info@rbisolar.com



## MATERIALS WARRANTY AGREEMENT

"Project": Eddy II-Epc / 1890002

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek Renewables

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
  - o have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
  - o have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
  - o have any serial numbers, markings, legends or labeling altered, defaced, or removed;
  - o have only non-structural wear and tear, aging, or surface imperfections; or
  - o are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
  - o The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

_____          8/7/18
Customer                                          _____
                                                 Date

_____              8/7/18
RBI Solar, Inc.                                  _____
                                                 Date

Effective Date: **August 6, 2018**



# Purchase Order

| | |
|---|---|
| PROJECT NAME : | GASTON II-EPC |
| PROJECT ID: | SC-000569 |
| PO NUMBER : | P16151 |
| ORDER DATE: | 08/01/2018 |
| SHIP TO: | DDP PROJECT LOCATION (SEE NOTES) |
| PAYMENT TERMS: | NET 45 |
| REFERENCE TERMS: | SPECIAL T&Cs |

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

**Vendor:**

RBI Solar
5513 Vine Street
Cincinnati, OH 45217
Phone: 513-242-2051

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Material to include: Design, Drawings, Post & Racking | $2,221,278.00 | 1 | Each | $2,221,278.00 |
| Freight | $96,574.00 | 1 | Each | $96,574.00 |
| Commissioning | $10,000.00 | 1 | Each | $10,000.00 |
| | | | SUBTOTAL | $2,327,852.00 |
| | | | TOTAL | $2,327,852.00 |

Notes:

1. Deliver By Date: ~~07/31/2018~~ 10/5/2018 *CML*
2. Project Location: 260 George Derrick Road  Swansea, SC 29160
3. Required 72 hr Notice Prior to Delivery – Vendor Must Contact Project Manager: Roger Berryment - roger.berryment@ccrenew.com
4. PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE AGREED DELIVERY SCHEDULE
5. General Notes: Site Address: 260 George Derrick Road Swansea, South Carolina 29160 / Assistant PM/Approver: Colby Webb 828-318-6468, Complete Pile/Racking Delivery Date: 25 Sep 2018, Please send PO to: bvietas@rbisolar.com
6. Project Accountant: Jenny Holtsclaw - jenny.holtsclaw@ccrenew.com

ADDRESS PO CORRESPONDENCE TO:

Procurement Department
Buyers@ccrenew.com

CYPRESS CREEK:

APPROVED BY
DATE: 08/01/2018

VENDOR: Christopher M. Lantz

Digitally signed by Christopher M. Lantz
DN: cn=Christopher M. Lantz, o=RBI Solar,
ou=Ground Mount Manager,
email=clantz@rbisolar.com, c=US
Date: 2018.08.06 08:04:46 -04'00'

APPROVED BY
DATE: 08/01/2018

**All Documentation MUST reference PO# and Project Name to be accepted. All invoices must include an executed lien waiver to be considered acceptable for processing. All invoices must be submitted by the 10th of each month to epc.ap@ccrenew.com and CC Project Accountant to ensure that payment is processed timely.**

**This PO is only valid for pricing and scope as provided on vendor quote/email correspondence.**

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**

**Gaston 2 - Swansea SC**



**RBI SOLAR**

| | |
|---|---|
| **CLIENT:** | Jesse Mattson |
| | **Cypress Creek Renewables** |
| | **Phone:** 919-525-2772 |
| | **Email:** jesse.mattson@ccrenew.com |
| **DATE:** | July 30, 2018 |

**RACKING SPECIFICATIONS, PROJECT SPECIFIC**

| | | |
|---|---|---|
| • | Number Of Modules Supported: | 58,168 modules |
| • | Module Manufacturer/Model Number: | Solar Frontier |
| • | Module Wattage: | 180 watts |
| • | Total System Size (DC): | 10.47024 MW |
| • | Module Orientation: | Portrait |
| • | Number Of Modules High: | 2 ea |
| • | Minimum Module Clearance: | 18 inches |
| • | String Size: | 11 Mods/String |
| • | Post Embedment Depth: | 8.5 ft. |
| • | Post Configuration (Single or Dual Post): | Single Post |
| • | Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • | Module Mounting Method: | Bottom Mount |
| • | Loading Assumptions: Snow: 10 psf* | Wind: Per Code** |
| | *IBC 2012 | **ASCE 7-10 (Wind Category I) |

**TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - <u>APPROXIMATE</u>:**

| | | |
|---|---|---|
| • | # of Tables: | 2644 Total |
| • | # of Rows: | 348 Total |
| • | # of Modules Per Row: | Varies |
| • | Tracking Parameters: | +/- 55 degrees |
| • | # of Motors per Row: | 1 each |
| • | # of Controllers per Row: | 1 each |
| • | Type of Motor: | DC Gear-Motor |
| • | Power Source (DC/AC): | DC Self-Powered |
| • | Snow Sensor (Y/N): | No |
| • | Back Tracking: | Yes |
| • | Windstow & Nighttime Stow: | Yes |
| • | Controller Communication: | Wireless |

**PRICING**

Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | $$/Watt | $$/Mod. |
|---|---|---|---|
| TOTAL PRICE: | $ 2,221,278.00 | $ 0.212 | $ 38.19 |

Price includes:

| | |
|---|---|
| • Design | • Racking System |
| • Stamped Engineered Drawings | • Foundation Post Assumed to be Rolled Cee-Channel |
| • Approved Module Grounding Method | • No Freight |

| | | | |
|---|---|---|---|
| Freight of Materials to Site: | $ 96,574.00 | $ 0.009 | $ 1.66 |
| Commissioning Services: | $ 10,000.00 | | |

**Steel based product pricing used within this estimate is based on current material availability, and costs, as of the date of this quotation. Due to the inherent volatility in steel plate product costs, RBI Solar reserves the right to modify pricing after 10 days from the date of this proposal. Additional price modifications may be applied at the time of "release to fabricate" should it not occur within 60 days of contract execution. All modifications shall be to offset any additional cost increases as indexed to HR CRU Midwest Monitor**

**MATERIAL AND DESIGN SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- The work shall be designed, engineered, fabricated and supplied with due consideration to known local weather conditions and environmental protection requirements.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design and engineering shall be based on a pull test performed by RBI Solar or recommendations and data supplied in a certified geotechnical report (by others).
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to releasing materials for fabrication.
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of SC
- RBI Solar shall provide progress drawings along with a final stamped set. Revisions to the project after written approval of the stamped set, may result in additional revision fees.
- Foundations/posts, racking system and module mounting hardware (includes bonding to racking).
- Freight to site as a separate line item.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- RBI Solar provides a grid powered controller for projects located in colder regions. These require a 120V power source wired directly to each individual controller/row. Option to step up to a 277V power supply must be requested.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G115 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others. Service can be performed for an additional fee at time of pull test, if requested in writing by customer.
- Sales/Use Tax and Permit Fees are excluded unless noted.
- Delays to the project delivery date, after fabrication, may result in storage fees.
- Domestic Content/Made In The USA is available. Requirement must be stated at time of contract.
- Special fabrication requirements/certification are excluded. Fabrication is performed in RBI Solar or approved facilities.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**

- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0 ), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.
- Control Installation Checklist completed, signed, and submitted to RBI. Checklist includes calibration and scanning of TCU's.

**RBI Commisioning scope:**

- Confirm all tracker control components are communicating with the zigbee mesh network.
- Program all RBI controls equipment for full operation of site.

**FOUNDATION REFUSAL DEFINITION:**

- In the event that review of documentation reveals potential for difficult foundation installation due to site conditions, surface contours, soil conditions, drainage, trees, fill, ground, rock, subsurface conditions or any other condition of the sites, Additional Site Exploration shall be discussed to determine alternative foundations and/or means and methods of performing the Work.

- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing
  - Above grade ballast

**OTHER PROVISIONS:**

**GROUNDING:**
- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**
- Wire management components not included. Base design inlcudes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**
- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**
- Structural: 10 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT | Contract Value | Description of Work |
|---|---|---|
| PAYMENT | 15% | Deposit With Order (Due Upon Receipt) |
| TERMS: | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

    **Contact:** RBI Solar                               **Phone:** 513-242-2051

    **Email:** info@rbisolar.com


**RBI SOLAR**

## MATERIALS WARRANTY AGREEMENT

"Project": Gaston II-Epc

"Product Warranted" (the "Products"): Tracker Racking Material

"Owner/Customer": Cypress Creek EPC, LLC

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.

- The Warranty does not apply to Products that:

  - have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;

  - have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;

  - have any serial numbers, markings, legends or labeling altered, defaced, or removed;

  - have only non-structural wear and tear, aging, or surface imperfections; or

  - are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).

  - The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.

- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.

- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.

- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.

- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT; AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

_____          2/13/19
Customer                           Date

_____          01/09/2019
RBI Solar, Inc.                    Date

Effective Date: 01/09/2019

Page 3 of 3



## WARRANTY TRANSFER AGREEMENT

"Project": Gaston Solar II, LLC

"Product Warranted" (the "Product"): Racking Materials

"Original Owner/Customer": Cypress Creek EPC, LLC

"Original Warranty Issue Date": 10/8/18

"New Owner/Customer": Gaston Solar II, LLC

New Owner/Customer's Representative Gaston Solar II, LLC

New Owner/Customer's Address 260 George Derrick Road, Swansea, SC 29160

"Warranty Transfer Date": 11/20/18

In consideration of NA _____ Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Cypress Creek EPC, LLC _____ does hereby grant, convey and agree to transfer unto Gaston Solar II, LLC _____ all of Cypress Creek EPC, LLC _____ 's right, title and interest in the Warranty for the Product.

It is understood by all parties that the RBI Solar Limited Warranty may be transferred only one (1) time during the first five years after the original installation date. Subsequent buyers do not qualify.

In witness whereof, Original Owner/Customer has caused this Transfer to be executed as of the date of the last signature noted below.

_____
Original Owner/Customer Signature

11/7/18
Date

_____
New Owner/Customer Signature

1/8/19
Date

Acknowledged and Accepted By RBI Solar Authorized Representative:

_____
RBI Solar

1/9/19
Date



**CYPRESS CREEK**
SERVICES

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

# Purchase Order

PO DATE: 08/09/2017
TERMS: SEE CYPRESS CREEK SEPARATE TERMS & CONDITION

*All Documentation MUST reference PO# and Project Name*

Purchase Order #: PO5536
Project Name: Highway 56 Epc
Pin #: TX-ONC-033
Project Location: 16480 Hwy 56, Sherman TX 75092
Shipping Term: DDP (Project Site)

| To: | Ship To: |
|-----|----------|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-628-7268 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Vendor Must Contact Project Manager, Corey Carson @ (512) 593-8912 for Validation PRIOR to SHIPPING |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|-------------|-----------|-----|------|--------|
| Materials Only | $1,583,411.00 | 1 | Each | $1,583,411.00 |
| Freight of Materials to Site | $91,870.00 | 1 | Each | $91,870.00 |
| Add for Pull Test | $6,000.00 | 1 | Each | $6,000.00 |
| Commissioning Services | $10,188.00 | 1 | Each | $10,188.00 |
| Estimated Tax      Posts 9/24/17 | $130,532.00 | 1 | Each | $130,532.00 |
| Delivery to Site by: 9/10/2017Racking  10/15/17 | $0.00 | 1 | Each | $0.00 |
| Reference Quote Highway 56 7/21/2017 | $0.00 | 1 | Each | $0.00 |
| Project Manager Corey Carson  corey.carson@ccrenew.com | $0.00 | 1 | Each | $0.00 |
| Site Address: 16480 Hwy 56, Sherman TX 75092 | $0.00 | 1 | Each | $0.00 |
| See attached quote for contract payment terms. | $0.00 | 1 | Each | $0.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE
ON OR BEFORE : 09/10/2017

Reference: Proposal Dated July 21, 2017
Deliver By Date: 09/30/2017   SEE ABOVE

| RECAP | |
|-------|---|
| SUBTOTAL | $1,822,101.00 |
| TOTAL | $1,822,101.00 |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lien.pham@ccrenew.com
(213) 357-5437

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

_____   08/09/2017
APPROVED BY                          DATE

*SEE CYPRESS CREEK'S SEPARATE TERMS AND CONDITIONS ATTACHED AND INCORPORATED HEREIN*

APPROVED BY
DATE
8/10/2015
VENDOR:

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

**ACCEPTANCE**
This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

**TIMING, DELIVERY AND SHIPPING**
Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

**SECURITY INTEREST**

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

**INSPECTION OF WORK**

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

**INVOICES**
Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of Insurance, (c) Business Automobile Liability insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability Insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1); however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

page 4 of 5

**INDEPENDENT CONTRACTOR**

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

**PROPRIETARY INFORMATION & CONFIDENTIALITY**

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

**ASSIGNMENT**

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

**APPLICABLE LAW**

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**
Highway 56

**RBI SOLAR**

**CLIENT:** Dan Noren
Cypress Creek Renewables
Phone: 530-304-9420
Email: dan.noren@ccrenew.com

**DATE:** July 21, 2017

**PROJECT:** Highway 56

### RACKING SPECIFICATIONS, PROJECT SPECIFIC

| | |
|---|---|
| • Number Of Modules Supported: | 65,160 modules |
| • Module Manufacturer/Model Number: | First Solar Series 4 |
| • Module Wattage: | 117.5 watts |
| • Total System Size (DC): | 7.6563 MW |
| • Module Orientation: | Landscape |
| • Number Of Modules High: | 4 ea |
| • Approximate Distance Between Posts: | Varies |
| • Minimum Module Clearance: | 18 inches |
| • String Size | 10 Mods/String |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions | Snow: 5 psf Wind*\*: 105 mph |
| *IBC 2012 | **ASCE 7-10 (Wind Category I) |

### TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - APPROXIMATE:

| | |
|---|---|
| • # of Tables | 1642 Total |
| • # Rows | 278 Total |
| • # of Modules Per Row | 180, 240 each |
| • Tracking Parameters: | +/- 60 degrees |
| • # of Motors per Row | 1 each |
| • # of Controllers per Row | 1 each |
| • # of Inclinometer Sensors in a Row | 1 each |
| • Type of Motor | DC Gear Motor |
| • Back Tracking | Yes |
| • Windstow & Nighttime Stow | Yes |
| • Controller Communication | Wireless |

### PRICING

Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | $$/Watt | $$/Mod. |
|---|---|---|---|---|
| TOTAL PRICE | $ | 1,583,411.00 $ | 0.207 $ | 24.30 |

Price includes:

| • Design | • Racking System |
|---|---|
| • Stamped Engineered Drawings | • Motors / Controls System |
| • Approved Module Grounding Method | • No Freight |
| • Posts (Estimated 3284 Total) @ 6' Embed | • Module Clamps |

| | | | | |
|---|---|---|---|---|
| Freight of Materials to Site: | $ | 91,870.00 $ | 0.012 $ | 1.41 |
| Add For Pull Test: | $ | 6,000.00 $ | 0.001 $ | 0.09 |
| Commissioning Services: | $ | 10,188.00 $ | 0.001 $ | 0.16 |
| Estimated Tax: | $ | 130,632.00 $ | 0.017 $ | 2.00 |

Due to steel price volatility, this quote is valid for 45 days and subject to reconfirmation thereafter or indexed to CRU:

**GENERAL RACKING SPECIFICATION**
- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 3% uniform and 6% differential. Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design shall be based on recommendations and data supplied in a certified geotechnical report (by others). A signed and sealed geotechnical report is required for final foundation design and submittals to the local building authorities.
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to placement for orders of any materials.

**MATERIALS ONLY INCLUSIONS:**
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of TX.
- Posts for tracking system C-Channel.
- Structural racking for tracker system, including all hardware and module mounting hardware.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection.
- Freight to site.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G160 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.

**MATERIALS ONLY EXCLUSIONS:**
- Geotechnical Report or site survey.
- Electrical wiring and grounding/bonding material (unless called-out in Pricing section above).
- Fencing, unloading of materials and storage of materials.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others.
- Site Management Control System - wind speed, monitoring, etc
- Sales/Use Tax and Permit Fees.

**OTHER PROVISIONS:**

**GROUNDING:**
- Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 3703.

**WIRE MANAGEMENT:**
- Base design includes prepunched holes in the purlin for wire management
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**
- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**
- Structural: 25 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT | Contract Value | Description of Work |
|---|---|---|
| PAYMENT | 15% | Deposit With Order |
| TERMS: | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:

Contact: RBI Solar        Phone: 513-242-2051

Email: info@rbisolar.com


**RBI SOLAR**

## MATERIAL/LABOR WARRANTY AGREEMENT

"Project":   Highway 56 - EPC

"Product Warranted" (the "Product"):   RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer":   Cypress Creek Renewables

- RBI Solar warrants that it installed all material aspects of the RBI Solar Product in accordance with the industry standards of the profession, in effect on the date the Project is deemed Substantially Completed.  Subject to the following terms and conditions, RBI Solar will, for a period of twelve (12) months, at its expense, repair or caused to be repaired those failures directly resulting from the defects in RBI Solar's installation.  Upon expiration of this term of the Warranty, without notice from Owner/Customer of some defect, RBI Solar shall have no further obligation to make repairs at RBI Solar's expenses under any provision of this Warranty and Owner/Customer shall not make any further demand or claim against RBI Solar concerning installation, provided that RBI Solar promptly commences and diligently proceeds with the correction and repair of such defects covered by this Warranty which are called to RBI Solar's attention in the manner set forth during the term of this Warranty by Owner/Customer.

- RBI Solar warrants that the Product will be free from structural failure for a period of twenty (20) years after the date the Project is Substantially Completed.  For purposes of this Warranty Agreement, the Project shall be deemed "Substantially Completed" when all material aspects of the RBI Solar Product have been installed, and only minor punch list items remain to be completed.  RBI Solar will provide Owner/Customer with a certificate of substantial completion indicating the date RBI Solar deems the Project Substantially Completed.  However, the warranty will not be binding until RBI Solar has received payment in full inclusive of all change orders. RBI Solar makes no warranties as to items or components furnished or warranted by others, or as to any item or component which is furnished by RBI Solar and altered, damaged or misused by others.  RBI Solar further makes no warranties as to items or components damaged by storm, flooding, lightening, hurricane, tornado, earthquake, fire, instability of the sub-surface or foundation, chemical or biological effects, or other casualties. The warranty is applicable only to damage to or failure of the structure of the Product caused by normal atmospheric exposure.  Deterioration caused by excessive exposure to standing water, whether salt or fresh, or any exposure to corrosive chemicals, ash, or fumes, or any other foreign chemical substances is specifically excluded from this warranty (the "Warranty").

- The Warranty does not cover photovoltaic modules, electrical components, wiring connections, or any other accessories, fixtures, insulation, goods, or materials not directly associated with the structure of the Product. The Warranty does not cover any goods or materials not provided by RBI Solar.

- The Warranty shall be valid only if the Product is erected by RBI Solar or if the Product is erected and installed strictly in accordance with RBI Solar's specifications.  Any modification of, or deviation or variation from RBI Solar's specifications for erection and installation will void the Warranty.

- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer agrees to promptly notify RBI Solar in writing regarding the alleged breach of Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Owner/Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as chosen by RBI Solar at its sole option.

- THE FOREGOING LIMITED EXPRESS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES AND, EXCEPT AS PROVIDED ABOVE, RBI SOLAR MAKES NO REPRESENTATION, GUARANTY, OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCTS, MATERIALS, AND LABOR IT IS SUPPLYING PURSUANT TO THIS WARRANTY AGREEMENT. EXCEPT AS OTHERWISE PROVIDED ABOVE, RBI SOLAR HEREBY DISCLAIMS ALL REPRESENTATIONS, GUARANTIES, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR HABITABILITY. THERE IS NO WARRANTY, EXPRESS OR IMPLIED, OTHER THAN THAT WARRANTY SPECIFICALLY AND EXPRESSLY PROVIDED ABOVE.

- RBI Solar reserves the right to inspect the Product alleged to have breached the Warranty. Owner/Customer is required under this Warranty to conduct annual inspections of the Product and to provide annual maintenance which includes tightening any loose bolts or other connections and repairing any galvanized coating showing any signs of wear, rust or other deterioration. Owner/Customer agrees to hold and protect the Product alleged to have breached the Warranty until Owner/Customer is instructed to do otherwise by RBI Solar. While the Product is in Owner/Customer's possession, Owner/Customer shall not alter same. Owner/Customer shall be liable for all damages to the Product which are alleged to have breached the Warranty, which damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent Owner/Customer fails to conduct annual inspections or maintenance of the Product, fails to hold or protect the Product complained of, or fails to provide to RBI Solar the unencumbered right and opportunity to timely inspect fully the Product alleged by Owner/Customer to have breached the Warranty.

- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. OWNER/CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO OWNER/CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, OWNER/CUSTOMER AGREES THAT, IN THE EVENT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR ALLEGED TO

HAVE CAUSED DAMAGES, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, OWNER/CUSTOMER'S DAMAGES RECOVERABLE FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

CIN2000 1049220v2
26555.00003



**CYPRESS CREEK**
RENEWABLES

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

# Purchase Order

PO DATE: 03/27/2018
TERMS: SEE ATTACHED

*All Documentation MUST reference PO# and Project Name*

Purchase Order #: P12412
Project Name: Sterling-Epc
Pin #: TX-ONC-00522
Project Location: Sterling Farm  2001 CR 1061 Greenville TX 75401
Shipping Term: DDP (Project Site)

| To: | Ship To: |
|-----|----------|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-242-2051 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Please send correspondence to corey.carson@ccrenew.com |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|-------------|-----------|-----|------|--------|
| Design, Stamped Engineering Drawings, Approved Module Grounding Method, Posts, Racking System, Motors, Control System | $2,788,542.00 | 1 | Each | $2,788,542.00 |
| Pull Test | $7,000.00 | 1 | Each | $7,000.00 |
| Commissioning Services | $8,000.00 | 1 | Each | $8,000.00 |
| Freight of Materials to Site | $192,812.00 | 1 | Each | $192,812.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE
ON OR BEFORE : 03/27/2018  5/13/18 *WP*

Reference:
Deliver By Date: 03/27/2018  5/13/18 *WP*

| RECAP | |
|-------|--|
| SUBTOTAL | $2,996,354.00 |
| TOTAL | $2,996,354.00 |

ADDRESS CORRESPONDENCE TO:

Procurement Department
commodities@ccrenew.com

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

03/27/2018
APPROVED BY
DATE

VENDOR:

03/29/2018  *Wes Pauly*
APPROVED BY
DATE

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**

**Sterling - Greenville TX**



**RBI SOLAR**

**CLIENT:**   Corey Kuhar
             **Cypress Creek Renewables**
             **Phone:**   919-921-8690
             **Email:**   corey.kuhar@ccrenew.com

**DATE:**    **March 20, 2018**

**PROJECT:**   **Sterling - Greenville TX**

**RACKING SPECIFICATIONS, PROJECT SPECIFIC**

| | |
|---|---|
| • Number Of Modules Supported: | 81,504 modules |
| • Module Manufacturer/Model Number: | Solar Frontier |
| • Module Wattage: | 175 watts |
| • Total System Size (DC): | 14.2632 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 2 ea |
| • Approximate Distance Between Posts: | Varies |
| • Minimum Module Clearance: | 18 inches |
| • String Size: | 12 Mods/String |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions: Snow*: 5 psf | Wind**: 105 mph |
| *IBC 2012 | **ASCE 7-10 (Wind Category I) |

**TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - APPROXIMATE:**

| | |
|---|---|
| • # of Tables: | 3397 Total |
| • # of Rows: | 499 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • # of Inclinometer Sensors in a Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | DC Self-Powered |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING**

Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | $$/Watt | | $$/Mod. |
|---|---|---|---|---|---|
| TOTAL PRICE: | $ 2,788,542.00 | $ 0.196 | $ | | 34.21 |

Price includes:
- Design
- Stamped Engineered Drawings
- Approved Module Grounding Method
- Posts (Estimated 6794 Total) @ 7' Embed

- Racking System
- Motors & Controls System
- Foundation Post Assumed to be Structural Cee-Channel
- No Freight

| | | | | |
|---|---|---|---|---|
| Freight of Materials to Site: | $ 192,812.00 | $ 0.014 | $ | 2.37 |
| Add For Pull Test: | $ 7,000.00 | $ 0.000 | | |
| Commissioning Services: | $ 8,000.00 | $ 0.001 | | |
| | $ 2,996,354.00 | $ 0.210 | | |

**Due to steel price volatility, this quote is valid for 10 days and subject to reconfirmation thereafter or indexed to CRU.**

**GENERAL RACKING SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design shall be based on recommendations and data supplied in a certified geotechnical report (by others). A signed and sealed geotechnical report is required for final foundation design and submittals to the local building authorities.
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to placement for orders of any materials.

**MATERIALS ONLY INCLUSIONS:**

- 
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of TX
- C-Channel posts for tracking system.
- Structural racking for tracker system, including all hardware and module mounting hardware.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- Freight to site.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G160 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.

**MATERIALS ONLY EXCLUSIONS:**

- Geotechnical Report or site survey.
- Electrical wiring and grounding/bonding material (unless called-out in Pricing section above).
- Fencing, unloading of materials and storage of materials.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others.
- Site Management Control System - wind speed, monotoring, etc
- Sales/Use Tax and Permit Fees.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**
- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0 ), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.

**RBI Commisioning scope:**
- Ensure all tracker control components are communicating with the zigbee mesh network.
- RSU, Anemometers, & Snow Sensor setup
- Tracker auto-mode and parametrization

**FOUNDATION REFUSAL DEFINITION:**
- A refusal is encountered when the advancement of a pile ceases for a period of 30 seconds or more during post driving prior to reaching full design embedment depth. Should a refusal be encountered additional charges are possible.
- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing

**OTHER PROVISIONS:**

**GROUNDING:**
- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**
- Wire management components not included. Base design includes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**
- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**
- Structural: 25 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT | Contract Value | Description of Work |
|----------|---------------|---------------------|
| PAYMENT | 15% | Deposit With Order |
| TERMS: | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

Contact: RBI Solar                                  Phone: 513-242-2051

Email: info@rbisolar.com



## MATERIALS WARRANTY AGREEMENT

"Project": Sterling Solar LLC/ 1890001

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek Renewables

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
    - o have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
    - o have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
    - o have any serial numbers, markings, legends or labeling altered, defaced, or removed;
    - o have only non-structural wear and tear, aging, or surface imperfections; or
    - o are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
    - o The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

Customer _____

8/7/18

Date _____

RBI Solar, Inc. _____

8/7/18

Date _____

Effective Date: **August 6, 2018**



**CYPRESS CREEK**
DEVELOPMENT

# Purchase Order

| | |
|---|---|
| PROJECT NAME : | WEST MOORE II-EPC |
| PROJECT ID: | TX-000064 |
| PO NUMBER: | P15689 |
| ORDER DATE: | 07/19/2018 |
| SHIP TO: | DDP PROJECT LOCATION (SEE NOTES) |
| PAYMENT TERMS: | NET 45 |
| REFERENCE TERMS: | SPECIAL T&Cs |

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

**Vendor:**

RBI Solar
5513 Vine Street
Cincinnati, OH 45217
Phone: 513-242-2051

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Design, Stamped Engineered Drawings, Racking System, Grounding Method | $1,544,198.00 | 1 | Each | $1,544,198.00 |
| Freight To Site | $100,666.00 | 1 | Each | $100,666.00 |
| Commissioning | $5,000.00 | 1 | Each | $5,000.00 |
| | | | SUBTOTAL | $1,649,864.00 |
| | | | TOTAL | $1,649,864.00 |

Notes:
1. Deliver By Date: ~~08/01/2018~~ 09/04/2018 *w/p*
2. Project Location: 1917 W. Moore St Sherman, TX 78057
3. Required 72 hr Notice Prior to Delivery – Vendor Must Contact Project Manager: Corey Carson - corey.carson@ccrenew.com
4. PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE AGREED DELIVERY SCHEDULE
5. General Notes: For More Detail See Attached
6. Project Accountant: Clayton Messer – clayton.messer@ccrenew.com

ADDRESS PO CORRESPONDENCE TO:

Procurement Department
Buyers@ccrenew.com

CYPRESS CREEK:

APPROVED BY
DATE: 07/19/2018

VENDOR: Wes Pauly

Digitally signed by Wes Pauly
Date: 2018.07.24
08:31:39 -04'00'

APPROVED BY
DATE: 07/19/2018

All Documentation MUST reference PO# and Project Name to be accepted. All invoices must include an executed lien waiver to be considered acceptable for processing. All invoices must be submitted by the 10th of each month to epc.ap@ccrenew.com and CC Project Accountant to ensure that payment is processed timely.

This PO is only valid for pricing and scope as provided on vendor quote/email correspondence.

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

## ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

## TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

## SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

## INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

## INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

## TAXES
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

## WARRANTIES
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

## CHANGES
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

## INSURANCE
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

## NO WAIVER
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

## TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

## LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

## CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

## INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party;or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**

**West Moore II - Sherman TX**



**RBI SOLAR**

**CLIENT:**   Greg Loomis
**Cypress Creek Renewables**
Phone: 919-230-8629
Email: greg.loomis@ccrenew.com

**DATE:**   July 17, 2018

**RACKING SPECIFICATIONS, PROJECT SPECIFIC**

| | |
|---|---|
| • Number Of Modules Supported: | 41,088 modules |
| • Module Manufacturer/Model Number: | Solar Frontier |
| • Module Wattage: | 165 & 175 watts |
| • Total System Size (DC): | 7.13268 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 2 ea |
| • Minimum Module Clearance: | 18 inches |
| • String Size: | 12 Mods/String |
| • Post Embedment Depth: | 6 ft. |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions: Snow: 5 psf* | Wind: Per Code** |
| *IBC 2012 | **ASCE 7-10 (Wind Category I) |

**TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - APPROXIMATE:**

| | |
|---|---|
| • # of Tables: | 1712 Total |
| • # of Rows: | 290 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | DC Self-Powered |
| • Snow Sensor (Y/N): | No |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING**   Pricing, per scope of work as defined above in this proposal.

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | $$/Watt | $$/Mod. |
|---|---|---|---|
| TOTAL PRICE: | $ 1,544,198.00 | $ 0.216 | $ 37.58 |

Price includes:

| | |
|---|---|
| • Design | • Racking System |
| • Stamped Engineered Drawings | • Foundation Post Assumed to be Structural Cee-Channel |
| • Approved Module Grounding Method | • No Freight |

| | | | |
|---|---|---|---|
| Freight of Materials to Site: | $ 100,666.00 | $ 0.014 | $ 2.45 |
| Commissioning Services: | $ 5,000.00 | | |

Steel based product pricing used within this estimate is based on current material availability, and costs, as of the date of this quotation. Due to the inherent volatility in steel plate product costs, RBI Solar reserves the right to modify pricing after 10 days from the date of this proposal. Additional price modifications may be applied at the time of "release to fabricate" should it not occur within 60 days of contract execution. All modifications shall be to offset any additional cost increases as indexed to HR CRU Midwest Monitor

**MATERIAL AND DESIGN SPECIFICATION**
- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- The work shall be designed, engineered, fabricated and supplied with due consideration to known local weather conditions and environmental protection requirements.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design and engineering shall be based on a pull test performed by RBI Solar or recommendations and data supplied in a certified geotechnical report (by others).
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to releasing materials for fabrication.
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of TX
- RBI Solar shall provide progress drawings along with a final stamped set. Revisions to the project after written approval of the stamped set, may result in additional revision fees.
- Foundations/posts, racking system and module mounting hardware (includes bonding to racking).
- Freight to site as a separate line item.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- RBI Solar provides a grid powered controller for projects located in colder regions. These require a 120V power source wired directly to each individual controller/row. Option to step up to a 277V power supply must be requested.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G115 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others. Service can be performed for an additional fee at time of pull test, if requested in writing by customer.
- Sales/Use Tax and Permit Fees are excluded unless noted.
- Delays to the project delivery date, after fabrication, may result in storage fees.
- Domestic Content/Made In The USA is available. Requirement must be stated at time of contract.
- Special fabrication requirements/certification are excluded. Fabrication is performed in RBI Solar or approved facilities.

**COMMISSIONING SPECIFICATIONS:**
    **Prior to RBI arriving on site:**
- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0°), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.
- Control Installation Checklist completed, signed, and submitted to RBI. Checklist includes calibration and scanning of TCU's.

    **RBI Commisioning scope:**
- Confirm all tracker control components are communicating with the zigbee mesh network.
- Program all RBI controls equipment for full operation of site.

**FOUNDATION REFUSAL DEFINITION:**

- In the event that review of documentation reveals potential for difficult foundation installation due to site conditions, surface contours, soil conditions, drainage, trees, fill, ground, rock, subsurface conditions or any other condition of the sites, Additional Site Exploration shall be discussed to determine alternative foundations and/or means and methods of performing the Work.

- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing
  - Above grade ballast

**OTHER PROVISIONS:**

**GROUNDING:**

- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**

- Wire management components not included. Base design inlcudes prepunched holes in the purlin for wire management.

- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**

- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**

- Structural: 10 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| | Contract Value | Description of Work |
|---|---|---|
| **CONTRACT** | | |
| **PAYMENT** | 15% | Deposit With Order (Due Upon Receipt) |
| **TERMS:** | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

Contact: RBI Solar         **Phone:** 513-242-2051

**Email:** Info@rbisolar.com

| | |
|---|---|
| **From:** | Corey Carson |
| **To:** | Cydney Walker |
| **Subject:** | RE: 179016 Cypress Creek - West Moore II Fully Executed Agreement |
| **Date:** | Wednesday, July 25, 2018 1:24:02 PM |
| **Attachments:** | image010.png |
| | image011.png |
| | image012.png |
| | image013.png |
| | image014.png |
| | image015.png |
| | image001.png |
| | image003.png |

Is that the earliest they can deliver? If so, we will have to live with that.

Thanks,

**Corey Carson**
Project Manager (Texas)
Cypress Creek Renewables
(c) 512-431-1011 | corey.carson@ccrenew.com



**From:** Cydney Walker
**Sent:** Wednesday, July 25, 2018 10:46 AM
**To:** Corey Carson <corey.carson@ccrenew.com>
**Subject:** RE: 179016 Cypress Creek - West Moore II Fully Executed Agreement

Morning Corey,

Just following up here, how does the 9/1 delivery date sound to you for West MooreII_RBI?

**From:** Cydney Walker
**Sent:** Tuesday, July 24, 2018 11:04 AM
**To:** Tripp Mcswain <tripp.mcswain@ccrenew.com>; Corey Carson <corey.carson@ccrenew.com>;
Greg Loomis <greg.loomis@ccrenew.com>; Andrew Fahey <andrew.fahey@ccrenew.com>
**Subject:** RE: 179016 Cypress Creek - West Moore II Fully Executed Agreement

Removed RBI

Hi Corey,

Are you in agreeance with the proposed 09/01/2018 date?

Thanks!

Kind Regards,

**Cydney Walker**
Buyer
Cypress Creek Renewables
5310 S. Alston Ave, Bldg 300 Durham NC 27713
(0)919.504.6427 | cydney.walker@ccrenew.com



CYPRESS CREEK
RENEWABLES

---

**From:** Jones, Michelle [mailto:MJones@rbisolar.com]
**Sent:** Tuesday, July 24, 2018 9:34 AM
**To:** Cydney Walker <cydney.walker@ccrenew.com>; Tripp Mcswain
<tripp.mcswain@ccrenew.com>; Corey Carson <corey.carson@ccrenew.com>; Greg Loomis
<greg.loomis@ccrenew.com>; Andrew Fahey <andrew.fahey@ccrenew.com>
**Cc:** Vietas, Bill <BVietas@rbisolar.com>; Pauly, Wes <WPauly@rbisolar.com>; Hudepohl, Pat
<PHudepohl@rbisolar.com>
**Subject:** 179016 Cypress Creek - West Moore II Fully Executed Agreement

Attached please find the fully executed agreement for your records.

RBI Team – This document is saved in the project executed contract docs folder.

Thanks.

**Michelle Jones**

RBI SOLAR

**RBI Solar, Inc.**
**Solar Mounting Systems**
5513 Vine Street
Cincinnati OH 45217
Ph: 513-242-2051 Ext. 543
Fax: 513-242-0816
E-mail: mjones@rbisolar.com
www.rbisolar.com



## MATERIALS WARRANTY AGREEMENT

"Project": West Moore II-EPC / 179016

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek Renewables

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

RBI Solar, Inc Warranty – Tracker, 2017 Version

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.

- The Warranty does not apply to Products that:
    o have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
    o have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
    o have any serial numbers, markings, legends or labeling altered, defaced, or removed;
    o have only non-structural wear and tear, aging, or surface imperfections; or
    o are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
    o The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.

- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.

- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.

- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.

- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT; AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

Customer _____     Date 12/13/18 _____

RBI Solar, Inc. _____     Date 12/13/2018 _____

Effective Date: August 31, 2018 _____



**CYPRESS CREEK**

# Purchase Order

PO DATE: 06/22/2018
TERMS: SPECIAL T&Cs

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

*All Documentation MUST reference PO# and Project Name*

**Purchase Order #:** P15054
**Project Name:** Bar D-Epc
**Pin #:** CO-002417
**Project Location:** Bar D Solar, LLC  567 County Road 83 Meeker CO 81641
**Shipping Term:** DDP (Project Site)

| To: | Ship To: |
|---|---|
| RBi Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-242-2051 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Contact: Chris Emerson, Project Manager 707-245-5349 /<br>Physical Job Site Address: 567 County Rd 83 Meeker, CO<br>81641 / SHIPPING ADDRESS USE GPS COORDINATES:<br>39.9129780, -108.3849650 |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Pricing, per scope of work as defined above in this proposal: | $0.00 | 1 | Each | $0.00 |
| Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included. | $0.00 | 1 | Each | $0.00 |
| Price includes: Design, Racking System, Stamped Engineered Drawings, Approved Module Grounding Method, Posts (Estimated 3226 Total) @ 6.5' Embed | $1,081,843.00 | 1 | Each | $1,081,843.00 |
| Foundation Post Assumed to be Rolled Cee-Channel, Freight fee separate | $0.00 | 1 | Each | $0.00 |
| Freight of Materials to Site: | $89,755.00 | 1 | Each | $89,755.00 |
| Add/Deduct per ft. of Post Embedment (All Posts): | $15,347.00 | 1 | Each | $15,347.00 |
| Add For Pull Test: | $6,000.00 | 1 | Each | $6,000.00 |
| Add to Furnish 80 Equipment Post(s): | $60.00 | 80 | Each | $4,800.00 |
| Commissioning Services: | $10,000.00 | 1 | Each | $10,000.00 |
| Physical Job Site Address: 567 County Rd 83 Meeker, CO 81641 | $0.00 | 1 | Each | $0.00 |
| SHIPPING ADDRESS USE GPS COORDINATES: 39.9129780, -108.3849650 | $0.00 | 1 | Each | $0.00 |
| Contact: Chris Emerson, Project Manager 7072455349 | $0.00 | 1 | Each | $0.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE : 09/14/2018

Reference:
Deliver By Date: 09/14/2018

| RECAP | |
|---|---|
| SUBTOTAL | $1,207,745.00 |
| TOTAL | $1,207,745.00 |

ADDRESS CORRESPONDENCE TO:

Procurement Department
Buyers@ccrenew.com

**Forward invoice/ billing to:**
epc.ap@ccrenew.com

CYPRESS CREEK: _____

06/22/2018
APPROVED BY
DATE

VENDOR:

_____
APPROVED BY
DATE

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

**ACCEPTANCE**

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

**TIMING, DELIVERY AND SHIPPING**

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

**SECURITY INTEREST**

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

**INSPECTION OF WORK**

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

**INVOICES**

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:
(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or
(b) is received without restriction from a third party without breach of any obligation of confidentiality; or
(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or
(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or
(e) is disclosed by either Party to a third party under no confidentiality obligation.
Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**

**Bar D - Meeker CO**



**CLIENT:** **Corey Kuhar**
**Cypress Creek Renewables**
**Phone:** 919-921-8690
**Email:** corey.kuhar@ccrenew.com

**DATE:** June 21, 2018

**RACKING SPECIFICATIONS, PROJECT SPECIFIC**

| | |
|---|---|
| • Number Of Modules Supported: | 17,208 modules |
| • Module Manufacturer/Model Number: | 72 Cell |
| • Module Wattage: | 325 watts |
| • Total System Size (DC): | 5.5926 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 1 ea |
| • Minimum Module Clearance: | 36 inches |
| • String Size: | 18 Mods/String |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mounting |
| • Loading Assumptions: Snow*: 60 psf | Wind**: 105 mph |
| *IBC 2012 | **ASCE 7-10 (Wind Category I) |

**TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - APPROXIMATE:**

| | |
|---|---|
| • # of Tables: | 1613 Total |
| • # of Rows: | 181 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | AC Powered |
| • Snow Sensor (Y/N): | Yes |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING**

Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | | | $$/Watt | | $$/Mod. |
|---|---|---|---|---|---|---|---|
| TOTAL PRICE: | $ | 1,081,843.00 | $ | 0.193 | $ | | 62.87 |

Price includes:

| | |
|---|---|
| • Design | • Racking System |
| • Stamped Engineered Drawings | • Foundation Post Assumed to be Rolled Cee-Channel |
| • Approved Module Grounding Method | • No Freight |
| • Posts (Estimated 3226 Total) @ 6.5' Embed | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Freight of Materials to Site: | $ | 89,755.00 | $ | 0.016 | $ | 5.22 |
| Add/Deduct per ft. of Post Embedment (All Posts): | $ | 15,347.00 | | | | |
| Add For Pull Test: | $ | 6,000.00 | | | | |
| Commissioning Services: | $ | 10,000.00 | | | | |
| Add to Furnish 80 Equipment Post(s): | $ | 4,800.00 | | | | |

**Steel based product pricing used within this estimate is based on current material availability, and costs, as of the date of this quotation. Due to the inherent volatility in steel plate product costs, RBI Solar reserves the right to modify pricing after 10 days from the date of this proposal. Additional price modifications may be applied at the time of "release to fabricate" should it not occur within 60 days of contract execution. All modifications shall be to offset any additional cost increases as indexed to HR CRU Midwest Monitor**

**MATERIAL AND DESIGN SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- The work shall be designed, engineered, fabricated and supplied with due consideration to known local weather conditions and environmental protection requirements.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design and engineering shall be based on a pull test performed by RBI Solar or recommendations and data supplied in a certified geotechnical report (by others).
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to releasing materials for fabrication.
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of CO

- RBI Solar shall provide progress drawings along with a final stamped set. Revisions to the project after written approval of the stamped set, may result in additional revision fees.
- Foundations/posts, racking system and module mounting hardware (includes bonding to racking).
- Freight to site as a separate line item.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- RBI Solar provides a grid powered controller for projects located in colder regions. These require a 120V power source wired directly to each individual controller/row. Option to step up to a 277V power supply must be requested.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G115 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others. Service can be performed for an additional fee at time of pull test, if requested in writing by customer.
- Sales/Use Tax and Permit Fees are excluded unless noted.
- Delays to the project delivery date, after fabrication, may result in storage fees.
- Domestic Content/Made In The USA is available. Requirement must be stated at time of contract.
- Special fabrication requirements/certification are excluded. Fabrication is performed in RBI Solar or approved facilities.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**

- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0 ), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.
- Control Installation Checklist completed, signed, and submitted to RBI. Checklist includes calibration and scanning of TCU's.

**RBI Commisioning scope:**

- Confirm all tracker control components are communicating with the zigbee mesh network.
- Program all RBI controls equipment for full operation of site.

**FOUNDATION REFUSAL DEFINITION:**

- In the event that review of documentation reveals potential for difficult foundation installation due to site conditions, surface contours, soil conditions, drainage, trees, fill, ground, rock, subsurface conditions or any other condition of the sites, Additional Site Exploration shall be discussed to determine alternative foundations and/or means and methods of performing the Work.

- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing
  - Above grade ballast

**OTHER PROVISIONS:**

**GROUNDING:**
- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**
- Wire management components not included. Base design inlcudes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**
- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**
- Structural: 10 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT PAYMENT TERMS: | Contract Value | Description of Work |
|---|---|---|
| | 15% | Deposit With Order (Due Upon Receipt) |
| | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

Contact: RBI Solar          Phone: 513-242-2051

Email: info@rbisolar.com



# Purchase Order

| | |
|---|---|
| PROJECT NAME : | BAR D-EPC |
| PROJECT ID: | CO-002417 |
| PO NUMBER: | P16216 |
| ORDER DATE: | 08/06/2018 |
| SHIP TO: | DDP PROJECT LOCATION (SEE NOTES) |
| PAYMENT TERMS: | NET 45 |
| REFERENCE TERMS: | SPECIAL T&Cs |

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

**Vendor:**

RBI Solar
5513 Vine Street
Cincinnati, OH 45217
Phone: 513-242-2051

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| This starter PO is to cover 20% of final subcontract costs of mechanical installation to be performed. (Total subcontract price is $761,814.00) | $152,362.80 | 1 | Each | $152,362.80 |
| | | | SUBTOTAL | $152,362.80 |
| | | | TOTAL | $152,362.80 |

Notes:

1. Deliver By Date: ~~09/01/2018~~ 9/10/2018 *CML*
2. Project Location: 567 County Road 83 Mee' er, CO 81641
3. Required 72 hr Notice Prior to Delivery – Vendor Must Contact Project Manager: Christopher Emerson - chris.emerson@ccrenew.com
4. PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE AGREED DELIVERY SCHEDULE
5. General Notes: Physical Job Site Address: 567 County Rd 83 Meeker, CO 81641, SHIPPING ADDRESS USE GPS COORDINATES: 39.9129780, -108.3849650 Contact: Chris Emerson, Project Manager, 707.245.5349
6. Project Accountant: Jenny Holtsclaw - jenny.holtsclaw@ccrenew.com

ADDRESS PO CORRESPONDENCE TO:

Procurement Department
Buyers@ccrenew.com

CYPRESS CREEK:

APPROVED BY
DATE: 08/06/2018

VENDOR: Christopher M. Lantz

Digitally signed by Christopher M. Lantz
DN: cn=Christopher M. Lantz, o=RBI Solar,
ou=Ground Mount Manager,
email=clantz@rbisolar.com, c=US
Date: 2018.08.07 09:39:40 -04'00'

APPROVED BY
DATE: 08/06/2018

All Documentation MUST reference PO# and Project Name to be accepted. All invoices must include an executed lien waiver to be considered acceptable for processing. All invoices must be submitted by the 10th of each month to epc.ap@ccrenew.com and CC Project Accountant to ensure that payment is processed timely.

This PO is only valid for pricing and scope as provided on vendor quote/email correspondence.

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

**ACCEPTANCE**

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

**TIMING, DELIVERY AND SHIPPING**

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

**SECURITY INTEREST**

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

**INSPECTION OF WORK**

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

**INVOICES**

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

## TAXES
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

## WARRANTIES
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

## CHANGES
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

## INSURANCE
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

## NO WAIVER
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

## TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

## LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

## CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

## INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

RBI Mechanical Bid

**CYPRESS CREEK** 

**STRUCTURAL BID FORM - Revisied Bid**

| COST BREAKOUT LINE ITEM | UNIT | UNIT PRICE | QTY | PRICE |
|---|---|---|---|---|
| **GENERAL** | | | | |
| Mobilization/ Demob and Site Clean up | Lot price | | | $ 15,053.00 |
| Storage / office trailer / rentals | Lot price | | | 30,105.00 |
| Dumpsters and Toilets | Lot price | | | 9,032.00 |
| Safety Management | Lot price | | | 6,021.00 |
| | | | | |
| **PILE DRIVING, RACKING STRUCTURE AND MODULE INSTALLATION** | | | | |
| Racking Pile Installation (Includes 80 combiner box posts) | Each | | | $ 219,593.00 |
| Alternate Foundations – Cut/Drill (This amount covers all refusals) | Each | $ 60.00 | | $ 235,845.00 |
| Alternate Foundations – Concrete | Each | $ 175.00 | | $ - |
| Racking Installation | Lot price | | | $ 115,020.00 |
| Module Installation | Each | $ - | | $ 131,145.00 |
| Commissioning | Lot Price | | | $ - |
| | | | | |

| | | | **TOTAL PROJECT COST** | $ 761,814.00 |
|---|---|---|---|---|

**CYPRESS CREEK**



**RBI SOLAR**

## WARRANTY TRANSFER AGREEMENT

"Project": Bar D Solar, LLC

"Product Warranted" (the "Product"): Racking Materials

"Original Owner/Customer": Cypress Creek EPC, LLC

"Original Warranty Issue Date": 9/21/18

"New Owner/Customer": Bar D Solar, LLC

New Owner/Customer's Representative Bar D Solar, LLC

New Owner/Customer's Address 567 County Road 83, Meeker, CO 81641

"Warranty Transfer Date": 11/15/18

In consideration of NA _____ Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Cypress Creek EPC, LLC _____ does hereby grant, convey and agree to transfer unto Bar D Solar, LLC _____ all of Cypress Creek EPC, LLC _____'s right, title and interest in the Warranty for the Product.

It is understood by all parties that the RBI Solar Limited Warranty may be transferred only one (1) time during the first five years after the original installation date. Subsequent buyers do not qualify.

In witness whereof, Original Owner/Customer has caused this Transfer to be executed as of the date of the last signature noted below.

| | |
|---|---|
| Original Owner/Customer Signature | 1/7/19 |
| | Date |
| New Owner/Customer Signature | 1/8/19 |
| | Date |

Acknowledged and Accepted By RBI Solar Authorized Representative:

| | |
|---|---|
| RBI Solar | 1/9/19 |
| | Date |



CYPRESS CREEK
RENEWABLES

# Purchase Order

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

PO DATE:                    05/15/2018
TERMS:          SEE ATTACHED

*All Documentation MUST reference PO# and Project Name*

**Purchase Order #:** P13794
**Project Name:** Bovine-Epc
**Pin #:** TX-000261
**Project Location:** Bovine Solar, LLC  427 W FM 1093 Wallis Texas 77485
**Shipping Term:** DDP (Project Site)

| To: | Ship To: |
|-----|----------|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-242-2051 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Site contact corey.carson@ccrenew.com |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|-------------|-----------|-----|------|--------|
| Total Price - Includes Design, Eng Services, and Material | $2,416,130.00 | 1 | Each | $2,416,130.00 |
| Freight to Site | $248,068.00 | 1 | Each | $248,068.00 |
| Commissioning Services | $8,000.00 | 1 | Each | $8,000.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE: ~~07/15/2018~~ 7/16/18  *WP*

Reference:
Deliver By Date: ~~07/15/2018~~ 7/16/18  *WP*

| RECAP | |
|-------|--|
| SUBTOTAL | $2,672,198.00 |
| TOTAL | $2,672,198.00 |

ADDRESS CORRESPONDENCE TO:

Procurement Department
Buyers@ccrenew.com

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

05/15/2018
APPROVED BY
DATE

VENDOR: Wes Pauly
Digitally signed by Wes Pauly
Date: 2018.05.17
10:27:21 -04'00'

APPROVED BY
DATE

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

**ACCEPTANCE**

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

**TIMING, DELIVERY AND SHIPPING**

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

**SECURITY INTEREST**

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

**INSPECTION OF WORK**

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

**INVOICES**

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

**TAXES**

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

**WARRANTIES**

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

**CHANGES**

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

**INSURANCE**

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

**NO WAIVER**

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

## TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

## LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

## CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

## INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:
(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or
(b) is received without restriction from a third party without breach of any obligation of confidentiality; or
(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or
(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or
(e) is disclosed by either Party to a third party under no confidentiality obligation.
Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**

**Bovine - Walls TX**



**RBI SOLAR**

**CLIENT:**    Corey Kuhar
**Cypress Creek Renewables**
**Phone:**   919-921-8690
**Email:**   corey.kuhar@ccrenew.com

**DATE:**    **May 8, 2018**

**RACKING SPECIFICATIONS, PROJECT SPECIFIC**

| | |
|---|---|
| • Number Of Modules Supported: | 43,703 modules |
| • Module Manufacturer/Model Number: | 72 Cell |
| • Module Wattage: | 325 & 330 watts |
| • Total System Size (DC): | 14.258 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 1 ea |
| • Minimum Module Clearance: | 18 inches |
| • String Size: | 29 Mods/String |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions: Snow*: 5 psf | Wind**: 105 mph |
| *IBC 2012 | **ASCE 7-10 (Wind Category I) |

**TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - APPROXIMATE:**

| | |
|---|---|
| • # of Tables: | 3839 Total |
| • # of Rows: | 425 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | DC Self-Powered |
| • Snow Sensor (Y/N): | No |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING**    Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | $$/Watt | | $$/Mod. |
|---|---|---|---|---|---|
| **TOTAL PRICE:** | $ | 2,416,130.00 | $ | 0.169 | $ | 55.29 |

Price includes:

- Design
- Stamped Engineered Drawings
- Approved Module Grounding Method
- Posts (Estimated 7678 Total) @ 6.5' Embed

• Racking System
• Foundation Post Assumed to be Rolled Cee-Channel
• No Freight

| | | | | | |
|---|---|---|---|---|---|
| Freight of Materials to Site: | $ | 248,068.00 | $ | 0.017 | $ | 5.68 |
| Commissioning Services: | $ | 8,000.00 | | | |

**Steel based product pricing used within this estimate is based on current material availability, and costs, as of the date of this quotation. Due to the inherent volatility in steel plate product costs, RBI Solar reserves the right to modify pricing after 10 days from the date of this proposal. Additional price modifications may be applied at the time of "release to fabricate" should it not occur within 60 days of contract execution. All modifications shall be to offset any additional cost increases as indexed to HR CRU Midwest Monitor**

**MATERIAL AND DESIGN SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- The work shall be designed, engineered, fabricated and supplied with due consideration to known local weather conditions and environmental protection requirements.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design and engineering shall be based on a pull test performed by RBI Solar or recommendations and data supplied in a certified geotechnical report (by others).
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to releasing materials for fabrication.
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of TX

- RBI Solar shall provide progress drawings along with a final stamped set. Revisions to the project after written approval of the stamped set, may result in additional revision fees.
- Foundations/posts, racking system and module mounting hardware (includes bonding to racking).
- Freight to site as a separate line item.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- RBI Solar provides a grid powered controller for projects located in colder regions. These require a 120V power source wired directly to each individual controller/row. Option to step up to a 277V power supply must be requested.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G115 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others,. Service can be performed for an additional fee at time of pull test, if requested in writing by customer.
- Sales/Use Tax and Permit Fees are excluded unless noted.
- Delays to the project delivery date, after fabrication, may result in storage fees.
- Domestic Content/Made In The USA is available. Requirement must be stated at time of contract.
- Special fabrication requirements/certification are excluded. Fabrication is performed in RBI Solar or approved facilities.

**COMMISSIONING SPECIFICATIONS:**
**Prior to RBI arriving on site:**
- All TCU's, and NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0 ), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.
- Control Installation Checklist completed, signed, and submitted to RBI. Checklist includes calibration and scanning of TCU's.

**RBI Commisioning scope:**
- Confirm all tracker control components are communicating with the zigbee mesh network.
- Program all RBI controls equipment for full operation of site.

**FOUNDATION REFUSAL DEFINITION:**
- In the event that review of documentation reveals potential for difficult foundation installation due to site conditions, surface contours, soil conditions, drainage, trees, fill, ground, rock, subsurface conditions or any other condition of the sites, Additional Site Exploration shall be discussed to determine alternative foundations and/or means and methods of performing the Work.

- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing
  - Above grade ballast

**OTHER PROVISIONS:**
**GROUNDING:**
- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**
- Wire management components not included. Base design inlcudes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**
- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**
**WARRANTY SPECIFICATION:**
- Structural: 10 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT | Contract Value | Description of Work |
|---|---|---|
| PAYMENT | 15% | Deposit With Order (Due Upon Receipt) |
| TERMS: | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

      **Contact:** RBI Solar                      **Phone:** 513-242-2051

      **Email:** info@rbisolar.com



# MATERIALS WARRANTY AGREEMENT

"Project": <u>Bovine-Epc / 1890009</u>

"Product Warranted" (the "Products"): <u>RBI Solar Single-Axis Tracker II Racking System</u>

"Owner/Customer": <u>Cypress Creek Renewables</u>

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
  - o have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
  - o have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
  - o have any serial numbers, markings, legends or labeling altered, defaced, or removed;
  - o have only non-structural wear and tear, aging, or surface imperfections; or
  - o are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
  - o The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

_____       **8/7/18**
Customer                                              _____
                                                              Date

_____       8/7/2018
                                                              _____
RBI Solar, Inc.                                       Date

Effective Date: _____August 8, 2018_____

Page 3 of 3



**CYPRESS CREEK**
科学的发展电力公司

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

# Purchase Order

PO DATE:                    05/23/2018
TERMS:              SEE ATTACHED

*All Documentation MUST reference PO# and Project Name*

| | |
|---|---|
| **Purchase Order #:** P13795 | |
| **Project Name:** Cascade-Epc | |
| **Pin #:** TX-002639 | |
| **Project Location:** Cascade Solar, LLC  10407 TX-60 Wharton Texas 77488 | |
| **Shipping Term: DDP** (Project Site) | |

| To: | Ship To: |
|---|---|
| RBI Solar | PROJECT LOCATION |
| 5513 Vine Street | |
| Cincinnati, OH 45217 | ***Required 72 hr Notice Prior to Delivery*** |
| Phone: 513-242-2051 | Site contact corey.carson@ccrenew.com |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Material Price - Including Design, ENG service, and Racking Equipment | $2,330,953.00 | 1 | Each | $2,330,953.00 |
| Freight of Material to Site | $223,208.00 | 1 | Each | $223,208.00 |
| Commissioning Services | $8,000.00 | 1 | Each | $8,000.00 |
| PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE : 07/15/2018 | Reference: Deliver By Date: 07/15/2018 | | | |

ADDRESS CORRESPONDENCE TO:

**Procurement Department**
Buyers@ccrenew.com

**Forward invoice/ billing to:**
epc.ap@ccrenew.com

| RECAP | |
|---|---|
| **SUBTOTAL** | $2,562,161.00 |
| **TOTAL** | $2,562,161.00 |

CYPRESS CREEK:

_____
05/23/2018
APPROVED BY
DATE

VENDOR:

_____
APPROVED BY
DATE

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

## TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

## LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

## CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

## INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

page 4 of 5

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:
(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or
(b) is received without restriction from a third party without breach of any obligation of confidentiality; or
(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or
(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or
(e) is disclosed by either Party to a third party under no confidentiality obligation.
Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**

**Cascade TX**

**RBI SOLAR**

| | |
|---|---|
| **CLIENT:** | Ben Hunter |
| | **Cypress Creek Renewables** |
| | **Phone:** 916-407-2237 |
| | **Email:** ben.hunter@ccrenew.com |
| **DATE:** | **April 4, 2018** |
| **PROJECT:** | **Cascade TX** |

**RACKING SPECIFICATIONS, PROJECT SPECIFIC**

| | |
|---|---|
| • Number Of Modules Supported: | 43,703 modules |
| • Module Manufacturer/Model Number: | 72 Cell |
| • Module Wattage: | 325 watts |
| • Total System Size (DC): | 14.25756 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 1 ea |
| • Approximate Distance Between Posts: | Varies |
| • Minimum Module Clearance: | 18 inches |
| • String Size: | 29 Mods/String |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions: Snow*: 0 psf | Wind**: 126 mph |

*IBC 2012  **ASCE 7-10 (Wind Category I)

**TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - APPROXIMATE:**

| | |
|---|---|
| • # of Tables: | 3799 Total |
| • # of Rows: | 412 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • # of Inclinometer Sensors in a Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | DC Self-Powered |
| • Snow Sensor (Y/N): | No |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING**

Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | | **$$/Watt** | | **$$/Mod.** |
|---|---|---|---|---|---|---|
| TOTAL PRICE: | $ | 2,330,953.00 | $ | 0.163 | $ | 53.34 |

Price includes:

| | |
|---|---|
| • Design | • Racking System |
| • Stamped Engineered Drawings | • Foundation Post Assumed to be Rolled Cee-Channel |
| • Approved Module Grounding Method | • No Freight |
| • Posts (Estimated 7598 Total) @ 5.5' Embed | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Freight of Materials to Site: | $ | 223,208.00 | $ | 0.016 | $ | 5.11 |
| Commissioning Services: | $ | 8,000.00 | | | | |

**Due to steel price volatility, this quote is valid for 10 days and subject to reconfirmation thereafter or indexed to CRU.**

**GENERAL RACKING SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design shall be based on recommendations and data supplied in a certified geotechnical report (by others). A signed and sealed geotechnical report is required for final foundation design and submittals to the local building authorities.
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to placement for orders of any materials.

**MATERIALS ONLY INCLUSIONS:**

-
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of TX
- C-Channel posts for tracking system.
- Structural racking for tracker system, including all hardware and module mounting hardware.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- Freight to site.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G115 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.

**MATERIALS ONLY EXCLUSIONS:**

- Geotechnical Report or site survey.
- Electrical wiring and grounding/bonding material (unless called-out in Pricing section above).
- Fencing, unloading of materials and storage of materials.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others.
- Site Management Control System - wind speed, monotoring, etc
- Sales/Use Tax and Permit Fees.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**

- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0°), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.

**RBI Commisioning scope:**

- Ensure all tracker control components are communicating with the zigbee mesh network.
- RSU, Anemometers, & Snow Sensor setup
- Tracker auto-mode and parametrization

**FOUNDATION REFUSAL DEFINITION:**
- A refusal is encountered when the advancement of a pile ceases for a period of 30 seconds or more during post driving prior to reaching full design embedment depth. Should a refusal be encountered additional charges are possible.
- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing

**OTHER PROVISIONS:**

**GROUNDING:**
- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**
- Wire management components not included. Base design inlcudes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**
- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**
- Structural: 25 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT PAYMENT TERMS: | Contract Value | Description of Work |
|---|---|---|
| | 15% | Deposit With Order |
| | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

> Contact: RBI Solar        **Phone:** 513-242-2051
> Email: info@rbisolar.com



## MATERIALS WARRANTY AGREEMENT

"Project": Cascade-Epc / 1890014

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek Renewables

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.

- The Warranty does not apply to Products that:
  - have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
  - have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
  - have any serial numbers, markings, legends or labeling altered, defaced, or removed;
  - have only non-structural wear and tear, aging, or surface imperfections; or
  - are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
  - The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.

- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.

- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.

- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.

- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

| | |
|---|---|
| Customer | 8/7/18 <br> Date |
| RBI Solar, Inc. | 8/7/2018 <br> Date |

Effective Date: August 31, 2018



# Purchase Order

| | |
|---|---|
| PROJECT NAME : | COPPERFIELD-EPC |
| PROJECT ID: | NC-001297 |
| PO NUMBER: | P16314 |
| ORDER DATE: | 08/07/2018 |
| SHIP TO: | DDP PROJECT LOCATION (SEE NOTES) |
| PAYMENT TERMS: | NET 45 |
| REFERENCE TERMS: | SPECIAL T&Cs |

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

**Vendor:**

RBI Solar
5513 Vine Street
Cincinnati, OH 45217
Phone: 513-242-2051

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| RACKING MATERIALS & STAMPED ENGINEERING DRAWINGS | $456,617.00 | 1 | Each | $456,617.00 |
| FREIGHT TO SITE | $17,480.00 | 1 | Each | $17,480.00 |
| | | | SUBTOTAL | $474,097.00 |
| | | | TOTAL | $474,097.00 |

Notes:
1. Deliver By Date: 10/05/2018
2. Project Location: 948  Liberty Hill Church Road, Troy, NC 27306  ,
3. Required 72 hr Notice Prior to Delivery – Vendor Must Contact Project Manager: James Potter - james.potter@ccrenew.com
4. PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE AGREED DELIVERY SCHEDULE
5. General Notes: DELIVERY REQUESTED 10/5/18
6. Project Accountant: Jenny Holtsclaw - jenny.holtsclaw@ccrenew.com

ADDRESS PO CORRESPONDENCE TO:

Procurement Department
Buyers@ccrenew.com

CYPRESS CREEK:

APPROVED BY
DATE: 08/07/2018

VENDOR: Christopher M. Lantz

Digitally signed by Christopher M. Lantz
DN: cn=Christopher M. Lantz, o=RBI Solar,
ou=Ground Mount Manager,
email=clantz@rbisolar.com, c=US
Date: 2018.08.08 11:02:56 -04'00'

APPROVED BY
DATE: 08/07/2018

All Documentation MUST reference PO# and Project Name to be accepted. All invoices must include an executed lien waiver to be considered acceptable for processing. All invoices must be submitted by the 10th of each month to epc.ap@ccrenew.com and CC Project Accountant to ensure that payment is processed timely.

This PO is only valid for pricing and scope as provided on vendor quote/email correspondence.

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

## TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

## LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

## CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

## INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**

Copperfield - Troy, NC



**CLIENT:** Charlie Hunes
Cypress Creek Renewables
Phone: 828-233-8142
Email: charlie.hunes@ccrenew.com

**DATE:** August 6, 2018

**RACKING SPECIFICATIONS, PROJECT SPECIFIC**

| | |
|---|---|
| • Number Of Modules Supported: | 7,896 modules |
| • Module Manufacturer/Model Number: | 72 Cell |
| • Module Wattage: | 365 watts |
| • Total System Size (DC): | 2.88204 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 1 ea |
| • Minimum Module Clearance: | 18 inches |
| • String Size: | 28 Mods/String |
| • Post Embedment Depth: | 6 ft |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions: | Snow: 10 psf* Wind: Per Code** |
| *IBC 2009 (2012 NC Building Code) | **ASCE 7-05 (Wind Category I) |

**TRACKER SPECIFICATIONS, PROJECT SPECIFIC – PER ROW – APPROXIMATE:**

| | |
|---|---|
| • # of Tables: | 669 Total |
| • # of Rows: | 105 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | DC Self-Powered |
| • Snow Sensor (Y/N): | No |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING** Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | $$/Watt | | $$/Mod. |
|---|---|---|---|---|---|
| **TOTAL PRICE:** | $ | 456,617.00 | $ 0.158 | $ | 57.83 |
| • Price includes: | | | | | |

| | | |
|---|---|---|
| • Design | • Racking System | |
| • Stamped Engineered Drawings | • Foundation Post Assumed to be Rolled Cee-Channel | |
| • Approved Module Grounding Method | • No Freight | |

| | | | | | |
|---|---|---|---|---|---|
| Freight of Materials to Site: | $ | 17,480.00 | $ 0.006 | $ | 2.21 |
| Installation of Racking & Post Driving (Non-Prevailing Wage Rates): | $ | 144,970.00 | $ 0.050 | $ | 18.36 |
| Installation of Modules (Non-Prevailing Wage Rates): | $ | 67,333.00 | $ 0.023 | $ | 8.53 |
| Add/Deduct per ft. of Post Embedment (All Posts): | $ | 5,281.00 | | | |
| Add For Pull Test: | $ | 5,000.00 | | | |
| Commissioning Services: | $ | 5,000.00 | | | |

Steel based product pricing used within this estimate is based on current material availability, and costs, as of the date of this quotation. Due to the inherent volatility in steel plate product costs, RBI Solar reserves the right to modify pricing after 10 days from the date of this proposal. Additional price modifications may be applied at the time of "release to fabricate" should it not occur within 60 days of contract execution. All modifications shall be to offset any additional cost increases as indexed to HR CRU Midwest Monitor

**MATERIAL AND DESIGN SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- The work shall be designed, engineered, fabricated and supplied with due consideration to known local weather conditions and environmental protection requirements.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design and engineering shall be based on a pull test performed by RBI Solar or recommendations and data supplied in a certified geotechnical report (by others).
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to releasing materials for fabrication.
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of NC
- RBI Solar shall provide progress drawings along with a final stamped set. Revisions to the project after written approval of the stamped set, may result in additional revision fees.
- Foundations/posts, racking system and module mounting hardware (includes bonding to racking).
- Freight to site as a separate line item.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- RBI Solar provides a grid powered controller for projects located in colder regions. These require a 277V power source wired directly to each individual controller/row. Option to step down to a 120V power supply must be requested. Pricing may be affected upon request.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G115 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others. Service can be performed for an additional fee at time of pull test, if requested in writing by customer.
- Sales/Use Tax and Permit Fees are excluded unless noted.
- Delays to the project delivery date, after fabrication, may result in storage fees.
- Domestic Content/Made In The USA is available. Requirement must be stated at time of contract.
- Special fabrication requirements/certification are excluded. Fabrication is performed in RBI Solar or approved facilities.

**INSTALLATION SPECIFICATIONS:**

- Unloading and Staging of material will follow the mutually agreed upon schedule.
- Driving of posts, Installation of racking system, Installation of modules. Racking system includes the mounting of the motor, controller/control system, snow sensor, and 60W pv panel.
- RBI Solar's grade following racking system may result in the modules having a "saw-tooth" appearance. RBI will adjust the system, as needed, to minimize this effect, but results are not guaranteed.
- Uninterrupted access to the site shall be provided. Delays due to weather and access to the site are outside the installer's responsibility.
- Uninterrupted access to the site shall be provided in accordance with the RBI Solar Installation standards. RBI Solar shall be responsible for the jobsite safety of its employees and subcontractors and may stop work if site conditions are deemed unsafe in accordance with our subcontractor's standards. Delays in the schedule due to severe weather, impacted access to the site, or safety concerns, are outside the installer's responsibility and may result in additional costs.
- Access to site is assumed to be at least 12 hours per day and 6 days per week. Any restrictions limiting these working hours will result in additional cost.
- Stabilized road base to the site (and stabilized lay-down area) shall be provided by others.
- A path, minimum of 13'-0" wide shall be provided around the perimeter of the array.
- General Contractor shall provide dumpster or provide for trash removal from site. RBI to put debris in dumpster.
- Site preparation, including grading, soil stabilization, removal of landscaping and final grading is excluded. Disposal of soil/spoil created from the foundation installation is assumed to be on-site, and any off-site disposal is by others. For ballasted projects, procuring and placing gravel is excluded unless noted otherwise.
- The marking of underground utilities (gas lines, electric lines, water and sewer piping) and the cost to relocate array or posts due to underground utilities is excluded.
- RBI Solar will repair ruts and site damage directly attributed to RBI equipment when the site conditions allow at mutually convenient times with the General Contractor.
- Dumpster, portolets, and temporary electric are excluded.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**

- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0 ), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.
- Control Installation Checklist completed, signed, and submitted to RBI. Checklist includes calibration and scanning of TCU's.

**RBI Commisioning scope:**

- Confirm all tracker control components are communicating with the zigbee mesh network.
- Program all RBI controls equipment for full operation of site.

**FOUNDATION REFUSAL DEFINITION:**

- In the event that review of documentation reveals potential for difficult foundation installation due to site conditions, surface contours, soil conditions, drainage, trees, fill, ground, rock, subsurface conditions or any other condition of the sites, Additional Site Exploration shall be discussed to determine alternative foundations and/or means and methods of performing the Work.

- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing
  - Above grade ballast

**OTHER PROVISIONS:**

**GROUNDING:**

- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**

- Wire management components not included. Base design includes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**

- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**

- Structural: 10 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT | Contract Value | Description of Work |
|---|---|---|
| PAYMENT | 15% | Deposit With Order (Due Upon Receipt) |
| TERMS: | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

Contact: RBI Solar                                      Phone: 513-242-2051

Email: info@rbisolar.com



## MATERIALS WARRANTY AGREEMENT

"Project": Copperfield-Epc

"Product Warranted" (the "Products"): Tracker Racking Material

"Owner/Customer": Cypress Creek EPC, LLC

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
  - o have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
  - o have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
  - o have any serial numbers, markings, legends or labeling altered, defaced, or removed;
  - o have only non-structural wear and tear, aging, or surface imperfections; or
  - o are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
  - o The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

_____    2/13/19
Customer                             _____
                                     Date

_____    02/01/2019
RBI Solar, Inc.                      _____
                                     Date

Effective Date: 01/08/2019


**RBI SOLAR**

## WARRANTY TRANSFER AGREEMENT

"Project": Copperfield Solar, LLC

"Product Warranted" (the "Product"): Racking Materials

"Original Owner/Customer": Cypress Creek EPC, LLC

"Original Warranty Issue Date": 11/15/18

"New Owner/Customer": Copperfield Solar, LLC

New Owner/Customer's Representative Copperfield Solar, LLC

New Owner/Customer's Address 948 Liberty Hill Church Road, Troy, NC 27306

"Warranty Transfer Date":

In consideration of _____ Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Cypress Creek EPC, LLC _____ does hereby grant, convey and agree to transfer unto Copperfield Solar, LLC _____ all of Cypress Creek EPC, LLC _____'s right, title and interest in the Warranty for the Product.

It is understood by all parties that the RBI Solar Limited Warranty may be transferred only one (1) time during the first five years after the original installation date. Subsequent buyers do not qualify.

In witness whereof, Original Owner/Customer has caused this Transfer to be executed as of the date of the last signature noted below.

_____  2/1/19
Original Owner/Customer Signature   Date

_____  2-1-19
New Owner/Customer Signature   Date

Acknowledged and Accepted By RBI Solar Authorized Representative:

_____  02-01-2019
RBI Solar   Date



**CYPRESSCREEK**
RENEWABLES

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

# Purchase Order

PO DATE: 09/11/2017
TERMS: SEE ATTACHED

*All Documentation MUST reference PO# and Project Name*

Purchase Order #: PO6310
Project Name: Gaston I-Epc
PIN #: SC-SCE-003
Project Location: Off US 321, near George Derrick Road, Gaston, SC
Shipping Term: DDP (Project Site)

| To: | Ship To: |
|---|---|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-618-7268 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Please send correspondence to Matt Pringle |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Gaston I - RBI Tracking System Racking | $2,426,528.00 | 1 | Each | $2,426,528.00 |
| Freight of Materials to Site | $79,831.00 | 1 | Each | $79,831.00 |
| Add/Deduct per ft. of Post Embedment (All Posts) | $27,008.00 | 1 | Each | $27,008.00 |
| Add for Pull Test | $7,000.00 | 1 | Each | $7,000.00 |
| Commissioning Services | $10,188.00 | 1 | Each | $10,188.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE
ON OR BEFORE :

Reference:
Deliver By Date:

| RECAP | |
|---|---|
| SUBTOTAL | $2,550,555.00 |
| TOTAL | $2,550,555.00 |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lien.pham@ccrenew.com
(213) 357-5437

Forward Invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

_____ 09/11/2017
APPROVED BY          DATE

VENDOR:

_____ 9/11/2017
APPROVED BY          DATE

*SEE CYPRESS CREEK'S SEPARATE TERMS AND CONDITIONS ATTACHED AND INCORPORATED HEREIN*

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

**ACCEPTANCE**

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

**TIMING, DELIVERY AND SHIPPING**

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

**SECURITY INTEREST**

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

**INSPECTION OF WORK**

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

**INVOICES**

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agree to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

**TAXES**
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

**WARRANTIES**
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

**CHANGES**
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

**INSURANCE**
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order; (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability Insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point; Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limits requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

**NO WAIVER**
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1); however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

page 4 of 5

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement; provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.



# Purchase Change Order

**Cypress Creek EPC, LLC ("Cypress Creek")**
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

PO DATE: 10/11/2017
TERMS: SEE ATTACHED

*All Documentation MUST reference PO# and Project Name*

**Purchase Order #:** PC10346
**Project Name:** Gaston I-Epc
**Pin #:** SC-SCE-003
**Project Location:** Off US 321, near George Derrick Road, Gaston, SC
**Shipping Term:** DDP (Project Site)

| To: | Ship To: |
|---|---|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-618-7268 | PROJECT LOCATION<br><br>**Cypress Creek is the Sole Price to Delivery**<br>Please send all correspondence to Lien Pham |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Revised post to Structural C5x6.7 for corrosive soils – 35 year post design | $175,900.000 | 1 | Each | $175,900.000 |
| PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE : | | Reference:<br>Deliver By Date: | | |

| RECAP | |
|---|---|
| SUBTOTAL | $175,900.00 |
| TOTAL | $175,900.00 |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lian.pham@ccrenew.com
(213) 357-5437

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

APPROVED BY                          DATE
10/11/2017

VENDOR:

APPROVED BY                          DATE
10/13/17

*SEE CYPRESS CREEK'S SEPARATE TERMS AND CONDITIONS ATTACHED AND INCORPORATED HEREIN*

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

**ACCEPTANCE**

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

**TIMING, DELIVERY AND SHIPPING**

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

**SECURITY INTEREST**

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

**INSPECTION OF WORK**

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

**INVOICES**

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agree to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

## TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

## LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

## CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

## INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:
(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or
(b) is received without restriction from a third party without breach of any obligation of confidentiality; or
(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or
(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or
(e) Is disclosed by either Party to a third party under no confidentiality obligation.
Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.



## MATERIALS WARRANTY AGREEMENT

"Project": Gaston I-Epc

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker Racking System

"Owner/Customer": Gaston Solar I, LLC - US 321, George Derrick Road, Gaston, SC 29160

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
  - o have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
  - o have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
  - o have any serial numbers, markings, legends or labeling altered, defaced, or removed;
  - o have only non-structural wear and tear, aging, or surface imperfections; or
  - o are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
  - o The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

Customer _____     3/27/18
                                 Date _____

RBI Solar, Inc. _____     3/27/18
                                        Date _____

Effective Date: March 21, 2018 _____



**CYPRESS CREEK**
RENEWABLES

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

# Purchase Order

PO DATE: 08/08/2017
TERMS: SEE CYPRESS CREEK SEPARATE
TERMS & CONDITION

*All Documentation MUST reference PO# and Project Name*

Purchase Order #: P05483
Project Name: Leon-Epc
Pin #: TX-SHA-002
Project Location: 639 CR 1119, Greenville, TX 75401
Shipping Term: DDP (Project Site)

| To: | Ship To: |
|---|---|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-618-7268 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Vendor Must Contact Project Manager, Corey Carson @ (512) 593-8912 for Validation PRIOR to SHIPPING |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Design, Stamped Engineered Drawings, Posts, Racking System, Motors, Controls System | $2,315,940.00 | 1 | Each | $2,315,940.00 |
| Freight to Site | $167,119.00 | 1 | Each | $167,119.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE:

Reference: Proposal Dated August 3, 2017
Deliver By Date:

| RECAP | |
|---|---|
| SUBTOTAL | $2,483,059.00 |
| TOTAL | $2,483,059.00 |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lien.pham@ccrenew.com
(213) 357-5437

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

_____  08/08/2017
APPROVED BY          DATE

VENDOR:

_____  8/9/2017
APPROVED BY          DATE

*SEE CYPRESS CREEK'S SEPARATE TERMS AND CONDITIONS ATTACHED AND INCORPORATED HEREIN*

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the order or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agree to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

page 4 of 5

**INDEPENDENT CONTRACTOR**

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

**PROPRIETARY INFORMATION & CONFIDENTIALITY**

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:
(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or
(b) is received without restriction from a third party without breach of any obligation of confidentiality; or
(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or
(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or
(e) is disclosed by either Party to a third party under no confidentiality obligation.
Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

**ASSIGNMENT**

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

**APPLICABLE LAW**

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.



## MATERIAL/LABOR WARRANTY AGREEMENT

"Project":  Leon - EPC

"Product Warranted" (the "Product"):  RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer":  Cypress Creek Renewables

- RBI Solar warrants that it installed all material aspects of the RBI Solar Product in accordance with the industry standards of the profession, in effect on the date the Project is deemed Substantially Completed. Subject to the following terms and conditions, RBI Solar will, for a period of twelve (12) months, at its expense, repair or caused to be repaired those failures directly resulting from the defects in RBI Solar's installation. Upon expiration of this term of the Warranty, without notice from Owner/Customer of some defect, RBI Solar shall have no further obligation to make repairs at RBI Solar's expenses under any provision of this Warranty and Owner/Customer shall not make any further demand or claim against RBI Solar concerning installation, provided that RBI Solar promptly commences and diligently proceeds with the correction and repair of such defects covered by this Warranty which are called to RBI Solar's attention in the manner set forth during the term of this Warranty by Owner/Customer.

- RBI Solar warrants that the Product will be free from structural failure for a period of twenty (20) years after the date the Project is Substantially Completed. For purposes of this Warranty Agreement, the Project shall be deemed "Substantially Completed" when all material aspects of the RBI Solar Product have been installed, and only minor punch list items remain to be completed. RBI Solar will provide Owner/Customer with a certificate of substantial completion indicating the date RBI Solar deems the Project Substantially Completed. However, the warranty will not be binding until RBI Solar has received payment in full inclusive of all change orders. RBI Solar makes no warranties as to items or components furnished or warranted by others, or as to any item or component which is furnished by RBI Solar and altered, damaged or misused by others. RBI Solar further makes no warranties as to items or components damaged by storm, flooding, lightening, hurricane, tornado, earthquake, fire, instability of the sub-surface or foundation, chemical or biological effects, or other casualties. The warranty is applicable only to damage to or failure of the structure of the Product caused by normal atmospheric exposure. Deterioration caused by excessive exposure to standing water, whether salt or fresh, or any exposure to corrosive chemicals, ash, or fumes, or any other foreign chemical substances is specifically excluded from this warranty (the "Warranty").

- The Warranty does not cover photovoltaic modules, electrical components, wiring connections, or any other accessories, fixtures, insulation, goods, or materials not directly associated with the structure of the Product. The Warranty does not cover any goods or materials not provided by RBI Solar.

- The Warranty shall be valid only if the Product is erected by RBI Solar or if the Product is erected and installed strictly in accordance with RBI Solar's specifications. Any modification of, or deviation or variation from RBI Solar's specifications for erection and installation will void the Warranty.

E-FILED 03/08/2024 10:57 AM / CONFIRMATION 1441483 / A 2401119 / COMMON PLEAS DIVISION / IFIJ

- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer agrees to promptly notify RBI Solar in writing regarding the alleged breach of Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Owner/Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as chosen by RBI Solar at its sole option.

- THE FOREGOING LIMITED EXPRESS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES AND, EXCEPT AS PROVIDED ABOVE, RBI SOLAR MAKES NO REPRESENTATION, GUARANTY, OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCTS, MATERIALS, AND LABOR IT IS SUPPLYING PURSUANT TO THIS WARRANTY AGREEMENT. EXCEPT AS OTHERWISE PROVIDED ABOVE, RBI SOLAR HEREBY DISCLAIMS ALL REPRESENTATIONS, GUARANTIES, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR HABITABILITY. THERE IS NO WARRANTY, EXPRESS OR IMPLIED, OTHER THAN THAT WARRANTY SPECIFICALLY AND EXPRESSLY PROVIDED ABOVE.

- RBI Solar reserves the right to inspect the Product alleged to have breached the Warranty. Owner/Customer is required under this Warranty to conduct annual inspections of the Product and to provide annual maintenance which includes tightening any loose bolts or other connections and repairing any galvanized coating showing any signs of wear, rust or other deterioration. Owner/Customer agrees to hold and protect the Product alleged to have breached the Warranty until Owner/Customer is instructed to do otherwise by RBI Solar. While the Product is in Owner/Customer's possession, Owner/Customer shall not alter same. Owner/Customer shall be liable for all damages to the Product which are alleged to have breached the Warranty, which damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent Owner/Customer fails to conduct annual inspections or maintenance of the Product, fails to hold or protect the Product complained of, or fails to provide to RBI Solar the unencumbered right and opportunity to timely inspect fully the Product alleged by Owner/Customer to have breached the Warranty.

- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. OWNER/CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO OWNER/CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, OWNER/CUSTOMER AGREES THAT, IN THE EVENT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR ALLEGED TO

HAVE CAUSED DAMAGES, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, OWNER/CUSTOMER'S DAMAGES RECOVERABLE FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

CIN2000 1049220v2
26555.00003


CYPRESS CREEK

# Purchase Order

PO DATE: 05/25/2017
TERMS: SEE CYPRESS CREEK SEPARATE
TERMS & CONDITIONS

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405.

*All Documentation MUST reference PO# and Project Name.*

Purchase Order #: PO3487
Project Name: Marlin-Epc
Pin #: TX-ONC-004
Project Location: 253 CR 2861 Marlin, TX 76661
Shipping Term: DDP (Project Site)

| To: | Ship To: |
|---|---|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-618-7268 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Vendor Must Contact Project Manager, Ricardo Betts @ (310)<br>228-7014 for Validation PRIOR to SHIPPING |

| QTY | UNIT | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| 1 | Each | Purchase Order - Structural Engineering and Backing Drawings for Marlin | $7,500.00 | $7,500.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE :

Reference:
Deliver By Date:

| RECAP | |
|---|---|
| SUBTOTAL | $7,500.00 |
| TOTAL | $7,500.00 |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lien.pham@ccrenew.com
(213) 357-5437

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

_____ 05/25/2017
APPROVED BY          DATE

VENDOR:

_____ 5/25/2017
APPROVED BY          DATE

*SEE CYPRESS CREEK'S SEPARATE TERMS AND CONDITIONS ATTACHED AND INCORPORATED HEREIN*

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agree to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance; (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound-up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause); or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

## INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

## PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all Information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:
(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or
(b) is received without restriction from a third party without breach of any obligation of confidentiality; or
(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or
(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or
(e) is disclosed by either Party to a third party under no confidentiality obligation.
Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

## ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

## APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.



**CYPRESS CREEK**

# Purchase Order

PO DATE: 06/08/2017
TERMS: SEE CYPRESS CREEK SEPARATE
TERMS & CONDITIONS

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

*All Documentation MUST reference PO# and Project Name*

Purchase Order #: P03684
Project Name: Marlin-Epc
Pin #: TX-ONC-004
Project Location: 253 CR 2861 Marlin, TX 76661
Shipping Term: DDP (Project Site)

| To: | Ship To: |
|-----|----------|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-618-7268 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior To Delivery***<br>Vendor Must Contact Project Manager, Ricardo Betts @ (310)<br>228-7014 for Validation PRIOR to SHIPPING |

| QTY | UNIT | DESCRIPTION | UNIT PRICE | AMOUNT |
|-----|------|-------------|-----------|--------|
| 1 | Each | Equipment - Racking and Design | $1,242,467.00 | $1,242,467.00 |
| 1 | Each | Freight | $97,676.00 | $97,676.00 |
| PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE: | Reference: Proposal Dated June 1, 2017<br>Deliver By Date: | | | |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lien.pham@ccrenew.com
(213) 357-5437

Forward Invoice/ billing to:
epc.ap@ccrenew.com

| RECAP | |
|-------|------|
| SUBTOTAL | $1,340,143.00 |
| TOTAL | $1,340,143.00 |

CYPRESS CREEK:

_____  06/08/2017
APPROVED BY                    DATE

VENDOR:

_____  6-12-2017
APPROVED BY                    DATE

*SEE CYPRESS CREEK'S SEPARATE TERMS AND CONDITIONS ATTACHED AND INCORPORATED HEREIN*

CYPRESS CREEK / RBI SOLAR- PURCHASE ORDER TERMS AND CONDITIONS

### ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

### TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

### SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

### INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

### INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms are Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agree to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability Insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance. (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability). (d) Professional Liability Insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and/or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.



# MATERIALS WARRANTY AGREEMENT

"Project": Marlin-Epc / 179003

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek Renewables

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
  - have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
  - have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
  - have any serial numbers, markings, legends or labeling altered, defaced, or removed;
  - have only non-structural wear and tear, aging, or surface imperfections; or
  - are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
  - The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

_____    **11/3/17**
Customer                           Date

_____    11/09/2017
RBI Solar, Inc.                    Date

Effective Date: **10/31/2017**



**CYPRESS CREEK**
RENEWABLES

# Purchase Order

| | |
|---|---|
| PROJECT NAME : | MORNING VIEW-EPC |
| PROJECT ID: | NC-001205 |
| PO NUMBER: | P16262 |
| ORDER DATE: | 08/06/2018 |
| SHIP TO: | DDP PROJECT LOCATION (SEE NOTES) |
| PAYMENT TERMS: | NET 45 |
| REFERENCE TERMS: | SPECIAL T&Cs |

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

**Vendor:**

RBI Solar
5513 Vine Street
Cincinnati, OH 45217
Phone: 513-242-2051

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Racking material | $471,208.00 | 1 | Each | $471,208.00 |
| Freight | $16,429.00 | 1 | Each | $16,429.00 |
| | | | SUBTOTAL | $487,637.00 |
| | | | TOTAL | $487,637.00 |

Notes:
1. Deliver By Date: 10/08/2018
2. Project Location: 1089 Morning View Rd., Seagrove, NC 27341 ,
3. Required 72 hr Notice Prior to Delivery – Vendor Must Contact Project Manager: Matthew Eaker - matthew.eaker@ccrenew.com
4. PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE AGREED DELIVERY SCHEDULE
5. General Notes: Per attached proposal for SAT racking system / Site contact Frank Trunck (330) 338-7793
6. Project Accountant: Jenny Holtsclaw - jenny.holtsclaw@ccrenew.com

ADDRESS PO CORRESPONDENCE TO:

Procurement Department
Buyers@ccrenew.com

CYPRESS CREEK:

APPROVED BY
DATE: 08/06/2018

VENDOR: **Christopher M. Lantz**

Digitally signed by Christopher M. Lantz
DN: cn=Christopher M. Lantz, o=RBI Solar, ou=Ground Mount Manager, email=clantz@rbisolar.com, c=US
Date: 2018.08.07 12:14:15 -04'00'

APPROVED BY
DATE: 08/06/2018

All Documentation MUST reference PO# and Project Name to be accepted. All invoices must include an
executed lien waiver to be considered acceptable for processing. All invoices must be submitted by the 10th of each month to
epc.ap@ccrenew.com and CC Project Accountant to ensure that payment is processed timely.

This PO is only valid for pricing and scope as provided on vendor quote/email correspondence.

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

**ACCEPTANCE**

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

**TIMING, DELIVERY AND SHIPPING**

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

**SECURITY INTEREST**

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

**INSPECTION OF WORK**

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

**INVOICES**

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.


WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.


CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.


INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.


NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

## TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

## LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

## CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

## INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:
(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or
(b) is received without restriction from a third party without breach of any obligation of confidentiality; or
(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or
(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or
(e) is disclosed by either Party to a third party under no confidentiality obligation.
Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**
**Morning View - Seagrove, NC**

RBI SOLAR

**CLIENT:**    Mike Gotthardt
              **Cypress Creek Renewables**
              **Email:** mike.gotthardt@ccrenew.com

**DATE:**     August 1, 2018

### RACKING SPECIFICATIONS, PROJECT SPECIFIC

| | |
|---|---|
| • Number Of Modules Supported: | 8,008 modules |
| • Module Manufacturer/Model Number: | Boviet |
| • Module Wattage: | 360 watts |
| • Total System Size (DC): | 2.88288 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 1 ea |
| • Minimum Module Clearance: | 18 inches |
| • String Size: | 28 Mods/String |
| • Post Embedment Depth: | 6 ft. |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions: Snow: 15 psf* | Wind: Per Code** |

*IBC 2009 (2012 NC Building Code)    **ASCE 7-05 (Wind Category I)

### TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - APPROXIMATE:

| | |
|---|---|
| • # of Tables: | 675 Total |
| • # of Rows: | 103 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | DC Self-Powered |
| • Snow Sensor (Y/N): | No |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING**    Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | $$/Watt | $$/Mod. |
|---|---|---|---|---|
| TOTAL PRICE: | $ | 471,208.00 | $ 0.163 | $ 58.84 |

Price includes:
- Design        • Racking System
- Stamped Engineered Drawings    • Foundation Post Assumed to be Rolled Cee-Channel
- Approved Module Grounding Method    • No Freight

| | | | $$/Watt | $$/Mod. |
|---|---|---|---|---|
| Freight of Materials to Site: | $ | 16,429.00 | $ 0.006 | $ 2.05 |
| Installation of Racking & Post Driving (Non-Prevailing Wage Rates): | $ | 146,156.00 | $ 0.051 | $ 18.25 |
| Installation of Modules (Non-Prevailing Wage Rates): | $ | 68,240.00 | $ 0.024 | $ 8.52 |
| Add/Deduct per ft. of Post Embedment (All Posts): | $ | 5,422.00 | | |
| Add For Pull Test: | $ | 5,000.00 | | |
| Commissioning Services: | $ | 5,000.00 | | |

**Steel based product pricing used within this estimate is based on current material availability, and costs, as of the date of this quotation. Due to the inherent volatility in steel plate product costs, RBI Solar reserves the right to modify pricing after 10 days from the date of this proposal. Additional price modifications may be applied at the time of "release to fabricate" should it not occur within 60 days of contract execution. All modifications shall be to offset any additional cost increases as indexed to HR CRU Midwest Monitor**

## MATERIAL AND DESIGN SPECIFICATION

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- The work shall be designed, engineered, fabricated and supplied with due consideration to known local weather conditions and environmental protection requirements.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stopping of the racking to accommodate.
- Foundations design and engineering shall be based on a pull test performed by RBI Solar or recommendations and data supplied in a certified geotechnical report (by others).
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to releasing materials for fabrication.
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of NC
- RBI Solar shall provide progress drawings along with a final stamped set. Revisions to the project after written approval of the stamped set, may result in additional revision fees.
- Foundations/posts, racking system and module mounting hardware (includes bonding to racking).
- Freight to site as a separate line item.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- RBI Solar provides a grid powered controller for projects located in colder regions. These require a 120V power source wired directly to each individual controller/row. Option to step up to a 277V power supply must be requested.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G115 minimum and brackets to a G90 minimum, Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others. Service can be performed for an additional fee at time of pull test, if requested in writing by customer.
- Sales/Use Tax and Permit Fees are excluded unless noted.
- Delays to the project delivery date, after fabrication, may result in storage fees.
- Domestic Content/Made In The USA is available. Requirement must be stated at time of contract.
- Special fabrication requirements/certification are excluded. Fabrication is performed in RBI or approved facilities.

## INSTALLATION SPECIFICATIONS:

- Unloading and Staging of material will follow the mutually agreed upon schedule.
- Driving of posts, Installtion of racking system, Installation of modules. Racking system includes the mounting of the motor, controller/control system, snow sensor, and 60W pv panel.
- RBI Solar's grade following racking system may result in the modules having a "saw-tooth" appearance. RBI will adjust the system, as needed, to minimize this effect, but results are not guaranteed.
- Uninterrupted access to the site shall be provided. Delays due to weather and access to the site are outside the installer's responsibility.

- Uninterrupted access to the site shall be provided in accordance with the RBI Solar Installation standards. RBI Solar shall be responsible for the jobsite safety of its employees and subcontractors and may stop work if site conditions are deemed unsafe in accordance with our subcontractor's standards. Delays in the schedule due to severe weather, impacted access to the site, or safety concerns, are outside the installer's responsibility and may result in additional costs
- Access to site is assumed to be at least 12 hours per day and 6 days per week. Any restrictions limiting these working hours will result in additional cost.
- Stabilized road base to the site (and stabilized lay-down area) shall be provided by others.
- A path, minimum of 13'-0" wide shall be provided around the perimeter of the array.
- General Contractor shall provide dumpster or provide for trash removal from site. RBI to put debris in dumpster.
- Site preparation, including grading, soil stabilization, removal of landscaping and final grading is excluded. Disposal of soil/spoil created from the foundation installation is assumed to be on-site, and any off-site disposal is by others. For ballasted projects, procuring and placing gravel is excluded unless noted otherwise.
- The marking of underground utilities (gas lines, electric lines, water and sewer piping) and the cost to relocate array or posts due to underground utilities is excluded.
- RBI Solar will repair ruts and site damage directly attributed to RBI equipment when the site conditions allow at mutually convenient times with the General Contractor.
- Dumpster, portolets, and temporary electric are excluded.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**

- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0 ), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.
- Control Installation Checklist completed, signed, and submitted to RBI. Checklist includes calibration and scanning of TCU's.

**RBI Commissioning scope:**

- Confirm all tracker control components are communicating with the zigbee mesh network.
- Program all RBI controls equipment for full operation of site.

**FOUNDATION REFUSAL DEFINITION:**

- In the event that review of documentation reveals potential for difficult foundation installation due to site conditions, surface contours, soil conditions, drainage, trees, fill, ground, rock, subsurface conditions or any other condition of the sites, Additional Site Exploration shall be discussed to determine alternative foundations and/or means and methods of performing the Work.

- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing
  - Above grade ballast

**OTHER PROVISIONS:**

**GROUNDING:**

- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**

- Wire management components not included. Base design inlcudes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**

- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**

- Structural: 10 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT PAYMENT TERMS: | Contract Value | Description of Work |
|---|---|---|
| | 15% | Deposit With Order (Due Upon Receipt) |
| | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

Contact: RBI Solar        Phone: 513-242-2051

Email: info@rbisolar.com



## MATERIALS WARRANTY AGREEMENT

"Project": Morning View-Epc

"Product Warranted" (the "Products"): Bl Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek EPC, LLC

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
    - o have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
    - o have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
    - o have any serial numbers, markings, legends or labeling altered, defaced, or removed;
    - o have only non-structural wear and tear, aging, or surface imperfections; or
    - o are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
    - o The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

_____        **2/13/19**
Customer                                _____
                                        Date

_____        **02/13/2019**
RBI Solar, Inc.                         _____
                                        Date

Effective Date: **01/09/2019**
_____



**RBI SOLAR**

## WARRANTY TRANSFER AGREEMENT

"Project": Morning View Solar, LLC

"Product Warranted" (the "Product"): Racking Materials

"Original Owner/Customer": Cypress Creek EPC, LLC

"Original Warranty Issue Date": 10/30/18

"New Owner/Customer": Morning View Solar, LLC

New Owner/Customer's Representative Morning View Solar, LLC

New Owner/Customer's Address 1089 Morning View Rd., Seagrove, NC 27341

"Warranty Transfer Date": 11/28/18

In consideration of NA Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Cypress Creek EPC, LLC does hereby grant, convey and agree to transfer unto Morning View Solar, LLC all of Cypress Creek EPC, LLC 's right, title and interest in the Warranty for the Product.

It is understood by all parties that the RBI Solar Limited Warranty may be transferred only one (1) time during the first five years after the original installation date. Subsequent buyers do not qualify.

In witness whereof, Original Owner/Customer has caused this Transfer to be executed as of the date of the last signature noted below.

| | |
|---|---|
| Original Owner/Customer Signature | 11/7/19 <br> Date |
| New Owner/Customer Signature | 1/8/19 <br> Date |

Acknowledged and Accepted By RBI Solar Authorized Representative:

| | |
|---|---|
| RBI Solar | 1/9/19 <br> Date |

RBI Solar Warranty Transfer_2016



# Purchase Order

PO DATE: 05/25/2017
TERMS: SEE CYPRESS CREEK SEPARATE
TERMS & CONDITIONS

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

*All Documentation MUST reference PO# and Project Name.*

Purchase Order #: PO3488
Project Name: N. Gainesville-Epc
Pin #: TX-ONC-006
Project Location: 2651 N. Weaver Street Gainesville, TX 76240
Shipping Term: DDP (Project Site)

| To: | Ship To: |
|---|---|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-618-7268 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Vendor Must Contact Project Manager, Ricardo Betts @ (330) 223-7014 for Validation PRIOR to SHIPPING |

| QTY | UNIT | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| 1 | Each | Purchase Order – Strucural Racking drawings for North Gainesville | $7,500.00 | $7,500.00 |
| PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE: | Reference:<br>Deliver By Date: | | | |

| RECAP | |
|---|---|
| SUBTOTAL | $7,500.00 |
| TOTAL | $7,500.00 |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lien.pham@ccrenew.com
(213) 357-5437

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK: _____ 05/25/2017
APPROVED BY                                    DATE

VENDOR: _____ 5/30/2017
APPROVED BY                                    DATE

CYPRESS CREEK / RBI SOLAR  PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will  retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate.  In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agree to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services or delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage; including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1); however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.



CYPRESS CREEK

# Purchase Order

| | |
|---|---|
| PO DATE: | 06/08/2017 |
| TERMS: | SEE CYPRESS CREEK SEPARATE TERMS & CONDITIONS |

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

*All Documentation MUST reference PO# and Project Name*

Purchase Order #: P03707
Project Name: N. Gainesville-Epc
Pin #: TX-ONC-00G
Project Location: 2651 N. Weaver Street Gainesville, TX 76240
Shipping Term: DDP (Project Site)

| To: | Ship To: |
|---|---|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-618-7268 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Vendor Must Contact Project Manager, Ricardo Betts @ (310)<br>228-7014 for Valuation PRIOR to SHIPPING. |

| QTY | UNIT | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| 1 | Each | Equipment - Engineering/Posts, and Racking | $1,200,994.00 | $1,200,994.00 |
| 1 | Each | Freight | $84,751.00 | $84,751.00 |
| PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE : | Reference: Proposal Dated June 1, 2017<br>Deliver By Date: | | | |

| RECAP | |
|---|---|
| SUBTOTAL | $1,285,745.00 |
| TOTAL | $1,285,745.00 |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lien.pham@ccrenew.com
(213) 357-5437

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

APPROVED BY      06/08/2017    DATE

VENDOR:

APPROVED BY    6-12-2017    DATE

*SEE CYPRESS CREEK'S SEPARATE TERMS AND CONDITIONS ATTACHED AND INCORPORATED HEREIN*

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense, Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agree to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability Insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance. (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability Insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all molds, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1). If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.



## MATERIALS WARRANTY AGREEMENT

"Project": North Gainesville-Epc / 179004

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek Renewables

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
  - o have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
  - o have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
  - o have any serial numbers, markings, legends or labeling altered, defaced, or removed;
  - o have only non-structural wear and tear, aging, or surface imperfections; or
  - o are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
  - o The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RES ___ OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

Customer

11/3/17

Date

RBI Solar, Inc.

11/09/2017

Date

Effective Date: 10/31/2017

Page 3 of 3



# Purchase Order

| | |
|---|---|
| PROJECT NAME : | STAUNTON-EPC |
| PROJECT ID: | IN-000988 |
| PO NUMBER: | P15157 |
| ORDER DATE: | 06/27/2018 |
| SHIP TO: | DDP PROJECT LOCATION (SEE NOTES) |
| PAYMENT TERMS: | NET 45 |
| REFERENCE TERMS: | SPECIAL T&Cs |

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

**Vendor:**

RBI Solar
5513 Vine Street
Cincinnati, OH 45217
Phone: 513-242-2051

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Material to include: Design, Drawings, Post & Racking | $1,005,726.00 | 1 | Each | $1,005,726.00 |
| Freight | $20,700.00 | 1 | Each | $20,700.00 |
| Commissioning | $10,000.00 | 1 | Each | $10,000.00 |
| | | | SUBTOTAL | $1,036,426.00 |
| | | | TOTAL | $1,036,426.00 |

Notes:

1. Deliver By Date: 08/21/2018
2. Project Location: 4387 N Cory-Staunton Road  Brazil, IN 47834
3. Required 72 hr Notice Prior to Delivery – Vendor Must Contact Project Manager: Roger Berrymont - roger.berrymont@ccrenew.com
4. PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE AGREED DELIVERY SCHEDULE
5. General Notes: Assistant PM/Approver: Colby Webb 828-318-6468, Complete Pile Delivery Date: 21 August 2018, Complete Racking Delivery Date: 21 September 2018, Please send PO to: bvietas@rbisolar.com/ Site Address: 4387 N Cory-Staunton Road, Brazil, IN 47834
6. Project Accountant: Jenny Holtsclaw - jenny.holtsclaw@ccrenew.com

ADDRESS PO CORRESPONDENCE TO:

Procurement Department
Buyers@ccrenew.com

CYPRESS CREEK:

APPROVED BY
DATE: 06/27/2018

VENDOR:     Wes Pauly    Digitally signed by Wes Pauly Date: 2018.07.02 11:29:00 -04'00'

APPROVED BY
DATE: 06/27/2018

All Documentation MUST reference PO# and Project Name to be accepted. All invoices must include an
executed lien waiver to be considered acceptable for processing. All invoices must be submitted by the 10th of each month to
epc.ap@ccrenew.com and CC Project Accountant to ensure that payment is processed timely.

This PO is only valid for pricing and scope as provided on vendor quote/email correspondence.

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**

**Staunton, IN**



**CLIENT:** **Mike Quinn**

**Cypress Creek Renewables**

**Phone:** 404-374-5775

**Email:** mike.quinn@ccrenew.com

**DATE:** **June 26, 2018**

**RACKING SPECIFICATIONS, PROJECT SPECIFIC**

| | | |
|---|---|---|
| • | Number Of Modules Supported: | 16,992 modules |
| • | Module Manufacturer/Model Number: | 72 Cell |
| • | Module Wattage: | 360 watts |
| • | Total System Size (DC): | 6.11712 MW |
| • | Module Orientation: | Portrait |
| • | Number Of Modules High: | 1 ea |
| • | Minimum Module Clearance: | 24 inches |
| • | String Size: | 18 Mods/String |
| • | Post Embedment Depth: | 6.5 ft. |
| • | Post Configuration (Single or Dual Post): | Single Post |
| • | Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • | Module Mounting Method: | Bottom Mount |
| • | Loading Assumptions: | Snow: 20 psf* Wind: Per Code** |
| | *IBC 2012 | **ASCE 7-10 (Wind Category I) |

**TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - <u>APPROXIMATE</u>:**

| | | |
|---|---|---|
| • | # of Tables: | 1416 Total |
| • | # of Rows: | 220 Total |
| • | # of Modules Per Row: | Varies |
| • | Tracking Parameters: | +/- 55 degrees |
| • | # of Motors per Row: | 1 each |
| • | # of Controllers per Row: | 1 each |
| • | Type of Motor: | DC Gear Motor |
| • | Power Source (DC/AC): | DC Self-Powered |
| • | Snow Sensor (Y/N): | Yes |
| • | Back Tracking: | Yes |
| • | Windstow & Nighttime Stow: | Yes |
| • | Controller Communication: | Wireless |

**PRICING** Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

| | | | $$/Watt | $$/Mod. |
|---|---|---|---|---|
| TOTAL PRICE: | $ | 1,005,726.00 | $ 0.164 | $ 59.19 |

Price includes:

| | |
|---|---|
| • Design | • Racking System |
| • Stamped Engineered Drawings | • Foundation Post Assumed to be Rolled Cee-Channel |
| • Approved Module Grounding Method | • No Freight |

| | | | | |
|---|---|---|---|---|
| Freight of Materials to Site: | $ | 20,700.00 | $ 0.003 | $ 1.22 |
| Commissioning Services: | $ | 10,000.00 | | |

Steel based product pricing used within this estimate is based on current material availability, and costs, as of the date of this quotation. Due to the inherent volatility in steel plate product costs, RBI Solar reserves the right to modify pricing after 10 days from the date of this proposal. Additional price modifications may be applied at the time of "release to fabricate" should it not occur within 60 days of contract execution. All modifications shall be to offset any additional cost increases as indexed to IIR CRU Midwest Monitor

**MATERIAL AND DESIGN SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- The work shall be designed, engineered, fabricated and supplied with due consideration to known local weather conditions and environmental protection requirements.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design and engineering shall be based on a pull test performed by RBI Solar or recommendations and data supplied in a certified geotechnical report (by others).
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to releasing materials for fabrication.
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of IN
- RBI Solar shall provide progress drawings along with a final stamped set. Revisions to the project after written approval of the stamped set, may result in additional revision fees.
- Foundations/posts, racking system and module mounting hardware (includes bonding to racking).
- Freight to site as a separate line item.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- RBI Solar provides a grid powered controller for projects located in colder regions. These require a 120V power source wired directly to each individual controller/row. Option to step up to a 277V power supply must be requested.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G115 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others. Service can be performed for an additional fee at time of pull test, if requested in writing by customer.
- Sales/Use Tax and Permit Fees are excluded unless noted.
- Delays to the project delivery date, after fabrication, may result in storage fees.
- Domestic Content/Made In The USA is available. Requirement must be stated at time of contract.
- Special fabrication requirements/certification are excluded. Fabrication is performed in RBI Solar or approved facilities.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**

- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0°), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.
- Control Installation Checklist completed, signed, and submitted to RBI. Checklist includes calibration and scanning of TCU's.

**RBI Commissioning scope:**

- Confirm all tracker control components are communicating with the zigbee mesh network.
- Program all RBI controls equipment for full operation of site.

**FOUNDATION REFUSAL DEFINITION:**

- In the event that review of documentation reveals potential for difficult foundation installation due to site conditions, surface contours, soil conditions, drainage, trees, fill, ground, rock, subsurface conditions or any other condition of the sites, Additional Site Exploration shall be discussed to determine alternative foundations and/or means and methods of performing the Work.

- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing
  - Above grade ballast

**OTHER PROVISIONS:**

### GROUNDING:

- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

### WIRE MANAGEMENT:

- Wire management components not included. Base design inlcudes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

### END OF ROW SURVEY (If Selected):

- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

## CONTRACT TERMS AND CONDITIONS:

### WARRANTY SPECIFICATION:

- Structural: 10 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT PAYMENT TERMS: | Contract Value | Description of Work |
|---|---|---|
| | 15% | Deposit With Order (Due Upon Receipt) |
| | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

Contact: RBI Solar        Phone: 513-242-2051

Email: info@rbisolar.com



## WARRANTY TRANSFER AGREEMENT

"Project": Staunton Solar, LLC

"Product Warranted" (the "Product"): Racking Materials

"Original Owner/Customer": Cypress Creek EPC, LLC

"Original Warranty Issue Date": 9/27/18

"New Owner/Customer": Staunton Solar, LLC

New Owner/Customer's Representative Staunton Solar, LLC

New Owner/Customer's Address 4387 N Cory-Staunton Rd., Brazil, IN 47834

"Warranty Transfer Date": 11/1/18

In consideration of NA _____ Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Cypress Creek EPC, LLC _____ does hereby grant, convey and agree to transfer unto Staunton Solar, LLC _____ all of Cypress Creek EPC, LLC _____ 's right, title and interest in the Warranty for the Product.

It is understood by all parties that the RBI Solar Limited Warranty may be transferred only one (1) time during the first five years after the original installation date. Subsequent buyers do not qualify.

In witness whereof, Original Owner/Customer has caused this Transfer to be executed as of the date of the last signature noted below.

_____          1/7/19
Original Owner/Customer Signature      Date

_____          1/8/19
New Owner/Customer Signature        Date

Acknowledged and Accepted By RBI Solar Authorized Representative:

_____          1/9/19
RBI Solar                          Date



# Purchase Order

**CYPRESS CREEK**
AEROSPACE

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

PO DATE: 08/08/2017
TERMS: SEE CYPRESS CREEK SEPARATE
TERMS & CONDITION

All Documentation MUST reference PO# and Project Name

Purchase Order #: PO5480
Project Name: Whitesboro-Epc
Pin #: TX-ONC-023
Project Location: 4633 FM 901, Whitesboro, TX 76273
Shipping Term: DDP (Project Site)

| To: | Ship To: |
|---|---|
| RBI Solar | PROJECT LOCATION |
| 5513 Vine Street | |
| Cincinnati, OH 45217 | ***Required 72 hr Notice Prior to Delivery*** |
| Phone: 513-618-7268 | Vendor Must Contact Project Manager, Corey Carson @ (512) 593-8912 for Validation PRIOR to SHIPPING |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Design, Stamped Engineered Drawings, Posts, Racking System, Motors, Control System | $1,161,491.00 | 1 | Each | $1,161,491.00 |
| Freight to Site | $77,736.00 | 1 | Each | $77,736.00 |
| PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE: | | Reference: Proposal Dated August 3, 2017 Deliver By Date: | | |

| RECAP | |
|---|---|
| SUBTOTAL | $1,239,227.00 |
| TOTAL | $1,239,227.00 |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lien.pham@ccrenew.com
(213) 357-5437

Forward invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK:

_____ 08/08/2017
APPROVED BY                DATE

VENDOR:

_____ 8/9/2017
APPROVED BY                DATE

*SEE CYPRESS CREEK'S SEPARATE TERMS AND CONDITIONS ATTACHED AND INCORPORATED HEREIN*

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

**ACCEPTANCE**

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

**TIMING, DELIVERY AND SHIPPING**

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

**SECURITY INTEREST**

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

**INSPECTION OF WORK**

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

**INVOICES**

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agree to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performance, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability Insurance with limits at least of $1,000,000, if applicable; and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and-or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

**INDEPENDENT CONTRACTOR**

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

**PROPRIETARY INFORMATION & CONFIDENTIALITY**

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

**ASSIGNMENT**

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

**APPLICABLE LAW**

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.


**RBI SOLAR**

## MATERIAL/LABOR WARRANTY AGREEMENT

"Project": __Whitesboro I - EPC__

"Product Warranted" (the "Product"): __RBI Solar Single-Axis Tracker II Racking System__

"Owner/Customer": __Cypress Creek Renewables__

- RBI Solar warrants that it installed all material aspects of the RBI Solar Product in accordance with the industry standards of the profession, in effect on the date the Project is deemed Substantially Completed. Subject to the following terms and conditions, RBI Solar will, for a period of twelve (12) months, at its expense, repair or caused to be repaired those failures directly resulting from the defects in RBI Solar's installation. Upon expiration of this term of the Warranty, without notice from Owner/Customer of some defect, RBI Solar shall have no further obligation to make repairs at RBI Solar's expenses under any provision of this Warranty and Owner/Customer shall not make any further demand or claim against RBI Solar concerning installation, provided that RBI Solar promptly commences and diligently proceeds with the correction and repair of such defects covered by this Warranty which are called to RBI Solar's attention in the manner set forth during the term of this Warranty by Owner/Customer.

- RBI Solar warrants that the Product will be free from structural failure for a period of twenty (20) years after the date the Project is Substantially Completed. For purposes of this Warranty Agreement, the Project shall be deemed "Substantially Completed" when all material aspects of the RBI Solar Product have been installed, and only minor punch list items remain to be completed. RBI Solar will provide Owner/Customer with a certificate of substantial completion indicating the date RBI Solar deems the Project Substantially Completed. However, the warranty will not be binding until RBI Solar has received payment in full inclusive of all change orders. RBI Solar makes no warranties as to items or components furnished or warranted by others, or as to any item or component which is furnished by RBI Solar and altered, damaged or misused by others. RBI Solar further makes no warranties as to items or components damaged by storm, flooding, lightening, hurricane, tornado, earthquake, fire, instability of the sub-surface or foundation, chemical or biological effects, or other casualties. The warranty is applicable only to damage to or failure of the structure of the Product caused by normal atmospheric exposure. Deterioration caused by excessive exposure to standing water, whether salt or fresh, or any exposure to corrosive chemicals, ash, or fumes, or any other foreign chemical substances is specifically excluded from this warranty (the "Warranty").

- The Warranty does not cover photovoltaic modules, electrical components, wiring connections, or any other accessories, fixtures, insulation, goods, or materials not directly associated with the structure of the Product. The Warranty does not cover any goods or materials not provided by RBI Solar.

- The Warranty shall be valid only if the Product is erected by RBI Solar or if the Product is erected and installed strictly in accordance with RBI Solar's specifications. Any modification of, or deviation or variation from RBI Solar's specifications for erection and installation will void the Warranty.

- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer agrees to promptly notify RBI Solar in writing regarding the alleged breach of Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Owner/Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as chosen by RBI Solar at its sole option.

- THE FOREGOING LIMITED EXPRESS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES AND, EXCEPT AS PROVIDED ABOVE, RBI SOLAR MAKES NO REPRESENTATION, GUARANTY, OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCTS, MATERIALS, AND LABOR IT IS SUPPLYING PURSUANT TO THIS WARRANTY AGREEMENT. EXCEPT AS OTHERWISE PROVIDED ABOVE, RBI SOLAR HEREBY DISCLAIMS ALL REPRESENTATIONS, GUARANTIES, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR HABITABILITY. THERE IS NO WARRANTY, EXPRESS OR IMPLIED, OTHER THAN THAT WARRANTY SPECIFICALLY AND EXPRESSLY PROVIDED ABOVE.

- RBI Solar reserves the right to inspect the Product alleged to have breached the Warranty. Owner/Customer is required under this Warranty to conduct annual inspections of the Product and to provide annual maintenance which includes tightening any loose bolts or other connections and repairing any galvanized coating showing any signs of wear, rust or other deterioration. Owner/Customer agrees to hold and protect the Product alleged to have breached the Warranty until Owner/Customer is instructed to do otherwise by RBI Solar. While the Product is in Owner/Customer's possession, Owner/Customer shall not alter same. Owner/Customer shall be liable for all damages to the Product which are alleged to have breached the Warranty, which damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent Owner/Customer fails to conduct annual inspections or maintenance of the Product, fails to hold or protect the Product complained of, or fails to provide to RBI Solar the unencumbered right and opportunity to timely inspect fully the Product alleged by Owner/Customer to have breached the Warranty.

- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. OWNER/CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO OWNER/CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, OWNER/CUSTOMER AGREES THAT, IN THE EVENT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR ALLEGED TO

HAVE CAUSED DAMAGES, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, OWNER/CUSTOMER'S DAMAGES RECOVERABLE FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

CIN2000 1049220v2
26555.00003



## MATERIALS WARRANTY AGREEMENT

"Project": Whitesboro-Epc / 179007

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek Renewables

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
  - o have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
  - o have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
  - o have any serial numbers, markings, legends or labeling altered, defaced, or removed;
  - o have only non-structural wear and tear, aging, or surface imperfections; or
  - o are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
  - o The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.


---

Customer                                        Date


---

RBI Solar, Inc.                                 Date

Effective Date: November 29, 2017



**CYPRESS CREEK**
RENEWABLES

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

# Purchase Order

PO DATE:          08/08/2017
TERMS:     SEE CYPRESS CREEK SEPARATE
                TERMS & CONDITION

*All Documentation MUST reference PO# and Project Name*

Purchase Order #: PO5488
Project Name: Whitesboro II-Epc
Pin #: TX-ONC-032
Project Location: 4859 FM 901 Whitesboro, TX 76273
Shipping Term: DDP (Project Site)

| To: | Ship To: |
|---|---|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-618-7268 | PROJECT LOCATION:<br><br>***Required 72 hr Notice Prior to Delivery***<br>Vendor Must Contact Project Manager, Corey Carson @ (512) 593-8912 for Validation PRIOR to SHIPPING |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Design, Stamped Engineered Drawings, Posts, Racking System, Motors, Controls System | $1,171,000.00 | 1 | Each | $1,171,000.00 |
| Freight to Site | $77,736.00 | 1 | Each | $77,736.00 |
| PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE: | | Reference: Proposal Dated August 3, 2017<br>Deliver By Date: | | |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lien.pham@ccrenew.com
(213) 357-5437

Forward Invoice/ billing to:
epc.ap@ccrenew.com

| RECAP | |
|---|---|
| SUBTOTAL | $1,248,736.00 |
| TOTAL | $1,248,736.00 |

CYPRESS CREEK:

_____  08/08/2017
APPROVED BY            DATE

VENDOR:

_____  8/8/2017
APPROVED BY            DATE

*SEE CYPRESS CREEK'S SEPARATE TERMS AND CONDITIONS ATTACHED AND INCORPORATED HEREIN*

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing, containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agree to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

page 2 of 5

**TAXES**
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

**WARRANTIES**
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

**CHANGES**
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

**INSURANCE**
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

**NO WAIVER**
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order, whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

page 4 of 5

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:
(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or
(b) is received without restriction from a third party without breach of any obligation of confidentiality; or
(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or
(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or
(e) is disclosed by either Party to a third party under no confidentiality obligation.
Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.


**RBI SOLAR**

## MATERIAL/LABOR WARRANTY AGREEMENT

"Project": ___Whitesboro II - EPC_____

"Product Warranted" (the "Product"): ___RBI Solar Single-Axis Tracker II Racking System___

"Owner/Customer": ___Cypress Creek Renewables_____

- RBI Solar warrants that it installed all material aspects of the RBI Solar Product in accordance with the industry standards of the profession, in effect on the date the Project is deemed Substantially Completed. Subject to the following terms and conditions, RBI Solar will, for a period of twelve (12) months, at its expense, repair or caused to be repaired those failures directly resulting from the defects in RBI Solar's installation. Upon expiration of this term of the Warranty, without notice from Owner/Customer of some defect, RBI Solar shall have no further obligation to make repairs at RBI Solar's expenses under any provision of this Warranty and Owner/Customer shall not make any further demand or claim against RBI Solar concerning installation, provided that RBI Solar promptly commences and diligently proceeds with the correction and repair of such defects covered by this Warranty which are called to RBI Solar's attention in the manner set forth during the term of this Warranty by Owner/Customer.

- RBI Solar warrants that the Product will be free from structural failure for a period of twenty (20) years after the date the Project is Substantially Completed. For purposes of this Warranty Agreement, the Project shall be deemed "Substantially Completed" when all material aspects of the RBI Solar Product have been installed, and only minor punch list items remain to be completed. RBI Solar will provide Owner/Customer with a certificate of substantial completion indicating the date RBI Solar deems the Project Substantially Completed. However, the warranty will not be binding until RBI Solar has received payment in full inclusive of all change orders. RBI Solar makes no warranties as to items or components furnished or warranted by others, or as to any item or component which is furnished by RBI Solar and altered, damaged or misused by others. RBI Solar further makes no warranties as to items or components damaged by storm, flooding, lightening, hurricane, tornado, earthquake, fire, instability of the sub-surface or foundation, chemical or biological effects, or other casualties. The warranty is applicable only to damage to or failure of the structure of the Product caused by normal atmospheric exposure. Deterioration caused by excessive exposure to standing water, whether salt or fresh, or any exposure to corrosive chemicals, ash, or fumes, or any other foreign chemical substances is specifically excluded from this warranty (the "Warranty").

- The Warranty does not cover photovoltaic modules, electrical components, wiring connections, or any other accessories, fixtures, insulation, goods, or materials not directly associated with the structure of the Product. The Warranty does not cover any goods or materials not provided by RBI Solar.

- The Warranty shall be valid only if the Product is erected by RBI Solar or if the Product is erected and installed strictly in accordance with RBI Solar's specifications. Any modification of, or deviation or variation from RBI Solar's specifications for erection and installation will void the Warranty.

- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer agrees to promptly notify RBI Solar in writing regarding the alleged breach of Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Owner/Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as chosen by RBI Solar at its sole option.

- THE FOREGOING LIMITED EXPRESS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES AND, EXCEPT AS PROVIDED ABOVE, RBI SOLAR MAKES NO REPRESENTATION, GUARANTY, OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCTS, MATERIALS, AND LABOR IT IS SUPPLYING PURSUANT TO THIS WARRANTY AGREEMENT. EXCEPT AS OTHERWISE PROVIDED ABOVE, RBI SOLAR HEREBY DISCLAIMS ALL REPRESENTATIONS, GUARANTIES, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR HABITABILITY. THERE IS NO WARRANTY, EXPRESS OR IMPLIED, OTHER THAN THAT WARRANTY SPECIFICALLY AND EXPRESSLY PROVIDED ABOVE.

- RBI Solar reserves the right to inspect the Product alleged to have breached the Warranty. Owner/Customer is required under this Warranty to conduct annual inspections of the Product and to provide annual maintenance which includes tightening any loose bolts or other connections and repairing any galvanized coating showing any signs of wear, rust or other deterioration. Owner/Customer agrees to hold and protect the Product alleged to have breached the Warranty until Owner/Customer is instructed to do otherwise by RBI Solar. While the Product is in Owner/Customer's possession, Owner/Customer shall not alter same. Owner/Customer shall be liable for all damages to the Product which are alleged to have breached the Warranty, which damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent Owner/Customer fails to conduct annual inspections or maintenance of the Product, fails to hold or protect the Product complained of, or fails to provide to RBI Solar the unencumbered right and opportunity to timely inspect fully the Product alleged by Owner/Customer to have breached the Warranty.

- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. OWNER/CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO OWNER/CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, OWNER/CUSTOMER AGREES THAT, IN THE EVENT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR ALLEGED TO

HAVE CAUSED DAMAGES, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, OWNER/CUSTOMER'S DAMAGES RECOVERABLE FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

CIN2000 1049220v2
26555.00003



# Purchase Order

PO DATE: 07/18/2017
TERMS: SEE CYPRESS CREEK SEPARATE
TERMS & CONDITION

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

*All Documentation MUST reference PO# and Project Name.*

**Purchase Order #: PO4757**
**Project Name: Whitewright-Epc**
**Pin #: TX-TNMP-002**
**Project Location: 15058 N.W. State Highway 11, Whitewright, TX 75491**
**Shipping Term: DDP (Project Site)**

| To: | Ship To: |
|---|---|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-618-7268 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Vendor Must Contact Project Manager, Kirk Kleifer @ (904) 705-5111 for Validation PRIOR to SHIPPING |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Total material price | $2,365,293.00 | 1 | Each | $2,365,293.00 |
| Freight of materials to site | $151,939.00 | 1 | Each | $151,939.00 |
| Commissioning Services | $10,188.00 | 1 | Each | $10,188.00 |
| Ship to site | $0.00 | 1 | Each | $0.00 |
| Deliver by 9/1 | $0.00 | 1 | Each | $0.00 |
| Reference attached quote | $0.00 | 1 | Each | $0.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE: 09/01/2017 posts; 10/1/2017 racking

Reference: Proposal Dated 07/11/17
Deliver By Date: 09/01/2017 posts; 10/1/2017 racking

| RECAP | |
|---|---|
| SUBTOTAL | $2,527,420.00 |
| TOTAL | $2,527,420.00 |

ADDRESS CORRESPONDENCE TO:

Lien Pham
lien.pham@ccrenew.com
(213) 357-5437

Forward Invoice/ billing to:
epc.ap@ccrenew.com

CYPRESS CREEK: _____ 07/18/2017
APPROVED BY          DATE

VENDOR: _____ 7/18/2017
APPROVED BY          DATE

SEE CYPRESS CREEK'S SEPARATE TERMS AND CONDITIONS ATTACHED AND INCORPORATED HEREIN

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agree to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

TAXES
Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

WARRANTIES
Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

CHANGES
Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

INSURANCE
During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

NO WAIVER
No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's sole obligation shall be to pay Vendor all amounts due and not previously paid to Vendor for goods furnished or Services rendered in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services or delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1); however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright.

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

## INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

## PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:
(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or
(b) is received without restriction from a third party without breach of any obligation of confidentiality; or
(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or
(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or
(e) is disclosed by either Party to a third party under no confidentiality obligation.
Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

## ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

## APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.



## <u>MATERIALS WARRANTY AGREEMENT</u>

"Project": <u>Whitewright-Epc / 179005</u>

"Product Warranted" (the "Products"): <u>RBI Solar Single-Axis Tracker II Racking System</u>

"Owner/Customer": <u>Cypress Creek Renewables</u>

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
    - o have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
    - o have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
    - o have any serial numbers, markings, legends or labeling altered, defaced, or removed;
    - o have only non-structural wear and tear, aging, or surface imperfections; or
    - o are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
    - o The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

_____      **11/29/17**
Customer                                         Date

_____      **11/29/2017**
RBI Solar, Inc.                            Date

            **November 9, 2017**
Effective Date: _____



**CYPRESS CREEK**
R E N E W A B L E S

# Purchase Order

PO DATE: 03/27/2018
TERMS: SEE ATTACHED

Cypress Creek EPC, LLC ("Cypress Creek")
3250 Ocean Park Boulevard, Suite 355
Santa Monica, CA 90405

*All Documentation MUST reference PO# and Project Name*

**Purchase Order #:** P12407
**Project Name:** Yellow Jacket-Epc
**Pin #:** TX-TNMP-003
**Project Location:** Yellow Jacket Solar, LLC Hwy 174\nMeridian, TX 76665
**Shipping Term:** DDP {Project Site}

| To: | Ship To: |
|---|---|
| RBI Solar<br>5513 Vine Street<br>Cincinnati, OH 45217<br>Phone: 513-242-2051 | PROJECT LOCATION<br><br>***Required 72 hr Notice Prior to Delivery***<br>Please send correspondence to corey.carson@ccrenew.com |

| DESCRIPTION | UNIT PRICE | QTY | UNIT | AMOUNT |
|---|---|---|---|---|
| Design, Stamped Engineering Drawings, Approved Module Grounding Method, Posts, Racking System, Motors, and Controls | $1,158,834.00 | 1 | Each | $1,158,834.00 |
| Pull Test | $6,000.00 | 1 | Each | $6,000.00 |
| Commissioning | $5,000.00 | 1 | Each | $5,000.00 |
| Freight of Material to Site | $106,385.00 | 1 | Each | $106,385.00 |

PLEASE NOTIFY US IMMEDIATELY IF THIS ORDER CANNOT BE SHIPPED COMPLETE ON OR BEFORE: ~~03/27/2018~~ 5/13/18 *WP*

Reference:
Deliver By Date: ~~03/27/2018~~ 5/13/18 *WP*

ADDRESS CORRESPONDENCE TO:

Procurement Department
commodities@ccrenew.com

Forward invoice/ billing to:
epc.ap@ccrenew.com

| RECAP | |
|---|---|
| SUBTOTAL | $1,276,219.00 |
| TOTAL | $1,276,219.00 |

CYPRESS CREEK:

03/27/2018
APPROVED BY
DATE

VENDOR:

03/29/2018     *Wes Pauly*
APPROVED BY
DATE

CYPRESS CREEK / RBI SOLAR PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE

This purchase order constitutes an offer by Cypress Creek EPC, LLC ("Company") to Vendor upon the terms and conditions stated herein and in the body of the purchase order, and will become a binding contract upon acceptance either by acknowledgement or performance in whole or in part. If Vendor fails to accept this offer promptly upon receipt, Vendor shall be deemed to have rejected the offer, unless such offer is expressly revived by Company. No additional or different terms contained in any Vendor invoice, quote, proposal, sales order or other document supplied by Vendor will be binding on Company, and Company expressly rejects such additional or different terms. Vendor should keep these terms and conditions on file as they may not be sent with each individual purchase order, but it is intended that these terms govern. These terms and conditions shall remain in effect until otherwise notified by Company.

TIMING, DELIVERY AND SHIPPING

Time and rate of deliveries and performance are of the essence of this order. Vendor will inform Company immediately whenever it has reason to believe that circumstances within or beyond its control are likely to delay or prevent Vendor's timely performance under this purchase order. Vendor shall perform any services required by the purchase order ("Services") in a prompt and expeditious manner on the timeline directed by Company so as to avoid delay in the development or construction of projects being contemplated, or being completed, by Company. Vendor is responsible for all Company costs and damages as a result of any Vendor late delivery or performance. In no event shall the Vendor be held liable for damages arising from delays beyond its direct control. Company reserves the right to cancel the order and reject the goods or Services upon default by Vendor in time or rate of delivery or performance, or, in Company's sole discretion, accept a revised delivery or performance schedule. Such revisions will be binding on Company only if Company has given its express written consent to the change. Company may require Vendor to make late shipments via the fastest means available, shipped prepaid at Vendor's sole expense. Vendor will not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Company's agreed delivery schedule. Vendor agrees to make all shipments as specified in a purchase order, including the use of the carrier and routing, if stated, and to the exact destination required. Vendor shall not charge for any packing containers, loading, or draying, unless otherwise authorized by this order. Vendor further agrees to pack, mark, and describe all merchandise to obtain the lowest rate under freight and express classifications, except when Company otherwise specifies, and any additional costs arising from failure to comply with this provision shall be charged to the Vendor's account. Vendor agrees promptly to mail all bills of lading and shipping receipts to Company on the date of shipment or include them with the shipment.

SECURITY INTEREST

Vendor will retain security interest in goods shipped to Company. Until payment in full of all monies due pursuant to terms of this Purchase Order.

INSPECTION OF WORK

Company may accept or reject any or all products or Services within a reasonable time after receipt. Acceptance of the products or Services shall in no way be a waiver of or impair Company's right to reject or revoke its acceptance of nonconforming products or Services, or to avail itself of any other remedies to which Company may be entitled, notwithstanding Company's knowledge of the nonconformity, its substantiality or ease of discovery.

INVOICES

Company may adjust the amount due on any invoice for shortage, rejection, or revocation of acceptance. Any cash discount period available to Company shall commence on the date of receipt of the merchandise or the date of receipt of the invoice. Vendor shall clearly identify the original purchase order number on any delivery including backordered items. In making payments hereunder, Company shall be entitled to conclusively presume that payment information furnished by Vendor, such as name, account number(s) and name of payee is accurate. In no event shall Vendor make a second payment where the first payment is made in accordance with such Vendor furnished information unless mutually agreed to otherwise. All payments shall be in U.S. currency. Payment terms shall be immediately upon receipt for deposit invoices and all subsequent invoices Net forty five (45) days from date of invoice unless otherwise agreed to under this purchase order. Company agrees to return disputed invoices within fifteen (15) days of that invoice with a clear description of the nature of the dispute. Amounts unpaid forty five (45) days after the invoice date shall bear interest at the rate of one and one-half percent per month on balances outstanding.

## TAXES

Except as provided herein, and in connection with Vendor's performance of Services or delivery of products hereunder.

## WARRANTIES

Vendor warrants that any articles and products delivered under a purchase order will be merchantable, free from defect in design, material and workmanship (including damage due to unsatisfactory packaging), and suitable for their ordinary and intended purposes and for Company's particular purposes, to the extent Vendor knows or should know of. Vendor also warrants that the design of any equipment delivered under the purchase order conforms to all regulations of the Federal Occupational Safety and Health Act and other applicable federal and state laws at the time of delivery. Vendor shall provide any Services being provided under the purchase order in accordance with generally accepted professional practices existing at the time of performance for the locality where the Services are performed. Vendor represents it is appropriately licensed and registered to perform the Services in the location or locations contemplated by the purchase order. For all Services performed in connection with the purchase order, Vendor shall comply with all applicable statutes, laws, codes, ordinances, rules, regulations and governmental orders pertaining in any way to the Services, including all applicable equal employment opportunity laws. Company waives none of the warranties available to it, either by express promise or implication.

## CHANGES

Company shall have the right at any time before completion of the purchase order to make changes in quantities, in drawings and specification, in delivery schedules, and methods of shipment and packaging. If such changes cause an increase or decrease in prices, or in the time required for performances, Vendor shall promptly notify Company thereof, and an equitable adjustment shall be made. Changes shall not be binding upon Company unless evidenced by a purchase order change notice issued by an authorized purchasing agent of Company and signed by Vendor.

## INSURANCE

During Vendor's performance under the purchase order, the Vendor and its subcontractors, if any, shall secure and maintain, at its own expense, the following insurance requirements with companies satisfactory and acceptable to Company and shall furnish Company certificates evidencing such insurance prior to commencement of Services under the purchase order: (a) Worker's Compensation and Employer's Liability Insurance which shall fully comply with the statutory requirements of all state laws as well as federal laws which may be applicable; Employer's Liability limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000.00 per employee/aggregate for disease (b) Commercial General Liability insurance with a minimum combined single limit of liability of $4,000,000 per occurrence and $5,000,000 aggregate for injury and/or death and/or property damage using ISO Occurrence form CG 0001 12/07 or its equivalent; liability limits may be ascertained with the use of an Umbrella policy if applicable. Policies must contain a per location / per project aggregate limit of insurance, (c) Business Automobile Liability Insurance covering all owned, leased, hired, and non-owned / borrowed vehicles and equipment used by the Vendor with a minimum combined single limit of liability of $4,000,000.00 for injury and/or death and/or property damage (limit may be achieve via combination of Auto and Umbrella liability, (d) Professional Liability insurance with limits at least of $1,000,000, if applicable, and (e) transit coverage in an amount equal to the replacement cost of any shipment of Vendor's goods to Company with the mutual understanding that title for Vendor's goods and the related Risk of Loss to those goods remain solely with Vendor until Vendor's goods are received by Company at the designated delivery point. Vendor is solely responsible for any property damage to any items it uses to deliver goods or provide Services as described in this purchase order. Vendor is solely responsible for insuring said items. All insuring companies must have a minimum AM Best rating of A-VIII. Company, its assigns and or successors, shall be named on the insurance certificates as additionally insured using CG 2010 and CG 2037, or their equivalent. All insurance policies must include Waivers of Subrogation in favor of Company. Insurance limit requirements included in this section do not limit Vendor's insurance company's liability. These requirements are not intended as guidance for Vendor's insurance purchase decisions. Vendor's insurance shall be primary and non-contributory to any insurance or self-insurance maintained by Company.

## NO WAIVER

No valid waiver of any provisions contained herein shall occur unless made in writing and signed by Company. Failure of Company to insist upon strict performance or to object to any attempted modification shall not constitute waiver of any provisions. Company reserves the right to insist at any time on strict compliance with the terms and conditions notwithstanding any previous custom, practice, or course of dealing to the contrary.

TERMINATION

Company reserves the right to cancel or suspend, at any time, by written notice, in whole or in part, this order. Except in the case of termination for breach, Company's obligation shall be to pay Vendor all amounts due and not previously paid to Vendor to include all costs incurred for all performance completed to date through the duration of the contract for goods and services in accordance with the purchase order. This order may be terminated by Company, in Company's sole discretion, as follows (each, an "Event of Default"): (i) if Vendor materially breaches; or (ii) if Vendor, or an affiliate of Vendor involved in this order, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver appointed over its property, becomes subject to a voluntary or involuntary bankruptcy petition, and/or is liquidated or dissolved or its affairs are wound up. Any such termination by Company shall be without prejudice to any other right or remedy Company may have under this order or at law or in equity. No such remedy of Company shall be exclusive of any other remedy.

This order may be suspended by Company in its sole discretion. For any suspension or delay, Vendor may, at its sole option (1) require a payment to be made based on any reasonable basis, including but not limited to the purchase order price, and any additional expenses, or cost resulting from such a delay; or (2) store products at the sole cost and risk of loss of Company. Payment for such price, expenses and costs, in any such event, shall be due by Company within thirty (30) days from date of Vendor's invoice therefore. Any such suspension or delay beyond three (3) months will be treated as Company's termination. Failure of Company to make payments to the Vendor in accordance with this Agreement may be considered substantial nonperformance and cause termination.

LIMITATION OF LIABILITY

(a) In no event shall Company, its parent company, subsidiaries, affiliates, divisions, and their respective directors, officers, managers, members, shareholders, employees, agents, representatives, successors or any combination of them, be liable (in contract or in tort, including negligence and strict liability) to Vendor or its subcontractors or suppliers of or any tier for special, indirect, incidental, or consequential damages, resulting from Company's performance, non-performance, or delay in performance of its obligations under this purchase order, or from Company's delay, termination (with or without cause), or suspension of the Services of delivery of products under this purchase order. (b) In no event shall Vendor, its subcontractors or suppliers of any tier, be liable (in contract or in tort, including negligence and strict liability) to Company or its parent corporation for special, indirect, incidental, or consequential loss or damage, including without limitation, loss of data, loss of use of equipment, cost of capital, loss of profits or revenues or the loss of use thereof, or cost of purchased or replacement power. (c) Vendor's total liability for any and all liability to Company arising out of or in connection with its performance of this purchase order whether in contract or in tort (including negligence and strict liability) shall not exceed the price of the goods or Services on which such liability is based.

CLEAR TITLE AND LIEN REMOVAL

Vendor warrants that it shall have clear title to all of the goods furnished hereunder and the right to sell such goods. Vendor agrees that (a) all specific materials developed by Vendor on behalf of Company and (b) all models, designs, formulas, methods, documents, tangible items or other work product prepared by Vendor or submitted to Company by Vendor as part of any Services rendered under the purchase order shall be the property of Company. (1) If any lien arises as a result of the Vendor's performance hereunder, Vendor shall immediately take all steps necessary to obtain the release of such lien and indemnify Company from and against the lien and any and all costs and expenses associated therewith, including reasonable attorney's fees and costs. (1): however, the Vendor shall be deemed that author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright

INDEMNIFICATION

If any article or product sold and delivered under a purchase order is covered by any patent, copyright or application thereof, Vendor agrees to indemnify Company from any and all loss, cost or expense, including attorneys' fees, on account of any claims, suits, or judgments for use or sale of the article or product in violation of rights under the patent, copyright, or application. Vendor further agrees to indemnify and hold Company harmless from any and all claims, demands, liability, loss, damage, fines, penalties, attorney's fees and litigation expenses (collectively "Loss") arising out of Vendor's performance under the purchase order, to the extent that the Loss is caused by the negligent acts or omissions of Vendor, and the Loss results from injury to, including the death of, persons and/or damage to property. In addition, Vendor agrees to indemnify and hold Company harmless from any and all Loss caused by the negligent acts or omissions of Vendor, or anyone working under Vendor, in the performance of any professional Services contemplated by the purchase. This indemnity shall apply to all Loss suffered by Company, whether or not asserted by third parties.

INDEPENDENT CONTRACTOR

The Company and Vendor agree that any Services to be performed under the purchase order are being performed by Vendor as an independent contractor, and that Vendor shall not be construed to be an agent of Company under any circumstances. Vendor hereby acknowledges and agrees that Vendor has no authority on behalf of, or as agent of, Company and shall not seek to modify any contract entered into by Company and any of its contractors or other consultants. Vendor shall be required to remind any contractor or consultant of Company of this limitation in any situation where a contractor or consultant of Company might reasonably conclude that Vendor is ordering additional or changed work on behalf of Company.

PROPRIETARY INFORMATION & CONFIDENTIALITY

Both Parties shall consider all information furnished by either Party to be confidential and shall not disclose any such information to any other entity or person, or use such information for any purpose other than performing each Party's obligation(s) under this purchase order unless either Party obtains prior written consent from the other Party. Nothing contained herein shall be construed as restricting or creating any confidentiality obligation or liability for the disclosure, communication or use of confidential information which:

(a) is or has become published or otherwise generally known to the trade through no wrongful act of either Party; or

(b) is received without restriction from a third party without breach of any obligation of confidentiality; or

(c) Either Party can reasonably show to have developed independently, or otherwise had in its lawful possession, prior to its receipt hereunder; or

(d) is disclosed pursuant to government or judicial requirement, provided either Party is timely notified in writing and given the opportunity to seek confidential treatment of such Confidential Information; or

(e) is disclosed by either Party to a third party under no confidentiality obligation.

Vendor shall not engage in any advertising, publicity, or other promotional activity that directly or indirectly mentions or refers to Company, the relationship between the parties, or the products or Services provided under this order without submitting said information or release to Company for review and written consent.

ASSIGNMENT

Company reserves the right to assign this order to successors, affiliates, or subsidiaries with notice to but not consent from Vendor. Vendor shall not assign or subcontract any of its rights or obligations without Company's prior written consent. In no event shall Company's written consent be construed as discharging or releasing Vendor from its obligations. Any assignment made in contravention of these terms shall be null and void. The purchase order shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

APPLICABLE LAW

The exercise of any right or remedy herein shall be without prejudice to the right of Company to exercise any other right or remedy provided herein, or at law, or in equity. The laws of the State of California shall govern the relationship between Company and the Vendor. In addition Company shall have available to it all the rights and remedies provided by the Uniform Commercial Code. To resolve disputes, Company and Vendor agree to jurisdiction and venue in the state and federal courts located in Los Angeles, California.

**PLANNING PROPOSAL FOR:**
**Yellow Jacket - Meridian TX**

**RBI SOLAR**

**CLIENT:**  Mike Quinn
**Cypress Creek Renewables**
**Phone:**  404-374-5775
**Email:**  mike.quinn@ccrenew.com

**DATE:**  March 20, 2018

**PROJECT:**  Yellow Jacket - Meridian TX

### RACKING SPECIFICATIONS, PROJECT SPECIFIC

| | |
|---|---|
| • Number Of Modules Supported: | 21,888 modules |
| • Module Manufacturer/Model Number: | 72 Cell |
| • Module Wattage: | 325 & 330 watts |
| • Total System Size (DC): | 7.13108 MW |
| • Module Orientation: | Portrait |
| • Number Of Modules High: | 1 ea |
| • Approximate Distance Between Posts: | Varies |
| • Minimum Module Clearance: | 18 inches |
| • String Size: | 19 Mods/String |
| • Post Configuration (Single or Dual Post): | Single Post |
| • Foundation Type (Concrete, Driven, Screw, Ballast, Etc.): | Driven Post |
| • Module Mounting Method: | Bottom Mount |
| • Loading Assumptions: | Snow*: 5 psf    Wind**: 105 mph |

*IBC 2012                              **ASCE 7-10 (Wind Category I)

### TRACKER SPECIFICATIONS, PROJECT SPECIFIC - PER ROW - APPROXIMATE:

| | |
|---|---|
| • # of Tables: | 1976 Total |
| • # of Rows: | 267 Total |
| • # of Modules Per Row: | Varies |
| • Tracking Parameters: | +/- 55 degrees |
| • # of Motors per Row: | 1 each |
| • # of Controllers per Row: | 1 each |
| • # of Inclinometer Sensors in a Row: | 1 each |
| • Type of Motor: | DC Gear Motor |
| • Power Source (DC/AC): | DC Self-Powered |
| • Back Tracking: | Yes |
| • Windstow & Nighttime Stow: | Yes |
| • Controller Communication: | Wireless |

**PRICING**     Pricing, per scope of work as defined above in this proposal:

Taxes, Permit Fees, Bonds and Special Inspections, if applicable, are not included.

|  |  | $$/Watt | $$/Mod. |
|---|---|---|---|
| TOTAL PRICE: | $ 1,158,834.00 | $ 0.163 | $ 52.94 |

Price Includes:
- Design
- Stamped Engineered Drawings
- Approved Module Grounding Method
- Posts (Estimated 3952 Total) @ 5' Embed

- Racking System
- Motors & Controls System
- Foundation Post Assumed to be Rolled Cee-Channel
- No Freight

| | | | |
|---|---|---|---|
| Freight of Materials to Site: | $ 106,385.00 | $ 0.015 | $ 4.86 |
| Add For Pull Test: | $ 6,000.00 | $ 0.001 | |
| Commissioning Services: | $ 5,000.00 | $ 0.001 | |
| | | $ 0.179 | |

**Due to steel price volatility, this quote is valid for 10 days and subject to reconfirmation thereafter or indexed to CRU.**

**GENERAL RACKING SPECIFICATION**

- RBI Solar is **NOT** responsible for PV system design or shading analysis as related to PV system production.
- RBI Solar racking is designed to follow the terrain. Standard layouts are designed to accommodate an approximate North-South slope of up to 7.5% uniform and 10% differential (+/- 5%). Larger slopes may require additional layout work, racking material and stepping of the racking to accommodate.
- Foundations design shall be based on recommendations and data supplied in a certified geotechnical report (by others). A signed and sealed geotechnical report is required for final foundation design and submittals to the local building authorities.
- Solar module tolerance for side-by-side modules up and down the rack shall be no greater than 0.5%.
- Layouts are subject to customer review and approval. All layouts shall be deemed as final by customer prior to placement for orders of any materials.

**MATERIALS ONLY INCLUSIONS:**

-
- RBI Solar shall provide drawings signed and sealed by a Professional Engineer registered in the State of TX
- C-Channel posts for tracking system.
- Structural racking for tracker system, including all hardware and module mounting hardware.
- Tracker drive system including DC Motor.
- Control system to perform the following: stow, backtracking, wind protection, water/flood protection
- Freight to site.
- All structural members shall be galvanized steel. Posts pregalvanized to G235, top chords and purlins are pregalvanized to a G160 minimum and brackets to a G90 minimum. Module hardware is stainless steel and all other hardware is hot dipped galvanized.
- All member connections shall be bolted. No on-site welding shall be required.

**MATERIALS ONLY EXCLUSIONS:**

- Geotechnical Report or site survey.
- Electrical wiring and grounding/bonding material (unless called-out in Pricing section above).
- Fencing, unloading of materials and storage of materials.
- Soil analysis for compatibility with RBI foundation/pile design for corrosion resistance by others. .
- Site Management Control System - wind speed, monotoring, etc
- Sales/Use Tax and Permit Fees.

**COMMISSIONING SPECIFICATIONS:**

**Prior to RBI arriving on site:**

- All TCU's, NCU's, and RSU's shall be connected to power and with network/internet readily available.
- All Trackers are placed horizontally (0 ), and motor's are mounted and connected to the driveshaft.
- Must have clear internet connection on site to the router. Datalogger PC must be installed.

**RBI Commisioning scope:**

- Ensure all tracker control components are communicating with the zigbee mesh network.
- RSU, Anemometers, & Snow Sensor setup
- Tracker auto-mode and parametrization

**FOUNDATION REFUSAL DEFINITION:**

- A refusal is encountered when the advancement of a pile ceases for a period of 30 seconds or more during post driving prior to reaching full design embedment depth. Should a refusal be encountered additional charges are possible.
- In the event of a refusal, site specific conditions will determine alternate foundation option used:
  - Pull test/cut/re-drill
  - Pre-drill and drive with crush stone
  - Spread footing

**OTHER PROVISIONS:**

**GROUNDING:**

- RBI utilizes an approved integrated module bonding method. Grounding hardware for modules and racking is not included (unless called-out in Pricing section above).
- Module grounding to be per module manufacturer's installation instructions. RBI Solar's racking is WEEB compatible for certain modules. Please consult the module and RBI Solar installation manuals.
- Pricing above may or may not represent an RBI Solar racking solution that is Classified to UL 2703 & UL 3703.

**WIRE MANAGEMENT:**

- Wire management components not included. Base design inlcudes prepunched holes in the purlin for wire management.
- Various options are available, please ask about specific options and pricing.

**END OF ROW SURVEY (If Selected):**

- Contingent on entire site being available for surveying
- Assumes control has been established & CAD layout approved
- Pricing includes 811
- Does not include GPR (Ground Penetrating Radar) or other means of utility location

**CONTRACT TERMS AND CONDITIONS:**

**WARRANTY SPECIFICATION:**

- Structural: 25 yrs.
- Motor/Controls/Gearbox: 5 yrs.
- Reference Attachment "RBI Solar Terms and Conditions". Available upon request.

| CONTRACT PAYMENT TERMS: | Contract Value | Description of Work |
|---|---|---|
| | 15% | Deposit With Order |
| | 50% | Release Of Materials For Fabrication |
| | 25% | Delivery of Balance of Materials on Site |
| | 10% | Substantial Completion of Structural Scope of Work |

**Thank you for your interest in RBI Solar, if you have any questions about this proposal or RBI Solar, please contact:**

Contact: RBI Solar        Phone: 513-242-2051

Email: info@rbisolar.com



**RBI SOLAR**

## MATERIALS WARRANTY AGREEMENT

"Project": Yellow Jacket-Epc / 1890003

"Product Warranted" (the "Products"): RBI Solar Single-Axis Tracker II Racking System

"Owner/Customer": Cypress Creek Renewables

- Subject to the following terms and conditions, RBI Solar, Inc. ("RBI Solar") warrants that the structural components which have been sold to Owner/Customer pursuant to the purchase order, sales contract or other agreement between RBI Solar and the Owner/Customer relating to the purchase of the Products (any such purchase order, sales contract or other agreement being hereinafter the "Sales Agreement"), will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of ten (10) years from the date of the shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Structural Warranty").

- RBI Solar warrants that the motors, gearboxes and controller assembly components which have been sold to Owner/Customer pursuant to the Sales Agreement will be new, will conform in all material respects to the specifications expressly set forth in the Sales Agreement, and will be free from defects in material and/or workmanship for a period of five (5) years from the date of shipment of the Product when used under normal conditions, when used in accordance with its documentation, including system programming requirements contained in the operating manual and when constructed and installed in compliance with documentation supplied by RBI Solar and all applicable construction codes and regulatory requirements that have been approved by a licensed professional engineer (the foregoing warranty being the "Component Warranty").

- The Structural Warranty and the Component Warranty (hereafter collectively the "Warranty") will not be binding until RBI Solar has received payment from Owner/Customer of the full amount due to RBI Solar under the terms of the Sales Agreement.

- RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of items or components furnished or warranted by others, including, but not limited to, photovoltaic modules, electrical components, wiring connections and/or any other accessories, fixtures, insulation, goods, or materials not supplied by RBI Solar. Additionally RBI Solar makes no warranties as to and shall have no obligation for repair or replacement of any item or component which is furnished by RBI Solar and has subsequently been altered, damaged or misused by others. Finally, RBI Solar makes no warranties as to the electrical generation capabilities of the system which is attached to the Products.

- This Warranty does not apply to damage incurred during shipment and does not apply to damage that is the result of improper handling. The Warranty will be null and void if the Products have been improperly or incorrectly installed, used, or maintained, or have been operated under abnormal conditions or contrary to applicable specifications.
- The Warranty does not apply to Products that:
  - have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or manmade disasters;
  - have been used with any elements, equipment, or subcomponents not authorized in writing by RBI Solar, including, but not limited to, mirrors or other solar thermal systems of any kind;
  - have any serial numbers, markings, legends or labeling altered, defaced, or removed;
  - have only non-structural wear and tear, aging, or surface imperfections; or
  - are attached to or used in connection with the Product itself (i.e., this Warranty does not apply to solar modules and module mounting devices if these are not components of the Product).
  - The Warranty is not transferable without the express timely written notification to, and express written acceptance by, RBI Solar.
- In the event the structural components or the motor, gearbox and controller assembly components of the Products fail to comply with the Structural Warranty or the Component Warranty, then RBI Solar will repair or replace, at its option and cost, the defective Product. The foregoing remedy shall be RBI Solar's sole liability, and Owner/Customer's sole and exclusive remedy, in lieu of all remedies that Owner/Customer may have, and the Owner/Customer waives all other remedies.
- In the event of a claim against RBI Solar which is based on the Warranty, Owner/Customer shall, within thirty (30) days following the occurrence generating the Warranty claim, provide notice to RBI Solar in writing by mail to RBI Solar, Inc., ATTN: Single Axis Tracker Manager, 5513 Vine Street, Cincinnati, OH 45217 or by email at trackermanager@rbisolar.com regarding the alleged failure of the Product or installation to comply with the Warranty. Owner/Customer specifically waives any and all Warranty claims if RBI Solar does not receive written notification of a Warranty claim within thirty (30) days of the occurrence generating the Warranty claim. If the claim is covered by the Warranty, the Customer's sole remedy under the Warranty is either the repair or replacement of the Product, as determined by RBI Solar in its sole and absolute discretion.
- RBI Solar reserves the right to inspect the Product which is the subject of a Warranty claim by Owner/Customer. Owner/Customer shall be liable for all damages to any Product which is the subject of a Warranty claim to the extent that such damages occur while Owner/Customer is in possession of the Product. Owner/Customer specifically waives any and all claims against RBI Solar if and to the extent that: (1) Owner/Customer fails to use the Product in accordance with its documentation; (2) any components or products supplied by parties other than RBI Solar are improperly affixed to the Product or otherwise fail to perform as intended; and/or (3) Owner/Customer fails to provide to RBI Solar the unencumbered right and opportunity to timely and fully inspect the Product alleged by Owner/Customer not to be in compliance with the Warranty.
- Owner/Customer expressly waives all rights it may have against RBI Solar, its officers, employees, or agents, for damages caused or alleged to be caused by RBI Solar or the Product to the extent covered by any insurance applicable to the damages asserted.

Page 2 of 3

- RBI Solar's obligations are strictly limited to the obligations expressly set forth in this Warranty Agreement. RBI Solar neither assumes nor authorizes any person to assume on its behalf any other obligation not set forth in this Warranty Agreement. CUSTOMER AGREES THAT RBI SOLAR IS ONLY WILLING TO PROVIDE THIS WARRANTY AGREEMENT ON CERTAIN TERMS AND CONDITIONS, ONE OF WHICH IS THAT RBI SOLAR SHALL HAVE NO LIABILITY TO CUSTOMER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE PRODUCT OR ITS INSTALLATION, INCLUDING BUT NOT LIMITED TO, LOSS OF USE, REVENUE OR PROFIT. AS SUCH, CUSTOMER AGREES THAT, IN THE EVENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT OWNER/CUSTOMER HAS SUFFERED DAMAGES AS A RESULT OF A DEFAULT OR OTHER ACTS OR OMISSIONS BY RBI SOLAR, OWNER/CUSTOMER SHALL BE ENTITLED TO RECOVER FROM RBI SOLAR ONLY THOSE ACTUAL DAMAGES TO THE PRODUCT, AND THAT, IN ALL CASES, THE DAMAGES RECOVERABLE BY OWNER/CUSTOMER FROM RBI SOLAR, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, SHALL BE LIMITED TO A MAXIMUM AMOUNT EQUAL TO THE AMOUNT PAID BY OWNER/CUSTOMER TO RBI SOLAR FOR THE PRODUCT TO BE SUPPLIED TO OWNER/CUSTOMER UNDER THE TERMS OF THE SALES AGREEMENT. UNDER NO CIRCUMSTANCE WHATSOEVER WILL RBI SOLAR'S LIABILITY TO OWNER/CUSTOMER FOR DAMAGES, WHETHER BASED ON TORT, BREACH OF CONTRACT, OR ANY OTHER CAUSE OF ACTION, EXCEED THE AMOUNT PAID BY CUSTOMER TO RBI SOLAR FOR THE PRODUCT.

- The above-provided Warranty extends only to claims of the Owner/Customer. Third parties shall have no rights or benefits under the Warranty unless transferred by the initial Owner/Customer to a subsequent purchaser with written notification provided to and written approval received from RBI Solar. OWNER/CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD FOREVER HARMLESS RBI SOLAR AND ITS OFFICERS, AGENTS, AND EMPLOYEES FROM AND AGAINST ALL CLAIMS BY THIRD PARTIES, INCLUDING REASONABLE ATTORNEYS' FEES, FOR DAMAGES, INJURIES, OR LOSSES SUSTAINED BY THIRD PARTIES AS A RESULT OF OWNER/CUSTOMER'S USE OR MISUSE OF THE PRODUCT.

Customer _____

Date **8/7/18** _____

RBI Solar, Inc. _____

Date 8/7/18 _____

Effective Date: **August 6, 2018** _____